## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Hospital Acquisition LLC, *et al.*[1] | Case No. 19-10998 (   ) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF JAMES MURRAY, CHIEF EXECUTIVE OFFICER OF HOSPITAL ACQUISITION LLC, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James Murray, hereby declare under penalty of perjury:

1.     I am the chief executive officer of Hospital Acquisition LLC ("***HAL***"), a limited liability company organized under the laws of the state of Delaware and direct or indirect parent of each of the other above captioned debtors and debtors in possession (collectively, the "***Debtors***") and a member of the HAL board of directors.  To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases (as defined below) on their business, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094).  The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

"***First Day Pleadings***").[2]   I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") and (b) First Day Pleadings.   I am authorized to submit this declaration (the "***Declaration***") on behalf of the Debtors.

2.    I have held my current position with the Debtors since April 1, 2017 and have served as a member of the Debtors' board of directors since April 22, 2016.   Prior to that, I served as Chief Operating Officer of Humana Inc.  I was employed by Humana for twenty-seven (27) years in various management roles.   Prior to that, I was employed by Coopers & Lybrand for fourteen (14) years.   As a result of my tenure with the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management teams, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on information and materials that the Debtors personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.

3.    This Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtors, their business operations, their corporate and capital

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

structures, and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

**PART I**

**BACKGROUND**

**A.      The Debtors' Business**

4.      The Debtors are a leading operator of long-term acute care ("***LTAC***") hospitals in the United States.  The Debtors' predecessor was founded in 1992 and began its operations in 1993 with the opening of its first hospital in Shreveport, Louisiana.  The Debtors were founded by a clinician who recognized an opportunity to provide patients requiring acute care with better treatment than was available in general acute care hospitals.  The Debtors expanded and contracted their business over the next twenty-five (25) years.

5.      Through its operating subsidiaries, the Debtors provide a full range of clinical services to patients with serious and complicated illnesses or injuries requiring extended hospitalization.  Patients are admitted to the Debtors' facilities primarily from general acute care hospitals.  Many of the Debtors' patients suffer from one or more respiratory, neuromuscular, circulatory, renal, hepatic, cardiac or oncologic conditions.  These conditions require a high level of monitoring and specialized care yet may not necessitate the continued services of an intensive care unit.  The Debtors' hospitals are designed to accommodate such patients and provide them with a higher level of care than a skilled nursing facility or an inpatient rehabilitation facility. Substantially all of the Debtors' revenue derives from the provision of patient services and is received through Medicare and Medicaid reimbursements and payments from private payors.

6.      Additionally the Debtors operate a forty-nine (49) bed behavioral health hospital in Pittsburgh, Pennsylvania as well as three (3) out-patient wound care centers located within its Plano, Texas, Fort Worth, Texas and Dallas Texas hospitals.[3]

7.      As of the Petition Date, the Debtors operate seventeen (17) facilities in nine (9) states.  This consists of 865 beds in nine (9) freestanding (approximately 67% of the beds) and eight (8) hospitals within hospitals facilities (approximately 33% of the beds).

8.      The Debtors employ approximately 3,500 people, all but approximately 150 of whom are employed at the hospital level and many of whom are registered or licensed nurses and respiratory therapists.  While the Debtors employ several physicians, including a physician consultant as their National Medical Director, they do not employ the doctors that render services to its patients.  The doctors are independent practitioners and, other than physicians who are compensated at an hourly rate for providing overnight coverage and other regular administrative services of the Debtors' hospitals, generally provide care to the Debtors' patients on a fee for services basis billing third-party payors directly for their services.

9.      In addition to the LTAC facilities, certain non-Debtor affiliates (together with the Debtors, the "*Company*") own and operate home health care agencies ("***Home Healthcare***") with locations in the states of Texas, Florida and Nevada.  Unless otherwise noted herein, the Home Healthcare agencies and the Debtors' hospital facilities are operated completed independent of each other and the Company does not currently anticipate that the Home Healthcare agencies will seek chapter 11 protection.

---

[3] Debtor LifeCare Holdings LLC is the sole member of Debtor LifeCare Vascular Services, LLC ("*Vascular*").  Vascular holds a 33.3% membership interest in non-Debtor Neovascular Management Group, LLC ("*Neovascular*").  Neovascular is a non-operating joint venture.

B.    **The Debtors' Predecessor**

10.    In 2012, LCI Holdings found themselves capital constrained.  In an effort to address their liquidity concerns, on December 11, 2012, LCI Holdings filed chapter 11 petitions with the United States Bankruptcy Court for the District of Delaware, which were jointly administered under Case No. 12-13319 (KG).  The effects of Hurricane Katrina coupled with regulations promulgated by certain regulators that substantially reduced reimbursement rates for services caused LCI Holding to see a significant revenue reduction.  A series of regulations adopted to control health care spending in the LTAC space also frustrated growth efforts.  Although cost reduction measures were put in place, LCI Holding could not combat Katrina-related losses and lost growth opportunities.  *See Declaration of Phillip B. Douglas in Support of Chapter 11 Petitions and First Day Pleadings* at ¶14-18, Case No. 12-13319 (KG) (Bankr. D. Del. Dec. 11, 2012), Docket No. 13.

11.    After running a marketing and sales process prepetition and determining that no bid provided consideration equal to or in excess of their obligations under their prepetition credit agreement, LCI Holdings effectuated a sale of substantially all their assets to the Debtors.  *See Order (I) Authorizing the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief*, Case No. 12-13319 (KG) (Bankr. D. Del. Apr. 4, 2013), Docket No. 617.

12.    With substantially all of the assets sold, the bankruptcy court entered orders dismissing certain of LCI Holding's chapter 11 cases.  *See* Case No. 12-13319 (KG) (Bankr. D. Del), Docket Nos. 1255 (May 8, 2014), 1284 (June 11, 2014), 1367 (Sept. 10, 2014).  On September 16, 2016, upon motion of the United States Trustee, all of LCI Holding's remaining

chapter 11 cases were also dismissed.  *See* Case No. 12-13319 (KG) (Bankr. D. Del. Sept. 2016), Docket No. 1760.  Those remaining cases were closed on October 28, 2016.

**C.      The Debtors' Corporate and Capital Structure**

13.      A corporate organization chart depicting the ownership structure of the Debtors is attached hereto as **Exhibit A**.  Substantially all of the common stock of HAL is owned by Blue Mountain Capital, Monarch Alternative and Twin Haven.

14.      As of the Petition Date, the Debtors' total consolidated long-term debt obligations were approximately $185 million, consisting of, among other things institutional loans and secured note.

15.      In August 2018, LifeCare Holdings LLC ("*LifeCare*") (a) refinanced its then-existing revolving facility with a $40 million revolving facility by entering into a Credit Agreement, dated as of August 10, 2018 (as amended, supplemented or otherwise modified, the "*Prepetition Revolving Credit Agreement*"), by and among LifeCare, each of the Debtors party thereto, the lenders party thereto (the "*Prepetition Revolving Lenders*") and White Oak Healthcare Finance, LLC, as administrative agent and collateral agent (in such capacities, the "*Prepetition Revolving Agent*"), (b) entered into a Priming Term Loan Credit Agreement, dated as of August 10, 2018 (as amended, supplemented or otherwise modified, the "*Prepetition Priming Term Loan Credit Agreement*"), by and among LifeCare, Debtor Hospital Acquisition Intermediate Sub LLC ("*HAI Sub*"), the lenders party thereto (the "*Prepetition Priming Term Loan Lenders*") and Glas Trust Company LLC, as administrative agent and collateral agent (in such capacities, the "*Prepetition Priming Term Loan Agent*") pursuant to which LifeCare borrowed $7.5 million and which provided a term loan commitment of an additional $7.5 million and (c) amended their then-existing term loan credit facility under a Credit Agreement, dated as of May 31, 2013 (as amended, supplemented or otherwise modified, the "*Prepetition Term Loan*

*Credit Agreement*") among LifeCare, HAI Sub, the lenders party thereto (the "***Prepetition Term Loan Lenders***"), Seaport Loan Products LLC, as administrative agent (in such capacity, the "***Prepetition Term Loan Administrative Agent***") and Wilmington Trust, National Association, as co-administrative agent and collateral agent (in such capacities, the "***Prepetition Term Loan Collateral Agent***" and, together with the Prepetition Term Loan Administrative Agent, the "*Prepetition Term Loan Agent*") (collectively, the "***August 2018 Transactions***").

16.     Prepetition Revolving Credit Agreement.  Prior to August, 2018, LifeCare and the other Debtors were party to a $20 million revolving credit facility which matured by its terms in May 2018.  Pursuant to the August 2018 Transaction, LifeCare refinanced the debt under such revolving credit facility with the Prepetition Revolving Credit Agreement.

17.     As of the Petition Date, there was approximately $23.9 million outstanding under the Prepetition Revolving Credit Agreement, plus issued but undrawn letters of credit of approximately $9.4 million. These obligations are secured by substantially all of the Debtors' assets.

18.     Prepetition Priming Term Loan Credit Agreement.  As noted, in connection with the August 2018 Transactions, LifeCare entered into the Prepetition Priming Term Loan Credit Agreement governing a $15 million secured term loan credit facility constituting (a) an initial $7.5 million term loan at closing and (b) a commitment to borrow an additional $7.5 million of term loans after closing.  Each of LifeCare's subsidiaries (other than certain subsidiaries designated as non-guarantor subsidiaries under the Prepetition Priming Term Loan Credit Agreement that includes Home Healthcare) guaranty LifeCare's obligations under the Prepetition Priming Term Loan Credit Agreement.

19.    As of the Petition Date, there was approximately $7.7 million outstanding under the Prepetition Priming Term Loan Credit Agreement.  This obligation is secured by substantially all of the Debtors' assets.

20.    Prepetition Term Loan Credit Agreement.  Prior to the August 2018 Transactions, the term loan credit facility under the Prepetition Term Loan Credit Agreement matured by its terms in November 2018.  Pursuant to the August 2018 Transactions, LifeCare amended the Prepetition Term Loan Credit Agreement in order to, among other things, extend the maturity date to November 2021, reduce the cash interest payments and amend the financial covenants under the Prepetition Term Loan Credit Agreement.  Each of LifeCare's subsidiaries (other than certain subsidiaries designated as non-guarantor subsidiaries under the Prepetition Priming Term Loan Credit Agreement that includes Home Healthcare) guaranty LifeCare's obligations under the Prepetition Term Loan Credit Agreement.

