# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Hospital Acquisition LLC, *et al.*[1] | ) | Case No. 19-10998 (   ) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS ALL RELATED CHECKS AND TRANSFER REQUESTS

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***") respectfully submit this *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Certain Critical Vendors, (II) Authorizing, But Not Directing, Debtors to Re-Issue Uncashed Prepetition Physician Checks and (III) Authorizing Financial Institutions to Honor and Process All Related*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094).  The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

*Checks and Transfer Requests* (the "***Motion***").  In support of the Motion, the Debtors represent and set forth as follows: [2]

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 364, 503, 1107(a) and 1108, rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Rules 2002-1 and 9013-1(m).

---

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' restructuring, are set forth in greater detail in the *Declaration of James Murray, Chief Executive Officer of Hospital Acquisition LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

01:24471490.2

# BACKGROUND

## A.    General Background

4.      Commencing on May 6, 2019 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  No committees have been appointed or designated.

5.      This Motion incorporates by reference the facts set forth in the First Day Declaration as if fully set forth herein.  Additional facts specific to this Motion are set forth below.

## B.    Critical Vendors

6.      The Debtors operate long-term acute care ("***LTAC***") hospitals throughout the United States.  As described more fully in the First Day Declaration, the Debtors provide specialized clinical services to patients with serious and complicated illnesses or injuries requiring extended hospitalization.  Patients are admitted to LTAC hospitals primarily from general acute care hospitals.  Many of the patients suffer from one or more respiratory, neuromuscular, circulatory, renal, hepatic, cardiac, or oncologic conditions.

7.      To operate the LTAC hospitals, during the last twelve (12) months, the Debtors have relied on more than 3,050 vendors for goods and services.  However, certain vendors provide goods and services that are necessary for the Debtors to provide patient care and are critical to the health and safety of the Debtors' patients.  Although the Debtors desire to resume normal business relationships with all vendors, and all vendors and their goods and services are

01:24471490.2

important to the Debtors' businesses and operations, the immediate need to continue to provide uninterrupted service and maintain quality patient care is the Debtors' foremost concern.

8.     To determine those vendors whose continued, uninterrupted provision of goods and services play a crucial role in maintaining the Debtors' ongoing business operations as a LTAC healthcare provider (such vendors, the "***Critical Vendors***") and the aggregate prepetition amounts owed to such vendors to establish the Critical Vendor Caps (as defined herein), the Debtors, with the assistance of their advisors, have spent significant time reviewing and analyzing their books and records, consulting with operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice.  As part of this process, the Debtors examined a variety of factors, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, direct or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services, in particular, those that will impact patient care, on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

01:24471490.2

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

9.     Applying the criteria set forth above, the Debtors have identified approximately 200 vendors as Critical Vendors, each of which provides goods or services that are essential to the Debtors' operations (the "***Critical Goods and Services***") and each of whom has a balance in the Debtors' centralized accounts payable system.  The Critical Vendors are comprised of (i) physicians (the "***Physician Critical Vendors***") and (ii) other suppliers of Critical Goods and Services (the "***Other Critical Vendors***"), including, but not limited to, providers of medical supplies, pharmacy, blood suppliers, compressed oxygen and gas suppliers, laboratories, transportation providers, specialty treatments (such as gastrointestinal surgery specialists) and host hospitals that provide hoteling services, hospital food, and cleaning and linen services pursuant to purchase services agreements.  In some cases, there is no alternative vendor for the Critical Goods and Services.  In other cases, alternative vendors cannot supply the required Critical Goods and Services in sufficient quantity, quality, or reliability, or they are unable to supply the required Critical Goods and Services on a cost-efficient and timely basis in the appropriate geographic areas.

10.     The Debtors' failure to pay or otherwise honor the Critical Vendors' prepetition claims (the "***Critical Vendor Claims***") may eliminate the Debtors' access to the Critical Goods and Services.  Importantly, the Debtors do business with a majority of the Critical Vendors without the benefit of a contract[3] and, therefore, the Critical Vendors generally are not obligated

---

[3]     The Debtors, however, may need to identify vendors as Critical Vendors even if the Debtors' relationships with those vendors are contractual.  Additionally, for contracts of a short duration, with termination at will provisions, or where the vendor is operating under a purchase order, there is a risk that failure to pay prepetition amounts may result in the counterparties terminating, refusing to renew those contracts or accept a new purchase order.  Accordingly, the relief requested herein should only affect the timing of payment of those Critical Vendor Claims and will not prejudice the rights of other parties in interest.

01:24471490.2

to do business with the Debtors or to honor particular trade terms for future orders. Absent payment of the Critical Vendor Claims, the Critical Vendors may cease doing business with the Debtors or condition the provision of the Critical Goods and Services on onerous trade terms. Any disruption in the supply of the Critical Goods and Services may not only materially damage the Debtors' operations and substantially impair the Debtors' reorganization efforts but, due to the Debtors' operation of LTAC hospitals, may also risk patient safety.