21.    As of the Petition Date, there was approximately $136.8 million outstanding under the Prepetition Term Loan Credit Agreement.  This obligation is secured by substantially all of the Debtors' assets.

22.    Intercreditor Agreements.  In connection with the August 2018 Transactions, the Debtors entered into (i) an intercreditor agreement, dated  as of August 10, 2018 (as amended, supplemented or otherwise modified the "**ABL Intercreditor Agreement**"), by and among the Debtors, the Prepetition Revolving Agent, the Prepetition Priming Term Loan Agent and the Prepetition Term Loan Agent and (ii) a term loan intercreditor agreement, dated as of August 10, 2018 (as amended, supplemented or otherwise modified, the "**Term Loan Intercreditor Agreement**" and, together with the ABL Intercreditor Agreement, the "**Intercreditor Agreements**"), by and among the Prepetition Priming Term Loan Agent and Prepetition Term

Loan Agent and acknowledge by the Debtors.  Pursuant to the ABL Intercreditor Agreement, (a) the liens on ABL Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the obligations under the Prepetition Revolving Credit Agreement are senior to the liens on ABL Priority Collateral securing the obligations under the Prepetition Priming Term Loan Credit Agreement and the Prepetition Term Loan Credit Agreement and (b) the liens on Term Facility Priority Collateral (as defined in the ABL Intercreditor Agreement) securing the obligations under the Prepetition Priming Term Loan Credit Agreement and the Prepetition Term Loan Credit Agreement are senior to the liens on the Term Facility Priority Collateral securing the obligations under the Prepetition Revolving Credit Agreement.  Pursuant to the Term Loan Intercreditor Agreement, the liens on the collateral securing the obligations are under the Prepetition Priming Term Loan Credit Agreement are senior to the liens on the collateral securing the obligations under the Prepetition Term Loan Credit Agreement.

**D.**     **Events Leading to the Chapter 11 Cases**

23.     While the Debtors have established a market leadership position in post-acute care, internal and external factors have lead the Debtors to an unmanageable level of debt service obligations and an untenable liquidity position.  In 2015, Medicare's establishment of patient criteria to qualify as an LTAC-compliant patient facility led to significant reimbursement rate declines over the course of 2015 and 2016 as changes were implemented.  Average reimbursement rates for site neutral patients, representing approximately 57% of 2016 cases, is estimated to drop from $23,000 to $9,000 across the portfolio.  When rates declined sharply, the Debtors were unable to adjust.  Further, the number of patients that now qualify by Medicare to have services provided in an LTAC setting has declined substantially, resulting in a significant oversupply of LTAC beds in the market.

24.    In an effort to address decreasing Medicare rates and declining eligible patient volumes, the Company focused on four primary areas.  First, the Company sought to improve their core business by building profitable referral sources and offering world-class care.  Second, the Company sought to improve the value proposition of its strongest hospitals by adding complimentary businesses and/or developing centers of excellences for disease specific programs.  Third, the Company closed four (4) marginally performing hospitals.  Finally, the Company sought to implement a multi-faceted growth strategy designed to diversify its business's through home health agency acquisitions and developing offerings designed to utilize its post-acute care platform to compete in the evolving value-based health care environment.

25.    In addition to developing these areas of focus, in August 2018, the Company raised additional liquidity and completed an amend and extend transaction described in paragraphs 14-21 to provide runway to execute on their business plan, including the continued acquisition and expansion of home health businesses (the "***August 2018 Transaction***").

26.    During the course of pursuing the August 2018 refinancing, the Company's combined operations were generally performing in line with their business plan, although certain of the Company's home health agency acquisitions were experiencing unfavorable results. Through September 2018, these unfavorable home health agency results were generally offset by favorable hospital results.  In the fourth quarter of 2018, the Debtors' hospitals also began to experience unfavorable operating results against plan.  These unfavorable results coupled with the unfavorable home health operations against plan resulted in the Company being unable to perform in line with their 2018 business plan.  Due to the anticipated 2018 business plan shortfall, the Debtors concluded that they would be unable to meet the debt level covenant levels required by the August 2018 Transaction during 2019.  As a result, the Company initiated

discussions with their lender groups.  In conjunction with these discussions, the Company (a) closed five (5) additional marginally performing hospitals (b) identified and pursued cost savings opportunities to conserve liquidity and (c) engaged Houlihan Lokey Capital, Inc. ("***Houlihan Lokey***") to explore strategic alternatives including, but not limited to working with the lender groups on restructuring the Debtors' debt and providing access to funds necessary for continued operations.

27.     Beginning in March 2019, Houlihan Lokey began contacting strategic partners and financial buyers.  As of the Petition Date, Houlihan Lokey has contacted 65 parties, 32 of whom have executed non-disclosure agreements with the Debtors.  The Debtors are currently in advanced discussions regarding a potential sale transaction for some or all of the Debtors' assets with several potential stalking horse bidders.  Such bids may also include the assets of certain non-Debtor entities.  Following the completion of such discussions, the Debtors anticipate that by no later than July 15, 2019 they shall have entered into a stalking horse purchase agreement and the court shall have entered an order approving the bidding procedures for the sale of the Debtors or their assets.

## PART II

## FIRST DAY PLEADINGS

28.     To enable the Debtors to minimize the adverse effects of commencing the Chapter 11 Cases and to promote a smooth transition into chapter 11, the Debtors have requested various relief in the First Day Pleadings.  The Debtors have filed the following First Day Pleadings, which seek authority to, among other things, obtain debtor-in-possession financing, maintain employee morale, preserve vendor relationships, maintain patient confidentiality, and ensure the continuation of the Company's cash management system and other business operations without interruption:

01:24472219.1

(i)        Debtors' Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

(ii)       Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Petition Date

(iii)     Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Hereto

(iv)     Debtors' Motion for Entry of an Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules

(v)       Debtors' Motion for Entry of an Order (I) Authorizing But Not Directing, Debtors to (A) Continue Insurance Policies Entered Into Prepetition, (B) Satisfy All Obligations Relating to the Prepetition Insurance Policies, (C) Continue Insurance Premium Financing Agreements, and (II) Granting Related Relief

(vi)     Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Taxes and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Electronic Payments Requests

(vii)    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Existing Centralized Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (C) Maintain Existing Bank Accounts and Check Stock; and (II) Granting Related Relief

(viii)   Debtors' Motion for Entry of an Order Authorizing the Debtors to Maintain, Administer, Modify, and Renew their Refund Program and Practices and Honor Obligations Related Thereto

(ix)     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, Debtors to Pay Prepetition Claims of Certain Critical Vendors and (II) Authorizing Financial Institutions to Honor and Process All Related Checks and Transfer Requests

(x)       Debtors' Motion for Entry of an Order (I) Authorizing, but not Directing, Payment of Certain Prepetition Claims of

Warehousemen and Other Lien Claimants and (II) Granting Related Relief

(xi)     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Benefits, and Other Obligations and (B) Continue Employee Programs and Severance Program and (II) Granting Related Relief

29.     I have reviewed each of the First Day Pleadings, and the facts stated therein are true and correct to the best of my belief with appropriate reliance on corporate officers and advisors.  It is my belief that the relief sought in each of the First Day Pleadings is necessary to maintain high-quality patient care and uninterrupted business operations, as well constitutes a critical element in the successful implementation of the Debtors' restructuring efforts.  It is my further belief, with respect to those First Day Pleadings requesting the authority to pay certain prepetition claims within the first twenty-one days of the Chapter 11 Cases, that the Debtors have narrowly tailored their requests to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  The Debtors, therefore, request that the relief requested in each of the First Day Motions be granted.

**A.     Debtors' Motion for Entry of Interim and Final Orders  (I) Authorizing the Debtors to (A) Continue Using Existing Centralized Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (C) Maintain Existing Bank Accounts and Check Stock; and (II) Granting Related Relief (the "*Cash Management Motion*")**

*(a)     The Debtors' Cash Management System and Bank Accounts*

30.     The Debtors' business requires the collection, payment, and transfer of funds through a number of bank accounts at various banks.  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "*Cash Management System*").  Like other large and complex businesses, the Debtors designed the Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and

01:24472219.1

disbursements as they are made.  A detailed description of the Cash Management System is set forth below, a demonstrative chart of the Cash Management System is set forth in **Exhibit B**, and a list of bank accounts (collectively, the "***Bank Accounts***") are set forth in in **Exhibit C**.  The Bank Accounts are held at JPMorgan, Capital One, Citizens Bank, and PNC (collectively, the "***Banks***").

31. The Debtors generate revenue primarily from providing patient services paid by Medicare, Medicaid, and certain private payors.  All patient receipts are deposited to one of seven account receivable lockbox accounts (collectively, the "***Lockbox Accounts***"), which are swept daily into a lockbox concentration account (Account No. *3109) (the "***Lockbox Concentration Account***").

32. The Debtors and the lenders (the "***Prepetition Revolving Lenders***") under the Debtors' prepetition revolving credit facility (the "***Prepetition Revolving Facility***") agreed that all cash held at the Lockbox Concentration Account is swept on a daily basis into an account maintained by the agent for the Prepetition Revolving Lenders.  In this structure, the Debtors are required, pursuant to the Prepetition Revolving Facility, to re-borrow cash from the Prepetition Revolving Lenders on an as-needed basis to make disbursements out of the main operating account at JP Morgan (Account No. *2163) (the "***Operating Account***").

33. Three hospitals, LifeCare Hospitals of North Carolina, Pittsburgh, and Mechanicsburg, also deposit patient receipts into the Lockbox Accounts and also have accounts set up with local banks (Account Nos. *4400, *1859, and *5077) (the "***Local Accounts***") for depositing cafeteria receipts.  The North Carolina hospital's cash and paper checks related to cafeteria receipts are held at the facility and deposited into the local bank account monthly and subsequently manually transferred to the Operating Account, generally the following business

day.  The Debtors have closed the Mechanicsburg facility and the local bank account ending in *4400 is currently inactive.

34.      In addition to receipts described above, the Debtors generate de minimis amounts of revenue in various facilities from cafeteria receipts, corporate and facility deposits, and certain payment credits (the "***Miscellaneous Receipts***").  Miscellaneous receipts are deposited daily directly into the Operating Account.