11.    Consequently, the Debtors seek authority, but not direction, to pay Critical Vendor Claims on an interim basis in an aggregate amount not to exceed $1.5 million (the "***Interim Cap***") and on a final basis in an aggregate amount not to exceed $3 million (the "***Final Cap***" and together with the Interim Cap, the "***Critical Vendor Caps***"). In determining the Critical Vendor Caps, the Debtors carefully reviewed all of their vendors to determine which vendors could meet the stringent criteria used to identify the universe of potential Critical Vendors. Thus, the Critical Vendor Caps represent the Debtors' best estimates of how much in prepetition claims need to be paid to ensure a continued supply of Critical Goods and Services during the applicable period.

12.    As noted previously, during the last twelve (12) months, Debtors have done business with more than 3,050 vendors. The Interim Cap and Final Cap represent less than approximately 7.8% and 15%, respectively, of the Debtors' total trade accounts payable estimated at approximately $19 million. Given the current state of the Debtors' businesses, the detailed protocol described herein for determining whether to make a Critical Vendor payment, and the risks associated with non-payment, the Debtors submit that the Critical Vendor Caps are reasonable and appropriate caps on the expenditure of estate funds to satisfy certain prepetition claims.

**C.      Proposed Terms and Conditions for Payment of Critical Vendor Claims**

13.      In return for the payment of Critical Vendor Claims, the Debtors will use commercially reasonable efforts to condition such payment upon each Critical Vendor's agreement to continue supplying goods and services to the Debtors for the duration of these chapter 11 cases on "Customary Trade Terms."[4]  To ensure that the Critical Vendors deal with the Debtors on Customary Trade Terms, the Debtors will require execution by the Other Critical Vendors of a trade agreement substantially in the form of **Exhibit C** attached hereto (each, a "*Trade Agreement*").[5]

14.      The Debtors propose that a Trade Agreement include, without limitation, the following terms:

> (i)      The amount of each Critical Vendor's estimated Critical Vendor Claim, accounting for any setoffs, other credits, and discounts thereto, as mutually determined in good faith by the Critical Vendor and the Debtors (but such amount will be used only for the purposes of determining such Critical Vendor's claim under the Interim Order or Final Order, as applicable, and will not be deemed a claim allowed by the Court, and all rights of all interested persons to object to such claim shall be fully preserved until further order of the Court, unless such claim is waived by the Critical Vendor pursuant to the terms of the Trade Agreement);
>
> (ii)      The Customary Trade Terms between such Critical Vendor and the Debtors, or such other favorable terms as the Critical Vendor and the Debtors may agree, and the Critical Vendor's agreement to provide goods and services in accordance with such terms;
>
> (iii)      The Critical Vendor's agreement not to file or otherwise assert against the Debtors or their estates or any of their respective assets or property any

---

[4]  As used herein, "*Customary Trade Terms*" are defined as the contractual or normal and customary trade terms, practices, and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs) that were most favorable to the Debtors and in effect between the applicable Critical Vendor and the Debtors on a historical basis for the period within 180 days of the Petition Date, or such other trade terms, practices, and programs that are at least as favorable to the Debtors as those that were in effect during such time.

[5]  For the avoidance of doubt, the Physician Critical Vendors will be not required to enter into a Trade Agreement to receive payment for their Critical Vendor Claims.

01:24471490.2

lien (a "*Lien*"), regardless of the statute or other legal authority upon which such Lien is asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors, and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, the Critical Vendor must take whatever actions are necessary to remove such Lien;

(iv)    The Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the applicable order approving this Motion and consents to be bound thereby; and

(v)    The Critical Vendor's agreement that it will not separately seek payment for reclamation claims or claims pursuant to Bankruptcy Code section 503(b)(9) outside the terms of the Interim Order or Final Order, as applicable, unless the Critical Vendor's participation in the program to pay Critical Vendor Claims is terminated.

15.    By this Motion, the Debtors seek only the authority to enter into Trade Agreements when the Debtors determine, in their sole discretion, that payment of the applicable Critical Vendor Claims is necessary to the Debtors' postpetition operations.  The Debtors also seek authority, in their sole discretion when circumstances are appropriate, to pay Critical Vendor Claims in the event that no Trade Agreement has been executed if the Debtors determine, in their business judgment, that payment of the Critical Vendor Claim is necessary for the preservation of the Debtors' estates and a formal Trade Agreement is unnecessary to ensure such Critical Vendor's continued performance on Customary Trade Terms (or such other terms that are mutually agreed to by the Debtors and such Critical Vendor).

16.    If a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms following receipt of payment for a Critical Vendor Claim, or fails to comply with any Trade Agreement, the Debtors seek authorization, but not direction, without further order of the Court, to (i) return the parties to the positions they held immediately prior to entry of the Interim Order; (ii) declare that (a) the Trade Agreement is terminated and (b) any payments made to the Critical Vendor on account of a Critical Vendor Claim be deemed to have

8

been made on account of then-outstanding postpetition claims of such Critical Vendor; and (iii) seek to recover or disgorge any payment made to such Critical Vendor on account of a Critical Vendor Claim to the extent that payments on account of such Critical Vendor Claim exceeds the then-outstanding postpetition claims of such Critical Vendor without giving effect to any rights of setoff, claims, provision for payment of reclamation or section 503(b)(9) claims, or otherwise.