35.      Funds in the Operating Account are manually transferred to two Bank Accounts through which the Debtors' disbursements are funded by check, automated clearing house, and wired directly from the Operating Account.  The Debtors maintain separate disbursement accounts for payroll-related disbursements to the Debtors' payroll processor (Account No. *4895) (the "***Payroll Account***") and vendor payments (Account No. *7687) (the "***Cash Disbursement Account***").  The Payroll Account and the Cash Disbursement Account are zero balance accounts that are funded daily by the Operating Account based upon the amount of disbursements that the Debtors expect to clear through such accounts.

36.      The Debtors also maintain six accounts that are independent of the Operating Account (collectively, the "***Standalone Accounts***").  The Standalone Accounts comprise of one account that holds resident funds required by law to be available to patients at the Pittsburgh skilled nursing facility (Account No. *5172), one account that holds employee assistance funds (Account No. *3683), one account to collateralize certain letters of credit (Account No. *0359), one zero balance account that is no longer in use (Account No. *0307), and two accounts that hold funds to pay deposits as necessary (Account Nos. *0523 and *0515).

(b)      *Intercompany Transactions*

37.      Prior to the Petition Date, in the ordinary course of business, the Debtors engaged in certain limited intercompany transactions and transfers amongst themselves and between

themselves and their non-Debtor affiliates (the "*Intercompany Transactions*"). The Intercompany Transactions may result in intercompany receivables and payables (the "*Intercompany Claims*"). Specifically, and as further described in the Wages and Benefits Motion (as defined below), the Debtors offer health insurance to their employees through a program administered by Cigna. As further described in the Wages and Benefits Motion, the Debtors are self-insured (subject to a stop-loss policy). The Debtors must maintain a minimum balance of $741,000 in a Cigna-held account for the purpose of funding to Cigna amounts owed in respect of employee medical claims. This amount represents approximately two weeks of such employee medical claims based upon historical averages. Mechanically, Cigna reviews employee medical claims and invoices the Debtors for approved claims on behalf of the Debtors. On a weekly basis, Cigna automatically pulls the invoiced amount from this account. The Debtors then replenish this account, from funds in the Operating Account, with an amount sufficient to bring the balance to a minimum of $741,000.

**B.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Benefits, and Other Obligations and (B) Continue Employee Programs and (II) Granting Related Relief (the "*Wages and Benefits Motion*")**

*(a)      Overview of Debtors' Workforce*

38.      As of the Petition Date, the Debtors employ approximately 3,500 people in the United States across their various operations (collectively, the "*Employees*") on full-time, part-time, and *pro re nata* (as needed) bases, including nurses, therapists, technicians, dietitians, and other health professionals, maintenance technicians, business development professionals, administrative support and other staff and corporate personnel.

39.      The Employees perform a variety of critical functions that are required for the Debtors to operate and deliver superior patient care, including nursing, speech, physical,

respiratory, and occupational therapy, dietary services, medication management, case management, housekeeping, accounting (accounts payable, payroll, and billing), administrative support, compliance (legal and regulatory), business development, external affairs, financial planning and analysis, government sales/contracting, human resources, information technology, legal, managed care contracting, network operations and maintenance.

40.     To supplement their workforce, the Debtors utilize approximately 15 independent contractors (collectively, the "***Independent Contractors***"), although the number of Independent Contractors fluctuates based on current needs. The Independent Contractors provide a variety of essential functions for the Debtors, including information technology services, managed care contracting, clinical services, accounting, revenue cycle support, marketing communications support, medical records, case management activities, business development support (including working with insurance providers to appeal denials), and other administrative support functions. The Debtors also utilize approximately 35 staffing agencies, primarily through the services of Vizient, Inc. ("***Vizient***," and together with the other staffing agencies, the "***Staffing Agencies***," and together with the Independent Contractors, the "***Supplemental Workforce***"), a member-driven health care performance improvement company, to supplement their workforce from time to time based on current needs.  The Staffing Agencies primarily provide skilled nurses that are fundamental and critical to the Debtors' day-to-day operations and ability to provide quality patient care.  Importantly, Vizient does not fund any money to the local staffing agencies that provide nursing staff to the Debtors until Vizient receives payment from the Debtors. Accordingly, if the Debtors fail to pay Vizient, the local staffing agencies will not be willing to fill the Debtors' staffing requests and needs.

41.     The skills, knowledge, and understanding of the Employees and the Supplemental

Workforce with respect to the Debtors' operations, patient health and safety, and infrastructure

are essential to maintaining the Debtors' business as a going concern during these cases. Just as

the Debtors depend on their workforce to operate their business on a daily basis, those individuals

also depend on the Debtors.  Indeed, the vast majority of these individuals rely exclusively on

payments from the Debtors for their basic living necessities.[4]

     (b)    *Overview of the Employee Programs, Severance Program, and Related Obligations*

42.     In the ordinary course of business, the Debtors maintain a variety of business

practices, programs, and policies for their workforce (collectively, as may be modified, amended,

or supplemented from time to time in the ordinary course of business, the "***Employee***

***Programs***").[5] The following table contains descriptions of the significant Employee Programs

and the Debtors' estimates of the fees, costs, and expenses, including amounts owed to third-

party administrators, incident to the Employee Programs (collectively, the "***Employee***

***Obligations***") that have accrued but remain unpaid as of the Petition Date and, of the unpaid

Employee Obligations, the amounts due in the ordinary course of business within 21 days of the

Petition Date.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| **Employee** | Employee compensation consists of amounts | $4,000,000 | $4,000,000 |

---

[4] The Debtors are seeking to pay physicians that provide services to the Debtors pursuant to the Critical Vendor Motion (as defined herein), filed contemporaneously herewith.

[5] The Employee Programs do not include the Severance Program (as defined below), which is separately described.

| | | | |
|---|---|---|---|
| **Compensation** | owed to the Employees pursuant to their individual terms of employment and under applicable law (as more fully described herein, the "***Employee Compensation***").<br><br>Employee Compensation includes, as applicable, wages and salaries earned in the ordinary course of business, but does not include Severance, Reimbursable Expenses, Bonuses, accrued and unused PTO (each as defined below), or the value of the non-cash benefits described herein.<br><br>The Debtors have both salaried and hourly Employees, including full-time, part-time, and *pro re nata* contract ("***PRN***") Employees. Part-time Employees are regularly scheduled to work 16-29 hours per week. PRN Employees are not regularly scheduled and average less than 15 hours per week.<br><br>Employees, both exempt and non-exempt, are paid every two weeks. The Debtors estimate that the average aggregate amount of Employee Compensation is $16,300,000 per month. The most recent payroll occurred on May 3, 2019, representing payment for services performed through April 27, 2019. As a result, 9 days of prepetition Employee Compensation—approximately $4,000,000—has accrued but is unpaid as of the Petition Date. | | |
| **Payroll Costs** | The vast majority of the Debtors' payroll obligations are satisfied by direct deposit through the electronic transfer of funds from the Debtors' payroll department directly to each Employee's bank account, with the remainder of Employees receiving prepaid paycards. The Debtors handle payroll management internally and outsource the payroll processing operation to Automatic Data Processing ("***ADP***"). ADP bills the Debtors for its services—approximately $100,000—on a monthly basis. As of the | $125,000 | $100,000 |

| | | | |
|---|---|---|---|
| | Petition Date, the Debtors estimate that approximately $125,000 is due to ADP for payroll services that have accrued but remain unpaid. | | |
| **Supplemental Workforce Compensation** | To supplement their workforce, the Debtors utilize approximately 15 Independent Contractors, although the number of Independent Contractors fluctuates based on current needs. On average, the Debtors pay approximately $6,500 per month in compensation to each of their Independent Contractors.<br><br>The Debtors also utilize the services of approximately 35 Staffing Agencies from time to time to hire nursing staff. In connection therewith, the Debtors pay, among other things, approximately $300,000 per month to Vizient and approximately $100,000 per month in aggregate to the other Staffing Agencies.[6] | $746,000 | $600,000 |
| **Bonus Programs** | Prior to the Petition Date, the Debtors maintained discretionary bonus programs (the "***Bonus Programs***").<br><br>Among other things, certain Employees earn referral, business development, sales target, signing, and other bonuses (collectively, the "***Bonuses***") in the ordinary course of business, which Bonuses are paid to such Employees annually, quarterly, or on a per pay period basis, as applicable. The amount of the Bonuses varies from pay period to pay period and cannot be predicted with certainty. However, the Debtors estimate | $400,000 | $150,000 |

---

[6] The average hourly rates for nursing staff hired through the Staffing Agencies range from approximately $22 to approximately $56. Accordingly, in order for an individual hired through the Staffing Agencies to have a prepetition claim for unpaid wages that is above the cap of $13,650 set forth in the Bankruptcy Code, such individual would have to have worked, depending on their hourly rate, between 244 and 620 hours since they were last paid.

| | | | |
|---|---|---|---|
| | that, as of the Petition Date, approximately $400,000[7] in Bonuses have accrued but remain unpaid, and the Debtors' historical average monthly spend over the past 12 months is approximately $425,000 with respect to Bonuses.<br><br>By the Wages and Benefits Motion, the Debtors are seeking to (i) pay Bonuses to Employees earned prepetition in the ordinary course, with no Employee receiving cash payments of more than $13,650 in the aggregate on account of prepetition Compensation Obligations (as defined herein), unless required by applicable law, subject to entry of the Final Proposed Order, or as otherwise described herein,[8] and (ii) continue the Bonus Programs on a postpetition basis. | | |
| **Equity Incentive Plan** | The Debtors historically have maintained a discretionary equity incentive plan (the "*Equity Incentive Plan*") to encourage and incentivize Employees to maximize their performance for the benefit of the Debtors' businesses. The Debtors are seeking to continue the Equity Incentive Plan on a postpetition basis by the Wages and Benefits Motion; however, no amounts are currently due under the Equity Incentive Plan. | $0 | $0 |
| **Deductions and Payroll Taxes** | During each pay period, the Debtors routinely deduct certain amounts from the gross pay of Employees, including Employee contributions to retirement savings plans, health savings plans, flexible spending accounts, auto and home insurance premiums, health benefits plans, | $325,000 | $325,000 |

---

[7] For the avoidance of doubt, this amount is exclusive of annual bonus amounts that may have been accrued as of the Petition Date but will not be payable until 2020.