17.     The Debtors further propose that any Trade Agreement terminated as a result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated if: (i) such determination is subsequently reversed by the Court after notice and a hearing following a motion by the Critical Vendor, for good cause shown, on the grounds that the determination was materially incorrect; (ii) the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor that a default had occurred; or (iii) the Debtors reach a favorable alternative agreement with the Critical Vendor.

18.     The Debtors will maintain a matrix summarizing:  (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim; and (iii) the type of goods and services provided by each Critical Vendor.  This matrix shall be updated regularly and a copy provided, upon reasonable request, to:  (a) counsel and other professionals of the agent to the Debtors' postpetition lenders; (b) counsel to any statutory committee appointed in these chapter 11 cases, upon execution of a confidentiality agreement in a form satisfactory to the Debtors; and (c) counsel to the Debtors' prepetition secured lenders. Recipients of the matrix shall keep it confidential and not disclose it to anyone, except their respective professional advisors or as otherwise authorized by the Debtors or the Court.

01:24471490.2

## **RELIEF REQUESTED**

19.     The Debtors submit this Motion pursuant to Bankruptcy Code sections 105(a), 363, 364, 503, 1107(a) and 1108 requesting entry of an interim and final order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "***Interim Order***" and the "***Final Order***," respectively), (i) authorizing, but not directing, the Debtors to pay the Critical Vendor Claims, subject to the Critical Vendor Caps, as applicable; (ii) authorizing, but not directing, the Debtors to re-issue uncashed, prepetition physician checks; (iii) authorizing banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts authorized pursuant to the Interim Order or Final Order, as applicable, whether presented before or after the Petition Date; and (iv) granting related relief.

20.     The Debtors request that the Court schedule a hearing (the "***Final Hearing***") on the entry of the Final Order within thirty (30) days of the date hereof or as soon thereafter as practicable.

21.     Any and all payments arising under or in connection with or authorized to be made by the Motion or the Interim Order and Final Order shall be subject to, as applicable, any interim and final orders of the Court in these chapter 11 cases (i) authorizing the Debtors' use of cash collateral (the "***Cash Collateral***") and/or (ii) approving the Debtors' debtor-in-possession financing (the "***Proposed Financing***"), and the related budgets and projections as approved by the lenders as part of the Debtors' use of Cash Collateral and Proposed Financing, provided that no Cash Collateral shall be used until all DIP Obligations have been indefeasibly paid in full in cash and the DIP Facility terminated.

01:24471490.2

## SUPPORTING AUTHORITY

**A.    The Court Should Authorize Payment of the Critical Vendor Claims**

22.    As stated above, payment of the Critical Vendor Claims is essential to the provision of high-quality patient care and the continued operation of the Debtors' businesses.  In turn, the maintenance of the Debtors' businesses during these chapter 11 cases is crucial to the Debtors' ability to pursue restructuring alternatives and preserve going-concern value for the benefit of all of the Debtors' stakeholders.  As a result, payment of the Critical Vendor Claims is appropriate under the Bankruptcy Code and should be authorized by the Court.

23.    Courts consistently authorize the payment of prepetition obligations in appropriate circumstances.  *See, e.g., In re CoServe, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983) (affirming bankruptcy court's decision authorizing payment of prepetition claims of certain of the debtor's suppliers); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In doing so, these courts rely on several legal theories rooted in Bankruptcy Code sections 105(a), 363(b), 364, 1107(a), and 1108 to support the payment of prepetition critical vendor claims as provided herein.

24.    Courts have authorized payment of prepetition obligations under Bankruptcy Code section 363 where a sound business purpose exists for doing so.  *See Ionosphere Clubs*, 98 B.R. at 175 (noting section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).  Once a debtor has articulated a valid business justification, there "'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  This business judgment rule applies in chapter 11 cases like these.  *Id.* (noting that the "Delaware business judgment rule principles have 'vitality by analogy' in Chapter 11").  Additionally, where, as here, the relief at issue involves a request impacting the trade terms between a debtor and the vendor, the relief may, where an appropriate showing has been made, be approved pursuant to Bankruptcy Code section 364.  *See In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002) (stating that payments to critical trade vendors for prepetition obligations have further support when debtor seeks "the extension of credit under section 364 on different than usual terms, terms that might include the payment of a prepetition obligation").

25.    Payment of prepetition claims also may be authorized as a valid exercise of a debtor's fiduciaries duties.  "A debtor in possession, like a trustee, is a fiduciary holding the bankruptcy estate and operating the business for the benefit of its creditors and equity owners." *In re CoServ L.L.C.*, 273 B.R. at 497.  Indeed, a debtor in possession has a duty to protect and preserve the value of its estate, including the business' going-concern value, and may pay prepetition claims if necessary for the debtors to fulfill that duty.  *Id.*  ("There are occasions when this duty can only be fulfilled by the preplan satisfaction of a prepetition claim.").  The *CoServ* court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim.