[8] By the Wages and Benefits Motion, the Debtors are seeking authority to pay James Murray the aggregate amount of prepetition Compensation Obligations that is $14,193, or $543 over the $13,650 amount that would be entitled to administrative priority; however, such amount is owed on account of Employee Compensation only, and not the result of any Bonus owed to Mr. Murray.

| | | | |
|---|---|---|---|
| | employment insurance, life insurance, disability insurance, garnishments, child support, personal insurance premiums, meal cards, uniform expense reimbursement, technology reimbursement, employee assistance fund,[9] bankruptcy expenses, and similar deductions (collectively, the "*Deductions*"), which either the Debtors or a third-party service provider then forwards to the appropriate recipients.<br><br>The Debtors are required by law to withhold amounts from the gross pay of Employees that are related to federal, state, and local income taxes, including social security and Medicare taxes, and unemployment insurance for remittance to the appropriate taxing and other governmental authorities (collectively, the "*Withholdings*"). To the extent that any Deductions or Withholdings have been collected and not yet remitted, the Debtors seek authority to remit those amounts.<br><br>In addition, the Debtors are required by law to pay social security and Medicare taxes and, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (the "*Employer Payroll Taxes*"). The Debtors estimate that, as of the Petition Date, approximately $325,000 in Employer Payroll Taxes have accrued but remain unpaid. | | |
| **Reimbursable Expenses** | The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, such as travel and related meals and other eligible costs (the "*Business Expenses*"). For those Business Expenses that are paid with an Employee's American Express Corporate Card, the Debtors pay American Express | $275,000 | $210,000 |

---

[9] The employee assistance fund allows Employees to donate accrued PTO to the fund that can then be requested for and used by other eligible Employees.

| | | | |
|---|---|---|---|
| | directly on a monthly basis. Employees are required to pay any non-reimbursable charges on the corporate card directly to American Express, and any late charges that result are the individual Employee's responsibility.<br><br>The Debtors also directly pay certain providers, on a monthly basis, certain housing and automotive-related costs on behalf of approximately 5 Employees (the "***Allowances***," and together with the Business Expenses, the "***Reimbursable Expenses***").<br><br>There is a lag time between the time expenses are incurred and the time an expense is processed and reimbursed, and therefore it is difficult for the Debtors to determine the precise amount of incurred, but not reported, reimbursable expenses at any particular time. Based on the Debtors' historical average monthly spend over the past 12 months, the Debtors estimate that, as of the Petition Date, approximately $275,000 in Reimbursable Expenses have accrued but remain unpaid. | | |
| **PTO and Additional Leave** | The Debtors provide eligible Employees with various leaves of absence (paid and unpaid), including, but not limited to, paid time off ("***PTO***" and together with Employee Compensation and Bonuses, the "***Compensation Obligations***") for vacation, illness, holidays, and personal time, jury duty, bereavement, and family leave.<br><br>Eligible Employees are able to begin using PTO after completing 90 days of work. The Debtors' policies provide that the amount of time earned is based on actual non-overtime hours worked (up to 80 hours per pay period | $6,000,000 | N/A[10] |

[10] It is anticipated that Employees will continue to earn and use accrued PTO in the ordinary course following the Petition Date.

| | | | |
|---|---|---|---|
| | for full-time Employees, and 60 hours for part-time Employees). Employees may carry over unused PTO hours to the next calendar year, provided that the maximum limit is not exceeded.<br><br>Subject to the Debtors' PTO policies, the Debtors historically have paid out any remaining PTO balance upon termination of employment.<br><br>The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unused $6,000,000. A majority, if not all, of such amount is not a current cash pay obligation as Employees are only paid out for accrued but unused PTO upon termination.  The Debtors are requesting authority, but not direction, to honor, in the ordinary course of business, all unused PTO that accrued prior to the Petition Date, but not to make cash payments except upon termination of employment and provided that no Employee will receive cash payments of more than $13,650 in the aggregate on account of prepetition Compensation Obligations, unless required by applicable law, subject to entry of the Final Proposed Order, or as otherwise described herein. | | |
| **Health Benefits Plans** | The Debtors offer eligible Employees a number of benefits programs, including, among other things, self-funded medical, prescription drug coverage, dental and vision plans administered by Cigna, Cigna Dental, and Vision Service Provider, respectively (collectively, the "***Health Benefits Plans***").  The Debtors estimate that the monthly cost of the Health Benefits Plans, including administrative fees, Stop Loss Insurance,[11] | $290,000 | $290,000 |

---

[11] Although many of the Medical Benefit Plans are self-funded by the Debtors, the Debtors maintain stop-loss insurance to protect against catastrophic or unpredictable losses (the "***Stop Loss Insurance***").  Cigna provides the Stop Loss Insurance at a cost of $12.20 per employee per month.  The premium for a given month is generally

(Continued…)

and the premium for the vision plan, is approximately $274,000.

The Debtors offer three medical plans, two of which are high-deductible medical plans (each, an "*HDMP*"). Employees enrolled in an HDMP may contribute a portion of their compensation into a health savings account ("*HSA*") administered by HSA Bank. An HSA allows an Employee to save and pay for qualified health expenses on a pre-tax basis. Participating Employees can make payroll contributions to the HSA up to the maximum amount permitted by the Internal Revenue Service (the "*IRS*"). In addition, Employees with an HSA are eligible for a base contribution by the Debtors to the HSA and are able to earn additional matching contributions by the Debtors, up to a yearly maximum of $500 (for an Employee-only HDMP) or $1,000 (for a two-person/family HDMP). Employer contributions are funded on a per pay period basis. On an average annual basis, the Debtors spend approximately $700,000 on account of HSA contributions. The Debtors do not incur any administrative fees to HSA Bank on account of the HSAs.

The Debtors also provide eligible Employees with access to a flexible spending account ("*FSA*"), administered by WageWorks, which can be used to cover incidental medical costs and dependent childcare. The Debtors do not make contributions to the FSAs and do not incur any administrative fees to WageWorks on account of the FSAs.

In addition to the foregoing, the Debtors have in place miscellaneous practices, programs, and policies that provide medical and welfare benefits to eligible Employees, including COBRA and an employee

---

received and paid during that month. As of the Petition Date, the April and May 2019 premiums with respect to the Stop Loss Insurance have not yet been paid.

| | | | |
|---|---|---|---|
| | assistance program (collectively, the "**Other Welfare Programs**").  The Debtors believe that the Other Welfare Programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce.  The monthly cost of such programs for the Debtors is negligible in the context of the Debtors' aggregate compensation and benefit obligations.  The Debtors believe that failing to honor expected benefits under such Other Welfare Programs would have an adverse effect on the Employees. | | |
| **Workers' Compensation** | The Debtors provide workers' compensation insurance for Employees at the statutorily required level for each applicable state.  Additionally, in accordance with state law, the Debtors provide workers' compensation coverage to the Employees under state-administered workers' compensation programs.  The Debtors are insured through Century. The Debtors are seeking authority to pay amounts owed on account of workers' compensation premiums by separate motion filed on the Petition Date. | N/A | N/A |
| **Life, Disability, and Accident Insurance** | The Debtors provide eligible Employees with basic life and long-term disability insurance coverage through Cigna (the "**Basic Insurance**").  The Debtors pay approximately $40,000 per month on account of premiums for the Basic Insurance. As of the Petition Date, the Debtors have not yet paid the April 2019 premium with respect to the Basic Insurance.<br><br>The Debtors also provide eligible Employees with the opportunity to purchase additional insurance coverage through Cigna (the "**Supplemental Insurance**"), including various optional life and accidental death and dismemberment, short-term disability, and buy-up long-term disability. The premiums for the Supplemental Insurance are paid entirely by the electing Employee. | $67,000 | $40,000 |

| | | | |
|---|---|---|---|
| **401(k) Plan** | The Debtors offer eligible Employees the opportunity to participate in a 401(k) plan (the "***401(k) Plan***") administered by Fidelity Investments. Employees who participate in the 401(k) Plan can make pre-tax payroll contributions to their 401(k) accounts up to the maximum amount permitted by the IRS. Each Employee's 401(k) contributions are deducted automatically from their paychecks. The Debtors match 20% of an Employee's 401(k) contributions, up to a maximum of 3% of the Employee's eligible pay (the "***401(k) Contributions***"). Generally, the 401(k) Contributions are made by the Debtors at each pay period. While the 401(k) Contributions will vary by pay period, the Debtors estimate that the annual spend for 401(k) Contributions will be approximately $750,000. | $29,000 | $29,000 |
| **Tuition Reimbursement Program** | Eligible Employees may receive financial assistance in furthering their education under the Debtors' tuition reimbursement program (the "***Tuition Reimbursement Program***"). The Tuition Reimbursement Program provides reimbursements up to a maximum of $5,250 in a calendar year for courses related to an Employee's vocation, but not for continuing education units required to maintain licenses and certification. In 2018, the Debtors paid approximately $205,000 on account of the Tuition Reimbursement Program.<br><br>Some of the Employees may have incurred expenses in connection with the Tuition Reimbursement Program prior to the Petition Date, but have not yet sought reimbursement therefor. In most, if not all, such instances, the Employees incurred such expenses based on the Debtors' policies and their eligibility to participate in the Tuition Reimbursement Program. | $44,000 | $15,000 |
| **Miscellaneous** | In addition to the benefit plans described | $42,000 | $12,000 |

| | | | |
|---|---|---|---|
| **Benefit Programs** | above, the Debtors are currently aware of, and may discover other, *de minimis* prepetition obligations owed with respect to their Employees, including MetLaw everyday legal services, MetLife Auto & Home Insurance, MetLife VPI-Pet Insurance, a personalized wellness and rewards program ("**Go365**"), and other voluntary benefits (collectively, the "**Miscellaneous Benefit Programs**"). Except with respect to Go365, the Miscellaneous Benefit Programs are self-funded by the Employees and the Debtors to not owe any amounts on account of such programs.<br><br>The Debtors estimate that, as of the Petition Date, approximately $42,000 is accrued but unpaid with respect to Go365, and the Debtors' historical average monthly spend over the past 12 months is approximately $13,000 with respect to Go365. | | |

43.     In addition to the Employee Programs described above, the Debtors have historically offered a severance program to Employees (the "**Severance Program**," and the obligations thereunder, the "**Severance Obligations**") described below.   The Employee Obligations and the Severance Obligations are referred to collectively herein as the "**Workforce Obligations**."