> Third, there is no practical or legal alternative by which the debtor
> can deal with the claimant other than by payment of the claim.

*Id.* at 498.

26.      Finally, a payment on account of a prepetition claim may be justified pursuant to

Bankruptcy Code section 105 and under the "doctrine of necessity."  Bankruptcy Code section

105(a) authorizes the Court to enter any order "necessary or appropriate" to carry out the

provisions of the Bankruptcy Code.  *See* 11 U.S.C. § 105(a).  Under the doctrine of necessity, the

Court can authorize payment of certain prepetition claims prior to the completion of the

reorganization process where the payment of such claims is necessary to the reorganization.[6]  *See*

*In re Lehigh & New England Ry. Co.*, 675 F.2d at 581 (authorizing payment of creditors' claims

under "necessity of payment" doctrine); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d

Cir. 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor cannot survive absent

payment of certain prepetition claims, the doctrine of necessity should be invoked to permit

payment); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting

that the debtors may pay prepetition claims that are essential to continued operation of business).

27.      The Debtors respectfully submit that payment of the Critical Vendor Claims is

supported by the foregoing authority and should be authorized by the Court.  As discussed

above, the Debtors have determined, in the sound exercise of their business judgment, that the

Critical Goods and Services provided by the Critical Vendors are vital to the provision of high-

---

[6] The Court's power to utilize the doctrine of necessity in chapter 11 cases derives from the Court's inherent equity powers and its statutory authority under section 105(a).  The United States Supreme Court first articulated the doctrine of necessity over a century ago, in *Miltenberger v. Logansport Railway Company*, 106 U.S. 286 (1882), in affirming the lower court's authorization of the use of receivership funds to pay pre-receivership debts owed to employees, vendors, and suppliers, among others, when such payments were necessary to preserve the receivership property and the integrity of the business in receivership.  *See id.* at 309–14.  The modern application of the doctrine of necessity is largely unchanged from the Court's reasoning in *Miltenberger*.  *See In re Lehigh & New England Ry.*, 657 F.2d 570, 581–82 (3d Cir. 1981) ("[I]n order to justify payment under the 'necessity of payment' rule, a real and immediate threat must exist that failure to pay will place the [debtor's] continued operation . . . in serious jeopardy.").

01:24471490.2

quality care and the Debtors' continuing business operations.  If certain Critical Vendors are unwilling to provide Critical Goods and Services because of their outstanding prepetition Claims, the Debtors' operations would suffer dramatically, compromising the value of the Debtors' estates to the detriment of all creditors.

28.    Certain Critical Vendors may assert claims falling under the Perishable Agricultural Commodities Act of 1930 ("*PACA*").  In the ordinary course of business the Debtors purchase a variety of consumable goods from Critical Vendors, essential for the operations of their cafés.  Pursuant to PACA, vendors dealing in covered commodities asserting claims ("*PACA Claims*") in chapter 11 cases are granted priority status ahead of all other secured and unsecured creditors.  The Debtors believe that a certain portion of the goods purchased from vendors may qualify as "perishable agricultural commodities" under PACA, and such vendors will be eligible to assert PACA Claims, elevating these potential claims to administrative priority status under Bankruptcy Code section 503(b)(9).  To ensure that the Debtors continue to receive a constant supply of fresh and frozen fruits and vegetables postpetition, the Debtors seek authority, but not direction, in their sole discretion, to continue to pay in the ordinary course of business and consistent with their historical practices Critical Vendors who may assert PACA Claims.  The Debtors believe payments to these Critical Vendors will not prejudice other creditors in these chapter 11 cases, and such payments, in the ordinary course, are necessary for the continued operation of the Debtors' businesses.

29.    Any interruption or delay in the supply of the Critical Goods and Services provided by the Critical Vendors could significantly impact patient care.  Also, any doubt about the Debtors' ability to provide appropriate care without interruption may result in a decrease in patient referrals.  Even a small decrease in referrals could be detrimental to the Debtors'

14

businesses and going-concern value.  In turn, the preservation and protection of the Debtors'

businesses through ongoing relationships with the Critical Vendors provides a sufficient business

justification under Bankruptcy Code sections 105 and 363 for payment of the Critical Vendor

Claims, even if such payment were deemed to be outside the ordinary course of business.  Such

payment is further supported by Bankruptcy Code section 364 as the relief requested in this

Motion contemplates that the payment of the Critical Vendor Claims be made, to the extent

possible, to Critical Vendors that agree to extend Customary Trade Terms to the Debtors.

30.    The Debtors also submit that payment of the Critical Vendor Claims will allow

them to discharge their fiduciary duties as debtors in possession under Bankruptcy Code sections

1107(a) and 1108 as payment of the Critical Vendor Claims meets each prong of the *CoServ* test.