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due Within 21 Days of Petition Date |
|---|---|---|---|
| **Severance Program** | Except as set forth explicitly in a written employment contract between an Employee and the Debtors, the Debtors provide eligible full-time and part-time Employees who incur an involuntary termination of employment by reason of a layoff, reduction in force, or elimination of the Employee's position with severance ("**Severance**") in the ordinary course | $225,000 | $80,000 |

01:24472219.1

of business. Severance is calculated as an amount equal to weekly base pay multiplied by years of service, up to a maximum of weekly base pay multiplied by 13, and subject to a minimum of: (a) $0 for part-time Employees; (b) weekly base pay multiplied by two for full-time non-exempt Employees; and (c) weekly base pay multiplied by four for full-time exempt Employees.

There are approximately 67 individuals (consisting of approximately 7 former insiders and approximately 60 former non-insiders) that were terminated prior to the Petition Date and are entitled to receive payments under the Severance Program (the "**Prepetition Severed Employees**"). The remaining payments under the Severance Program to the Prepetition Severed Employees total approximately $225,000 in the aggregate. Approximately $80,000 of those payments will come due on the Debtors' next regularly scheduled payroll date of May 17, 2019, with no individual Prepetition Severed Employee receiving in excess of $8,000. There are approximately 5 Prepetition Severed Employees whose remaining Severance payments as of the Petition Date are in excess of $13,650 in the aggregate. The Debtors request authority, but not direction, to (i) make the next regularly scheduled payment under the Severance Program to the Prepetition Severed Employees due to the *de minimis* nature of such payments and the extreme hardship that would result to the Prepetition Severed Employees if these amounts were not paid and (ii) continue making payments under the Severance Program to the Prepetition Severed Employees in the ordinary course of business. Additionally, in the ordinary course of business, the Debtors may incur Severance Obligations after the Petition Date. Subject to entry of the Final Order, the Debtors request authorization, but not direction, to continue the Severance Program in the ordinary course of business with respect to Employees that may be terminated after the Petition Date and to pay any Severance

| | Obligations owing thereunder.

Payment of Severance Obligations to Prepetition Severed Employees or Employees terminated postpetition that are insiders or former insiders complies with Bankruptcy Code section 503(c)(2). Although certain such Employees and Prepetition Severed Employees may be insiders or former insiders, Severance is paid to such Employees and Prepetition Severed Employees as part of a program generally applicable to full-time employees, and the Debtors are not seeking to pay such insiders or former insiders amounts that exceed the cap set forth in Bankruptcy Code section 503(c)(2). | | |
| --- | --- | --- | --- |

**C.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Certain Critical Vendors, (II) Authorizing, But Not Directing, Debtors to Re-Issue Uncashed Prepetition Physician Checks and (III) Authorizing Financial Institutions to Honor and Process All Related Checks and Transfer Requests (the "*Critical Vendor Motion*")**

> *(a)      Critical Vendors*

44.      To operate the LTAC hospitals, during the last twelve (12) months, the Debtors have relied on more than 3,050 vendors for goods and services.  However, certain vendors provide goods and services that are necessary for the Debtors to provide patient care and are critical to the health and safety of the Debtors' patients.  Although the Debtors desire to resume normal business relationships with all vendors, and all vendors and their goods and services are important to the Debtors' businesses and operations, the immediate need to continue to provide uninterrupted service and maintain quality patient care is the Debtors' foremost concern.

45.      To determine those vendors whose continued, uninterrupted provision of goods and services play a crucial role in maintaining the Debtors' ongoing business operations as a LTAC healthcare provider (such vendors, the "***Critical Vendors***") and the aggregate prepetition amounts owed to such vendors to establish the Critical Vendor Caps (as defined herein), the

Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records, consulting with operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice.  As part of this process, the Debtors examined a variety of factors, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, direct or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services, in particular, those that will impact patient care, on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

46.     Applying the criteria set forth above, the Debtors have identified approximately 200 vendors as Critical Vendors, each of which provides goods or services that are essential to the Debtors' operations (the "*Critical Goods and Services*") and each of whom has a balance in the Debtors' centralized accounts payable system.  The Critical Vendors are comprised of (i) physicians (the "*Physician Critical Vendors*") and (ii) other suppliers of Critical Goods and

Services (the "***Other Critical Vendors***"), including, but not limited to, providers of medical supplies, pharmacy, blood suppliers, compressed oxygen and gas suppliers, laboratories, transportation providers, specialty treatments (such as gastrointestinal surgery specialists) and host hospitals that provide hoteling services, hospital food, and cleaning and linen services pursuant to purchase services agreements.  In some cases, there is no alternative vendor for the Critical Goods and Services.  In other cases, alternative vendors cannot supply the required Critical Goods and Services in sufficient quantity, quality, or reliability, or they are unable to supply the required Critical Goods and Services on a cost-efficient and timely basis in the appropriate geographic areas.

47.     The Debtors' failure to pay or otherwise honor the Critical Vendors' prepetition claims (the "***Critical Vendor Claims***") may eliminate the Debtors' access to the Critical Goods and Services.  Importantly, the Debtors do business with a majority of the Critical Vendors without the benefit of a contract and, therefore, the Critical Vendors generally are not obligated to do business with the Debtors or to honor particular trade terms for future orders.  Absent payment of the Critical Vendor Claims, the Critical Vendors may cease doing business with the Debtors or condition the provision of the Critical Goods and Services on onerous trade terms. Any disruption in the supply of the Critical Goods and Services may not only materially damage the Debtors' operations and substantially impair the Debtors' reorganization efforts but, due to the Debtors' operation of LTAC hospitals, may also risk patient safety.

48.     Consequently, the Debtors seek authority, but not direction, to pay Critical Vendor Claims on an interim basis in an aggregate amount not to exceed $1.5 million (the "***Interim Cap***") and on a final basis in an aggregate amount not to exceed $3 million (the "***Final Cap***" and together with the Interim Cap, the "***Critical Vendor Caps***").  In determining the

Critical Vendor Caps, the Debtors carefully reviewed all of their vendors to determine which vendors could meet the stringent criteria used to identify the universe of potential Critical Vendors.  Thus, the Critical Vendor Caps represent the Debtors' best estimates of how much in prepetition claims need to be paid to ensure a continued supply of Critical Goods and Services during the applicable period.

49.     As noted previously, during the last twelve (12) months, Debtors have done business with more than 3,050 vendors. The Interim Cap and Final Cap represent less than approximately 7.8% and 15%, respectively, of the Debtors' total trade accounts payable estimated at approximately $19 million.  Given the current state of the Debtors' businesses, the detailed protocol described herein for determining whether to make a Critical Vendor payment, and the risks associated with non-payment, the Debtors submit that the Critical Vendor Caps are reasonable and appropriate caps on the expenditure of estate funds to satisfy certain prepetition claims.

**D.      Debtors' Motion for Entry an Order Authorizing the Debtors to Maintain, Administer, Modify, and Renew their Refund Program and Practices and Honor Obligations Related Thereto (the "*Patient Refund Motion*")**

*(a)      The Debtors' Refund Program*

50.     In the ordinary course of business, the Debtors refund patients and third-party payors when overpayments are identified.  These third-party payors include healthcare insurers, managed care organizations, workers' compensation programs, contract management services, private pay sources, Medicare and Medicaid (collectively, "*Third-Party Payors*").   In the ordinary course of business, the Debtors routinely issue refunds or are subject to offsets or recoupments for reimbursement of overpayments made by or on behalf of patients resulting from the interaction between the Debtors' billing procedures, patient medical insurance deductibles and third-party payments (the "*Refund Program*").

51.     The case-by-case nature of the Debtors' medical services makes the process of determining each patient's insurance coverage particularly complex.  As a result, whether due to data input errors during claims processing or overpayments arising from coordination of benefits issues among multiple insurers, patient accounts—once fully processed—may contain credit balances.  Once the Debtors receive payments from patients or insurers, the Debtors review accounts that have credit balances and, if appropriate, refund any surplus to the patient or the applicable Third-Party Payor to address any overpayments.

52.     When the Debtors discover and verify an overpayment from a patient or Third-Party Payor, the amount of the overpayment is reviewed in the Debtors' billing system, which then administers refunds to the patient as appropriate.  Offsets by Third-Party Payors are reconciled by the Debtors after the offset occurs.  There is typically a significant lag between when the patient is treated, when the overpayment is recognized or determined, and when the overpayment is reviewed in the Debtors' billing system.  After the overpayment amount is determined, either the Debtors issue a check or other form of payment to the patient or Third-Party Payor, or the Third-Party Payor will offsets future payments in the amount of the overpayment.

53.     At any given time, it is difficult to determine the amount of outstanding overpayments that have been identified and made but have not yet been issued a refund check or given an offset.  Moreover, some refund checks issued to patients before the petition date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system, and accordingly, have not been honored and paid as of the Petition Date.

54.     Nonetheless, the Debtors are required, under the laws of various states, to reimburse patients and Third-Party Payors as overpayments are identified.

55.     As of the Petition Date, the Debtors estimate that approximately $5.1 million in refunds and credit balances may be due and owing under the Refund Program, of which approximately $2 million could become due and owing during the first 21 days of these chapter 11 cases.  The Debtors request authority to continue to issue and pay and allow offsets for the Refund Program to patients and Third-Party Payors on a postpetition basis, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business.

**E.     Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Hereto (the "*Utilities Motion*")**

56.     In the normal course of operation of their business, the Debtors obtain electricity, natural gas, sewer, water, telecommunications, waste disposal, and other similar services (collectively, the "*Utility Services*") from various utility companies (each, a "*Utility Company*" and collectively, the "*Utility Companies*").  A list of Utility Companies that provide Utility Services to the Debtors as of the Petition Date is attached hereto as **Exhibit D** (as supplemented, the "*Utility Service List*").  On average, the Debtors spend approximately $400,000 per month on the Utility Services.

57.     In general, the Debtors have established a good payment history with the Utility Companies and have made payments on a regular and timely basis.  To the best of the Debtors' knowledge, there are no material defaults or arrearages of any significance with respect to the Debtors' undisputed Utility Services invoices, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.