First, as described in the protocol above, the Debtors have narrowly tailored the definition of

"Critical Vendors" to encompass only those vendors that provide Critical Goods and Services

and may refuse to provide those goods and services absent payment of their prepetition claims.

Second, because of the essential nature of the Critical Goods and Services and the difficulty

associated with finding alternate sources for those Critical Goods and Services, the potential

harm and economic disadvantage that would stem from the failure of any of the Critical Vendors

to perform, as further described above, is disproportionate to the amount of any Critical Vendor

Claim sought to be paid.  Third, with respect to each of the Critical Vendor Claims, the Debtors

have examined other legal options short of payment of such Critical Vendor Claims and have

determined that there exists no practical or legal alternative to payment of the Critical Vendor

Claims.

**B.      Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

31.      The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to the Proposed Financing and Cash Collateral, provided that no cash collateral shall be used until all DIP Obligations have been indefeasibly paid in full in cash and the DIP Facility terminated.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Critical Vendor Claims.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfers in respect of the relief requested in this Motion.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

32.      For a debtor to obtain relief to make payments within twenty-one (21) days of the Petition Date, it must establish that making such payments satisfies the requirements mandated by Bankruptcy Rule 6003—namely, the relief requested is necessary to avoid "immediate and irreparable harm."

33.      As described above, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

01:24471490.2

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

34.     Given the nature of the relief requested herein, the Debtors respectfully request a waiver of (a) the notice requirements under Bankruptcy Rule 6004(a) and (b) the fourteen (14) day stay under Bankruptcy Rule 6004(h), to the extent that either rule is applicable.

## DEBTORS' RESERVATION OF RIGHTS

35.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code section 365.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

36.     The Debtors will provide notice of this Motion to (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agents under the Debtors' prepetition credit facilities; (d) counsel to the lender under the Debtors' proposed postpetition debtor-in-possession financing; and (e) the Debtors' banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  In light of the nature of the relief requested in this Motion, the Debtors respectfully submit that no further notice is necessary.

01:24471490.2

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (i) enter the proposed Interim Order and Final Order substantially in the forms annexed hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in the Motion and (ii) grant such other and further relief as may be just and proper.

Dated: May 7, 2019
      Wilmington, Delaware

    */s/ Jaime Luton Chapman*
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Joseph M. Mulvihill (No. 6061)
Betsy L. Feldman (No. 6410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

– and –

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Scott Alberino  (*pro hac vice* motion pending)
Kevin M. Eide (*pro hac vice* motion pending)
2001 K Street, N.W.
Washington, DC 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Sarah Link Schultz (*pro hac vice* motion pending)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

**Exhibit A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hospital Acquisition LLC, *et al.*[1] | ) | Case No. 19-10998 (   ) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **RE: Docket No. ___** |

## INTERIM ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS ALL RELATED CHECKS AND TRANSFER REQUESTS

Upon the Motion[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") for entry of this Interim Order pursuant to Bankruptcy Code sections 105(a), 363(b), 364, 503, 1107(a), and 1108 (i) authorizing, but not directing, the Debtors to pay the Critical Vendor Claims, (ii) authorizing, but not directing, the Debtors to re-issue uncashed prepetition checks and (iii) authorizing banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts authorized by this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094).  The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

[2] All capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

Interim Order whether presented before or after the Petition Date, all as further described in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding in accordance with 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and upon the record of any hearing been held to consider the relief requested in the Motion; and upon the First Day Declaration and all proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is granted on an interim basis to the extent provided herein.

2.      The Debtors are hereby authorized, but not required, to pay, in their sole discretion, without further order of this Court, the Critical Vendor Claims.  Notwithstanding the foregoing, payments on account of Critical Vendor Claims shall not exceed $1.5 million without further order of this Court.

3.      The Debtors are hereby authorized, but not required, to re-issue uncashed prepetition physician checks, in their sole discretion, without further order of this Court.

4.      The Debtors shall undertake appropriate efforts to cause the Critical Vendors to enter into Trade Agreements with the Debtors substantially in the form of the letter annexed as Exhibit C to the Motion as a condition to payment of the Critical Vendor Claims; *provided*, *however*, the Physician Critical Vendors are not required to enter into a Trade Agreement to receive payment for their Critical Vendor Claims.

5.      The Debtors are authorized to (i) make payment on account of Critical Vendor Claims in the absence of a Trade Agreement and (ii) subject to the voluntary, written agreement (which may be by email) of the affected Critical Vendor, modify the Customary Trade Terms[2] (including contractual terms), even if less favorable to the Debtors, in the absence or as part of a Trade Agreement, after the Debtors have undertaken appropriate efforts to cause the Critical Vendor to execute a Trade Agreement and if the Debtors determine that failure to pay the Critical Vendor Claim presents a material risk of irreparable harm to the Debtors' businesses.