**F.  Debtors' Motion for Entry of an Order (I) Authorizing, but not Directing, Debtors to (A) Continue Insurance Policies Entered into Prepetition, (B) Satisfy all Obligations Relating to the Prepetition Insurance Policies, (C) Continue Insurance Premium Financing Agreements, and (II) Granting Related Relief (the "*Insurance Motion*")**

*(a)    The Insurance Program and Policies*

58.    The Debtors, in the ordinary course of business and in connection with their business operations, maintain various insurance policies and procedures, including, but not limited to, workers' compensation insurance, general liability insurance, property insurance, director and officer insurance, and other state specific policies (the "***Insurance Program***").  A list of the Debtors' insurance policies as of the Petition Date is included herein as **Exhibit E** (collectively, the "***Insurance Policies***").  **Exhibit E** provides a comprehensive list of the Insurance Policies and other information such as type of coverage, policy numbers and the names of the Debtors' insurance providers (the "***Insurance Carriers***").

59.    To assist them in their efforts to obtain the insurance coverage necessary to operate their business in a reasonable, prudent and cost-effective manner, the Debtors utilize the expertise, experience, and services of Marsh USA, Inc. and Hub International as insurance brokers (together, the "***Brokers***").  Among other things, the Brokers represent the Debtors in negotiations with their various insurance underwriters.   The Debtors remit the premium payments on certain of the Policies to the Brokers for payment by the Brokers to the Insurance Carriers.  The Debtors believe it is in the best interests of their creditors and estates to continue these business relationships with the Brokers.  Accordingly, as a part of this Motion, the Debtors also seek authority, in their sole discretion, to continue their prepetition practice of paying brokerage fees and remitting premiums to the Brokers and any other agent or broker engaged by the Debtors in connection with their respective representations of the Debtors in negotiations

with the Insurance Carriers and other activities related to the maintenance of the Insurance Program.

60.     As of the Petition Date, the Debtors believe that approximately $45,000 in premiums are due and owing and will be paid within the first 21 days of these cases.   The Debtors believe that authorizing them to make the payments required to maintain the full effectiveness of the Policies and to continue the Insurance Program is essential to the preservation of their business, estates, and assets.   The Debtors' are required by various state and federal laws and regulations, including the Operating Guidelines for Chapter 11 Cases set forth by the United States Trustee for the District of Delaware, to maintain the Insurance Policies in the ordinary course of business.   Additionally, Bankruptcy Code section 1112(b)(4)(C) requires the Debtors to maintain the proper level of insurance, warning failure to maintain appropriate insurance that creates a risk to the estate or general public is cause for mandatory conversion or dismissal of a chapter 11 case.   11 U.S.C. § 1112(b)(4)(C).

61.     The premiums for the Insurance Policies are approximately $4,456,000, not including applicable taxes and surcharges, deductible, and broker and consulting fees and commissions.   The Debtors pay such premiums in full annually, or, to manage liquidity, through two insurance premium finance agreements (the "***Premium Financing Agreements***") with AFCO Premium Credit, LLC (the "***PFA Lender***") for certain Insurance Policies (the "***PFA Policies***").   The first agreement is to finance certain director and officer liability policies (the "***D&O PFA***"), and the second agreement finances workers compensation, certain state specific policies, and other general corporate policies (the "***General PFA***").   Pursuant to the Premium Financing Agreements, the PFA Lender has agreed to pay the insurance premiums due under the PFA Policies in exchange for payments from the Debtors, as set forth more fully below.   The

Debtors' obligations under the Premium Financing Agreements are secured by all sums due under the Premium Financing Agreements and any unearned premiums or other sums that may become payable under the PFA Policies. The PFA Policies are essential to the preservation of the Debtors' business.

62.     For the General PFA, the Debtors made an initial down payment of $215,670.34, and agreed to make nine monthly payments in the amount of $215,670.34. The monthly installments were due on the 30th of each month, with the first installment due on June 30, 2018. The Debtors have made all monthly payments due under the General PFA.

63.     For the D&O PFA, which covers the period through August 15, 2019, the Debtors made an initial down payment of $36,284.22, and agreed to make six monthly payments in the amount of $36,284.22. The monthly installments were due on the 30th of each month, with the first installment due on September 30, 2018. The Debtors have made all payments due under the D&O PFA. In addition, prior to the Petition Date, the Debtors purchased a six-month extension of their D&O coverage, along with policy for a six-year run-off period. The run-off policy will incept at either a change in control triggering event, or the expiration of the six-month extension. The premium for the six-month extension was $350,000, and the premium for the six-year run-off was $687,000. The extension and run-off premiums are non-cancellable, and have been paid in full.

64.     In the Debtors' business judgment, the terms of the Premium Financing Agreements represent the best available terms. The Debtors' estates will benefit by maintaining this low-cost financing from the PFA Lender. Moreover, any interruption of payments might adversely affect the Debtors' ability to obtain financing for future policies on favorable terms. Thus, the Debtors request the authority to continue honoring their obligations pursuant to the

Premium Financing Agreements, including the granting of security interests to the PFA Lender, and to renew or replace the Premium Financing Agreements in the ordinary course of business.

65.     The Debtors are also required by the law of the states in which they do business to provide workers' compensation coverage for their employees.  As required by law, and in the ordinary course of their business, the Debtors maintain workers' compensation and employers' liability coverage (the "***Workers' Compensation Program***") as part of the Insurance Program, under Insurance Policies with Sentry Casualty Company ("***Sentry***").  The current Insurance Policies provide coverage through August 10, 2019.  The annual cost of the Workers' Compensation Program is approximately $2,625,000, of which approximately $625,000 is paid for the premium and approximately $2,000,000 is paid towards claims.  The Workers' Compensation Program includes a self-insurance retention amount of $350,000 per occurrence.

66.     Pursuant to these Insurance Policies, Sentry manages the process and pays the workers' compensation claims (the "***Workers' Compensation Claims***") on behalf of the Debtors. The fees that Sentry charges to administer the Workers' Compensation Program are included in the Workers' Compensation Program premiums.  As of the Petition Date, the Debtors estimate that approximately $45,000 of premiums are due and owing under the Workers' Compensation Program and will be paid in the first 21 days of these cases.  To ensure that claims incurred under the Workers' Compensation Program are resolved, the Debtors must pay outstanding prepetition liabilities associated with the Workers' Compensation Program.  Accordingly, the Debtors request authority to continue to maintain the Workers' Compensation Program in the ordinary course of business, and to pay any prepetition amounts related thereto.

01:24472219.1

**G.**     **Debtors' Motion for Entry of an Order (I) Authorizing Payment of Certain Prepetition Taxes and (II) Authorizing Financial Institutions to Honor and Process all Related Checks and Electronic Payment Requests (the "*Taxes Motion*")**

*(a)     Prepetition Taxes and Fees Paid by the Debtors*

67.     This Motion seeks entry of an order authorizing, but not directing, the Debtors to remit and pay, in the ordinary course of business, certain taxes and fees, including, but not limited to sales, use, franchise, property, and certain other governmental fees and taxes (collectively, the "*Taxes*"); and (ii) authorizing the Debtors' banks and financial institutions (collectively, the "*Banks*") to honor and process all related checks and electronic payment requests.

68.     In the ordinary course of their business, the Debtors incur or collect the Taxes and remit such Taxes to various taxing, licensing, and other governmental authorities (collectively, the "*Taxing Authorities*").  Certain Taxes attributable to the prepetition period (the "*Prepetition Taxes*") have not yet become due or remain outstanding as of the Petition Date.  Additional detail with respect to the Prepetition Taxes is provided below.

*(b)     Sales and Use Taxes.*

69.     The Debtors collect and remit to certain Taxing Authorities a variety of sales, local gross receipts, and other similar taxes in connection with the Debtors' sale of certain goods and services (collectively, the "*Sales Taxes*").  Sales Taxes are paid in the ordinary course of the Debtors' business and are calculated based upon statutorily mandated percentages.  The Debtors remit Sales Taxes quarterly or monthly, depending on the particular taxing authority.

70.     In addition, the Debtors may be responsible for the payment of use taxes (the "*Use Taxes*" and together with the Sales Taxes, the "*Sales and Use Taxes*").  Vendors are not obligated to charge or remit Sales Taxes for sales to parties outside the state of the vendor's operations.  Nevertheless, a purchaser is obligated to self-assess and pay taxes on the use,

storage, or consumption of goods in the states in which the purchaser operates, regardless of whether the purchase took place in that state.  The Debtors incur and remit Use Taxes when they purchase property or services from vendors that have no nexus to the state in which the purchasing Debtor operates, and thus no Sales Taxes were collected by the vendor.

71.     Based upon historical payments, as of the Petition Date, the Debtors estimate that approximately $45,000 in Sales and Use Taxes relating to the prepetition period will be due and owing to the Taxing Authorities in the ordinary course of business after the Petition Date.

*(c)     Income, Franchise Taxes, Annual Report Taxes, and Other Business, License, and Corporate Fees.*

72.     The Debtors pay certain taxes based on their income (the "***Income Taxes***"), which are typically paid in the ordinary course of business.  In addition, the Debtors pay franchise, capital stock, and similar taxes and fees (collectively, the "***Franchise Taxes***") to certain of the Taxing Authorities to maintain the right to operate their business in the applicable taxing jurisdictions.  Certain states will refuse to qualify a Debtor to do business in a state if Franchise Taxes have not been paid.  Certain state governments also require the Debtors to pay annual report taxes and other corporate fees to be in good standing for purposes of conducting business within that state (collectively, the "***Corporate Fees***").  Finally, in some instances, the Debtors are required to pay Taxing Authorities for licenses, permits, registrations, and other various fees, taxes, and charges necessary for the Debtors to conduct their business operations, including certain permits and assessment fees, medical and hospital licenses, and commercial-vehicle related permits and fees (together with the Franchise Taxes and Corporate Fees, the "***Business Taxes and Fees***").  Based upon historical payments, the Debtors estimate that the aggregate amount of prepetition Business Taxes and Fees that will be due and owing to the

Taxing Authorities in the ordinary course of business after the Petition Date is approximately $150,000.