6.      If a Critical Vendor refuses to supply the applicable Critical Goods and Services to the Debtors on Customary Trade Terms following receipt of payment on its Critical Vendor Claim or fails to comply with any Trade Agreement entered into by such Critical Vendor and the Debtors, the Debtors may, in their sole discretion, and without further order of this Court, (i) declare that (a) any Trade Agreement between the Critical Vendor and the Debtors is terminated and (b) any payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to have been made in payment of then-outstanding postpetition claims of such Critical Vendor, and (ii) seek to recover any payments made to such Critical Vendor on account

---

[2] As used herein, "***Customary Trade Terms***" are defined as the contractual or normal and customary trade terms, practices, and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs) that were most favorable to the Debtors and in effect between the applicable Critical Vendor and the Debtors on a historical basis for the period within 180 days of the Petition Date, or such other trade terms, practices, and programs that are at least as favorable to the Debtors as those that were in effect during such time.

01:24471490.2

of its Critical Vendor Claim to the extent that payments on account of such Critical Vendor Claim exceed the postpetition claims of such Critical Vendor then outstanding without giving effect to any rights of setoff, claims, provision for payment of reclamation or section 503(b)(9) claims, or otherwise.  In the event that a Trade Agreement is terminated or a Critical Vendor refuses to supply the applicable Critical Goods and Services to the Debtors following receipt of payment on its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), it is the explicit intention of this Court to return the parties to their position immediately prior to the entry of this Interim Order with respect to all prepetition claims.

7.      The Debtors may, in their sole discretion, reinstate a terminated Trade Agreement if: (i) such determination is subsequently reversed by this Court after notice and a hearing following a motion by the Critical Vendor, for good cause shown, that the determination was materially incorrect; (ii) the underlying default under the Trade Agreement was fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor that a default had occurred; or (iii) the Debtors reach a favorable alternative agreement with the Critical Vendor.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Interim Order in accordance with the Motion.

9.       The Debtors shall maintain a matrix summarizing:  (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim; and (iii) the type of goods and services provided by each Critical Vendor.  This matrix shall be updated regularly and a copy provided, upon reasonable request, to:  (a) counsel and other professionals of the agent to the Debtors' postpetition lenders; (b) counsel to any statutory

01:24471490.2

committee appointed in these chapter 11 cases, upon execution of a confidentiality agreement in a form satisfactory to the Debtors; and (c) counsel to the Debtors' prepetition secured lenders. Recipients of the matrix shall keep it confidential and not disclose it to anyone, except their respective professional advisors or as otherwise authorized by the Debtors or this Court.

10.     The deadline by which objections to the Motion and the Final Order must be filed is _____, 2019, at 4:00 p.m. (ET).   Objections must be served on:  (a) proposed counsel to the Debtors, (i) Akin Gump Strauss Hauer & Feld LLP, 2001 K Street, N.W., Washington, DC 20006, Attn: Kevin Eide, Esq. (keide@akingump.com) and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: M. Blake Cleary, Esq. (mbcleary@ycst.com); (b) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware, 19801, Attn: Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); (c) counsel to the lender under the Debtors' proposed postpetition debtor-in-possession financing, King & Spalding LLP, 1185 Avenue of the Americas, New York, New York 10036, Attn: Arthur Steinberg, Esq. (asteinberg@kslaw.com); and (d) counsel to any statutory committee appointed in these chapter 11 cases.   A final hearing, if required, on the Motion will be held on _____, 2019, at _____ __.m. (ET).   If no objections are filed to the Motion, this Court may enter the Final Order without further notice or hearing.

11.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the

Debtors' designation of any particular check or electronic payment request as being approved by this Interim Order.

12.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Interim Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, the creation of an administrative priority claim on account of the prepetition obligations sought to be paid, or the assumption or adoption of any contract or agreement under Bankruptcy Code section 365.

13.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

14.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, this Interim Order shall be immediately effective and enforceable upon its entry.

15.     To the extent that the Motion is inconsistent with this Interim Order, the terms of this Interim Order shall govern.

16.     This Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Interim Order.


Dated: Wilmington, Delaware
       _____, 2019                   _____

                                              United States Bankruptcy Judge

01:24471490.2

**Exhibit B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Hospital Acquisition LLC, *et al.*[1] | ) | Case No. 19-10998 (   ) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **RE: Docket Nos. ___** |

### FINAL ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS ALL RELATED CHECKS AND TRANSFERS

Upon the Motion[2] of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") for entry of this Final Order pursuant to Bankruptcy Code sections 105(a), 363(b), 364, 503, 1107(a), and 1108 (i) authorizing the Debtors to pay the Critical Vendor Claims; and (ii) authorizing banks and other financial institutions to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts authorized by this Final Order whether presented before or after the Petition Date, all as further described in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094).  The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

[2] All capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding in accordance with 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and upon the record of any hearing been held to consider the relief requested in the Motion; and upon the First Day Declaration and all proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is granted on a final basis to the extent provided herein.

2.      The Debtors are hereby authorized, but not required, to pay, in their sole discretion, without further order of this Court, the Critical Vendor Claims.  Notwithstanding the foregoing, payments on account of Critical Vendor Claims shall not exceed $3.0 million without further order of this Court.