   (d)   *Property-Related Taxes.*

73.    Various state and local governments in jurisdictions where the Debtors' operations are located have the authority to levy property taxes, including certain mineral right taxes, against the Debtors' real and personal property (the "***Property Taxes***").  The Debtors typically pay Property Taxes annually or bi-annually depending on how the relevant tax is assessed.  Based upon historical payments, the Debtors estimate that as of the Petition Date, there is approximately $1,300,000 of unpaid Property Taxes for the prepetition period.  Of the amount of unpaid Property Taxes, the Debtors estimate that approximately $90,000 will come due within the first 21 days of these bankruptcy proceedings, and that an additional $385,000 is currently past-due.

74.    Many Taxing Authorities impose personal liability on directors or responsible officers of entities responsible for collecting or paying certain taxes and fees to the extent that such taxes or fees are not remitted.  Thus, if any such Taxes remain unpaid, the Debtors' directors and responsible officers may be subject to lawsuits or even criminal prosecution on account of such nonpayment during the pendency of these chapter 11 cases.  Such lawsuits or proceedings obviously would constitute a significant distraction for the Debtors' directors and responsible officers at a time when they should be focused on the Debtors' efforts to stabilize their postpetition business operations.

75.    Although the Debtors believe that all Taxes for which the Debtors' directors or responsible officers may be personally liable are described herein, it is possible that other prepetition obligations similar in nature (and in threat of personal liability) may be uncovered by the Debtors subsequent to the filing of this Motion.  To the extent that such prepetition

obligations exist, the Debtors will consider such obligations "***Prepetition Taxes***" as that term is defined and used herein and request the authority to pay such Prepetition Taxes as they may arise in the ordinary course of their business.

**H.     Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, Payment of Certain Prepetition Claims of Warehousemen and Other Lien Claimants and (II) Granting Related Relief (the "*Lienholder Motion*")**

76.     In operating the LTAC hospitals, the Debtors rely on thousands of vendors for the goods and services necessary to operate the LTAC hospitals and provide the highest level of patient care and treatment.  As described below, certain of these vendors provide specific types of goods or services that may entitle them to security interests, priorities, or other rights in or over the Debtors' property.

77.     To ensure the uninterrupted flow of goods to the LTAC hospitals, the Debtors have a supply chain and distribution network that includes, amongst others, third-party warehousemen (the "***Warehousemen***").  In the ordinary course of business, the Debtors rely on the Warehousemen to store certain goods and other property of the Debtors, such as medical supplies and certain patient records stored on behalf of certain physician groups.  The failure of the Debtors to pay the prepetition claims of the Warehousemen (the "***Warehousing Claims***") may result in the Warehousemen asserting possessory liens, under applicable non-bankruptcy law, against the Debtors' property in their possession.

78.     Additionally, in the ordinary course of business, the Debtors transact business with a number of other third-party vendors who, under applicable non-bankruptcy law, have the potential to assert mechanics', materialmen's, artisan's, or other similar liens against the Debtors' property (collectively, the "***Other Lien Claimants***" and collectively with the Warehousemen, the "***Lien Claimants***") if the Debtors fail to pay their prepetition claims (the "***Other Lien Claims***" and together with the Warehousing Claims, the "***Lien Claims***").  The Other

Lien Claimants provide a number of services that are essential to patient care and treatment and the Debtors' ability to maximize the value of their estates, such as construction, maintenance, and repair services at the Debtors' LTAC hospitals and other facilities. Specifically, the Debtors have a number of ongoing repair and construction projects (collectively, the "***Construction Projects***"). The Construction Projects are located at several different LTAC hospitals and involve several different third-party vendors. Tasks include gas-leak repair, boiler repair, fire-panel replacement, kitchen walls repair, and bathroom-leak repair. These Construction Projects are critical and necessary for the LTAC hospitals' viability, and ensure the Debtors are maintaining their business operations to the utmost safety standards.

79. The Debtors have generally made timely payments to the Lien Claimants as of the Petition Date, yet some of the Lien Claimants may not have been paid in full for certain Lien Claims. This may result in such Lien Claimants asserting or perfecting possessory or other liens under applicable non-bankruptcy law with respect to certain of the Debtors' property (collectively, the "***Liens***"). Moreover, to protect any asserted Lien rights, the Lien Claimants may refuse to release goods or property in their possession unless and until the Lien Claims have been satisfied. Irrespective of the amount and validity of the Liens, the mere assertion of the Liens would delay the Debtors' access to critical goods and services and severely impair the Debtors' ability to provide quality patient care and otherwise operate their businesses, thereby causing irreparable harm to the Debtors' estates. Accordingly, the Debtors seek authority, but not direction, to pay the Lien Claims to the extent the Debtors determine, in the exercise of their business judgment, that such payments are necessary or appropriate, in an amount not to exceed $400,000 in the aggregate. The Debtors believe that such amount will be sufficient to ensure a continued supply of the critical goods and services.

I.     **Debtors' Motion for Entry of an Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules (the "*Patient Confidentiality Motion*")**

80.     In the ordinary course of business, the Debtors have access to and receive "protected health information" that the Debtors are required to confidentially maintain pursuant to the Health Insurance Portability and Accountability Act of 1996[12] and corresponding privacy rules[13] ("*HIPAA*").   It is of paramount importance to the Debtors that protected health information be maintained in accordance with patient expectations and HIPAA.  I am advised by counsel that the establishment of the Privacy Procedures will balance the need to protect patient health information pursuant to HIPAA with the need to disclose information regarding these chapter 11 cases to the public.

---

[12] 42 Pub. L. No. 104-191, 110 Stat. 1936 (codified as amended in scattered sections of 42 U.S.C.).

[13] 45 C.F.R. pts. 160, 164.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 7, 2019

*/s/ James Murray*
James Murray
Chief Executive Officer
Hospital Acquisition, LLC

**EXHIBIT A**

**Corporate Organization Chart**



LifeCare Organizational Chart

**EXHIBIT B**

**Chart of Cash Management System**

Cash Management Flowchart[1]



[1] Unless otherwise specified, the Bank Account is at JPMorgan.

**EXHIBIT C**

## Bank Accounts

| Account Type | Account Owner | Bank | Account Number (Last 4 Digits) |
|---|---|---|---|
| Cafeteria Account | New LifeCare Hospitals of Mechanicsburg LLC | Citizens Bank | 4400 |
| Cafeteria Account | New LifeCare Hospitals of North Carolina LLC | PNC Bank | 1859 |
| Cafeteria Account | New LifeCare Hospitals of Pittsburgh LLC | Citizens Bank | 5077 |
| Main Operating Account | New LifeCare Management Services LLC | JPMorgan Chase | 2163 |
| Secondary Operating Account | New LifeCare Management Services LLC | Capital One | 3106 |
| Controlled Disbursement Account | New LifeCare Management Services LLC | JPMorgan Chase | 7687 |
| Payroll Account | New LifeCare Management Services LLC | JPMorgan Chase | 4895 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 4280 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 4298 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 4413 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 4405 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 8806 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 2118 |
| Receivables Account (Lockbox) | New LifeCare Management Services LLC | JPMorgan Chase | 8057 |
| Receivables Account (Lockbox Concentration Account) | New LifeCare Management Services LLC | Capital One | 3109 |
| Funds Account (Employee Assistance Fund) | LifeCare Hospitals Employee Assistance Fund | JPMorgan Chase | 3683 |
| Funds Account | LifeCare Hospitals of Pittsburgh TCC Resident Trust | Citizens Bank | 5172 |
| Funds Account | Hospital Acquisition LLC | Capital One | 0359 |
| Funds Account | Hospital Acquisition MI LLC | JPMorgan Chase | 0307 |
| Reserve Account | LifeCare Holdings, LLC | Capital One | 6187 |
| Funds Account (Deposits) | New LifeCare Management Services LLC | JPMorgan Chase | 0523 |
| Funds Account (Deposits) | New LifeCare Management Services LLC | JPMorgan Chase | 0515 |

**EXHIBIT D**

**<u>Utility Companies</u>**

| Name of Utility Provider | Address | Services Provided | Account Number |
|---|---|---|---|
| A&W Communications Inc | 328 COLEMAN DR<br>MONROEVILLE, PA 15146 | Telephone | No Account Number |
| ACC Business | PO BOX 105306<br>ATLANTA, GA 30348-5306 | Internet | 000012044915 |
| ADT Security Services | PO BOX 650485<br>DALLAS, TX 75265-0485 | Security | 5724218 |
| Affiliated | 730 F AVE  STE 210<br>PLANO, TX 75074 | Telephone | 2717 |
| AT&T | PO BOX 660921<br>DALLAS, TX 75266-0921 | Telephone, Internet | 0304911362001 \| 1717948053604 \| 21464096006559 \| 318M75-08238230512 \| 318M75-08258250510 \| 318M75-08268260519 \| 8310003133785 |
| Atmos Energy | PO BOX 790311<br>ST LOUIS, MO 63179-0311 | Electric | 3027611299 \| 3025048910 \| 3031426080 |
| Birch | 115 GATEWAY DRIVE<br>MACON, GA 31210 | Internet | 893632 |
| Centerpoint Energy Arkla | PO BOX 4583<br>HOUSTON, TX 77210-4583 | Electric | 9789683-1 |
| CenturyLink | PO BOX 91155<br>SEATTLE, WA 98111-9255 | Internet | 87375453 \| 307754699 \| 418258732 |
| Charter/Spectrum | PO BOX 790086<br>SAINT LOUIS, MO 63179-0086 | Television | 8354100013453256 \| 8354100021393080 |
| City Of Dallas | CITY HALL 1AN<br>DALLAS, TX 75277 | Water | 100866731 \| 100649557 |
| City Of Las Vegas | FINANCE - 4TH FL 495 S MAIN ST<br>LAS VEGAS, NV 89101 | Water | FAN-21948 |
| City Of Las Vegas Sewer | DEPT OF FINANCE PO BOX 748022<br>LOS ANGELES, CA 90074-8022 | Sewer | 9475622222 |
| City Of Plano Utilites | PO BOX 861990<br>PLANO, TX 75086-1990 | Water | 311822 \| 311823 |
| City Of Shreveport | DEPARTMENT OF WATER & SEWERAGE PO BOX 30065<br>SHREVEPORT, LA 71153-0065 | Water | 143073301 |