3.      The Debtors are hereby authorized, but not required, to re-issue uncashed prepetition physician checks, without further order of this Court.

4.      The Debtors shall undertake appropriate efforts to cause the Critical Vendors to enter into Trade Agreements with the Debtors substantially in the form of the letter annexed as Exhibit C to the Motion as a condition to payment of the Critical Vendor Claims; *provided*,

01:24471490.2

*however*, the Physician Critical Vendors are not required to enter into a Trade Agreement to receive payment for their Critical Vendor Claims

5.      The Debtors are authorized to (i) make payment on account of Critical Vendor Claims in the absence of a Trade Agreement and (ii) subject to the voluntary, written agreement (which may be by email) of the affected Critical Vendor, modify the Customary Trade Terms[2] (including contractual terms), even if less favorable to the Debtors, in the absence or as part of a Trade Agreement, after the Debtors have undertaken appropriate efforts to cause the Critical Vendor to execute a Trade Agreement and if the Debtors determine, in their sole discretion, that failure to pay the Critical Vendor Claim presents a material risk of irreparable harm to the Debtors' businesses.

6.      If a Critical Vendor refuses to supply the applicable Critical Goods and Services to the Debtors on Customary Trade Terms following receipt of payment on its Critical Vendor Claim or fails to comply with any Trade Agreement entered into by such Critical Vendor and the Debtors, the Debtors may, in their sole discretion, and without further order of this Court, (i) declare that (a) any Trade Agreement between the Critical Vendor and the Debtors is terminated and (b) any payments made to the Critical Vendor on account of its Critical Vendor Claim be deemed to have been made in payment of then-outstanding postpetition claims of such Critical Vendor, and (ii) seek to recover any payments made to such Critical Vendor on account of its Critical Vendor Claim to the extent that payments on account of such Critical Vendor Claim exceed the postpetition claims of such Critical Vendor then outstanding without giving

---

[2] As used herein, "***Customary Trade Terms***" are defined as the contractual or normal and customary trade terms, practices, and programs (including credit limits, pricing, cash discounts, timing of payments, allowances, rebates, normal product mix and availability and other applicable terms and programs) that were most favorable to the Debtors and in effect between the applicable Critical Vendor and the Debtors on a historical basis for the period within 180 days of the Petition Date, or such other trade terms, practices, and programs that are at least as favorable to the Debtors as those that were in effect during such time.

effect to any rights of setoff, claims, provision for payment of reclamation or section 503(b)(9) claims, or otherwise.  In the event that a Trade Agreement is terminated or a Critical Vendor refuses to the applicable Critical Goods and Services to the Debtors following receipt of payment on its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), it is the explicit intention of this Court to return the parties to their position immediately prior to the entry of the Interim Order with respect to all prepetition claims.

7.      The Debtors may, in their sole discretion, reinstate a terminated Trade Agreement if: (i) such determination is subsequently reversed by this Court after notice and a hearing following a motion by the Critical Vendor, for good cause shown, that the determination was materially incorrect; (ii) the underlying default under the Trade Agreement was fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor that a default had occurred; or (iii) the Debtors reach a favorable alternative agreement with the Critical Vendor.

8.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Final Order in accordance with the Motion.

9.      The Debtors shall maintain a matrix summarizing:  (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim; and (iii) the type of goods and services provided by each Critical Vendor.  This matrix shall be updated regularly and a copy provided, upon reasonable request, to:  (a) counsel and other professionals of the agent to the Debtors' postpetition lenders; (b) counsel to any statutory committee appointed in these chapter 11 cases, upon execution of a confidentiality agreement in a form satisfactory to the Debtors; and (c) counsel to the Debtors' prepetition secured lenders.

01:24471490.2

Recipients of the matrix shall keep it confidential and not disclose it to anyone, except their respective professional advisors or as otherwise authorized by the Debtors or this Court.

10.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved by this Final Order.

11.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Final Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, the creation of an administrative priority claim on account of the prepetition obligations sought to be paid, or the assumption or adoption of any contract or agreement under Bankruptcy Code section 365.

12.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, this Final Order shall be immediately effective and enforceable upon its entry.

13.     To the extent that the Motion is inconsistent with this Final Order, the terms of this Final Order shall govern.

14.     This Court retains jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Final Order

Dated: Wilmington, Delaware
              _____, 2019          _____

                                            United States Bankruptcy Judge

## Exhibit C

**Form of Trade Agreement**

_____, 2019

TO:    [Critical Vendor]
        [Name]
        [Address]

Dear Valued Vendor:

As you may be aware, Hospital Acquisition LLC and certain of its affiliates (collectively, the "***Company***") filed voluntary petitions for relief (the "***Bankruptcy Cases***") under chapter 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") on [●], 2019 (the "***Petition Date***").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay claims of certain critical vendors in recognition of the importance of the Company's relationship with such vendors and the Company's desire that the Bankruptcy Cases have as little effect as possible on the Company's patients and ongoing business operations.  On [●], 2019, the Bankruptcy Court entered an [interim/final] order (the "***Order***") authorizing the Company, under certain conditions, to pay the prepetition claims of certain creditors that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.  [The Company has asked the Bankruptcy Court to schedule a final hearing and thereafter grant the relief provided in the Order on a final basis.]