| Name of Utility Provider | Address | Services Provided | Account Number |
|---|---|---|---|
| Comcast | PO BOX 3006<br>SOUTHEASTERN, PA 19398-3006 | Television, Security, Internet | 939743970 \| 939756725 \|<br>8396300012165050 \|<br>8396300012165055 \|<br>8396300012275623 \|<br>8396300020172762 \|<br>8497303262670913 \|<br>8499100830174313 \|<br>8993110820094828 \|<br>8993210300163976 \|<br>8535100441689135 |
| Constellation New Energy Inc | PO BOX 4640<br>CAROL STREAM, IL 60197-4640 | Electric | 8824156 \| 8824159 \| 7673856-1 |
| Cox Business | PO BOX 53262<br>PHOENIX, AZ 85072-3262 | Internet | 0018610115317001 \|<br>0018610123376501 |
| CPS Energy | PO BOX 2678<br>SAN ANTONIO, TX 78289-0001 | Electric | 300-3021-531 \|<br>300-3021-527 |
| Digital Telefones | 101C N. GREENVILLE AVE #230<br>ALLEN, TX 75002 | Telephone | 3054 \| 4649 \| 4840 \| 4842 \| 4863 |
| Direct Energy Business | PO BOX 660749<br>DALLAS, TX 75266 | Electric | 1294525 \| 1294526 \| 1294520 |
| Direct TV | PO BOX 105249<br>ATLANTA, GA 30348-5249 | Television | 032731559 \| 036310819 \|<br>039676887 \| 039962800 |
| Duquesne Light Co | PAYMENT PROCESSING CENTER PO BOX 10<br>PITTSBURGH, PA 15230-0010 | Electric | 6645-350-000 |
| Florida Power & Light Company | GENERAL MAIL FACILITY<br>MIAMI, FL 33188-0001 | Electric | 84699-81453 |
| Fort Worth Water Department | 920 FOURNIER ST<br>FORT WORTH, TX 76102-3456 | Water | 663131244918 |
| FPL Energy Services | PO BOX 25426<br>MIAMI, FL 33102-5426 | Electric | 1100218186 |
| Frontier | PO BOX 740407<br>CINCINNATI, OH 45274-0407 | Internet | 94137775260222100 |
| GlobalStar LLC | PO BOX 30519<br>LOS ANGELES, CA 90030-0519 | Telephone | 1.50018625 |
| Granite Communications LLC | CLIENT ID #311 PO BOX 983119<br>BOSTON, MA 02298-3119 | Telephone | 02884087 \| 03029890 \| 02884087 |
| Las Vegas Valley Water District | PO BOX 2921<br>PHOENIX, AZ 85062-2921 | Water | 6860586853-5 |

| Name of Utility Provider | Address | Services Provided | Account Number |
|---|---|---|---|
| Level3/CenturyLink | PO BOX 910182<br>DENVER, CO 80291-0182 | Internet | 0205296669 \| 0205314823 \|<br>2012040617205034 \|<br>5-4MBMVQGQ \| 5-QRRYM3F9 |
| Lower Allen Township | 2233 GETTYSBURGH RD<br>CAMP HILL, PA 17011 | Sewer | 2874450-0 |
| NV Energy | PO BOX 30150<br>RENO, NV 89520-3150 | Electric | 3000322266818370000 |
| Pennsylvania American Water | PO BOX  371412<br>PITTSBURGH, PA 15250-7412 | Water | 1024-210033115846 \|<br>1024-210033115556 |
| Peoples Natural Gas | PO BOX 644760<br>PITTSBURGH, PA 15264-4760 | Gas | 210000948211 |
| PPL Electric Utilities | PO BOX 25222<br>LEHIGH VALLEY, PA 18002-5222 | Electric | 95899-98004 \| 09601-20030 |
| Quality Waste Service Inc | 7829 ORLAND PARK CIRCLE<br>FORT WORTH, TX 76137 | Waste | No Account Number |
| RedAway LLC | 2000 McKinney Ave, #2125<br>Dallas, TX 75201 | Medical Waste | No Account Number |
| Republic Services Inc #620 | 770 E SAHARA AVE<br>LAS VEGAS, NV 89014-2943 | Waste | 3-0620-0719870 \|<br>3-0620-0241852 \|<br>3-0620-0426176 \|<br>3-0620-8006750 |
| Republic Services of Southern Nevada | PO BOX 78829<br>PHOENIX, AZ 85062-8829 | Waste | 3-0620-8008750 |
| Ring Central | DEPT CH 19585<br>PALATINE, IL 60055-9585 | Telephone | 243207031 \| 250040035 \|<br>1558762020 |
| San Antonio Water System | PO BOX 2990<br>SAN ANTONIO, TX 78299-2990 | Water | 000496756-0496757-0001 \|<br>000506909-0117899-0002 \|<br>000506910-0117900-0002 |
| Sarasota County Public Utilities | PO BOX 31320<br>TAMPA, FL 33631-3320 | Water | 337133-176598 \|<br>337133-515154 \|<br>422849-585664 |
| Service Waste Inc | PO BOX 1195<br>FORT WORTH, TX 76101 | Waste | 01-1485043 \| 01-1488138 |
| Southwest Gas Corporation | PO BOX 98890<br>LAS VEGAS, NV 89193-8890 | Gas | 211-5219039-004 |
| Southwestern Electric Power | PO BOX 371496<br>PITTSBURGH, PA 15250-7496 | Electric | 961-928-926-1-8 \|<br>964-237-142-1-9 |
| Spok Inc | PO BOX 660324<br>DALLAS, TX 75266-0324 | Telephone | 0384462-8 \| 0725110-1 \| 0288800-6 |

| Name of Utility Provider | Address | Services Provided | Account Number |
|---|---|---|---|
| Sprint | PO BOX 219100<br>KANSAS CITY, MO 64121-9100 | Telephone | 926976456 \| 928352606 \|<br>823291072 |
| SteriCycle | 28161 N. Keith Drive<br>Lake Forest, IL 60045 | Medical Waste | 2123759 \| 8294817 |
| Suddenlink | PO BOX 660365<br>DALLAS, TX 75266-0365 | Television | 7136690011 |
| Teco | PO BOX 31318<br>TAMPA, FL 33631-3318 | Electric | 211007440327 |
| Tiger Sanitation, Inc | PO BOX 200143<br>SAN ANTONIO, TX 78220 | Waste | 091287 |
| Time Warner/Spectrum | PO BOX 660815<br>DALLAS, TX 75266-0815 | Television, Internet | 063312101 \| 075201901 \|<br>076521501 \| 076562301 \|<br>104047001431014001 \|<br>104047184058014001 \|<br>8260130361839064 \|<br>8260130362703384 \|<br>8260130363419980 \|<br>8260130591565596 \|<br>8260130594941133 \|<br>8260141461055220 \|<br>8260141461730558 |
| TXU Energy | PO BOX 650638<br>DALLAS, TX 75265-0638 | Electric | 100031441379 |
| UGI Energy Services Llc | PO BOX 827032<br>PHILADELPHIA, PA 19182 | Electric | 210000948211 |
| UGI Utilities Inc | PO BOX 15503<br>WILMINGTON, DE 19886-5503 | Electric | 411000707710 |
| Upper Allen Township | 100 GETTYSBURG PIKE<br>MECHANICSBURG, PA 17055-5698 | Sewer | 700166 |
| Verizon | PO BOX 28003<br>LEHIGH VALLEY, PA 18002-8003 | Telephone, Internet | 11862X25 \| 24211632800001 \|<br>652533718000194 |
| Waste Industries, Inc | PO BOX 791519<br>BALTIMORE, MD 21279-1519 | Waste | 001378653 \| 001378654 |
| Waste Management | PO BOX 13648<br>PHILADELPHIA, PA 19101-3648 | Waste | 14-74465-72009 \|<br>18-69188-13009 |
| Waste Management Inc of Florida | PO BOX 4648<br>CAROL STREAM, IL 60197-4648 | Waste | 9-84922-43002 \|<br>10-12668-23003 |
| Waste Management of Nevada | PO BOX 541065 RIM WASTE SYSTEMS<br>LOS ANGELES, CA 90054-1065 | Waste | 9-31357-65002 |

| Name of Utility Provider | Address | Services Provided | Account Number |
|---|---|---|---|
| Waukesha Water Utility | PO BOX 1648 WAUKESHA, WI 53187-1648 | Water | 401463000 |
| WE Energies | PO BOX 90001 MILWAUKEE, WI 53290-0001 | Electric | 4699-088-076 |
| Wilkinsburg-Penn Joint Water | 2200 ROBINSON BLVD WILKINSBURG, PA 15221-1112 | Water | 175869-88608 \| 175871-88608 |
| Windstream/Earthlink | XETA TECHNOLOGIES PO BOX 843006 KANSAS CITY, MO 64184-3006 | Internet | 3246664 |

**EXHIBIT E**

**<u>Insurance Policies</u>**

| Coverage | Carrier | Last 4 digits of Policy No. | Expiration |
|---|---|---|---|
| Above/Ungrd Storage Liability | Ace American Insurance Co. | A004 | 8/1/2019 |
| Property Policy | Fireman's Fund | 2266 | 11/15/2019 |
| Storm Deductible Buy Down (FL, LA) | Lloyd's of London | 0234 | 11/15/2019 |
| General Liability / Professional Liability (CO) | TDC Specialty Insurance Company | 1801 | 5/31/2019 |
| General Liability / Professional Liability (FL) | TDC Specialty Insurance Company | 1801 | 5/31/2019 |
| LA State Fund | N/A | N/A | 5/31/2019 |
| General Liability / Professional Liability (PA) | Steadfast Insurance Company (Zurich) | 4702 | 5/31/2019 |
| Physicians Realty Insurance | N/A | N/A | 11/1/2019 |
| Workers Compensation (CO, FL, LA, NC, NV, PA, TX) | Sentry Insurance | 0181 | 8/10/2019 |
| Workers Compensation (WI, OH) | Sentry Insurance | 0181 | 8/10/2019 |
| D&O | AIG, Argonaut, Wesco, XL Specialty | 1339, 3210, 1500, 5718 | 2/15/2020 |
| D&O Tail | AIG, Underwriters at Lloyds, Argonaut, Sompo Insurance, Wesco, XL Specialties | | 6 years after D&O termination |
| Corporate Policies / GL/PL Policies / State Specific Policies | Various | 8817; 2314; 3103; 1581; 4502; 9385; 4502; 1801; 1801; 7492; 1763; 7404; 7404; 7403 | 5/31/2019 |