Pursuant to the Order, to receive payment on account of prepetition claims, you must agree to continue to supply goods and/or services to the Company based on "***Customary Trade Terms***."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability, and other applicable terms and programs) that were most favorable to the Company and in effect between you and the Company within one-hundred eighty (180) days of the Petition Date, or such other trade terms, practices, and programs that are at least as favorable to the Company as those that were in effect during such time.

For purposes of administration of this critical vendor program (the "***Critical Vendor Program***"), as authorized by the Bankruptcy Court and in accordance with the terms of the Order, [**Name of Vendor**] and the Company both mutually agree as follows (the "***Agreement***"):

    (a) The estimated balance of your prepetition claim (net of any setoffs, credits, or discounts) (the "***Critical Vendor Claim***") is $_____.  Your Critical Vendor Claim does not constitute a claim allowed by the Bankruptcy Court in the Bankruptcy Cases, and signing this Agreement does not excuse you from any requirement of filing a proof of claim in the Bankruptcy Cases.

    (b) The Company shall pay $_____ towards the Critical Vendor Claim (the "***Payment***"), subject to the terms and conditions of this Agreement, and this Payment will be applied to your most recent invoices, [**it being understood that the remaining amount of your Critical Vendor Claim shall be forever**

2

**released and waived/it being understood that the remaining amount of your Critical Vendor Claim is $\_\_\_\_].**

(c) You agree to supply goods and/or services to the Company in accordance with Customary Trade Terms, and the Company agrees to pay you in accordance with such Customary Trade Terms.

(d) The open trade balance or credit line that **[Name of Vendor]** will extend to the Company for the provision of postpetition goods or performance of postpetition services is $_____.

(e) In consideration for the Payment, you agree not to file or otherwise assert against the Company or their estates or any of their respective assets or property (real or personal) any lien (a "*Lien*") or claim for reclamation ("*Reclamation Claim*") or claim under Bankruptcy Code section 503(b)(9) (a "*503(b)(9) Claim*"), regardless of the statute or other legal authority upon which such Lien or Reclamation Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim, or 503(b)(9) Claim, you shall take (at your own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim unless your participation in the Critical Vendor Program is terminated.

(f) You will hereafter extend to the Company all Customary Trade Terms, which are:

**[ADD INDIVIDUALIZED SET OF CUSTOMARY TRADE TERMS OR ATTACH/CROSS-REFERENCE EXISTING AGREEMENT]**

The Payment may occur upon execution of this letter by a duly authorized representative of **[Name of Vendor]** and the return of this letter to the Company.  Your execution of this letter and return of the same to the Company constitutes an agreement by **[Name of Vendor]** and the Company:

i. to be bound by the Customary Trade Terms (as modified herein) and, subject to the reservations set forth in the Order, to the amount of the Critical Vendor Claim set forth above;

ii. that, at least during the pendency of the Bankruptcy Cases, **[Name of Vendor]** will continue to supply the Company with goods and/or services pursuant to the Customary Trade Terms (as modified herein) and that the Company will pay for such goods and/or services in accordance with the Customary Trade Terms (as modified herein);

iii. that **[Name of Vendor]** has reviewed the terms and provisions of the Order and that it consents to by bound by such terms, except as modified herein;

3

iv.  you will not separately seek payment for Reclamation Claims, 503(b)(9) Claims, or similar claims outside of the terms of the Order unless its participation in the Critical Vendor Program is terminated;

v.  that if either the Critical Vendor Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Critical Vendor Claim will be deemed to have been in payment of postpetition obligations owed to you, and you will immediately repay to the Company any payments made to you on account of your Critical Vendor Claim to the extent that the aggregate amount of such payments exceeds such postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense;

vi.  that if the Company shall be in default under this Agreement, you shall have no obligation to supply goods and/or services to the Company on Customary Trade Terms (as modified herein) until the Company cures such default and **[Name of Vendor]** shall have the right to terminate this Agreement upon written notice to the Company detailing the Company's defaults hereunder (which the Company shall have the right to dispute) and the Company's failure to cure such default within five (5) business days of such notice, in which event you retain all sums paid to you hereunder on account of its Critical Vendor Claim.

The Company and you also hereby agree that any dispute with respect to this Agreement, the Order, and/or your participation in the Critical Vendor Program shall be determined by the Bankruptcy Court.

Please indicate your agreement to the terms hereof by returning a signed copy of this letter.  If you have any questions about this Agreement or our restructuring process, please do not hesitate to call **[Contact Person]** at **[phone number]**.

Sincerely,

[Debtor Entity]

By:  _____
            [NAME]

Agreed and Accepted by:
[Critical Vendor]

By:  _____
Its:  _____

Dated:  _____

4