**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hospital Acquisition LLC, *et al.*[1] | ) | Case No. 19-10998 (BLS) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I)
AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING
AND TO USE CASH COLLATERAL; (II) GRANTING PRIMING LIENS
AND PROVIDING SUPER PRIORITY CLAIMS; (III) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
AND (IV) PRESCRIBING THE FORM AND MANNER OF NOTICE AND
<u>SETTING THE TIME FOR THE FINAL HEARING</u>**

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***") respectfully submit this *Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and to Use Cash Collateral; (II) Granting Priming Liens and Providing Superpriority Claims; (III) Granting Adequate Protection for Prepetition Secured Parties; and (IV) Prescribing the Form and Manner of Notice*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094). The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

*and Setting the Time for the Final Hearing* (the "**Motion**"). In support of the Motion, the Debtors represent and set forth as follows: [2]

## JURISDICTION

1.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.       Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, 364, 503 and 507, rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1, 4001-1, 4001-2 and 9013-1.

---

[2] A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this Motion and the Debtors' restructuring, are set forth in greater detail in the *Declaration of James Murray, Chief Executive Officer of Hospital Acquisition LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). In support of this Motion and the DIP Facility, the Debtors have also filed the *Declaration of Geoffrey Coutts in Support of the Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing and to Use Cash Collateral; (II) Granting Priming Liens and Providing Super Priority Claims; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing* (the "***Coutts Declaration***").

## RELIEF REQUESTED

4.      By this Motion, the Debtors request the entry of an interim order (the "***Interim Order***") substantially in the form attached hereto as **Exhibit B**, and a final order (the "***Final Order***") which, without limitation:

    (i)       authorize the Debtors to obtain senior secured, postpetition financing on a superpriority basis consisting of a senior secured superpriority revolving credit facility ("***DIP Facility***") pursuant to the terms and conditions of that certain *Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "***DIP Agreement***"), by and among the Borrowers (as defined below), Holdings (as defined below), as guarantor, White Oak Healthcare Finance, LLC, as administrative agent, collateral agent and lender thereto (in such capacities, the "***DIP Agent***" or "***DIP Lender***"), substantially in the form of **Exhibit A**, attached hereto;[3]

    (ii)      authorize the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents (as defined in the DIP Agreement) and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, in accordance with the terms hereof and thereof, collectively, and together with the DIP Agreement, the "***DIP Documents***") and to perform such other acts as may be necessary, desirable or appropriate in connection with the DIP Documents;

    (iii)     grant to the DIP Lender on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as defined in the DIP Agreement, the "***DIP Obligations***") allowed superpriority administrative expense claim status in each of the Debtors' chapter 11 cases and any successor cases, subject only to the Carve Out (as defined below);

    (iv)     grant to the DIP Lender under the DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("***Cash Collateral***"), which liens shall be subject to the priorities set forth in the Interim DIP Order and the Final Order;

---

[3] Subject to the entry of the Final Order, all Existing Debt (as defined herein) and all accrued and unpaid interest thereon and fees and expenses shall be fully-rolled into the DIP Facility and shall constitute DIP Obligations (as defined herein).

(v)      authorize the Debtors, subject to entry of a Final Order, to cash collateralize the letters of credit issued pursuant to the Prepetition Facility (as defined below) pursuant to the terms of the Prepetition Loan Documents (as defined below);

(vi)      authorize the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the Interim Order, the Final Order and the DIP Documents;

(vii)      vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order and the Final Order, including the turnover of cash collateral by the Borrowers to the Prepetition Lender (as defined herein) in repayment of the Existing Debt (as defined herein) owing under the Prepetition Facility;

(viii)      authorize the Debtors to use, on the terms described herein, the Prepetition Collateral (as defined below), including the Term Facility Priority Collateral as defined in the Intercreditor Agreements (as defined below);

(ix)      provide adequate protection to the Prepetition Term Facility Lender Parties (as defined below) for any diminution in value of their interests in the Term Facility Priority Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Term Facility Priority Collateral, and the priming of their respective interests in the Term Facility Priority Collateral (including by the Carve Out) ("***Diminution in Value***"); and

(x)      schedule a final hearing ("***Final Hearing***") to consider the relief requested in the DIP Motion, on a final basis, and approving the form of notice with respect to the Final Hearing.

## SUMMARY OF THE DIP AGREEMENT

5.      As required by Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the following is a summary of the material terms of the DIP Loan agreement and the Interim Order:[4]

| Term | Summary | Reference |
|---|---|---|
| **Borrower**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | LifeCare Holdings LLC ("*LifeCare Holdings*"), New LifeCare Hospitals LLC, New LifeCare Hospitals of Chester County LLC, New LifeCare Hospitals of Milwaukee LLC, New LifeCare Hospitals of North Carolina LLC, New LifeCare Hospitals of Pittsburgh LLC, New LifeCare Hospitals Management Services LLC, New NextCare Specialty Hospital of Denver LLC, New LifeCare REIT 1 LLC, New LifeCare Hospitals of Mechanicsburg LLC, New Pittsburgh Specialty Hospital LLC, New LifeCare Hospitals of Dayton LLC, New LifeCare Hospitals of Northern Nevada LLC, New LifeCare Hospitals of South Texas LLC, New LifeCare Hospitals of North Texas LLC. New San Antonio Specialty Hospital LLC, New LifeCare REIT 2 LLC, New LifeCare Hospital at Tenaya LLC, New LifeCare Hospitals of Sarasota LLC, LifeCare Behavioral Health Hospital of Pittsburgh LLC, LifeCare Pharmacy Services LLC (collectively, the "*Borrowers*"). | DIP Agreement, Preamble, Schedule A; Interim Order, Preamble. |
| **Guarantors**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Hospital Acquisition LLC ("*Hospital Acquisition*") and Hospital Acquisition Intermediate Sub LLC ("*Holdings*"). | DIP Agreement, Definition; Interim Order, Preamble |
| **DIP Lender**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | White Oak Healthcare Finance, LLC (the "*DIP Agent*" or "*DIP Lender*"). | DIP Agreement, Preamble; Interim Order Preamble. |
| **DIP Facility**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | A priming senior secured superpriority revolving credit facility in an aggregate principal amount of up to approximately $57.7 million (including $15 million of incremental liquidity). | DIP Agreement, "Guarantors"; Interim Order, Preamble. |
| **Borrowing**<br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | To prevent immediate and irreparable harm to the Debtors' estates, from the entry of the Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Date (as defined herein), and subject to the terms, conditions, limitations on availability and reserves (as applicable) set forth in the DIP Documents and the Interim Order, the Debtors are hereby authorized to borrow under the DIP Facility, in an aggregate outstanding principal amount so that the outstanding balance of the DIP Facility (after taking into | DIP Agreement, § 1.1; Interim Order ¶ 3. |

---

[4]  This statement is a summary of certain terms and conditions set forth in the DIP Agreement and Interim Order.  Refer to the DIP Agreement for a full and complete description of the DIP Facility.  To the extent this statement is inconsistent with the DIP Agreement, the DIP Agreement shall control.  To the extent this statement is inconsistent with the Interim Order, the Interim Order shall control.  To the extent the Interim Order and DIP Agreement conflict, the Final Order shall control.

| Term | Summary | Reference |
|------|---------|-----------|
| | account the repayment of the Existing Debt as authorized under the Interim Order, but without regard to the issued and outstanding letter of credit obligations) shall not exceed $27,000,000 (the "**Interim Financing**"), incurred pursuant to, and in accordance with, the Interim Order and the DIP Documents.<br><br>The Debtors are seeking authority to borrow an aggregate principal amount of up to $57.7 million on a final basis (including $15 million of incremental liquidity), subject to the terms and conditions of the DIP Facility. | |
| **Use of Proceeds**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | As a condition to entry into the DIP Agreement, the extension of credit under the DIP Facility and the use of Cash Collateral in accordance with the terms of the Interim Order, the DIP Lender requires, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances as permitted in the DIP Agreement, and as set forth in paragraphs 19 and 20 hereof, the "*Budget*"), solely for: (a) working capital and letters of credit, including, subject to the Final Order, the cash collateralization of letters of credits issued pursuant to the Prepetition Facility; (b) permitted payment of costs of administering the Cases, including any payments on account of the Adequate Protection described herein; (c) payment of such other prepetition obligations consented to by the DIP Agent in its sole discretion, and as approved by the Court; (d) payment of interest, fees and expenses (including without limitation, legal and other professionals' fees and expenses of the DIP Agent) and all other "Obligations" owed under the Prepetition Loan Documents and the DIP Documents; and (e) other general corporate purposes of the Debtors permitted by the Budget and the DIP Documents. | Interim Order ¶¶ I(v), 9. |
| **Interest Rates**<br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | *Non-Default*:  Interest is payable at the Base Rate[5] *plus* the Applicable Margin.[6]<br><br>*Default Rate*:  Default interest rate determined by adding two percent (2.00%) per annum to the Applicable Margin then in effect for the Revolving Loans (plus the Base Rate). | DIP Agreement, § 1.2. |
| **Maturity Date / Termination Date**<br>Fed. R. Bankr. P. | The scheduled maturity date is November 6, 2019.  In addition, the maturity date of the DIP Facility may be accelerated under certain circumstances set forth in section 7.1 of the DIP | DIP Agreement, "Scheduled Termination Date," |

[5] "***Base Rate***" means, for any day, an interest rate equal to the greater of (a) one percent (1.00%) per annum and (b) the LIBOR Index Rate, as adjusted as of each LIBOR Index Adjustment Date.

[6] "***Applicable Margin***" means LIBOR Index Rate plus 8.50% per annum.

| Term | Summary | Reference |
|---|---|---|
| 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | Agreement. | "Termination Date," and § 7.1. |
| **Conditions to Closing / Borrowing** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Agreement includes several conditions to closing, including (i) entry of the Interim Order within three Business Days after the Filing Date, (ii) entry of the First-Day Orders within three (3) Business Days after the Filing Date, (iii) receipt by the DIP Agent of an executed copy of the DIP Agreement and all other closing documents, (iv) receipt by the DIP Agent of the fully executed DIP Acknowledgments, (v) receipt by the DIP Agent of the duly executed Borrower Stipulations, (vi) confirmation of the continued operation of the Borrowers' cash management system, (vii) receipt by the DIP Agent of the Borrowers' "first-day" motions, (viii) receipt by the DIP Agent of the Budget, (ix) receipt by the DIP Agent of reasonably requested documents relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Transactions, (x) receipt by the DIP Agent (or its relevant affiliates) of payment of all outstanding fees then due and payable under the DIP Fee Letter, closing costs and expenses of the DIP Agent and reimbursement of certain other out-of-pocket expenses, and (xi) receipt of all material governmental and third-party approvals necessary to be obtained prior to the closing date. The DIP Agreement also includes several conditions to obligations of the DIP Lender to fund loans under the DIP Facility, including (i) that the Interim Order or, if applicable, the Final Order shall be in full force and effect and shall not have been reversed, appealed for good faith, stayed, modified or amended (except as approved by the DIP Agent), (ii) entry of the Final Order by no later than June 6, 2019, (iii) the accuracy of certain representations and warranties, (iv) receipt by the DIP Agent of the "to date" Budget for the Budget Testing Period and compliance with the Budget and certain availability requirements, (v) satisfaction of the conditions to closing, (vi) delivery of a notice of borrowing, (vii) the outstanding amount of the DIP loans shall not exceed the Maximum Revolving Loan Balance, and (viii) the cash management system shall continue in full force and effect. | DIP Agreement, §§ 2.1, 2.2. |
| **Events of Default** Fed. R. Bankr. P. 4001(c)(1)(B) | The occurrence of any of the following events, unless waived by the DIP Agent in writing and in accordance with the terms of the DIP Agreement, shall constitute an event of default (an "***Event of Default***") of the Interim Order: (i) the failure of the Debtors to perform or meet any of the terms, provisions, covenants, or obligations under the Interim Order (which will be subject to a three (3) business day cure period to the extent that the Debtors' failure to comply with the terms, provisions, covenants, or obligations under the Interim Order, which the Debtors failed to comply with, can be reasonably cured during such time period), including the failure to comply with the Milestones (as defined in section 4.27 of the DIP Agreement attached to the DIP | Interim Order ¶ 31; DIP Agreement, § 7.1. |

| Term | Summary | Reference |
|------|---------|-----------|
| | Motion), or (ii) the occurrence of an "Event of Default" under the DIP Agreement. | |
| **Carve Out**<br>Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F) | (a)      Subject to the terms and conditions set forth herein, the DIP Liens, the DIP Superpriority Claims, the Prepetition Revolving Liens, the Prepetition Term Facilities Liens, the Adequate Protection Liens and the Prepetition Term Facility Adequate Protection Claim shall all be subject to the payment of the following fees and expenses (the "***Carve Out***"):<br><br>(i)      Allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of this Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;<br><br>(ii)      on account of unpaid Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000,<br><br>(iii)      to the extent allowed at any time, whether by interim or final order, procedural order, or any other order of the Court, all accrued and unpaid fees, costs and expenses (including any sale transaction fee payable out of the proceeds of a consummated sale, and after indefeasible payment in full of the DIP Obligations, any restructuring or success based fee) ("***Allowed Professional Fees***") incurred by persons or firms retained by the Debtors (the "***Debtor Professionals***"), any official committee of unsecured creditors appointed in the Cases (the "***Committee***" and, such retained persons or firms, the "***Committee Professionals***"), and any patient care ombudsman appointed in the Cases (the "***Ombudsman***" and, together with the Debtor Professionals and the Committee Professionals, the "***Professional Persons***") at any time prior to the delivery of a Carve Out Trigger Notice; *provided, however,* that each Professional Person must be retained under sections 327, 328, 333 or 1103 of the Bankruptcy Code, as applicable, at any time, whether prior to or after the delivery of a Carve Out Trigger Notice; *provided further* that the obligations of the DIP Lender with respect to the Carve Out for legal fees, costs and expenses prior to the delivery of the Carve Out Trigger Notice (as defined herein) shall be limited in all respects to the aggregate amount required to be funded into the Professional Fee Escrow Account (as defined herein) as set forth herein prior to the earlier of (a) the occurrence of the DIP Repayment Event , and (b) the date of the delivery of a Carve Out Trigger Notice. (such amount shall be referred to as the "***DIP Lender Carve Out Amount***");<br><br>(iv)      to the extent allowed at any time, whether by interim or final order, procedural order, or any other order of the Court, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $350,000 incurred after the delivery of a Carve Out Trigger Notice (the amount set forth in this clause (iv) being the "***Post-Carve Out Trigger Notice*** | Interim Order ¶ 38. |

| Term | Summary | Reference |
|---|---|---|
| | *Cap*"); ); | |
| | (v)    The term "***Carve Out Trigger Notice***" shall mean a written notice delivered by e-mail transmission (or other electronic means) by the DIP Agent or, following a DIP Repayment Event and termination of the DIP Facility, the Prepetition Term Facility Agents, to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee and counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default, or following the DIP Repayment Event during the continuation of a Cash Collateral Termination Event (as defined below), stating that the Post-Carve Out Trigger Notice Cap has been invoked; *provided*, that until a DIP Repayment Event has occurred, the Carve Out Trigger Notice shall be delivered within three (3) business day after a determination by (i) the Debtors and the DIP Agent that there is no remaining availability under the DIP Facility and (ii) the DIP Agent that no further advances shall be made to the Debtors such that the funding of the Professional Fee Escrow Account (as defined herein) cannot be made;

(b)    On the Monday of each week after the week of the Filing Date, and subject to the Budget, unless otherwise agreed to by the DIP Agent, the Debtors shall cause to be transferred into an escrow account (the "***Professional Fee Escrow Account***") with an escrow agent selected by the Debtors an amount equal to the estimate of the fees and expenses of such Professional Persons set forth in the Budget for that week. If the Budget does not list the Professional Person, or the weekly amount for such Professional Person, then there shall be no obligation to fund the Professional Fee Escrow Account for such Professional Person. To the extent the budgeted amount deposited therein for such Professional Person for the prior month exceeds the actual fees and expenses incurred by such Professional Person for the prior month (the "***Excess Monthly Funding Amount***"), then the Excess Monthly Funding Amount shall be applied towards satisfaction of the Professional Fee Escrow Account funding obligations of the Debtors for such Professional Person for the subsequent month.  Except as provided herein, the DIP Lender's obligations to fund the DIP Lender Carve Out Amount shall terminate upon the earlier of (a) the occurrence of the DIP Repayment Event and (b) delivery by the DIP Agent of a Carve Out Trigger Notice. Notwithstanding anything to the contrary herein, upon the delivery of a Carve Out Trigger Notice, the DIP Agent shall be required to transfer cash that is swept, received or foreclosed upon into the Professional Fee Escrow Account in an amount equal to (x) any unfunded portion of the Carve Out that was required to be funded to the Professional Fee Escrow Account for the period prior to the delivery of the Carve Out Trigger Notice, after taking into account any credit for any applicable Excess Monthly Funding Amount that may be owing for the period prior to the delivery of | |

01:24475364.1

| Term | Summary | Reference |
|------|---------|-----------|
|  | the Carve Out Trigger Notice, less (y) any unused retainer held by such Profession Persons (the "***Potential Stub Payment***");  For the avoidance of doubt, none of the Prepetition Term Facility Lender Parties shall be responsible for funding the Professional Fee Escrow Account  For the avoidance of doubt, the DIP Lender Carve Out Amount shall not apply in the event that the DIP Obligations are indefeasibly paid in full in cash;<br><br>(c)      The Prepetition Term Facility Lender Parties shall not be, and, except for funding the Professional Fee Escrow Account, none of the DIP Lender or the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the DIP Lender Carve Out Amount.  Nothing contained herein or otherwise shall be construed to obligate either of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  Upon receipt of the Carve Out Trigger Notice, the Debtors shall provide notice by email to all Professional Persons, at the email addresses set forth in each Professional Person's notice of appearance filed with the Court (or, if there is no such notice of appearance, at such Professional Person's last known email address) informing them that such Carve Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Professional Persons is subject to and limited by the Carve Out.  Until such time as a DIP Repayment Event has occurred, Allowed Professional Fees of any Professional Person relating to the period prior to the delivery of a Carve Out Trigger Notice shall be paid solely from the Professional Fee Escrow Account and any retainer, as applicable.  After the occurrence of the DIP Repayment Event, Allowed Professional Fees of any Professional Fees relating to the period prior to the delivery of the Carve Out Trigger Notice shall first be paid from the Professional Fee Escrow Account and then paid in full from the proceeds of the Prepetition Facilities Collateral and/or the collateral securing the Adequate Protection Liens but solely as provided for in the Budget as set forth in Paragraph 49 hereof, and the Debtors shall no longer be required to fund the Professional Fee Escrow Account.<br><br>(d)      No advances under the DIP Facility, nor any Cash Collateral, nor any portion of the Carve Out may be used to prosecute actions, claims, demands or causes of action against the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties or to object to or contest in any manner, or to raise any defense in any pleading as to the validity, perfection, priority or enforceability of the Existing Debt, the Prepetition Revolving Liens, the Prepetition Term Facilities Liens and security interests in the collateral securing the Existing Debt, the DIP Liens and security interests granted to the DIP |  |

| Term | Summary | Reference |
|------|---------|-----------|
| | Lender in connection with the DIP Facility, or the DIP Obligations, or the Prepetition Term Facilities Liens and security interests in the Prepetition Term Facilities Collateral securing the Prepetition Term Facilities Obligations; *provided, however*, up to $20,000 of the Professional Fee Escrow Account may be used by the Committee (if appointed) to inquire into and investigate such matters.<br><br>(e)　　Upon entry of the Final Order, other than the Carve Out, the DIP Facility shall not otherwise be subject to any carve-out for Professional Fees and no other costs or expenses of any kind, nature or description whatsoever shall be imposed against the DIP Collateral (or the Prepetition Lender or the DIP Lender with respect to the Prepetition Revolving Collateral or the DIP Collateral) under sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise.<br><br>(f)　　For the avoidance of doubt nothing contained in the forgoing provisions shall be deemed or construed to limit or prevent the Debtors from paying Allowed Professional Fees of Professional Persons prior to the delivery of a Carve Out Trigger Notice; provided that Professional Persons shall in the first instance be paid from any unused retainers and then from amounts deposited in the Professional Fee Escrow Account.<br><br>(g)　　All amounts related to the Carve Out (other than amounts already funded into the Professional Fee Escrow Account) including without limitation the Potential Stub Payment shall be reserved for by the DIP Agent and shall reduce the availability under the DIP Facility. | |
| **Liens and Priorities** Fed. R. Bankr. P. 4001(c)(1)(B)(i) | *DIP Liens*.  In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "***DIP Liens***") all personal and real property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "***DIP Collateral***"), including without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds | Interim Order ¶¶ 5 – 7. |

| Term | Summary | Reference |
|------|---------|-----------|
| | and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtors, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) all proceeds of actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code); (e) subject to entry of a Final Order, the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and the proceeds thereof; and (f) all other DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Filing Date. For the avoidance of doubt, DIP Collateral that is of a type that would be Term Facility Priority Collateral (as defined in the Intercreditor Agreements) shall constitute DIP Collateral./  *DIP Superpriority Claim.* Upon entry of the Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "***DIP Superpriority Claim***") for all DIP Obligations. Except for the obligations with respect to the Carve Out, the DIP Superpriority Claim shall have priority over any and all other obligations, liabilities and indebtedness of each Debtor, including without limitation any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Superpriority Claim. | |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral** Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv) | *Adequate Protection Liens.* Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Facility Lender Parties in the Prepetition Term Facilities Collateral against any Diminution in Value of such interests in the Prepetition Term Facilities Collateral, the Debtors hereby grant to the Prepetition Term Facility Agents, for the benefit of themselves and the Prepetition Term Facility Lender Parties, continuing, valid, binding, enforceable, non-avoidable, and automatically and perfected | Interim Order ¶¶ 11 – 16, 37 |

| Term | Summary | Reference |
|------|---------|-----------|
| | postpetition security interests in and liens on the DIP Collateral (the "***Adequate Protection Liens***"). | |
| | *Adequate Protection Superpriority Claims.*  As further adequate protection of the interests of the Prepetition Term Facility Lender Parties in the Prepetition Term Facilities Collateral against any Diminution in Value of such interests in the Prepetition Term Facilities Collateral, the Prepetition Term Facility Agents, on behalf of themselves and the Prepetition Term Facility Lender Parties, are hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed priority administrative expense claim in each of the Cases and any Successor Cases (the "***Prepetition Term Facility Adequate Protection Priority Claim***"). | |
| | *Professional Fees.* As additional adequate protection, the Debtors shall pay the reasonable and documented accrued fees and expenses of (i) Ropes & Gray LLP, in its capacity as counsel to the Prepetition Priming Term Facility Lenders, in an amount not to exceed $55,000 per month, (ii) one local counsel retained by the Prepetition Priming Term Facility Lenders, in an amount not to exceed $10,000 per month, (iii) Thompson Hine LLP, in its capacity as counsel to the Prepetition Priming Term Facility Agent, in an amount not to exceed $20,000 per month, (iv) Shearman & Sterling LLP, in its capacity as counsel to the Prepetition Second Term Facility Agent, in an amount not to exceed $110,000 per month, (v) one local counsel retained by the Prepetition Second Term Facility Agent, in an amount not to exceed $10,000 per month, and (vi) Stout Risius Ross Advisors, LLC, in its capacity as financial advisors to the Prepetition Second Term Facility Agent, in an amount not to exceed $30,000 per month (collectively, the "***Prepetition Term Facility Lender Parties Advisors***"); *provided*, *however*, that if a Prepetition Term Facility Lender Parties Advisor's documented fees and expenses in any month (a) are less than its designated limit, then the difference between the designated amount and the actual amount shall roll over to the following month and (b) exceed its designated limit, then any such excess amounts may be paid in subsequent months so long as the Debtors' payment in the subsequent month does not exceed the monthly payment cap (including any rollover from the prior amounts).  Professionals for the Prepetition Priming Term Facility Agent and the Prepetition Second Term Facility Agents shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide copies of its invoices (which shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of | |

| Term | Summary | Reference |
|------|---------|-----------|
| | any benefits of the attorney work product doctrine) to the U.S. Trustee, counsel for the DIP Agent, and counsel for a Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  Any objections raised by the Debtors, the U.S. Trustee, the DIP Agent or a Committee (if appointed) with respect to the Debtors' payment of the amounts in such invoices must be filed with the Court and served within ten (10) days of such party's receipt of such invoice, and any such objection shall be subject to resolution by the Court. Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtors.  In addition, as part of the adequate protection provided to the Prepetition Term Facility Lender Parties hereunder, and subject to the rights preserved in paragraph 41 of the Interim Order, the Debtors are authorized to pay the Prepetition Term Facility Agents pursuant to the Interim Order a sum not greater than $531,000 for pre-Filing Date services rendered to the Prepetition Term Facility Agents. <br><br> *Use of Collateral Proceeds*.  Subject to the rights preserved in paragraph 41 of the Interim Order,  as of and commencing on the date of the Interim Hearing, and subject to the Carve Out, all net proceeds of the DIP Collateral and Prepetition Collateral, including whether sold in the ordinary course, liquidated or otherwise, shall be applied as follows: (i) first, to permanently reduce the Existing Debt until indefeasibly paid in full in cash (including provision for contingent obligations); (ii) second, to reduce the DIP Obligations until indefeasibly paid in full in cash (including provision for contingent obligations); (iii) third, to indefeasibly pay in full in cash all Prepetition Priming Facility Obligations due and owing under the Prepetition Priming Facility Documents, and (iv) fourth, to pay the Prepetition Second Term Facilities Obligations due and owing under the Prepetition Second Term Facility Documents. <br><br> *Reporting*.    The Prepetition Term Facility Agents, as an additional form of adequate protection, shall have the same rights of access, information and financial reporting as afforded to the DIP Lender herein and under the DIP Loan Documents. | |
| **Debtors' Stipulations** Fed. R. Bankr. P. 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i)(B) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 41 of the Interim Order, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xiii) of the Interim Order are referred to herein, collectively, as the "***Debtors' Stipulations***"): <br><br> (i)    *Prepetition Facility*.  Pursuant to that certain Credit Agreement, dated as of August 10, 2018 (as amended, modified and supplemented prior to the Filing Date, the "***Prepetition Credit Agreement***", and together with all documents, instruments, agreements, schedules and exhibits | Interim Order ¶ F. |

| Term | Summary | Reference |
|------|---------|-----------|
|  | executed and/or delivered in connection therewith, the "***Prepetition Loan Documents***"), among LifeCare Holdings as the borrower representative, the other borrowers party thereto from time to time, Holdings as guarantor, and White Oak Healthcare Finance, LLC, as administrative agent, collateral agent and lender party thereto (in such capacities, the "***Prepetition Agent***" or the "***Prepetition Lender***") the Prepetition Lender provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Borrowers pursuant to the Prepetition Loan Documents ("***Prepetition Facility***"). | |
|  | (ii)　　*Existing Debt*. The Prepetition Facility provided the Borrowers with, among other things, up to $40,000,000 aggregate principal amount of Revolving Loan Commitments (as defined in the Prepetition Credit Agreement), including letters of credit obligations.  As of the Filing Date, the Borrowers under the Prepetition Facility were truly and justly indebted to the Prepetition Lender pursuant to the Prepetition Loan Documents, without defense, counterclaim, or offset of any kind, and the aggregate principal amount outstanding under the Prepetition Facility was approximately $26,721,070.08 in outstanding revolving loans and approximately $9,448,735.49 in issued and outstanding letter of credit obligations (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, yield maintenance fee, early termination fee, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrowers' obligations or Holdings' obligations (as guarantor) pursuant to, or secured by, the Prepetition Loan Documents, including all "Obligations" as defined in the Prepetition Credit Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code (the "***Existing Debt***"). | |
|  | (iii)　　*Prepetition Revolving Liens and Prepetition Revolving Collateral*.  As more fully set forth in the Prepetition Loan Documents and the DIP Motion, prior to the Filing Date, the Borrowers and Holdings granted to the Prepetition Lender, a security interest in and continuing lien on ("***Prepetition Revolving Liens***") the Collateral as defined in the Prepetition Credit Agreement ("***Prepetition Revolving Collateral***"). | |
|  | (iv)　　*Prepetition Term Facility Agreements*.　(a) | |

| Term | Summary | Reference |
|------|---------|-----------|
|  | Pursuant to that certain Credit Agreement, initially dated as of May 31, 2013 (as amended, modified and supplemented from time to time prior to the Filing Date, the "***Prepetition Second Term Facility Agreement***", and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "***Prepetition Second Term Facility Documents***")), among LifeCare Holdings as the borrower, Hospital Acquisition Intermediate Sub LLC as "Holdings" and the other guarantors party thereto,[7] and the lenders that are parties thereto from time to time ("***Prepetition Second Term Facility Lenders***") and Seaport Loan Products LLC, as administrative agent (in such capacity, "***Seaport***"), and Wilmington Trust, National Association, as co-administrative agent and collateral agent for the Prepetition Second Term Facility Lenders (in such capacities, and together with Seaport, the "***Prepetition Second Term Facility Agents***" and together with the Prepetition Second Term Facility Lenders, the "***Prepetition Second Term Facility Lender Parties***"), the Prepetition Second Term Facility Lenders provided credit and other financial accommodations to LifeCare Holdings pursuant to the Prepetition Second Term Facility Documents ("***Prepetition Second Term Facility***"), and (b) pursuant to that certain Credit Agreement, dated as of August 10, 2018 (as amended, modified and supplemented from time to time prior to the Filing Date, the "***Prepetition Priming Term Loan Credit Agreement***",[8] and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "***Prepetition Priming Facility Documents***," and with the Prepetition Second Term Facility Documents, the "***Prepetition Term Facility Documents***"), among the Prepetition Term Facilities Loan Parties, and the lenders that are parties thereto from time to time (the "***Prepetition Priming Term Facility Lenders***," and with the Prepetition Second Term Facility Lenders, the "***Prepetition Term Facility Lenders***") and Glas Trust Company LLC, as administrative agent and collateral agent for the Prepetition Priming Term Facility Lenders (in such capacity, the |  |

---

[7] The other guarantors are New LifeCare Hospitals LLC, New LifeCare Hospitals of Chester County LLC, New LifeCare Hospitals of Milwaukee LLC, New LifeCare Hospitals of North Carolina LLC, New LifeCare Hospitals of Pittsburgh LLC, New LifeCare Management Services LLC, New NextCare Specialty Hospital of Denver LLC, New LifeCare REIT 1 LLC, New LifeCare Hospitals of Mechanicsburg LLC, New Pittsburgh Specialty Hospital LLC, New LifeCare Hospitals of Dayton LLC, New LifeCare Hospitals of Northern Nevada LLC, New LifeCare Hospitals of South Texas LLC, New LifeCare Hospitals of North Texas LLC, New San Antonio Specialty Hospital LLC, New LifeCare REIT 2 LLC, New LifeCare Hospital at Tenaya LLC, New LifeCare Hospitals of Sarasota LLC, LifeCare Behavioral Health Hospital of Pittsburgh LLC, LifeCare Pharmacy Services LLC (collectively with LifeCare Holdings, Holdings, as guarantor, and the other Loan Parties, the "***Prepetition Term Facilities Loan Parties***").

[8] The Prepetition Second Term Facility Agreement and the Prepetition Priming Term Loan Credit Agreement shall be referred to collectively as the "***Prepetition Term Facilities Agreements***".

| Term | Summary | Reference |
|------|---------|-----------|
| | "*Prepetition Priming Term Facility Agent*" and together with the Prepetition Priming Term Facility Lenders, the "*Prepetition Priming Term Facility Lender Parties*"),[9] the Prepetition Priming Term Facility Lenders provided credit and other financial accommodations to LifeCare Holdings pursuant to the Prepetition Priming Facility Documents ("*Prepetition Priming Facility*," and with the Prepetition Second Term Facility, the "*Prepetition Term Facilities*").<br><br>    (v)    *Prepetition Priming Facility Obligations*. The Prepetition Priming Facility provided the Borrower (as defined in the Prepetition Priming Term Loan Credit Agreement) with a term loan facility in the aggregate amount of $15,000,000. As of the Filing Date, the Prepetition Term Facilities Loan Parties were truly and justly indebted to the Prepetition Priming Term Facility Lenders pursuant to the Prepetition Priming Facility Documents, without defense, counterclaim, or offset of any kind, and the aggregate principal amount outstanding under the Prepetition Priming Facility was no less than $7,656,642.60 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, yield maintenance fee, early termination fee, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of LifeCare Holdings' or the guarantors' obligations pursuant to, or secured by, the Prepetition Priming Facility Documents, including all "Obligations" as defined in the Prepetition Priming Term Loan Credit Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "*Prepetition Priming Facility Obligations*").<br><br>    (vi)    *Prepetition Second Term Facility Obligations*. The Prepetition Second Term Facility provided the Borrower (as defined in the Prepetition Second Term Facility Agreement) with a term loan facility in the aggregate amount of $200,000,000. As of the Filing Date, the Prepetition Term Facilities Loan Parties were truly and justly indebted to the Prepetition Second Lien Term Facility Lenders pursuant to the Prepetition Second Term Facility Documents, without defense, counterclaim, or offset of any kind, and the aggregate principal amount | |

---

[9] The Prepetition Second Term Facility Agents and the Prepetition Priming Term Facility Agent shall be referred to collectively as the "Prepetition Term Facility Agents". The Prepetition Second Term Facility Lender Parties and the Prepetition Priming Term Facility Lender Parties shall be referred to herein as the "*Prepetition Term Facility Lender Parties*."

| Term | Summary | Reference |
|------|---------|-----------|
| | outstanding under the Prepetition Second Term Facility was not less than $140,947,579(collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, yield maintenance fee, early termination fee, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of LifeCare Holdings' or the guarantors' obligations pursuant to, or secured by, the Prepetition Second Term Facility Documents, including all "Obligations" as defined in the Prepetition Second Term Facility Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "***Prepetition Second Term Facility Obligations***" and, together with the Prepetition Priming Term Facility Obligations, the "***Prepetition Term Facilities Obligations***").<br><br>       (vii)    *Prepetition Term Facilities Liens and Prepetition Term Facilities Collateral.* As more fully set forth in the Prepetition Term Facility Documents and the DIP Motion, prior to the Filing Date, each of the Prepetition Term Facilities Obligors granted to the Prepetition Term Facility Agents, for the benefit of themselves and the Prepetition Term Facility Lenders, a security interest in and continuing lien on ("***Prepetition Term Facilities Liens***") the Collateral as defined in the Prepetition Term Facilities Agreements ("***Prepetition Term Facilities Collateral***," and with the Prepetition Revolving Collateral, the "***Prepetition Collateral***").<br><br>       (viii)    *Priority of Prepetition Liens; Intercreditor Agreements.* The Prepetition Agent, the Prepetition Term Facility Agents, and others are parties to that certain Intercreditor Agreement dated as of August 10, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms from time to time, the "***Revolving Intercreditor Agreement***"), which governs the respective rights, interests, obligations, priority and positions of the Prepetition Lender and the Prepetition Term Facility Lender Parties with respect to the assets and properties of the Debtors and other obligors. Additionally, the Prepetition Priming Term Agent, the Prepetition Second Term Facility Agents and others are parties to that certain Term Loan Intercreditor Agreement, dated as of August 10, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms from time to time prior to the Petition Date, the "***Term Loan Intercreditor Agreement***" and, together with the Revolving Intercreditor Agreement, the "***Intercreditor Agreements***"), which governs the respective rights, interests, obligations, priority and positions of the Prepetition Priming Term Facility Lender Parties and the | |

| Term | Summary | Reference |
|---|---|---|
| | Prepetition Second Term Facility Lender Parties with respect to the assets and properties of the Debtors and other obligors. Each of the Borrowers and Holdings acknowledged and agreed to the Intercreditor Agreements.<br><br>(ix) *Validity, Perfection, and Priority of Prepetition Revolving Liens and Existing Debt.* The Debtors acknowledge and agree that (a) the Prepetition Revolving Liens on the Prepetition Revolving Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value; (b) the Prepetition Revolving Liens were senior in priority over any and all other liens on the Prepetition Revolving Collateral other than valid and unavoidable Permitted Encumbrances (as defined in the Prepetition Loan Documents) specified in the Prepetition Loan Documents; (c) the Existing Debt constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Revolving Liens or Existing Debt exist, and no portion of the Prepetition Revolving Liens or Existing Debt is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Existing Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Existing Debt; and (g) the aggregate value of the Prepetition Revolving Collateral exceeds the amount of the Existing Debt and the claims of the Prepetition Lender arising under, or secured by, the Prepetition Loan Documents constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.<br><br>(x) *Validity, Perfection, and Priority of Prepetition Term Facilities Liens and Prepetition Term Facilities Obligations.* The Debtors acknowledge and agree that (a) the Prepetition Term Facilities Liens on the Prepetition Term Facilities Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Facility Agents (on behalf of the Prepetition Term Facility Lenders) for fair consideration and | |

| Term | Summary | Reference |
|------|---------|-----------|
| | reasonably equivalent value; (b) subject to the priming of the Prepetition Term Facility Liens on the Prepetition Term Facility Collateral as provided herein and which has been consented to by the Prepetition Term Facility Lender Parties pursuant to that *Consent and Acknowledgement*, dated as of May 7, 2019, by and among the Debtors, the DIP Agent and the Prepetition Term Facility Agents ("***Intercreditor Consent and Acknowledgement***"), the Prepetition Term Facilities Liens were senior in priority over any and all other liens on the Prepetition Term Facilities Collateral other than valid and unavoidable Permitted Encumbrances (as defined in the Prepetition Term Facility Documents) specified in the Prepetition Term Facility Documents ("***Prepetition Term Loan Permitted Prior Liens***"); (c) the Prepetition Term Facilities Obligations are legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Facility Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Facilities Liens or Prepetition Term Facilities Obligations exist, and no portion of the Prepetition Term Facilities Liens or Prepetition Term Facilities Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Term Facility Lender Parties or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Facilities; and (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Facilities Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Facilities Obligations.<br><br>(xi) *No Control.* None of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lenders controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the Interim Order, the DIP Facility, the DIP Documents, the Prepetition Facility, the Prepetition Loan Documents, the Prepetition Term Facilities and/or the Prepetition Term Facility Documents.<br><br>(xii) *Cash Collateral.* (a) All of the Debtors' cash, | |

| Term | Summary | Reference |
|---|---|---|
| | including any cash in deposit accounts of the Debtors, wherever located, and (b) proceeds from the sale of the DIP Collateral and the Prepetition Collateral, constitutes Cash Collateral of the Prepetition Lender and the Prepetition Term Facility Agents (for the benefit of the Prepetition Term Facility Lender Parties).<br><br>(xiii)    *Default by the Debtors.*    The Debtors acknowledge and stipulate that (i) they are in default of their obligations under both the Prepetition Loan Documents and the Prepetition Second Term Facility Documents and (ii) an Event of Default has occurred under the Prepetition Loan Documents and the Prepetition Second Term Facility Documents.  Prior to the Filing Date, therefore, the revolving commitments under the Prepetition Facility were terminated, and interest was accruing on the Existing Debt at the default rate.  In addition, as of March 30, 2019, due to the Debtors' failure to pay interest when due pursuant to the terms of the Prepetition Second Term Facility Agreement, interest was accruing on the Prepetition Second Term Facility Obligations at the default rate. | |
| **Waiver or Modification of Automatic Stay** Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claim, and Prepetition Term Facility Adequate Protection Priority Claim; (b) permit the Debtors to perform such acts as the DIP Agent, the Prepetition Agent and the Prepetition Term Facility Agents each may reasonably request to assure the perfection and priority of the liens granted in the Interim DIP Order; (c) permit the Debtors to incur all liabilities and obligations under the DIP Documents, the DIP Facility, and the Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Lender and the Prepetition Lender to retain and apply, payments made in accordance with the terms of the Interim Order and the DIP Documents. In particular, the Debtors are authorized and directed to turn over the proceeds of the Prepetition Revolving Collateral to the Prepetition Lender in repayment of the Prepetition Facility. | Interim Order ¶ 21. |
| **Waiver or Modification of Right to File a Plan** Fed. R. Bankr. P. 4001(c)(1)(B)(v) | None of the Debtors shall propose or support any plan of reorganization, or order confirming such plan, that is not conditioned upon the DIP Obligations being indefeasibly paid in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization) (a "**Prohibited Plan**") without the written consent of each of the DIP Lender and the Prepetition Lender, as applicable.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents. | Interim Order ¶ 58. |
| **Milestones** | (a)    By June 10, 2019 (or upon such later date as agreed in | DIP Agreement, § |

| Term | Summary | Reference |
|------|---------|-----------|
| Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | writing between Borrowers and the DIP Agent), Borrowers shall have entered into binding asset purchase agreement(s) with one or more prospective purchasers (subject to only customary conditions precedent, not including financing conditions) for the sale of all or substantially all of the assets of Borrowers, on such terms reasonably acceptable to the DIP Agent. <br><br> (b)    By July 3, 2019, the Court shall have entered an order or orders approving bidding procedures for the Specified Sale, which such order or orders shall be in form and substance reasonably acceptable to the DIP Agent. <br><br> (c)    By August 16, 2019, the Court shall have entered orders approving the sale of all or substantially all of the assets of Borrowers, on such terms reasonably acceptable to Agent (the "***Specified Sale Order***") which orders shall be in form and substance reasonably acceptable to Agent. <br><br> (d)    By September 27, 2019, the transactions contemplated in the Specified Sale Order shall have been consummated. | 4.7; Interim Order ¶ 31. |
| **Effect of Debtors' Stipulations on Third Parties** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The admissions, stipulations, agreements, releases, and waivers set forth in the Interim Order (collectively, the "***Prepetition Lien and Claim Matters***") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including, without limitation, a Committee (if appointed), unless, and solely to the extent that, a party in interest that has sought and obtained standing and the requisite authority to commence a Challenge (as defined below) (other than the Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely filed the pleadings, and timely commenced the proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 41 of the Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or pleading commencing a proceeding or other contested matter, a "***Challenge***") by no later than (A) for a Committee, (if appointed), forty-five (45) days from the date of formation of a Committee (if appointed), or (B) sixty (60) days following the entry of the Interim Order for any other party in interest with requisite standing (the earlier to occur of (A) and (B), the "***Challenge Deadline***"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition Agent (with respect to the Prepetition Loan Documents), the Prepetition Priming Term Facility Agent (with respect to the Prepetition Priming Term Facility Documents), or the Prepetition Second Term Facility Agents (with respect to the Prepetition Second Term Facility Documents), as applicable, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the | Interim Order ¶ 41. |

| Term | Summary | Reference |
|------|---------|-----------|
| | Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal. Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause, and (2) if the Committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such Challenge. | |
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Lender in accordance with the terms and conditions of the DIP Agreement. | DIP Agreement, § 9.6. |
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x) Local Rule 4001-2(a)(i)(C) | Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the Prepetition Agent or the Prepetition Term Facility Lender Parties (as applicable), the DIP Collateral, the Prepetition Revolving Collateral, or the Prepetition Term Facility Collateral pursuant to sections 506(c) and 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. | Interim Order ¶ 43. |
| **Liens on Avoidance Actions** Fed. R. Bankr. P. 4001(c)(1)(B)(xi) | Subject to entry of a Final Order, the obligations under the DIP Facility are secured by liens on the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code). | Interim Order ¶ 5. |
| **Section 552(b) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B) | Subject to entry of a Final Order, the Prepetition Lender and the Prepetition Term Facility Lender Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Lender or the Prepetition Term Facility Lender Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Revolving Collateral or the Prepetition Term Facilities Collateral. | Interim Order ¶ 45. |
| **Fees** Fed. R. Bankr. P. 4001(c)(1) | *Facility Fee*.  On, and subject to the occurrence of, the closing date, the borrower representative shall pay to DIP Agent a facility fee (the "***DIP Facility Fee***"), for the account of each Revolving Lender, equal to $150,000 (1.00% of the Interim DIP Commitment).  The Facility Fee is fully earned on the Closing | DIP Fee Letter |

| Term | Summary | Reference |
|------|---------|-----------|
| | Date and shall not be refundable under any circumstances.<br><br>*Collateral Tracking Fee*.  The Debtors shall pay to the DIP Agent for its own account, in arrears on each interest payment date (commencing with June 3, 2019) and on the Termination Date, a fee (the "***Collateral Tracking Fee***") equal to 0.50% per annum on the average outstanding principal balance of revolving loans, calculated on a daily basis, during the prior month.<br><br>*Administrative Fee*.  The Debtors shall pay to the DIP Agent for its own account a monthly administrative agent fee (the "***Administrative Fee***") of $5,000 (i) on, and subject to the occurrence of, the closing date, and (ii) on each interest payment date (commencing with June 3, 2019) until the date on which the Revolving Loan Commitments have been terminated, and all DIP Obligations are paid in full (other than contingent indemnification obligations arising under the DIP Documents to the extent no claim giving rise thereto has been asserted).<br><br>*Unused Commitment Fee*.  The Debtors shall pay to the DIP Agent for the benefit of the DIP Lenders a fee (the "***Unused Commitment Fee***"), in an amount equal (i) the average daily Aggregate Revolving Loan Commitment during the preceding calendar month, less the average outstanding principal amount of all Revolving Loans during the preceding calendar month; provided, in no event shall the amount computed pursuant to this clause (a) be less than zero, multiplied by (ii) 0.50% per annum. The Unused Commitment Fee is payable monthly in arrears on each interest payment date (commencing with June 3, 2019). The Unused Commitment Fee shall accrue at all times from and after the execution and delivery of the DIP Agreement.  Upon receipt of the Unused Commitment Fee in full on each interest payment date, the DIP Agent shall pay each DIP Lender the portion thereof due to such DIP Lender pursuant to the terms of its DIP Fee Letter.<br><br>*Exit Fee*.  The Debtors shall pay to the DIP Agent for its own account, concurrently with the termination of the Aggregate Revolving Loan Commitment, an amount (the "***Exit Fee***") equal to $150,000. | |
| **Discharge**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Obligations, and the obligations of the Debtors with respect to the adequate protection provided in the Interim Order shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Lender and the Prepetition Lender, as applicable, has otherwise agreed in writing.  None of the Debtors shall propose or support any plan of reorganization, or order confirming such plan, that is not conditioned upon the DIP Obligations being indefeasibly paid in full in cash within a commercially reasonable period of time (and in no event later | Interim Order ¶ 58. |

| Term | Summary | Reference |
|------|---------|-----------|
|  | than the effective date of such plan of reorganization) (a "*Prohibited Plan*") without the written consent of each of the DIP Lender and the Prepetition Lender, as applicable.  For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan, or the entry of an order with respect thereto, shall constitute an Event of Default under the Interim DIP Order and under the DIP Documents. |  |

## PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2

6.      The Debtors believe the following provisions of the DIP Agreement must be highlighted pursuant to Local Rule 4001-2:

(a)      Cross-Collateralization (Local Rule 4001-2(a)(i)(A)).  Not applicable.

(b)      Binding the Estate to Validity, Perfection or Amount of Secured Debt (Local Rule 4001-2(a)(i)(B)).  Paragraph F of the Interim Order contains customary stipulations of the Debtors regarding the validity, perfection, priority and amount of the (i) the Prepetition Revolving Liens and the Existing Debt and (ii) the Prepetition Term Facilities Liens and the Prepetition Term Facilities Obligations.  Paragraph 38(d) creates a fund of up to [\$20,000] to inquire into and investigate such matters.  Paragraph 41(a) gives (a) the Committee, if appointed, 45 days from the date of formation, and (b) any other party interest with requisite standing, 60 days from the date of entry of the Interim Order, to investigate such matters and commence a challenge.  *See* Interim Order ¶ F.

(c)      Waiver of Rights under Section 506(c) (Local Rule 4001-2(a)(i)(C)).  The Debtors shall grant a waiver of section 506(c) rights against the Prepetition Agent, the Prepetition Term Facility Lender Parties, the DIP Collateral, the Prepetition Revolving Collateral and the Prepetition Term Facility Collateral pursuant only to a Final Order.  The Debtors will not waive any section 506(c) rights pursuant to the Interim Order.  *See* Interim Order ¶ 43.

(d)      Liens on Avoidance Actions (Local Rule 4001-2(a)(i)(D)).  The DIP Lender shall receive first priority, valid, perfected, enforceable liens on all *the* proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code) pursuant only to the Final Order but shall not be granted such liens pursuant to the Interim Order.  *See* Interim Order ¶ 5.

(e)      Provisions that Deem Prepetition Debt to be Postpetition Debt (Local Rule 4001-2(a)(i)(E)).  Subject to the entry of the Final Order, all Existing Debt and all accrued and unpaid interest thereon and fees and expenses shall be fully-rolled into the DIP Facility and shall constitute DIP Obligations.  *See* DIP Agreement, § 1.1(iv); Interim Order ¶¶ I(i), (vi), 10, 16.

(f)      <u>Provisions that Provide Disparate Treatment of Professionals Retained by a Creditors' Committee (Local Rule 4001-2(a)(i)(F))</u>.  Not applicable.

(g)      <u>Provisions that Prime any Secured Liens without Consent of the Lienholder (Local Rule 4001-2(a)(i)(G))</u>.  Not applicable.

(h)      <u>Provisions that Affect the Court's Power to Consider the Equities of the Case under Section 552(b)(1) (Local Rule 4001-2(a)(i)(H))</u>.  Subject to entry of a Final Order, the Prepetition Lender and the Prepetition Term Facility Lender Parties are entitled to all of the rights and benefits of section 552(b), and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Lender or the Prepetition Term Facility Lender Parties. *See* Interim Order ¶ 45.

## BACKGROUND

7.     Commencing on May 6, 2019 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  No committees have been appointed or designated.

8.     This Motion incorporates by reference the facts set forth in the First Day Declaration as if fully set forth herein.  Additional facts specific to this Motion are set forth below.

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

9.     As of the Petition Date, the Debtors' total consolidated long-term debt obligations were approximately $185 million, consisting of, among other things institutional loans and secured notes.

10.    In August 2018, LifeCare Holdings (a) refinanced its then-existing revolving facility with a $40 million revolving facility by entering into the Prepetition Credit Agreement, (b) entered into Prepetition Priming Term Loan Credit Agreement, pursuant to which LifeCare borrowed $7.5 million and which provided a term loan commitment of an additional $7.5 million

and (c) amended Prepetition Second Term Facility Agreement (collectively, the "***August 2018 Transactions***").

**A.      Prepetition Credit Agreement**

11.      Prior to August 2018, LifeCare Holdings and the other Debtors were party to a $20 million revolving credit facility, which matured by its terms in May 2018.  Pursuant to the August 2018 Transaction, LifeCare Holdings refinanced the debt under such revolving credit facility with the Prepetition Credit Agreement.

12.      As of the Petition Date, there was approximately $26.7 million outstanding under the Prepetition Credit Agreement, plus issued but undrawn letters of credit of $9.4 million. These obligations are secured by substantially all of the Debtors' assets.

**B.      Prepetition Priming Term Loan Credit Agreement**

13.      As noted, in connection with the August 2018 Transactions, LifeCare Holdings entered into the Prepetition Priming Term Loan Credit Agreement governing a $15 million secured term loan credit facility constituting (a) an initial $7.5 million term loan at closing and (b) a commitment to borrow an additional $7.5 million of term loans after closing.  Each of LifeCare Holdings' subsidiaries (other than certain subsidiaries designated as non-guarantor subsidiaries under the Prepetition Priming Term Loan Credit Agreement which includes Home Healthcare) guaranty LifeCare Holdings' obligations under the Prepetition Priming Term Loan Credit Agreement.

14.      As of the Petition Date, there was approximately $7.7 million outstanding under the Prepetition Priming Term Loan Credit Agreement.   This obligation is secured by substantially all of the Debtors' assets.

**C.    Prepetition Second Term Facility Agreement**

15.    Prior to the August 2018 Transactions, the term loan credit facility under the Prepetition Second Term Facility Credit Agreement matured by its terms in November 2018. Pursuant to the August 2018 Transactions, LifeCare Holdings amended the Prepetition Second Term Facility Credit Agreement in order to, among other things, extend the maturity date to November 2021, reduce the cash interest payments and amend the financial covenants under the Prepetition Second Term Facility Agreement.  Each of LifeCare Holdings' subsidiaries (other than certain subsidiaries designated as non-guarantor subsidiaries under the Prepetition Priming Term Loan Credit Agreement which includes Home Healthcare) guaranty LifeCare Holdings' obligations under the Prepetition Second Term Loan Facility Agreement.

16.    As of the Petition Date, there was approximately $140.9 million outstanding under the Prepetition Second Term Facility Agreement.  This obligation is secured by substantially all of the Debtors' assets.

**D.    Intercreditor Agreements**

17.    In connection with the August 2018 Transactions, the Debtors entered into (i) the Revolving Intercreditor Agreement and (ii) the Term Loan Intercreditor Agreement.  Pursuant to the Revolving Intercreditor Agreement, (a) the liens on Prepetition Revolving Collateral (as defined in the Intercreditor Agreement) securing the obligations under the Prepetition Credit Agreement are senior to the liens on Prepetition Term Facilities Collateral securing the obligations under the Prepetition Priming Term Loan Credit Agreement and the Prepetition Term Loan Credit Agreement and (b) the liens on Prepetition Term Facilities Collateral (as defined in the Revolving Intercreditor Agreement securing the obligations under the Prepetition Priming Term Loan Credit Agreement and the Prepetition Term Loan Credit Agreement are senior to the liens on the Term Facility Priority Collateral securing the obligations under the Prepetition

Revolving Credit Agreement.  Pursuant to the Term Loan Intercreditor Agreement, the liens on the collateral securing the obligations are under the Prepetition Priming Term Loan Credit Agreement are senior to the liens on the collateral securing the obligations under the Prepetition Term Loan Credit Agreement.

### SUPPORTING AUTHORITY

18.    The Debtors do not have sufficient working capital and/or cash to fund these chapter 11 cases and continue operations of the businesses without further support from the DIP Facility and use of Cash Collateral.  The Debtors' continuing viability and the Debtors' ability to maximize the value of their estates for the benefit of all creditors depends heavily on the expeditious approval of the DIP Agreement, use of Cash Collateral and related relief requested herein.  As a result of, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to secure alternative sources of cash or credit in the form of unsecured credit permitted by Bankruptcy Code section 503(b)(1).

19.    Specifically, the proposed DIP Facility will fund the Debtors' working capital needs, permit the Debtors' to pay the costs of administering these chapter 11 cases, and provide the Debtors to pay other enterprise costs.  Furthermore, the DIP Facility will provide the necessary liquidity for the Debtors to operate in the ordinary course of business while seeking to pursue a sale and marketing process that will maximize the value of the Debtors' estates for the benefit of all creditors and enable the Debtors to successfully implement these chapter 11 cases.

**A.     The DIP Facility Should be Approved under Bankruptcy Code Section 364**

20.    The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the Interim Order and the DIP Agreement pursuant to Bankruptcy Code section 364(c).  The statutory requirement for obtaining postpetition credit under Bankruptcy Code section 364(c) is a finding, made after notice and a hearing, that the

debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of the [Bankruptcy Code]." 11 U.S.C. § 364(c). Indeed, section 364(c) financing is appropriate when the debtor is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code sections 364(a) and (b)); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Banker. E.D. Pa. 1987) (secured credit under Bankruptcy Code section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

21.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code section 364(c). Specifically, courts look to whether:

    (a)     the debtor is unable to obtain unsecured credit under Section 364(b), *i.e.*, by allowing a lender only an administrative claim;

    (b)     the credit transaction is necessary to preserve the assets of the estate; and

    (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (noting these three factors in considering proposed postpetition financing) (citations omitted); *Ames Dep't Stores*, 115 B.R. at 36–39.

22.     Prior to the Petition Date, the Debtors, through their advisors, endeavored to identify potential sources of financing. Based on that process, the Debtors that adequate financing would not be available on an unsecured basis. Indeed, no party has indicated a willingness to provide financing to the Debtors on such a basis. Without immediate access to the postpetition financing, the Debtors would suffer immediate and irreparable harm and significant impairment to their business operations and as a result, will find it challenging to preserve the value inherent in the potential restructuring scenarios contemplated by the Debtors.

23.     A debtor need only demonstrate by a good faith effort that credit was not available without the protections afforded to potential lenders by Bankruptcy Code section 364(c). *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (debtor has an obligation to make "reasonable efforts, under the circumstances ... to obtain [unsecured financing], in the ordinary course of business or otherwise").

24.     As set forth in the Coutts Declaration, the marketing process used to determine the most viable postpetition financing facility for the Debtors in the context of these chapter 11 proceedings was appropriate in light of the Debtors' condition, timing concerns, and existing capital structure.  Due to the exigency of a bankruptcy filing and the nature of the Debtors' prepetition capital structure, the Debtors and their advisors believed that existing stakeholders would be more likely than outside investors to provide financing that would enable the Debtors to pursue a successful sale and restructuring process.

25.     As the Debtors began to contemplate the need for DIP financing, they determined that it would be challenging to obtain financing without the participation or support of their prepetition secured lenders, including the Prepetition Lender and the Prepetition Term Facility Lender Parties.  The Debtors' determination was based on the fact that (i) substantially all of the Debtors' assets are encumbered by existing liens securing the Existing Debt and the Prepetition Term Facilities Obligations and (ii) certain of the Debtors' prepetition secured lenders indicated that they would not consent to a "priming" DIP facility provided by a third-party lender.

26.     Through their advisors, the Debtors engaged in preliminary discussions with certain potential financing sources and/or asset purchasers regarding the potential for providing

postpetition financing to the Debtors in connection with these chapter 11 cases.  In each case, these discussions failed to progress beyond the preliminary stages.  Upon learning of the timing of the Debtors' restructuring process, the unwillingness of certain existing secured creditors to be primed by third parties and potential economic terms, each of these potential lenders declined to further pursue the possibility of providing DIP financing to the Debtors.  In addition, the Prepetition Term Facility Lender Parties ultimately determined that they would consent to the proposed DIP Facility offered by the DIP Lender rather than offering an alternative DIP financing proposal.

27.    After extensive discussions and multiple rounds of negotiations with the DIP Lender, the Debtors and their advisors concluded that the proposed DIP Facility was the only actionable offer for obtaining DIP financing.  The Debtors believe that the DIP Facility will provide the Debtors with the financing necessary to preserve the value of the Debtors' estates during the pendency of these chapter 11 cases and to successfully pursue a sale process that will maximize value for the benefit of the Debtors' estates and their creditors.

28.    Accordingly, the requirements of Bankruptcy Code section 364(c) are satisfied here since alternative credit on more favorable terms was unavailable to the Debtors.

### (i)    The DIP Facility is Necessary to Preserve Estate Assets and is an Exercise of the Debtors' Sound Business Judgment

29.    A debtor's decision to enter into a postpetition financing facility under Bankruptcy Code section 364 is governed by the business judgment standard.  *See, e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *Ames Dep't Stores*, 115 B.R. at 38 (noting that other decisions under section 364 find that financing reflects a debtor's business judgment).

Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor in possession is afforded discretion to act with regard to business decision-making. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

30.    As this Court has found, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006). The Debtors' decision to enter into the DIP Facility satisfies this standard.

31.    The DIP Facility is necessary to preserve the value of the Debtors' estates while the Debtors conduct a sale process that will maximize the value of the Debtors' estates for the benefit creditors. Specifically, the DIP Facility will allow the Debtors to maintain their operations, pay their obligations to their employees and administer these chapter 11 cases. Without immediate access to the DIP Facility, the Debtors will suffer immediate and irreparable harm and significant impairment to their business operations and as a result, would be unable to preserve the value inherent in the potential restructuring scenarios contemplated by the Debtors and their affiliates at this time. Further, the Debtors will benefit from the message the funding will provide to their key stakeholders that operations are and will continue to be adequately funded throughout these chapter 11 cases. The ability of the Debtors to maintain business relationships with their vendors, suppliers, service providers and patients requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.

### (ii)    The DIP Facility Terms are Fair, Within the Range of Reasonableness and Appropriate Under the Circumstances

32.    The proposed terms of the DIP Facility Agreement and the other DIP Facility Documents are fair, within the range of reasonableness, and appropriate under the circumstances. As discussed above, the Debtors made a good-faith effort to obtain credit on the most favorable terms available. Based on those efforts, the Debtors determined that the proposed DIP Facility provided the best alternative for postpetition financing. Moreover, the terms of the DIP Facility were the subject of extensive, good faith arm's length negotiations, and as a result of those negotiations, the Debtors believe that the terms of the DIP Facility are appropriate under the circumstances. Absent the approval of the terms reflect in the proposed DIP Facility, the DIP Lender would not provide postpetition financing to the Debtors.

### B.    The Debtors Should be Permitted to Consensually Prime the Prepetition Term Facilities Liens

33.    Pursuant to Bankruptcy Code section 364(d), a court may authorize postpetition financing secured by a senior or equal lien on encumbered property (*i.e.*, a "priming" lien) without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). A seminal case describing what constitutes adequate protection for purposes of Bankruptcy Code section 364(d)(1) is *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552 (3d Cir. 1994). In that decision, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy," and "should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland*, 16 F.3d at 564. Adequacy, held the Third Circuit, "depends directly on how effectively it compensates the secured creditor for loss of value" caused by the priming lien granted to the new lender. *In re Swedeland*, 16 F.3d at 564

(quoting *In re Am. Mariner Inds., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984)).   Other courts, applying the same principles, have similarly held that adequate protection sufficient to permit the grant of a priming lien under Bankruptcy Code section 364(d) "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights."  *In re Swedeland*, 16 F.3d at 564 (quoting *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985)).

34.     Here, the Prepetition Term Facility Lenders are expressly consenting to the granting of the DIP Liens senior in priority to the Prepetition Term Facilities Liens.   As a condition to such consent, however, the Prepetition Term Facility Lenders require adequate protection of their interests and have agreed that the adequate protection provided in the Interim Order and as described in this Motion is sufficient to justify granting the DIP Liens senior in priority to the Prepetition Term Facilities Liens.   According, the consensual priming of the Prepetition Term Facilities Liens should be approved pursuant to Bankruptcy Code section 364(d).

### C.     Authority to Use Cash Collateral and Provide Adequate Protection

35.     Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."   11 U.S.C. §363(c)(2).   Here, the Prepetition Term Facility Lenders have consented to the use of Cash Collateral in accordance with the terms set forth in the proposed Interim Order.

36.     Bankruptcy Code section 363(e) provides that "on request of an entity that has an interest in property . . .  to be used, sold or leased, by the trustee, the court  . . .  shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest."

11 U.S.C. § 363(e).   Although the Bankruptcy Code does not define "adequate protection," Bankruptcy Code section 361 sets forth a non-exclusive list of examples as to how adequate protection may be provided, including cash payments and replacement liens.  *See Swedeland*, 16 F.3d at 564; *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).   The determination of what constitutes adequate protection is made on a case-by-case basis.  *See Swedeland*, 16 F.3d at 563.   The purpose of adequate protection is to preserve a secured creditor's position and to protect the secured creditor from diminution of the value of its interest in collateral during the bankruptcy process.  *See Beker Indus.*, 58 B.R. at 736; *see also In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

37.     In order to protect the Prepetition Term Facility Lenders from any diminution in value of their interest in the Cash Collateral during the pendency of the Debtors' chapter 11 cases and avoid needless litigation with the Prepetition Term Facility Lenders, the Debtors have agreed to the proposed adequate protection described in this Motion and the Interim Order.   The proposed adequate protection is justified to protect the Prepetition Term Facility Lenders from any diminution in the value of their interest in the Cash Collateral resulting from the use of the Cash Collateral and the imposition of the automatic stay.

**D.     Final Hearing**

38.     The Debtors further respectfully request that the Court set a date and time for the Final Hearing that will allow the Court to consider and enter the Final Order approving the relief sought in this Motion no later than June 6, 2019, as required under the DIP Agreement.

**E.      Waiver of Bankruptcy Rules 6004(h) and Local Rule 9013-1(m)**

39.      The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed.  R.  Bankr.  P.  6004(h).

40.      Pursuant to Local Rule 9013-1(m), requests for relief on less than seven (7) days' notice and prior to the earlier of the creditors' committee formation meeting or the 11 U.S.C. § 341 meeting of creditors are "confined to matters of a genuinely emergent nature required to preserve the assets of the estate and to maintain ongoing business operations and such other matters as the Court may determine appropriate." Local Rule 9013-1(m)(ii).

41.      As set forth above, without access to capital, the continued operation of the Debtors' businesses would be incredibly burdensome, resulting in serious and irreparable harm to the Debtors and their estates.  Accordingly, the Debtors submit that they have satisfied the requirements of Local Rule 9013-1(m) to support immediate authority to access the requested capital under the DIP Facility.

<u>**NOTICE**</u>

42.      The Debtors will provide notice of this Motion to (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agents under the Debtors' pre-petition credit facilities; (d) King & Spalding as counsel to the lender under the Debtors' proposed post-petition debtor-in-possession financing; (e) all parties known to have asserted a lien or security interest; (f) the state attorney general's office in each state where the Debtors operate; (g) the Internal Revenue Service; (h) the United States Attorney for the District of Delaware; (i) the Debtors' landlords; and (j) the Debtors'

banks.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).

## **<u>CONCLUSION</u>**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (i) enter the Interim Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, granting the relief requested herein; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

Dated: Wilmington, Delaware
May 7, 2019

/s/ Jaime Luton Chapman

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Joseph M. Mulvihill (No. 6061)
Betsy L. Feldman (No. 6410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

– and –

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Scott Alberino (*pro hac vice* motion pending)
Kevin M. Eide (*pro hac vice* motion pending)
2001 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

Sarah Link Schultz (*pro hac vice* motion pending)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

**PROPOSED COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION**

**Exhibit A**

**DIP Agreement**

# DEBTOR-IN-POSSESSION
# CREDIT AGREEMENT

dated as of May 6, 2019

among

# LIFECARE HOLDINGS LLC
## and each of the Persons Listed on Schedule A
### as debtors and debtors-in-possession
**as Borrowers**,

# LIFECARE HOLDINGS LLC
**as Borrower Representative,**

# WHITE OAK HEALTHCARE FINANCE, LLC,
and
## the Lenders from time to time parties hereto,
**as Lenders**

and

# WHITE OAK HEALTHCARE FINANCE, LLC,
**as Administrative Agent and Collateral Agent**

**TABLE OF CONTENTS**

ARTICLE I. THE CREDITS .................................................................................................... 2

    1.1    Amounts and Terms of Commitments ........................................................ 2
    1.2    Interest ........................................................................................................ 5
    1.3    Revolving Loan Accounts. ........................................................................... 6
    1.4    Procedure for Revolving Credit Borrowing. ............................................... 7
    1.5    Optional Prepayments. ............................................................................... 7
    1.6    Mandatory Prepayments of Revolving Loans. ........................................... 8
    1.7    Fees. ........................................................................................................... 9
    1.8    Payments by Borrowers. ............................................................................ 9
    1.9    Payments by the Lenders to Agent; Settlement. ..................................... 11
    1.10    Eligible Accounts ..................................................................................... 13
    1.11    Joint and Several Liability ......................................................................... 13
    1.12    Borrower Representative .......................................................................... 14
    1.13    Super Priority Nature of Obligations and DIP Liens ................................ 15

ARTICLE II. CONDITIONS PRECEDENT ............................................................................ 15

    2.1    Conditions Precedent to the Closing Date ............................................... 15
    2.2    Conditions Precedent to Funding of all Revolving Loans ........................ 16

ARTICLE III. REPRESENTATIONS AND WARRANTIES ...................................................... 18

    3.1    Organization; Powers ............................................................................... 18
    3.2    Authorization; Enforceability .................................................................. 18
    3.3    Governmental Approvals; No Conflicts ................................................... 18
    3.4    Financial Condition .................................................................................. 19
    3.5    DIP Collateral .......................................................................................... 19
    3.6    Litigation and Environmental Matters. ................................................... 19
    3.7    Compliance with Laws; Healthcare Laws ................................................ 20
    3.8    Licenses, etc. ........................................................................................... 20
    3.9    Investment Company Status; Margin Regulation. ................................... 22
    3.10    Taxes ....................................................................................................... 22
    3.11    ERISA. ...................................................................................................... 23
    3.12    Disclosure ................................................................................................ 23
    3.13    Subsidiaries ............................................................................................. 23
    3.14    Insurance ................................................................................................. 23
    3.15    Labor Matters ......................................................................................... 24
    3.16    DIP Security Documents. ......................................................................... 24
    3.17    Liens ........................................................................................................ 24
    3.18    Provider Agreements .............................................................................. 25
    3.19    Casualty, Etc ............................................................................................ 25
    3.20    Anti-Terrorism Laws ................................................................................ 25
    3.21    [Reserved] ............................................................................................... 25
    3.22    [Reserved] ............................................................................................... 25
    3.23    Foreign Corrupt Practices Act ................................................................. 25

i

ARTICLE IV. AFFIRMATIVE COVENANTS ........................................................................... 26

    4.1      Budget ....................................................................................................... 26
    4.2      Financial Statements and Other Reporting Requirements ............................. 26
    4.3      Notices of Material Events ............................................................................ 29
    4.4      Information Regarding DIP Collateral. ........................................................... 31
    4.5      Existence; Conduct of Business ..................................................................... 32
    4.6      Payment of Obligations ................................................................................. 32
    4.7      Maintenance of Properties ............................................................................ 32
    4.8      Insurance ..................................................................................................... 32
    4.9      ERISA .......................................................................................................... 33
    4.10    Books and Records; Inspection and Audit Rights .......................................... 33
    4.11    Compliance with Laws .................................................................................. 33
    4.12    Use of Proceeds ........................................................................................... 33
    4.13    [Reserved] ................................................................................................... 34
    4.14    Further Assurances. ..................................................................................... 34
    4.15    [Reserved]. .................................................................................................. 34
    4.16    Healthcare Licenses. .................................................................................... 34
    4.17    Cash Management Systems. ......................................................................... 35
    4.18    Agent Calls. ................................................................................................. 36
    4.19    Subsidiaries ................................................................................................. 36
    4.20    Accounts. .................................................................................................... 36
    4.21    Financial Advisors ....................................................................................... 37
    4.22    Collections Services. .................................................................................... 37
    4.23    The Budget. ................................................................................................. 37
    4.24    [Reserved] ................................................................................................... 38
    4.25    [Reserved] ................................................................................................... 38
    4.26    The Financing Orders ................................................................................... 38
    4.27    Milestones. ................................................................................................. 38

ARTICLE V. NEGATIVE COVENANTS ................................................................................ 39

    5.1      Indebtedness; Certain Equity Securities. ...................................................... 39
    5.2      Liens ........................................................................................................... 41
    5.3      Fundamental Changes. ................................................................................. 41
    5.4      Investments, Loans, Advances, Guarantees and Acquisitions ....................... 42
    5.5      Asset Sales ................................................................................................... 43
    5.6      Rate Contracts ............................................................................................. 44
    5.7      Restricted Payments; Certain Payments of Indebtedness ............................. 44
    5.8      Transactions with Affiliates ......................................................................... 45
    5.9      Restrictive Agreements ................................................................................ 45
    5.10    Change in Business ...................................................................................... 46
    5.11    Fiscal Year ................................................................................................... 46
    5.12    Amendment of Material Documents ............................................................. 46
    5.13    Partnerships, Etc .......................................................................................... 47
    5.14    Sale and Leaseback Transactions ................................................................. 47
    5.15    Account Matters .......................................................................................... 47
    5.16    Modifications of the Financing Orders ......................................................... 47

Error! Unknown document property name.

5.17    Entry of the Final Order ................................................................................................. 47
5.18    Prohibition on Priming of Liens of the Lender ............................................................... 47
5.19    Press Releases ............................................................................................................... 47

**ARTICLE VI. FINANCIAL COVENANTS** ..................................................................................... 48

6.1    Permitted Variances ...................................................................................................... 48
6.2    Average Length of Stay .................................................................................................. 48
6.3    Monthly Revenues ......................................................................................................... 48

**ARTICLE VII. EVENTS OF DEFAULT** ......................................................................................... 48

7.1    Events of Default............................................................................................................ 48
7.2    Remedies ....................................................................................................................... 52
7.3    Rights Not Exclusive ...................................................................................................... 53
7.4    Attorney-In-Fact............................................................................................................. 53

**ARTICLE VIII. THE AGENT** ....................................................................................................... 53

8.1    Appointment and Duties................................................................................................ 53
8.2    Binding Effect................................................................................................................. 54
8.3    Use of Discretion........................................................................................................... 54
8.4    Delegation of Rights and Duties .................................................................................... 55
8.5    Reliance and Liability. .................................................................................................... 55
8.6    Agent Individually ......................................................................................................... 57
8.7    Lender Credit Decision................................................................................................... 57
8.8    Expenses; Indemnities; Withholding. ............................................................................ 58
8.9    Resignation of Agent..................................................................................................... 58
8.10    Release of DIP Collateral or Guarantors ....................................................................... 59
8.11    Additional Secured Parties............................................................................................. 60
8.12    Credit Bid ....................................................................................................................... 60
8.13    Additional Titles ............................................................................................................ 61

**ARTICLE IX. MISCELLANEOUS** ................................................................................................ 61

9.1    Amendments and Waivers............................................................................................. 61
9.2    Notices. .......................................................................................................................... 62
9.3    Electronic Transmissions................................................................................................ 63
9.4    No Waiver; Cumulative Remedies ................................................................................. 63
9.5    Costs and Expenses ....................................................................................................... 63
9.6    Indemnity....................................................................................................................... 64
9.7    Marshaling; Payments Set Aside. .................................................................................. 65
9.8    Successors and Assigns .................................................................................................. 65
9.9    Assignments and Participations; Binding Effect. ........................................................... 65
9.10    Non-Public Information; Confidentiality......................................................................... 68
9.11    Set-off; Sharing of Payments. ....................................................................................... 69
9.12    Counterparts; Facsimile and Electronic Signature ........................................................ 70
9.13    Severability ................................................................................................................... 70
9.14    Captions ........................................................................................................................ 70

**Error! Unknown document property name.**

9.15    Independence of Provisions.................................................................70
9.16    Interpretation .....................................................................................71
9.17    No Third Parties Benefited..................................................................71
9.18    Governing Law and Jurisdiction. .........................................................71
9.19    Waiver of Jury Trial ............................................................................72
9.20    Entire Agreement; Release; Survival....................................................72
9.21    Patriot Act .........................................................................................72
9.22    [Reserved]..........................................................................................72
9.23    Creditor-Debtor Relationship .............................................................73
9.24    Actions in Concert .............................................................................73

ARTICLE X. TAXES, YIELD PROTECTION AND ILLEGALITY.........................................73

10.1    Taxes. ................................................................................................73
10.2    Increased Costs and Reduction of Return. ..........................................76
10.3    Funding Losses ..................................................................................77
10.4    Inability to Determine Rates. ..............................................................77
10.5    Reserves on Revolving Loans .............................................................77
10.6    Certificates of Lenders .......................................................................78

ARTICLE XI. DEFINITIONS.............................................................................79

11.1    Defined Terms....................................................................................79
11.2    Other Interpretive Provisions. ..........................................................116
11.3    Accounting Terms; GAAP .................................................................117
11.4    Payments .........................................................................................118

Error! Unknown document property name.

**SCHEDULES**

| | | |
|---|---|---|
| Schedule A | — | Borrowers |
| Schedule B | — | Other Debt Obligations |
| Schedule C | — | Material Events |
| Schedule 1.1(a) | — | Revolving Loan Commitments |
| Schedule 1.1(b) | — | Existing Letters of Credit |
| Schedule 3.5(c) | — | Real Property |
| Schedule 3.7 | — | Compliance with Laws, Healthcare Laws |
| Schedule 3.8(a) | — | Payor Contracts; Provider Agreements |
| Schedule 3.8(b) | — | Accreditation Matters |
| Schedule 3.8(c) | — | Medicare Healthcare Facility Matters |
| Schedule 3.8(d) | — | Medicaid Healthcare Facility Matters |
| Schedule 3.8(e) | — | Cost Report Matters |
| Schedule 3.8(f) | — | Healthcare Facilities |
| Schedule 3.13 | — | Subsidiaries |
| Schedule 3.14 | — | Insurance |
| Schedule 3.18 | — | Defaults |
| Schedule 4.11 | — | Closing Date Sources and Uses |
| Schedule 4.17(e) | — | Deposit, Securities and Commodity Accounts |
| Schedule 5.1 | — | Existing Indebtedness |
| Schedule 5.2 | — | Existing Liens |
| Schedule 5.4 | — | Existing Investments |
| Schedule 5.6 | — | Existing Rate Contracts |
| Schedule 5.9 | — | Existing Restrictions |

**EXHIBITS**

| | |
|---|---|
| Exhibit I | Form of Budget |
| Schedule I-A | List of Overpayments |
| Exhibit II | Interim Order |
| Exhibit III | First-Day Orders |
| Exhibit IV | Closing Document Checklist |
| Exhibit 1.1(b) | Reserved |
| Exhibit 4.1(d) | Form of Compliance Certificate |
| Exhibit 11.1(a) | Form of Affiliate Subordination Agreement |
| Exhibit 11.1(b) | Form of Assignment |
| Exhibit 11.1(c) | Form of Borrowing Base Certificate |
| Exhibit 11.1(d) | Form of Notice of Borrowing |
| Exhibit 11.1(e) | Form of Weekly Report |

**Error! Unknown document property name.**

`

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (including all exhibits and schedules hereto, as the same may be amended, supplemented or otherwise modified and/or restated from time to time in accordance with its terms and the Financing Orders (as hereinafter defined) (this "<u>Agreement</u>"), dated as of May 6, 2019, by and among LIFECARE HOLDINGS LLC, a Delaware limited liability company ("<u>LifeCare Holdings</u>"), and as of the Filing Date (as defined below), a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, each Subsidiary of LifeCare Holdings listed on <u>Schedule A</u> hereto as a Borrower and as of the Filing Date, a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (LifeCare Holdings and each Subsidiary of LifeCare Holdings listed on <u>Schedule A</u> hereto, and their respective successors and assigns, each a "<u>Borrower</u>", and collectively and jointly and severally, "<u>Borrowers</u>" or the "<u>LifeCare Entities</u>"), LIFECARE HOLDINGS LLC, as the representative of Borrowers (the "<u>Borrower Representative</u>"), the Revolving Lenders from time to time party hereto (together with their successors and permitted assigns in that capacity, each a "<u>Lender</u>" and, collectively, the "<u>Lenders</u>") and WHITE OAK HEALTHCARE FINANCE, LLC, a Delaware limited liability company ("<u>WOHCF</u>"), in its capacity as administrative agent and collateral agent for the Lenders (together with its successors and permitted assigns in those capacities, "<u>Agent</u>").

Each of Borrowers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on May 6, 2019 (the "<u>Filing Date</u>");

Prior to the Filing Date, the LifeCare Entities were party to that certain Credit Agreement, dated as August 10, 2018 (as amended, modified and supplemented prior to the Filing Date, the "<u>Prepetition Credit Agreement</u>", and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "<u>Prepetition Facility</u>"), among the LifeCare Entities, as borrowers, LifeCare Holdings as Borrower Representative, the revolving lenders from time to time party thereto (the "<u>Prepetition Lenders</u>") and White Oak Healthcare Finance, LLC, as administrative agent and collateral agent for the Prepetition Lenders (in such capacity, the "<u>Prepetition Agent</u>" and together with the Prepetition Lenders, the "<u>Prepetition Lender Parties</u>"), secured by a lien in the "Collateral" (as defined in the Prepetition Credit Agreement). Terms not otherwise defined herein shall have the meanings set forth in the Prepetition Credit Agreement;

As of the Filing Date, the total principal amount outstanding under the Prepetition Facility is approximately $26,721,070.08 and the total Letter of Credit Obligations outstanding under the Prepetition Facility is approximately $9,448,735.49, in each case, plus accrued and unpaid interest, fees (including fees arising from the Events of Default and termination of funding obligations thereunder) and expenses including professional fees and expenses incurred under or in connection with the Prepetition Facility (collectively, the "<u>Existing Debt</u>");

Borrowers have requested that the Lenders provide to Borrowers a debtor-in-possession revolving credit facility secured by a first priority Lien in the DIP Collateral (this Agreement, together with the other Loan Documents and the Financing Orders, as such documents may be amended, modified or supplemented from time to time, the "<u>DIP Facility</u>"), and the Lender has agreed to make available to Borrowers such facility upon and subject to the terms and conditions set forth in this Agreement (i) to provide for working capital and other general corporate purposes of Borrowers, and (ii) to fund certain fees and expenses associated with the DIP Facility, each as set forth in the Budget;

Borrowers have agreed, pursuant to the Financing Orders, to secure the Obligations under the Loan Documents by granting Agent for the benefit of the Lenders a first priority (and priming) Lien in the DIP Collateral as security for the Obligations, senior in priority to all Liens other than Permitted Liens;

Hospital Acquisition Intermediate Sub LLC, a Delaware limited liability company ("Holdings") directly owns all of the Equity Interests of LifeCare Holdings and has agreed to guaranty all of the Obligations and has agreed to secure all of its Obligations under the Loan Documents by pledging to Agent, for the benefit of the Secured Parties, all of the Equity Interests of LifeCare Holdings and granting to Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its other Property;

Hospital Acquisition LLC, a Delaware limited liability company ("Parent Holdings") directly owns all of the Equity Interests of Holdings and has agreed to guaranty all of the Obligations and has agreed to secure all of its Obligations under the Loan Documents by pledging to Agent, for the benefit of the Secured Parties, all of the Equity Interests of Holdings and granting to Agent, for the benefit of the Secured Parties, a security interest in and lien upon substantially all of its other Property; and

LifeCare Holdings has agreed to secure all of its Obligations under the Loan Documents by pledging to Agent, for the benefit of the Secured Parties, all of the Equity Interests of the other Borrowers.

Accordingly, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

**ARTICLE I.**
**THE CREDITS**

1.1     Amounts and Terms of Commitments.

(a)     The Revolving Credit.

(i)     Subject to the terms and conditions of this Agreement and the Financing Orders, and in reliance upon the representations and warranties of the Loan Parties contained herein, each Revolving Lender severally and not jointly agrees to make Revolving Loans to Borrowers (each such loan, a "Revolving Loan") from time to time on any Business Day during the period commencing on the Closing Date through the Termination Date, in an aggregate amount not to exceed at any time outstanding the amount set forth opposite such Lender's name on Schedule 1.1(a) under the heading "Revolving Loan Commitments" (such amount as the same may be reduced or increased from time to time in accordance with this Agreement and the Financing Orders, being referred to herein as such Lender's "Revolving Loan Commitment"); *provided, however*, that, Borrowers may utilize the proceeds of Revolving Loans solely in a manner permitted under Section 4.12 hereto; and *provided, further*, that after giving effect to any Borrowing of Revolving Loans, the aggregate principal amount of all outstanding Revolving Loans shall not exceed the Maximum Revolving Loan Balance.  For clarity, the Revolving Loan Commitment of each Lender set forth on Schedule 1.1(a) shall be inclusive of the *pro rata* allocation among the Lenders of the Incremental DIP Commitment.  Subject to the other terms and conditions hereof and the Financing Orders, amounts borrowed under this subsection 1.1(a) may be repaid and reborrowed from time to time.  The "Maximum Revolving Loan Balance" from time to time shall equal the lesser of:

**Error! Unknown document property name.**

(1)    the lesser of (x) the Borrowing Base (as calculated pursuant to the Borrowing Base Certificate) in effect from time to time, and (y) the Aggregate Revolving Loan Commitment then in effect;

*less*, in either case for the period prior to the Cash Collateral Account Funding Date, the aggregate amount of Letter of Credit Obligations; and

(2)    the Committed Amount.

(ii)    If at any time the then outstanding principal balance of Revolving Loans exceeds the Maximum Revolving Loan Balance (an "Overadvance"), then Borrowers shall immediately prepay outstanding Revolving Loans in an amount necessary to eliminate such Overadvance.

(iii)    The Revolving Loans made by each Revolving Lender are evidenced by this Agreement.

(iv)    On the Final Order Date, Borrowers hereby direct, consent and agree that:  (i) Borrowers shall be deemed to have requested a Revolving Loan in an amount equal to the Existing Debt outstanding on the Final Order Date, (ii) Borrowers shall be deemed to have directed Agent to pay the proceeds of such Revolving Loan to the Prepetition Agent with a direction to repay the Existing Debt in full.

(b)    Letters of Credit.

(i)    Conditions.  Pursuant to the Interim Order and the Final Order, the Letter of Credit Obligations with respect to the Letters of Credit listed on Schedule 1.1(b) shall be deemed and considered Obligations for all purposes hereunder, secured by the DIP Collateral.

(ii)    Notice of Issuance.  No new Letters of Credit shall be issued under this Agreement.

(iii)    Reporting Obligations of L/C Issuer.  The L/C Issuer agrees to provide Agent, in form and substance satisfactory to Agent, each of the following on the following dates: (i) immediately upon receipt of any request for drawing under any such Letter of Credit; (ii) immediately upon any drawing under any such Letter of Credit; and (iii) immediately after any payment (or failure to pay when due) by Borrowers of any related L/C Reimbursement Obligation, notice thereof, which shall contain a detailed description of such Issuance, drawing or payment, and Agent shall provide copies of such notices to each Revolving Lender reasonably promptly after receipt thereof.

(iv)    Cash Collateral for Letters of Credit.  On the Final Order Date, Borrowers hereby authorize Agent and each Lender to make, and Borrowers shall be deemed to have requested the Revolving Lenders to make, a Revolving Loan equal to 102% of the amount of Letter of Credit Obligations, and Agent shall deposit the proceeds of such Revolving Loan into the Cash Collateral Account for the benefit of the L/C Issuer as collateral security for L/C Reimbursement Obligations. Borrowers hereby instruct the L/C Issuer to immediately apply amounts in the Cash Collateral Account to the reimbursement of all L/C Reimbursement Obligations when such obligations become due and payable.  Following the termination, discharge or repayment of any L/C Reimbursement Obligation, the L/C Issuer shall withdraw from the Cash Collateral Account and deposit into the Collection Account amounts held in the Cash Collateral Account, if any, in excess of 102% of the amount of Letter of Credit

3

Obligations, as reduced by the amount of such termination, discharge or repayment and following the Cash Collateral Account Funding Date, the L/C Issuer shall not have any claim against any Lender Party or any right or access to the DIP Collateral to discharge or repay any L/C Reimbursement Obligation.  The L/C Issuer shall return to Borrowers all remaining and unapplied amounts in the Cash Collateral Account when all Letters of Credit have been terminated or discharged, all Commitments have been terminated and all Obligations have been paid in full in cash.

(v)        Reimbursement Obligations of Borrowers.  Until the occurrence of the Cash Collateral Account Funding Date, Borrowers agree to pay to the L/C Issuer each L/C Reimbursement Obligation owing with respect to such Letter of Credit no later than the first Business Day after Borrower Representative receives notice from such L/C Issuer or from Agent that payment has been made under such Letter of Credit or that such L/C Reimbursement Obligation is otherwise due (the "L/C Reimbursement Date") with interest thereon computed as set forth below.  In the event that any L/C Reimbursement Obligation is not repaid by Borrowers as provided in this clause (v) (or any such payment by Borrowers is rescinded or set aside for any reason), such L/C Issuer shall promptly notify Agent of such failure (and, upon receipt of such notice, Agent shall notify each Revolving Lender) and, irrespective of whether such notice is given, such L/C Reimbursement Obligation shall be payable on demand by Borrowers with interest thereon computed from the date on which such L/C Reimbursement Obligation arose to the L/C Reimbursement Date, at the Prime Rate, and thereafter at the Prime Rate plus 2.00% *per annum*.

(vi)        Reimbursement Obligations of the Revolving Credit Lenders.

(1)        Until the occurrence of the Cash Collateral Account Funding Date, upon receipt of the notice described in clause (v) above from Agent, each Revolving Lender shall pay to Agent for the account of such L/C Issuer its Commitment Percentage of such Letter of Credit Obligations (as such amount may be increased pursuant to subsection 1.9(e)(ii)).

(2)        By making any payments described in clause (1) above, such Lender shall be deemed to have made a Revolving Loan to Borrowers, which, upon receipt thereof by Agent for the benefit of such L/C Issuer, Borrowers shall be deemed to have used in whole to repay such L/C Reimbursement Obligation.  Any such payment that is not deemed a Revolving Loan shall be deemed a funding by such Lender of its participation in the applicable Letter of Credit and the Letter of Credit Obligation in respect of the related L/C Reimbursement Obligations.  Such participation shall not otherwise be required to be funded.  Following receipt by any L/C Issuer of any payment from any Lender pursuant to this clause (vi) with respect to any portion of any L/C Reimbursement Obligation, such L/C Issuer shall promptly pay to Agent, for the benefit of such Lender, all amounts received by such L/C Issuer (or to the extent such amounts shall have been received by Agent for the benefit of such L/C Issuer, Agent shall promptly pay to such Lender all amounts received by Agent for the benefit of such L/C Issuer) with respect to such portion.

(vii)        Obligations Absolute.  The obligations of Borrowers and the Revolving Lenders pursuant to clauses (iv), (v) and (vi) above shall be absolute, unconditional and irrevocable and performed strictly in accordance with the terms of this Agreement irrespective of (A) (i) the invalidity or unenforceability of any term or provision in any Letter of Credit, any document transferring or purporting to transfer a Letter of Credit, any Loan Document (including the sufficiency of any such instrument), or any modification to any provision of any of the foregoing, (ii) any document presented under a Letter of Credit being forged, fraudulent, invalid, insufficient or inaccurate in any respect or

4

failing to comply with the terms of such Letter of Credit or (iii) any loss or delay, including in the transmission of any document, (B) the existence of any setoff, claim, abatement, recoupment, defense or other right that any Person (including any Loan Party) may have against the beneficiary of any Letter of Credit or any other Person, whether in connection with any Loan Document or any other Contractual Obligation or transaction, or the existence of any other withholding, abatement or reduction, (C) in the case of the obligations of any Revolving Lender, (i) the failure of any condition precedent set forth in <u>Section 2.2</u> to be satisfied (each of which conditions precedent the Revolving Lenders hereby irrevocably waive) or (ii) any adverse change in the condition (financial or otherwise) of any Loan Party and (D) any other act or omission to act or delay of any kind of Agent, any Lender or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>clause (vii)</u>, constitute a legal or equitable discharge of any obligation of any Borrower or any Revolving Lender hereunder.  No provision hereof shall be deemed to waive or limit Borrowers' right to seek repayment of any payment of any L/C Reimbursement Obligations from the L/C Issuer under the terms of the applicable L/C Reimbursement Agreement or applicable law.

1.2    <u>Interest.</u>

(a)    Subject to <u>subsections 1.2(c)</u> and <u>1.2(d)</u>, Borrowers shall pay interest on the outstanding principal amount of each Revolving Loan from the date when made at a rate *per annum* equal to the Base Rate *plus* the Applicable Margin calculated utilizing the same methodology in effect under the Prepetition Facility.  Each determination of an interest rate by Agent shall be conclusive and binding on Borrowers and the Lenders in the absence of manifest error.  All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed.  Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof through the last day thereof.

(b)    Interest on each Revolving Loan shall be paid in arrears on each Interest Payment Date.  Interest shall also be paid on the date of any payment or prepayment of Revolving Loans on the Termination Date.

(c)    At any time that an Event of Default exists and is continuing, Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Revolving Loans under the Loan Documents from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding two percent (2.00%) *per annum* to the Applicable Margin then in effect for such Revolving Loans (plus the Base Rate).  All such interest shall be payable on demand of Agent or the Required Lenders.

(d)    Anything herein to the contrary notwithstanding, the obligations of Borrowers hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event Borrowers shall pay such Lender interest at the highest rate permitted by applicable law ("<u>Maximum Lawful Rate</u>")*; provided, however*, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by Agent, on behalf of Lenders, is equal to the total interest that would have been

5

received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

1.3     Revolving Loan Accounts.

(a)     Agent, on behalf of the Lenders, shall record on its books and records the amount of each Revolving Loan made, the interest rate applicable, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  Agent shall deliver to Borrower Representative on a monthly basis a loan statement setting forth such record for the immediately preceding calendar month.  Such record shall, absent manifest error, be conclusive evidence of the amount of the Revolving Loans made by the Lenders to Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of Borrowers hereunder to pay any amount owing with respect to the Revolving Loans or provide the basis for any claim against Agent.

(b)     Agent, acting as a non-fiduciary agent of Borrowers solely for Tax purposes and solely with respect to the actions described in this subsection 1.3(b), shall establish and maintain at its address referred to in Section 9.2 (or at such other address as Agent may notify Borrower Representative) (A) a record of ownership (the "Register") in which Agent agrees to register by book entry the interests (including any rights to receive payment hereunder) of Agent, each Lender and the L/C Issuer in the Revolving Loans, L/C Reimbursement Obligations and Letter of Credit Obligations, each of their obligations under this Agreement to participate in each Revolving Loan, Letter of Credit, Letter of Credit Obligations, and L/C Reimbursement Obligations, and any assignment of any such interest, obligation or right and (B) accounts in the Register in accordance with its usual practice in which it shall record (1) the names and addresses of the Lenders and the L/C Issuer (and each change thereto pursuant to Sections 9.9 and 9.22), (2) the Commitments of each Lender, (3) the amount of each Revolving Loan, (4) the amount of any principal or interest due and payable or paid, (5) the amount of the L/C Reimbursement Obligations due and payable or paid in respect of Letters of Credit and (6) any other payment received by Agent from Borrowers and its application to the Obligations.  The entries in the Register shall be conclusive absent manifest error, and Borrowers, Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrower Representative and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)     Notwithstanding anything to the contrary contained in this Agreement, the Revolving Loans and the L/C Reimbursement Obligations are registered obligations, the right, title and interest of the Lenders and the L/C Issuers and their assignees in and to such Revolving Loans or L/C Reimbursement Obligations, as the case may be, shall be transferable only upon notation of such transfer in the Register and no assignment thereof shall be effective until recorded therein.  This Section 1.3 and Section 9.9 shall be construed so that the Revolving Loans and L/C Reimbursement Obligations are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code.

(d)     Borrowers, Agent, the Lenders and the L/C Issuers shall treat each Person whose name is recorded in the Register as a Lender or L/C Issuer, as applicable, for all purposes of this Agreement.  Information contained in the Register with respect to any Lender or any L/C Issuer shall be available for access by Borrower Representative, Agent, such Lender or such L/C Issuer during normal

6

business hours and from time to time upon at least one Business Day's prior notice.  No Lender or L/C Issuer shall, in such capacity, have access to or be otherwise permitted to review any information in the Register other than information with respect to such Lender or L/C Issuer unless otherwise agreed by Agent.

1.4     Procedure for Revolving Credit Borrowing.

(a)     Each Borrowing of a Revolving Loan shall be made upon Borrower Representative's irrevocable (subject to Section 10.4) written notice delivered to Agent substantially in the form of a Notice of Borrowing or in a writing in any other form acceptable to Agent, which notice must be received by Agent prior to 2:00 p.m. (New York time) on the date which is two (2) Business Days (or during the Interim Period, one (1) Business Day) prior to the requested Borrowing date (or such later time as Agent may agree to in its Permitted Discretion).  Such Notice of Borrowing shall specify:

(i)     the amount of the Borrowing (which shall be in an aggregate minimum principal amount of $100,000); and

(ii)     the requested Borrowing date, which shall be a Business Day.

Each such notice must be confirmed promptly by delivery to Agent of a Borrowing Base Certificate with the amount of the requested advance in the appropriate line of that Borrowing Base Certificate, which must be signed by a Responsible Officer of Borrower Representative.

(b)     Upon receipt of a Notice of Borrowing, Agent will promptly notify each Revolving Lender of such Notice of Borrowing and of the amount of such Lender's Commitment Percentage of the Borrowing.

(c)     The proceeds of each requested Borrowing after the Closing Date will be made available to Borrower Representative by Agent by wire transfer of such amount to the Master Disbursement Account.

1.5     Optional Prepayments.

(a)     Termination of Revolving Loan Commitments.  Borrowers may at any time upon at least five (5) days' prior written notice by Borrower Representative to Agent terminate all Revolving Loan Commitments; provided, that upon such termination, all Obligations shall be paid in full and all Letter of Credit Obligations shall be fully cash collateralized pursuant to Section 1.1(b)(iv).  Any termination of the Revolving Loan Commitment shall be without premium or penalty except as provided in the DIP Fee Letter or Section 10.3.

(b)     Voluntary Prepayments. Borrowers may, in addition to any reduction by application of the Collections in accordance with Section 1.8(c), upon prior notice to Agent, at any time or from time to time voluntarily prepay the Revolving Loans in whole or in part without premium or penalty except as provided in Section 10.3; provided, that (i) such notice must be received by Agent not later than 2:00 p.m. (New York time), two (2) Business Days' prior to any date of prepayment; and (ii) any such prepayment shall be in a minimum amount equal to $100,000, or if less, the entire principal amount thereof then outstanding.

7

(c)    Notice.    The notice of any reduction in the Aggregate Revolving Loan Commitment or prepayment of Revolving Loans shall not thereafter be revocable by Borrower Representative and Agent will promptly notify each Lender thereof and of such Lender's Commitment Percentage of such reduction or prepayment, as the case may be; *provided* that a notice of prepayment delivered by Borrowers may state that such notice is conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by Borrower Representative (by notice to Agent on or prior to the specified effective date) if such condition is not satisfied.  In the case of any notice of prepayment, the payment amount specified in such notice shall be due and payable on the date specified therein.  Together with each prepayment under this Section 1.5, Borrowers shall pay any amounts required pursuant to the DIP Fee Letter and Section 10.3.

1.6    Mandatory Prepayments of Revolving Loans.

(a)    Mandatory Prepayments on the Revolving Loan Termination Date.    Borrowers shall repay to the Lenders in full on the date specified in clause (a) of the definition of "Termination Date" the aggregate principal amount of the Revolving Loans outstanding on the Termination Date.

(b)    Mandatory Prepayments from Dispositions.    Borrowers shall repay and there shall become due and payable, concurrently with the receipt of Net Proceeds with respect to Disposition, a prepayment of the Revolving Loans in an amount equal to 100% of Net Proceeds from any Disposition.  Such Net Proceeds shall be deposited solely in the Collateral Account for application towards the reduction of the Revolving Loans pursuant to and in accordance with the priorities set forth in Section 1.6(c).

(c)    Application of Prepayments.    Subject to subsection 1.8(c), any prepayments of the Revolving Loans pursuant to Section 1.5(a) or Net Proceeds from a Disposition pursuant to Section 1.6(b) (the "Mandatory Prepayment Amounts") shall be applied *first*, to payment of costs and expenses, including Professional Costs, of Agent payable or reimbursable by the Loan Parties under the Loan Documents relating to such Disposition; *second*, to the repayment and permanent reduction of outstanding amounts of Incremental DIP Advances until the Incremental DIP Advances are reduced to zero; *third*, to the repayment and permanent reduction of the aggregate outstanding amount of the Revolving Loans until the outstanding Revolving Loans do not exceed the Adjusted Commitment Amount; *fourth*, to the repayment (but not the permanent reduction) of the aggregate outstanding amount of the Revolving Loans until the outstanding Revolving Loans do not exceed the Maximum Revolving Loan Balance, and *fifth*, to the repayment of the Obligations in accordance with, and in the order established under the waterfall provisions of Section 1.8(c) or Section 1.8(d), as applicable.

(d)    Reductions of Aggregate Revolving Loan Commitment.    Simultaneously with, and in connection with the application of Mandatory Prepayment Amounts to the Revolving Loan pursuant to Section 1.6(c) above, the Aggregate Revolving Loan Commitments shall be reduced as follows:  *first,* the Incremental DIP-Base Commitment (and that portion of the Aggregate Revolving Loan Commitments relating to the Incremental DIP-Base Commitment) shall be permanently reduced by the amount of all Mandatory Repayment Amounts on a dollar-for-dollar basis, until the Incremental DIP-Base Commitment is equal to zero, *second,* the Incremental DIP-Supplemental Commitment (and that portion of the Aggregate Revolving Loan Commitments relating to the Incremental DIP-Supplemental Commitment) shall be permanently reduced by the amount of all Mandatory Repayment Amounts on a dollar-for-dollar basis, until the Incremental DIP-Supplemental Commitment is equal to zero, and *third,* the remaining Aggregate Revolving Loan Commitments shall be permanently reduced by the amount of

8

all Mandatory Repayment Amounts on a dollar-for-dollar basis, until the Aggregate Revolving Loan Commitments equals the Adjusted Commitment Amount.

(e)    <u>Net Proceeds from Dispositions</u>. Borrower Representative and Borrowers shall deliver, and Agent shall be entitled to receive all Net Proceeds from any DIP Collateral, including from any Disposition, for deposit solely into the Collection Account for application as Collections pursuant to the provisions of this Agreement.

(f)    <u>No Implied Consent</u>. Provisions contained in this <u>Section 1.6</u> for the application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

1.7    <u>Fees</u>.

(a)    <u>Agent and Lender Fees</u>.  Borrowers shall pay to Agent the fees in the amounts and at the times set forth in DIP Fee Letter.

(b)    <u>[Reserved]</u>.

(c)    <u>Letter of Credit Fee</u>.    Until the occurrence of the Cash Collateral Account Funding Date, Borrowers agree to pay to Agent for the ratable benefit of the Revolving Lenders, as compensation to such Lenders for Letter of Credit Obligations incurred hereunder, (i) without duplication of costs and expenses otherwise payable to Agent or Lenders hereunder or fees otherwise paid by Borrowers, all costs and expenses incurred by Agent or any Lender on account of such Letter of Credit Obligations, and (ii) for each fiscal quarter during which any Letter of Credit Obligation shall remain outstanding, a fee (the "<u>Letter of Credit Fee</u>") in an amount equal to the product of the average daily undrawn face amount of all Letters of Credit Issued, guarantied or supported by risk participation agreements multiplied by a per annum rate equal to the Applicable Margin with respect to Revolving Loans; *provided, however*, during the continuance of an Event of Default, such rate shall be increased by two percent (2.00%) *per annum*.  Such fee shall be paid to Agent for the benefit of the Revolving Lenders in arrears, on the first day of each fiscal quarter and on the date on which all L/C Reimbursement Obligations have been discharged.  In addition, Borrowers shall pay to Agent, any L/C Issuer or any prospective L/C Issuer, as appropriate, on demand, such L/C Issuer's or prospective L/C Issuer's customary fees at then prevailing rates, without duplication of fees otherwise payable hereunder (including all per annum fees), charges and expenses of such L/C Issuer or prospective L/C Issuer in respect of the application for, and the Issuance, negotiation, acceptance, amendment, transfer and payment of, each Letter of Credit or otherwise payable pursuant to the application and related documentation under which such Letter of Credit is Issued.

1.8    <u>Payments by Borrowers</u>.

(a)    All payments (including prepayments) to be made by Borrowers on account of principal, interest, fees and other amounts required hereunder shall be made without set-off, recoupment, counterclaim or deduction of any kind, shall, except as otherwise expressly provided herein, be made to Agent (for the ratable account of the Persons entitled thereto) at the address for payment specified in the signature page hereof in relation to Agent (or such other address as Agent may from time to time specify in accordance with <u>Section 9.2</u>), and shall be made in Dollars and by wire transfer in immediately available funds (which shall be the exclusive means of payment hereunder).  Any payment (i) which is received by Agent on or prior to 1:00 p.m. (New York time) shall be credited on

9

such Business Day, and (ii) which is received by Agent later than 1:00 p.m. (New York time) may in Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue. Borrowers and the other Loan Parties hereby irrevocably waive the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of DIP Collateral. Borrowers hereby authorize Agent and each Lender to make a Revolving Loan to pay interest, principal, fees set forth in the DIP Fee Letter and Letter of Credit Fees and, until the occurrence of the Cash Collateral Account Funding Date, L/C Reimbursement Obligations, in each instance, on the date due and all other fees, costs or expenses payable by any Borrower or any of the Subsidiaries hereunder or under the other Loan Documents.

(b)       If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

(c)       On each Business Day (*provided*, with respect to distributions made prior to the Termination Date, and so long as no Event of Default exists, that Borrowers shall have successfully sent to Agent all Receivable Information reasonably required with respect to the Accounts), Agent shall distribute any and all cash Collections in the Collection Account (*provided*, with respect to distributions made prior to the Termination Date, and so long as no Event of Default exists, that such Collections were deposited in the Collection Account prior to 12:00 p.m. (New York time) on the immediately preceding Business Day) as follows:

*first*, to Agent, an amount in cash equal to expenses incurred with respect to the administration, service and maintenance of Agent's Lien on the DIP Collateral and all fees and collection costs that are due and payable, if any, as set forth in herein until such amounts have been paid in full;

*second*, to Agent, for the account of the Lenders, an amount in cash equal to fees, interest and expenses (including costs and expenses, including Professional Costs, of Agent payable or reimbursable by the Loan Parties under the Loan Documents) that are due and payable to the Lenders on account of the Revolving Loan as of such Business Day and have not otherwise been paid in full by Borrowers, if any, until such amounts have been paid in full, allocated ratably among the parties entitled thereto in accordance with the amounts then due to such parties;

*third*, until the occurrence of the Cash Collateral Account Funding Date, to Agent, for the account of the Lenders and the L/C Issuer, as applicable, an amount in cash equal to the principal amount of any outstanding L/C Reimbursement Obligations, allocated ratably among the parties entitled thereto in accordance with the amounts of L/C Reimbursement Obligations then due to such parties;

*fourth*, to Agent for the account of the Lenders, an amount in cash equal to the principal amount of the Revolving Loan, until such amount has been paid in full, allocated ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties;

Error! Unknown document property name.

*fifth*, to Agent, for the account of Agent or any applicable Lenders, an amount in cash equal to the aggregate amount of any other Obligations due and payable on such Business Day, if any, until such amount has been paid in full; and

*sixth*, to Borrowers, all remaining amounts of Collections, as requested.

(d)    During the continuance of an Event of Default, Agent may, and shall upon the direction of the Required Lenders, apply any and all payments received by Agent in respect of any Obligation in accordance with clauses first through sixth below.  Notwithstanding any provision herein to the contrary, all payments made by Borrowers to Agent after any or all of the Obligations have been accelerated (so long as such acceleration has not been rescinded), including proceeds of DIP Collateral, shall be applied as follows:

*first*, to payment of costs and expenses, including Professional Costs, of Agent payable or reimbursable by the Loan Parties under the Loan Documents;

*second*, to payment of Professional Costs of Lenders payable or reimbursable by Borrowers under this Agreement;

*third*, to payment of all accrued unpaid interest on the Obligations and fees owed to Agent, Lenders and L/C Issuers;

*fourth*, to payment of any L/C Reimbursement Obligations then due and payable, allocated ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties;

*fifth*, to payment of the principal of all Revolving Loans and the cash collateralization of unmatured L/C Reimbursement Obligations to the extent not then due and payable), allocated ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties;

*sixth*, to payment of any other amounts owing constituting Obligations; and

*seventh*, any remainder shall be for the account of and paid to whoever may be lawfully entitled thereto.

(e)    In carrying out the foregoing payments under Sections 1.8(c) and (d), (i) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category and (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to the applicable clause above.

1.9    Payments by the Lenders to Agent; Settlement.

(a)    Agent may, on behalf of Lenders, disburse funds to Borrower Representative for the benefit of one or more Borrowers for Revolving Loans requested.  Each Lender shall reimburse Agent on demand for all funds disbursed on its behalf by Agent, or if Agent so requests, each Lender will remit to Agent its Commitment Percentage of any Revolving Loan before Agent disburses same to Borrower Representative.  If Agent elects to require that each Lender make funds available to Agent

11

prior to disbursement by Agent to Borrower Representative, Agent shall advise each Lender by telephone or email of the amount of such Lender's Commitment Percentage of the Revolving Loan requested by Borrower Representative no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Agent such Lender's Commitment Percentage of such requested Revolving Loan, in same day funds, by wire transfer to Agent's account, as set forth on Agent's signature page hereto, no later than 1:00 p.m. (New York time) on such scheduled Borrowing date.  Nothing in this <u>subsection 1.9(a)</u> or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of <u>Section 1.9</u>, shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Agent, any Lender or Borrowers may have against any Lender as a result of any default by such Lender hereunder.

(b)    At least once each calendar week or more frequently at Agent's election (each, a "<u>Settlement Date</u>"), Agent shall advise each Lender by telephone or email of the amount of such Lender's Commitment Percentage of principal, interest and Fees paid for the benefit of Lenders.  Agent shall pay to each Lender such Lender's Commitment Percentage (except as otherwise provided in <u>subsection 1.1(b)(vi)</u> and <u>subsection 1.9(e)</u> and the DIP Fee Letter) of principal, interest and fees paid by Borrowers for the benefit of such Lender on the Revolving Loans held by it.  Such payments shall be made by wire transfer to such Lender not later than 2:00 p.m. (New York time) on the next Business Day following each Settlement Date.

(c)    <u>Availability of Lender's Commitment Percentage</u>.  Agent may assume that each Revolving Lender will make its Commitment Percentage of each Revolving Loan available to Agent on each Borrowing date.  If such Commitment Percentage is not, in fact, paid to Agent by such Revolving Lender when due, Agent will be entitled to recover such amount on demand from such Revolving Lender without setoff, counterclaim or deduction of any kind.  If any Revolving Lender fails to pay the amount of its Commitment Percentage forthwith upon Agent's demand, Agent shall promptly notify Borrower Representative and Borrowers shall immediately repay such amount to Agent.  Nothing in this <u>subsection 1.9(c)</u> shall be deemed to require Agent to advance funds on behalf of any Revolving Lender or to relieve any Revolving Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrowers may have against any Revolving Lender as a result of any default by such Revolving Lender hereunder.  Without limiting the provisions of <u>subsection 1.9(b)</u>, to the extent that Agent advances funds to Borrower Representative on behalf of any Revolving Lender and is not reimbursed therefor on the same Business Day as such advance is made, Agent shall be entitled to retain for its account all interest accrued on such advance from the date such advance was made until reimbursed by the applicable Revolving Lender.

(d)    <u>Return of Payments</u>.

(i)    If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If Agent determines at any time that any amount received by Agent under this Agreement or any other Loan Document must be returned to any Loan Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any

12

portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrowers or such other Person, without setoff, counterclaim or deduction of any kind, and Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(e)    [Reserved].

(f)    Procedures.  Agent is hereby authorized by each Borrower and each other Secured Party to establish procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Revolving Loans and other matters incidental thereto.  Without limiting the generality of the foregoing, Agent is hereby authorized to establish procedures to make available or deliver, or to accept, notices, documents and similar items through email.

1.10    Eligible Accounts.  The inclusion of Accounts as "Eligible Accounts" on each Borrowing Base Certificate delivered by Borrower Representative to Agent shall constitute a representation and warranty by Borrower Representative and the applicable Borrower that such Accounts satisfy the Eligibility Criteria and are Eligible Accounts.  Agent shall have the right to establish, modify or eliminate Reserves against Eligible Accounts from time to time in its Permitted Discretion.  In addition, Agent reserves the right, at any time and from time to time after the Closing Date, to adjust and to establish new Eligibility Criteria and to adjust advance rates with respect to Eligible Accounts and the Net Value Factor in its Permitted Discretion, subject to the approval of the Required Lenders with respect to any amendment set forth in Section 9.1(c)(i).

1.11    Joint and Several Liability.  All Revolving Loans made to Borrowers shall be deemed jointly funded to, and received by, Borrowers.  Each Borrower jointly and severally agrees to pay, and shall be jointly and severally liable for the payment and performance of, all Obligations.  Each Borrower acknowledges and agrees that the joint and several liability of all Borrowers is provided as an inducement to Agent and Lenders to provide loans and other financial accommodations to Borrowers, and that each such loan or other financial accommodation shall be deemed to have been done or extended by Agent and Lenders in consideration of, and in reliance upon, the joint and several liability of Borrowers.  The joint and several liability of each Borrower hereunder is absolute, unconditional and continuing, regardless of the validity or enforceability of any of the Obligations, or the fact that a Lien in any DIP Collateral may not be enforceable or subject to equities or defenses or prior claims in favor of others or may be invalid or defective in any way and for any reason.  Each Borrower hereby waives: (a) all notices to which such Borrower may be entitled as a co-obligor with respect to the Obligations, including, notice of (i) acceptance of this Agreement, (ii) the making of loans or other financial accommodations under this Agreement, or the creation or existence of the Obligations, and (iii) presentment, demand, protest, notice of protest and notice of non-payment; and (b) all defenses based on (i) any modification (or series of modifications) of this Agreement or the other Loan Documents that may create a substituted contract, or that may fundamentally alter the risks imposed on such Borrower hereunder, (ii) the release of any other Borrowers (or any other Loan Party) from its duties under this Agreement or the other Loan Documents, or the extension of the time of performance of any other Borrower's duties hereunder or thereunder, (iii) the taking, releasing, impairment or abandonment of any DIP Collateral, or the settlement, release or compromise of the Obligations or any other Borrower's or Guarantor's liabilities with respect to all or any portion of the Obligations, or (iv) any other act (or any failure to act) that fundamentally alters the risks imposed on such Borrower by virtue of its joint and several liability hereunder.  It is the intent of each Borrower by this paragraph to waive any and all

13

suretyship defenses available to such Borrower with respect to the Obligations, whether or not specifically enumerated above.  Notwithstanding any provisions of this Agreement to the contrary, it is the intent of the parties hereto that the joint and several nature of the liabilities of Borrowers, and the Liens granted by Borrowers to secure the Obligations, not constitute a fraudulent conveyance under Section 548 the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance, fraudulent transfer or similar law of any state, nation or other governmental unit, as in effect from time to time.  Accordingly, Agent and Borrowers agree that if the obligations and liabilities of any Borrower hereunder, or any Liens granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a fraudulent conveyance or fraudulent transfer under applicable Laws, the obligations and liabilities of such Borrower hereunder, as well as the Liens securing such obligations and liabilities, shall be valid and enforceable only to the maximum extent that would not cause such obligations, liabilities or Liens to constitute a fraudulent conveyance or fraudulent transfer under applicable Laws.  Each Loan Party hereby agrees that until the Full Payment and satisfaction of the Obligations and the termination of this Agreement and the Commitments, such Loan Party will not exercise any subrogation, contribution or other right or remedy against any other Loan Party or any security for any of the Obligations arising by reason of such Loan Party's performance or satisfaction of its joint and several liability hereunder.  In addition, each Loan Party agrees that (a) such Loan Party's right to receive any payment of amounts due with respect to such subrogation, contribution or other rights is subordinated to the Full Payment and satisfaction of the Obligations and termination of this Agreement and the Commitments, and (b) such Loan Party agrees not to demand, sue for or otherwise attempt to collect any such payment until the Full Payment and satisfaction of the Obligations and the termination of this Agreement and the Commitments

1.12    <u>Borrower Representative</u>.  Each Borrower hereby irrevocably appoints LifeCare Holdings as its representative and attorney-in-fact (in such capacity, the "<u>Borrower Representative</u>") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower acceptable to Agent has been appointed Borrower Representative.  Each Borrower hereby irrevocably appoints and authorizes Borrower Representative (a) to provide Agent with all notices with respect to Revolving Loans obtained for the benefit of any Loan Party and all other notices and instructions under this Agreement and (b) to take such action as Borrower Representative deems appropriate on its behalf to obtain Revolving Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Revolving Loans and the DIP Collateral of Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Agent shall not incur any liability to any Borrowers as a result hereof.  Each Loan Party expects to derive benefit, directly or indirectly, from the handling of Loans and the DIP Collateral in a combined fashion since the successful operation of each Loan Party is dependent on the continued successful performance of the integrated group.  To induce Agent to do so, and in consideration thereof, each Loan Party hereby jointly and severally agrees to indemnify Agent and hold it harmless against any and all liability, expense, loss or claim of damage or injury, made against Agent by any Loan Party or by any third party whosoever, arising from or incurred by reason of (a) the handling of the DIP Collateral of the Loan Parties as herein provided, (b) Agent relying on any instructions of Borrower Representative, or (c) any other action taken by Agent hereunder or under the other Loan Documents, except that the Loan Parties will have no liability under this Section 1.12 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of Agent. Agent and Lenders shall be entitled to rely upon, and shall be fully

Error! Unknown document property name.

protected in relying upon, any notice or communication (including any notice of borrowing) delivered by Borrower Representative on behalf of any Borrower.  Agent and Lenders may give any notice or communication with a Borrower hereunder to Borrower Representative on behalf of such Borrower. Each of Agent and Lenders shall have the right, in its discretion, to deal exclusively with Borrower Representative for all purposes under the Loan Documents.  Each Borrower agrees that any notice, election, communication, delivery, representation, agreement, action, omission or undertaking by Borrower Representative shall be binding upon and enforceable against such Borrower. Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to request or receive proceeds of each Revolving Loan made hereunder, which shall be solely advanced to and at the direction of Borrower Representative.  Agent and each Lender may regard any notice or other communication pursuant to any Loan Document from Borrower Representative as a notice or communication from all Borrowers and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers.  Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative will be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

1.13    Super Priority Nature of Obligations and DIP Liens

(a)    The first priority of Lenders' DIP Liens on the DIP Collateral owned by the Loan Parties, senior in priority to all Liens other than Permitted Liens, shall be set forth in the DIP Security Agreement, the Interim Order and the Final Order.

(b)    Subject to the Carve-Out, all Obligations shall constitute a superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over all other claims and administrative expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code, and shall at all times during the period that the Advances remain outstanding, remain senior in priority to all other claims or administrative expenses (other than the Carve-Out).

(c)    The DIP Liens granted to the Collateral Agent for the benefit of the Lenders on the DIP Collateral owned by the Loan Parties shall be valid and perfected on the basis and with the priority set forth in the definition of "DIP Lien" herein and in the Financing Orders.

**ARTICLE II.**
**CONDITIONS PRECEDENT**

2.1    Conditions Precedent to the Closing Date.  The effectiveness of this Agreement on the Closing Date and the obligation of each Lender to provide its Commitment and to fund Revolving Loans on any Funding Date are subject to the satisfaction of the following conditions, in form and substance satisfactory to Agent, or waived by Agent:

(a)    On or before the date that is three Business Days after the Filing Date, the Interim Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, vacated, modified, amended or stayed, except as approved by Agent.

Error! Unknown document property name.

(b)      On or before the date that is three Business Days after the Filing Date, the First-Day Orders impacting or pertaining to the Interim Order shall have been entered by the Bankruptcy Court, and such orders shall be in full force and effect and shall not have been reversed, vacated, modified, amended or stayed, except as approved by Agent.

(c)      Agent (or its counsel) shall have received executed copies of this Agreement, and each other Loan Document existing on or prior to the Closing Date, and originals or copies (as specified by Agent) of all of the other documents listed on the Closing Document Checklist attached hereto as Exhibit IV.

(d)      Agent shall have received the fully executed DIP Acknowledgements, each of which shall be in full force and effect.

(e)      [Reserved].

(f)      Borrowers shall have confirmed the continuing operation of the cash management system implemented under the Prepetition Credit Agreement, such cash management system shall be  permitted by the Bankruptcy Court and satisfactory to Agent which shall include, among other things, exclusive collection and other remittance procedures (without netting or offsets) and lockbox collection procedures; it being agreed that the cash management system established pursuant to the Prepetition Credit Agreement and previously approved by Agent, if maintained following the Filing Date, is acceptable to Agent.

(g)      Agent shall have received copies of Borrowers' "first-day" motions in form and substance acceptable to Agent, which shall have been entered by the Bankruptcy Court.

(h)      Agent shall have received the Budget, dated the Filing Date and including revised "to date" projections and cash flows.

(i)      Agent shall have received such documents and certificates as Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Transactions and any other legal matters relating to the Transactions.

(j)      Agent (or its relevant Affiliates) shall have received for the account of Agent, its Affiliates and the Lenders, payment of all outstanding fees then due and payable pursuant to the DIP Fee Letter, payment of closing costs and expenses of Agent, including Professional Costs and other amounts due and payable thereunder on or prior to the Closing Date, and to the extent invoiced at least one (1) Business Day prior to the Closing Date, reimbursement or payment of all reasonable documented out-of-pocket expenses required to be reimbursed or paid by any Borrower hereunder or under any other Loan Document.

(k)      All material governmental and third-party approvals necessary to be obtained prior to the Closing Date shall have been obtained and be in full force and effect.

2.2      Conditions Precedent to Funding of all Revolving Loans.  The obligation of each Lender to make any Revolving Loan on any Funding Date is subject to satisfaction of the following conditions precedent:

16

(a)	The Interim Order (if prior to the Final Order Date) is in form and substance satisfactory to Agent, shall be in full force and effect and shall not have been reversed, appealed for good faith, stayed, modified or amended, except as approved by Agent.

(b)	The Final Order shall have been entered no later than June 6, 2019, and following the Final Order Date, the Final Order shall be in form and substance satisfactory to Agent, shall be in full force and effect and shall not have been reversed, appealed for good faith, stayed, modified or amended, except as approved by Agent.

(c)	On that Funding Date the following statements are true and correct both immediately prior to and after giving effect to the making of the applicable Revolving Loan on such Funding Date (and acceptance of the proceeds of the applicable Revolving Loan will be deemed a representation and warranty by each Borrower that those statements are then true and correct):

(i)	no event has occurred and is continuing, or would result from such Revolving Loan or any actions connected therewith, that constitutes a Default or an Event of Default; and

(ii)	the representations and warranties contained herein or in any other Loan Document are true and correct in all material respects (except any representation or warranty that expressly indicates that it is qualified by materiality or Material Adverse Effect, in which case such representation or warranty is true and correct in all respects after giving effect to any such qualification) on and as of the date of such Revolving Loan as though made on and as of such date (except any representation or warranty that expressly indicates that it is being made as of a specified date, in which case each such representation or warranty is true and correct as of that specified date) both immediately prior to, and after giving effect to such extension of credit.

(d)	Agent shall have received the "to date" Budget for the Budget Testing Period in accordance with Section 4.1(b) (including a variance analysis with respect to actual results in accordance with Section 4.1(b)) , which Budget shall demonstrate (except as to matters previously approved by Agent and subject to Permitted Variances) that Borrowers are in material conformity with the prior Budget, the expenditures to be made by Borrowers and the use of proceeds of the proposed Revolving Loan are consistent with the prior Budget and Section 4.12, and the availability hereunder remains sufficient to fund the cash flow needs of Borrowers, as demonstrated by and as set forth in such updated Budget and shall otherwise meet the requirements of the definition of "Budget";

(e)	[Reserved].

(f)	At least two (2) Business Days (or during the Interim Period, one (1) Business Day) prior to the applicable Funding Date (or such later time as Agent may agree in its Permitted Discretion), Borrowers shall have delivered a Notice of Borrowing of Revolving Loans pursuant to Section 1.4, together with a Borrowing Base Certificate and any such other information or documents requested by Agent, including but not limited to third-party approvals, legal opinions, or other documents, each in form and substance satisfactory to Agent.

(g)	After giving effect to any Revolving Loan, the aggregate outstanding amount of the Revolving Loans shall not exceed the Maximum Revolving Loan Balance.

Error! Unknown document property name.

(h)    The cash management system under the Prepetition Facility shall continue to be in full force and effect as set forth in <u>Section 4.17</u> or Lenders shall be reasonably satisfied with alternative cash management arrangements of Borrowers.

The request by Borrower Representative and acceptance by Borrowers of the proceeds of any Revolving Loan shall be deemed to constitute, as of the date thereof, (i) a representation and warranty by Borrower Representative and Borrowers that the conditions in this <u>Section 2.2</u> have been satisfied and (ii) a reaffirmation by each Borrower of the granting and continuance of Agent's Liens, on behalf of itself and the Secured Parties, pursuant to the DIP Security Documents.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

The Loan Parties, jointly and severally, represent and warrant to Agent and each Lender on the Closing Date, on each Funding Date and each date of each delivery under <u>Section 4.1</u> and <u>Section 4.2</u> that:

3.1    <u>Organization; Powers</u>.  Each of Parent Holdings, Holdings, each Borrower and each of the Subsidiaries (i) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and (ii) has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

3.2    <u>Authorization; Enforceability</u>.  Subject to and giving effect to the Financing Orders, the Transactions entered into and to be entered into by each Loan Party are within such Loan Party's corporate, limited partnership or limited liability company powers, as applicable, and have been duly authorized by all necessary corporate, limited partnership or limited liability company and, if required, stockholder action.  This Agreement has been duly executed and delivered by each of Parent Holdings, Holdings and Borrowers and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party (as the case may be), subject to the Financing Orders and other applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law, and implied covenants of good faith and fair dealing.

3.3    <u>Governmental Approvals; No Conflicts</u>.  (a) The Transactions do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except for the Orders that have been obtained or made and are in full force and effect, prior to the Closing Date, or will be in full force and effect, (b) the Transactions will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of Parent Holdings, Holdings, any Borrower or any of the Subsidiaries or any order of any Governmental Authority including the Bankruptcy Court, (c) except for any violations arising directly as a result of the Chapter 11 Cases,  the Transactions will not violate or result in a default under any indenture, agreement or other instrument binding upon Parent Holdings, Holdings, any Borrower or any of the Subsidiaries or any of their assets, or give rise to a right thereunder to require any payment to be made by Parent Holdings, Holdings, any Borrower or any of the Subsidiaries, (d) subject to the Financing Orders, the Transactions will not result in the creation or imposition of any Lien on any asset of Parent Holdings, Holdings, any Borrower or any

18

of the Subsidiaries, except Liens permitted under Section 5.2; except, in the case of clauses (a), (b) and (c), where the failure to obtain such consent or approval or make such registration, filing or action or any such violation or default would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, and (e) except to the extent set forth in the Financing Orders, the Transactions will not result in any limitation on any right, qualification, approval, permit, authorization, reimbursement approval, reimbursement or franchise, or authorization granted by a Governmental Authority or third party payor or other Person applicable to the business or operations of any Borrower or adversely affect the ability of any Borrower or any of the Subsidiaries to participate in any third party payor arrangement or restrict the ability of any Borrower or any of the Subsidiaries to operate the Healthcare Facilities, except where such limitation will not have a Material Adverse Effect.

3.4    Financial Condition.  Borrower Representative has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders equity and cash flows of LifeCare Holdings as of the month ended March 31, 2019 and the quarter ended March 31, 2019.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of LifeCare Holdings and its consolidated Subsidiaries as of such date and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.  As of the Closing Date, no Borrower nor any of its subsidiaries has any material Guarantee, contingent liabilities and liabilities for Taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph.

3.5    DIP Collateral

(a)    Subject to any Liens permitted to exist pursuant to Section 5.2, each of Parent Holdings, Holdings, each Borrower and the Subsidiary Loan Parties (i) has good and legal title to all DIP Collateral, and (ii) has good and legal title, or valid leasehold interests in, (x) all its Real Property, and (y) all of its personal property material to its business, except, in the case of (x) or (y), for defects in title that do not materially affect the value of such Real Property or personal property and do not interfere in any material respect with its ability to conduct its business as currently conducted on any such property or to utilize any such property for its intended purposes.

(b)    Except, in each case, for any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each of Parent Holdings, Holdings, each Borrower and each of the Subsidiaries:  (i) owns, is licensed to use, or otherwise has the right to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and (ii) the use thereof by Parent Holdings, Holdings, such Borrower and such Subsidiaries does not infringe upon the rights of any other Person.

(c)    Schedule 3.5(c) sets forth the address of each Real Property that is owned or leased by any Borrower or any of the Subsidiary Loan Parties as of the Closing Date (and as of the date of the delivery by Borrower Representative of any supplement thereto pursuant to Section 4.13(b)).

3.6    Litigation and Environmental Matters.

(a)    Other than the filing of the Chapter 11 Cases and the material events set forth on Schedule C, there are no actions, suits, proceedings, audits or investigations by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Parent Holdings, Holdings

Error! Unknown document property name.

or any Borrower, threatened against Parent Holdings, Holdings, any Borrower or any Subsidiary or Healthcare Facilities (i) which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Transactions.

(b)    Except for matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, none of the Mortgaged Property, Holdings, any Borrower or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any facts or circumstances which are reasonably likely to form the basis for any Environmental Liability.

3.7    <u>Compliance with Laws; Healthcare Laws</u>. Except as set forth on <u>Schedule 3.7</u>, each of Parent Holdings, Holdings, each Borrower and each Subsidiary and each Healthcare Facility is in compliance with all laws, regulations and orders of any Governmental Authority, including all Healthcare Laws applicable to it or its property except where the failure to be in compliance, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

3.8    <u>Licenses, etc.</u>.

(a)    Set forth on <u>Schedule 3.8(a)</u> is a list, as of the Closing Date of (i) all third party payor contracts of Parent Holdings, Holdings, any Borrower and Subsidiary Loan Party and each Healthcare Facility, that are material to the conduct of their business, (ii) each of the Medicare Provider Agreements, or correspondence evidencing the existence of such Medicare Provider Agreements, of Parent Holdings, Holdings, any Borrower, the Subsidiaries and the Healthcare Facilities and (iii) each of the state Medicaid Provider Agreements, or correspondence evidencing the existence of such Medicaid Provider Agreements, of Parent Holdings, Holdings, any Borrower, the Subsidiaries and the Healthcare Facilities.

(b)    Except as set forth on <u>Schedule 3.8(b)</u>, each Healthcare Facility is duly accredited by the Joint Commission without contingencies other than a decision of Preliminary Accreditation for which a new hospital has not had a second survey or Accreditation with Follow-Up (each as set forth in The Joint Commission 2013 Accreditation Decision Rules), and true, correct, and complete copies of such Healthcare Facility's most recent survey reports, including statements of deficiencies and plans of correction, if any, and the most recent certificates of accreditation relating to each such Healthcare Facility, have been furnished or made available to the Lenders.

(c)    Each Healthcare Facility (i) participates in the Medicare program and is in compliance in all material respects with the conditions of participation for Medicare (it being understood that deficiencies specified in regulatory surveys, which each Borrower believes, in good faith, are capable of being remedied, will not be deemed material non-compliance with the conditions of participation for Medicare), and (ii) has a current and valid provider contract and provider number with the Medicare program. Set forth on <u>Schedule 3.8(c)</u> are the Medicare provider numbers of each of the Healthcare Facilities as of the Closing Date. Each Healthcare Facility (A) is eligible to receive payment under Title XVIII of the Social Security Act, (B) is a "provider" under provider agreements with the Medicare program through the applicable intermediaries, (C) except for any new Healthcare Facility that is not yet eligible to receive payments as a long-term care hospital under 42 C.F.R. §412.23(e) because it has not been in existence for more than one complete cost reporting period, is eligible to

Error! Unknown document property name.

receive payments as a long-term care hospital under 42 C.F.R. §412.23(e), and (D) except as set forth on Schedule 3.8(c) (specifying the average length of stay), has an average length of stay in the twelve month cost reporting period most recently ended that is equal to or greater than 25 days.   Each Healthcare Facility that Holdings, any Borrower or any Subsidiary treats as provider-based with respect to another Healthcare Facility meets the applicable requirements in 42 C.F.R. §413.65.  Except as set forth on Schedule 3.8(c) or under seal and not known to Parent Holdings, Holdings, any Borrower or any Subsidiary, or as would not individually or in the aggregate reasonably be expected to have a Material Adverse Effect, there is not pending or, to the knowledge of any Borrower or any Subsidiary threatened any proceeding or investigation under the Medicare program involving Parent Holdings, Holdings, any Borrower, any of the Subsidiaries or any Healthcare Facility.  Except as set forth on Schedule 3.8(c), none of Parent Holdings, Holdings, any Borrower, any of the Subsidiary Loan Parties, any of the Healthcare Facilities, nor any of their respective shareholders, directors, officers, managers nor, except as would not individually or in the aggregate reasonably be expected to have a Material Adverse Effect, any of their employees, are excluded from participation in the Medicare program or other federal health care program and, to the knowledge of Borrowers and the Subsidiaries, no such exclusion is pending or threatened.

(d)       As of the Closing Date, each of the Healthcare Facilities described on Schedule 3.8(d) participates in its respective state's Medicaid program, is in compliance in all material respects with the conditions of participation for Medicaid and has a current and valid provider contract and provider number with the Medicaid program.  Set forth on Schedule 3.8(d) are, as of the Closing Date, the Medicaid provider numbers of each of the Healthcare Facilities, as applicable. Each such Healthcare Facility is eligible to receive payment under Title XIX of the Social Security Act and is a "provider" under provider agreements with the Medicaid program in their state.  Except as set forth on Schedule 3.8(d) or under seal and not known to Holdings, any Borrower or any Subsidiary Loan Party, as of the Closing Date, there is not pending or, to the knowledge of Parent Holdings, Holdings, any Borrower or any Subsidiary, threatened any proceeding or investigation under any Medicaid program involving Parent Holdings, Holdings, any Borrower, any of the Subsidiary Loan Parties or any Healthcare Facility.  Except as set forth on Schedule 3.8(d), none of Parent Holdings, Holdings, any Borrower, any of the Subsidiary Loan Parties, any of the Healthcare Facilities nor any of their respective shareholders, directors, officers, managers nor, except as would not individually or in the aggregate reasonably be expected to have a Material Adverse Effect, any employees, are excluded from participation in any state's Medicaid program or other state healthcare program and, to the knowledge of Borrowers and the Subsidiaries, no such exclusion is pending or threatened.

(e)       Except as set forth on Schedule 3.8(e) or as otherwise would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, the Cost Reports of the Healthcare Facilities for the years since January 1, 2012 have been timely filed and are complete and correct in all material respects.   Except as set forth on Schedule 3.8(e) or as otherwise would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, there are no claims, actions or appeals pending before any commission, board or agency, including any fiscal intermediary or carrier, or the Provider Reimbursement Review Board of the Administrator of CMS, with respect to any state or federal Cost Reports filed on behalf of the  Healthcare Facilities or any disallowances by any Governmental Authority in connection with any audit of such Cost Reports.  Except as set forth on Schedule 3.8(e), the potential reimbursement liabilities that any Borrower, any Subsidiary Loan Party and the  Healthcare Facilities may have under any such Cost Reports (i) did not as of the date of the audited consolidated balance sheet of Borrowers for the fiscal year ended December 31, 2017, exceed the reserve therefor set forth on the face of the such audited balance sheet (rather than in any

Error! Unknown document property name.

notes thereto) and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of Borrowers, Parent Holdings, Holdings and the Subsidiaries.

(f)    Set forth on <u>Schedule 3.8(f)</u> is a true, correct and complete list of all Healthcare Facilities owned or leased and operated by Holdings, any Borrower or one of the Subsidiaries as of the Closing Date. As of the Closing Date, each Healthcare Facility listed on <u>Schedule 3.8(f)</u> is duly and appropriately licensed as a hospital by the applicable Governmental Authority to operate the number of beds listed adjacent to its name on <u>Schedule 3.8(f)</u>. Any hospital opened or acquired after the Closing Date will be duly and appropriately licensed as a hospital by the applicable Governmental Authority. Each Healthcare Facility holds all other licenses, permits, variances, exemptions, waivers and approvals that are required by applicable law to operate the business, except where the failure to hold such licenses, permits and approvals has not had and would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. Except as set forth on <u>Schedule 3.8(f)</u>, each Healthcare Facility is in compliance with all licensing requirements except where the failure to so comply has not had and would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. Set forth on <u>Schedule 3.8(f)</u> is a list of all material licenses and permits owned or held by Holdings, any Borrower or any Subsidiary relating to each Healthcare Facility set forth thereon as of the Closing Date, and each of such licenses is in good standing and in full force and effect as of the Closing Date.

(g)    None of the Loan Parties or any of the Subsidiaries, nor any owner, officer, director, partner, agent, managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §1001.1001) in any Healthcare Facility is a party to, or bound by, any order, individual integrity agreement, corporate integrity agreement, corporate compliance agreement, deferred prosecution agreement, or other formal or informal agreement with any Governmental Authority concerning compliance with Healthcare Laws.

3.9    <u>Investment Company Status; Margin Regulation</u>.

(a)    None of Parent Holdings, Holdings, any Borrower or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

(b)    None of Parent Holdings, Holdings, any Borrower or any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Revolving Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner that would entail a violation of the regulations of the Board, including Regulation T, U or X. No more than 25% of the assets of Parent Holdings, Holdings, any Borrower or any Subsidiary consists of Margin Stock. If requested by any Lender or Agent, Borrowers will furnish to Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U of the Board.

3.10    <u>Taxes</u>. Each of Parent Holdings, Holdings, Borrowers and the Subsidiaries has timely filed or caused to be filed all material Tax returns and reports required to have been filed and has paid or caused to be paid all material Taxes required to have been paid by it, except any Taxes that are being contested in good faith by appropriate proceedings and for which Parent Holdings, Holdings, such

Error! Unknown document property name.

Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP.

3.11    <u>ERISA</u>.

(a)    No ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed to be made, or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability has occurred during such five year period (which liability remains unsatisfied) or for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.

(b)    No Loan Party or any ERISA Affiliate maintains a Pension Plan or the present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715-30: Compensation-Retirement Benefits) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Pension Plan, and the present value of all accumulated benefit obligations of all underfunded Pension Plans did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Pension Plans, except to the extent that any such accumulated benefit obligations could not reasonably be expected to result in a Material Adverse Effect.

3.12    <u>Disclosure</u>.  None of the written reports, financial statements, certificates or other written information, taken as a whole, furnished by or on behalf of any Loan Party to Agent or any Lender in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as of the date thereof and as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, that, with respect to information of a general economic nature, estimates and projected financial information, Parent Holdings, Holdings and Borrowers represent only that such information was prepared in good faith based upon assumptions believed to be reasonable (i) at the time such projected financial information was prepared and (ii) as of the date hereof (it being understood that actual results may vary materially from such projected financial information).  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

3.13    <u>Subsidiaries</u>.  <u>Schedule 3.13</u> sets forth (i) the name of, and the ownership interest of Parent Holdings and Holdings in, each subsidiary of Parent Holdings and Holdings and identifies each subsidiary that is a Subsidiary Loan Party and each subsidiary that is an Unrestricted Subsidiary, in each case as of the Closing Date, and (ii) the name of, and the ownership interest of each Borrower in each Subsidiary of such Borrower and identifies each Subsidiary Loan Party and each Unrestricted Subsidiary, in each case as of the Closing Date.  As of the Closing Date, except as expressly identified on <u>Schedule A</u>, there are no Inactive Subsidiaries or Foreign Subsidiaries in existence.

3.14    <u>Insurance</u>.  <u>Schedule 3.14</u> sets forth a description of all material insurance maintained by or on behalf of Parent Holdings, Holdings, Borrowers and the Subsidiaries as of the Closing Date.  As of the Closing Date, all premiums due and payable in respect of such insurance have been paid except as set forth on <u>Schedule 3.14</u> hereto.  The properties of Parent Holdings, Holdings, Borrowers and the Subsidiaries are insured by financially sound and reputable insurance companies not Affiliates of any

23

Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Parent Holdings, Holdings, any Borrower or any applicable Subsidiary operates.

3.15    Labor Matters.  Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (a) as of the Closing Date, there are no strikes, lockouts or slowdowns against Parent Holdings, Holdings, any Borrower or any Subsidiary pending or, to the knowledge of Parent Holdings, Holdings or any Borrower, threatened; (b) the hours worked by and payments made to employees of Parent Holdings, Holdings, Borrowers and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters; (c) all payments due from Parent Holdings, Holdings, any Borrower or any Subsidiary, or for which any claim may be made against Parent Holdings, Holdings, any Borrower or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Parent Holdings, Holdings, such Borrower or such Subsidiary; and (d) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Parent Holdings, Holdings, any Borrower or any Subsidiary is bound.

3.16    DIP Security Documents.

(a)    The DIP Security Agreement is effective to create in favor of Agent, for the benefit of the respective Secured Parties, a legal, valid and enforceable security interest in the DIP Collateral described therein and proceeds thereof, except with respect to payments under Medicare and Medicaid, which may be subject to limitations under federal and state laws and regulations.  In the case of the DIP Collateral described in the DIP Security Agreement (except for (i) Initial Pledged Equity (as defined in the Prepetition Security Agreement) in Agent's possession, (ii) as otherwise provided in paragraph (b) of this Section 3.16 and (iii) with respect to payments under Medicaid and Medicare, which may be subject to limitations under federal and state laws and regulations), upon entry of the Financing Orders, as applicable, the DIP Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the DIP Collateral and the proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person other than Permitted Liens and free and clear of all other Liens except for Permitted Encumbrances.

(b)    Upon entry of the Financing Orders, as applicable, the DIP Intellectual Property Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property, in each case prior and superior in right to any other Person, except Liens permitted by Section 5.2 (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks and patents, trademark and patent applications and registered copyrights acquired by the grantors after the date hereof).

(c)    [Reserved].

3.17    Liens.  Each Borrower is the legal and beneficial owner of the DIP Collateral and upon the execution of the Loan Documents and the entry of the Financing Orders, Agent will hold a valid, perfected and continuing first priority Lien in the DIP Collateral as security for the Obligations, senior in priority to all Liens other than Permitted Liens and free and clear of any Lien other than Permitted

Error! Unknown document property name.

Encumbrances.    Except with respect to the Permitted Receivables Liens, no effective financing statement or other instrument similar in effect covering the Receivables is on file in any recording office other than those in favor of Agent relating to this Agreement, and no competing notice or notice inconsistent with the transactions contemplated in this Agreement has been sent to any obligor.

3.18    <u>Provider Agreements</u>.    None of Parent Holdings, Holdings, any Borrower or any of the Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any Medicaid Provider Agreement, Medicare Provider Agreement or other agreement or instrument to which any of Parent Holdings, Holdings, any Borrower or any Subsidiary is a party, which default has resulted in, or if not remedied within any applicable grace period could result in, the revocation, termination, cancellation or suspension of Medicaid Certification or Medicare Certification of any of Parent Holdings, Holdings, any Borrower or any of the Subsidiaries and such revocation, termination, cancellation or suspension could reasonably be expected to have a Material Adverse Effect or (ii) any other agreement or instrument to which any of Parent Holdings, Holdings, any Borrower or any Subsidiary is a party, which default has, or if not remedied within any applicable grace period could reasonably be likely to have, a Material Adverse Effect.

3.19    <u>Casualty, Etc</u>.    Neither the business nor the properties of any Loan Party or any of the Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that could be reasonably likely to have a Material Adverse Effect.

3.20    <u>Anti-Terrorism Laws</u>.    Neither of the advance of the Revolving Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "<u>Trading With the Enemy Act</u>") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "<u>Foreign Assets Control Regulations</u>") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "<u>Executive Order</u>") and (b) the Patriot Act. Furthermore, none of Parent Holdings, Holdings, any Borrower and any Subsidiary and their respective directors, officers, agents and employees (a) is a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) engages in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

3.21    [Reserved].

3.22    [Reserved].

3.23    <u>Foreign Corrupt Practices Act</u>.    Each of Parent Holdings, Holdings, each Borrower and the Subsidiaries and, to Borrowers' knowledge their respective directors, officers, agents, employees and any Person acting for or on behalf of Parent Holdings, Holdings, any Borrower or any Subsidiary, has complied with the U.S. Foreign Corrupt Practices Act, as amended from time to time (the "<u>FCPA</u>"), or any other applicable anti-bribery or anti-corruption law, and it and they have not made, offered, promised or authorized,   whether directly or indirectly, any payment, of anything of value to a Government Official while knowing or having a reasonable belief that all or some portion will be used for the purpose of:  (a) influencing any act, decision or failure to act by a Government Official in his or

25

her official capacity, (b) inducing a Government Official to use his or her influence with a government or instrumentality to affect any act or decision of such government or entity or (c) securing an improper advantage, in each case in order to obtain, retain or direct business.

## ARTICLE IV.
## AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Revolving Loan or other Obligation (other than (i) contingent indemnification obligations arising under the Loan Documents to the extent no claim giving rise thereto has been asserted, and (ii) Letter of Credit Obligations that have been cash collateralized in accordance with the terms hereof) shall remain unpaid or unsatisfied:

4.1    Budget. Borrower Representative will furnish to Agent and each Lender through Agent:

(a)    Monthly Budget. On the seventh Business Day of each month, Borrower Representative will furnish to Agent an updated Budget (previously approved by Agent).

(b)    Weekly Report.  On the third Business Day of each week, Borrower Representative shall provide Agent with a Weekly Report reflecting for the immediately preceding calendar week ended on the immediately preceding Friday, the variances for such preceding week and cumulative variances for all preceding weeks, together with a variance analysis with respect to Borrowers' total cash receipts and total operating disbursements during such preceding week measured on a line item basis as compared to the corresponding amounts set forth in the then-current Budget for such week, in each case in form and substance satisfactory to Agent.

(c)    Disposition Budget.  Not later than the fifth Business Day immediately prior to any proposed Disposition, Borrower Representative shall  provide Agent with a fully updated Budget reflecting on a projected basis such proposed Disposition and its impact, including the impact on the Borrowing Base, the proposed reduced Revolving Loan Commitments in connection with the proposed Disposition, and such other information and reporting as requested by Agent, in each case in form and substance satisfactory to Agent.

(d)    Compliance Certificate.  Each Budget or Budget update to be delivered pursuant to Section 4.1(a), (b) and (c) shall be accompanied by a certificate in the form attached hereto as Exhibit 4.1(d) stating that Borrowers are in compliance (or if not in compliance, stating the nature of such non-compliance and the steps being taken to address such non-compliance) with this Agreement including Permitted Variances, the Budget and the Financing Orders (in form and substance reasonably satisfactory to Agent).

4.2    Financial Statements and Other Reporting Requirements. Borrower Representative will furnish to Agent and each Lender through Agent:

(a)    the latest available draft (or most current version) of Borrowers' consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of fiscal year 2018, setting forth in each case in comparative form the figures for the previous fiscal year, as prepared by KPMG LLP and presents fairly in all material respects the financial condition and results of

Error! Unknown document property name.

operations of Borrowers and their consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)     [Reserved;]

(c)     no later than thirty (30) days after the end of each fiscal month, Borrowers' unaudited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form against the figures and projections for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal months;

(d)     within 10 days after any delivery of financial statements under clause (c) above, a certificate of a Financial Officer in the form of Exhibit 4.1(d), (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.4 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate, (iii) identifying any changes of the type described in Section 4.4(a) that have not been previously reported by Borrowers, and (iv) identifying any registered Intellectual Property (or applications therefor) with respect to which a notice is required to be delivered under the DIP Security Agreement and has not been previously delivered;

(e)     on the second Business Day following the final day of each calendar month, a report for each Healthcare Facility of (i) the average daily census for such monthly period, and (ii) the average length of stay for such monthly period, each together with a Compliance Certificate stating that Borrowers are in compliance (or if not in compliance, stating the nature of such non-compliance and the steps being taken to address such non-compliance) with Section 6.2 for such prior calendar month.

(f)     with respect to census matters (i) on the third Business Day of each week, a weekly "flash" census report, and (ii) together with the updated Budget delivered pursuant to Section 4.1(a) (or more frequently following an Event of Default), an updated average length of stay report for any Healthcare Facility;

(g)     promptly after any Borrower's or any of the Subsidiaries' determination thereof, any decision or determination to close, consolidate or materially reduce services provided by any Healthcare Facility;

(h)     promptly after any Borrower's or any of the Subsidiaries' receipt thereof, a copy of any "management letter" received from its certified public accountants and management's response thereto;

(i)     promptly after the same become publicly available, copies of all periodic and current reports, proxy statements and registration statements filed by Parent Holdings, Holdings, any Borrower or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or in the event Parent Holdings, Holdings becomes a publicly traded company, distributed by Parent Holdings, Holdings to its shareholders generally;

27

(j)        promptly upon transmission or receipt thereof, copies of all material reports and statements (other than routine reports and other statements prepared in the Ordinary Course of Business that would not result in any adverse action) that any of Parent Holdings, Holdings, any Borrower or any Subsidiary may render to or file with any Governmental Authority, including without limitation, CMS and the OIG;

(k)        promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Parent Holdings, Holdings, any Borrower or any Subsidiary or any Healthcare Facility, or compliance with the terms of any Loan Document, as Agent (including on behalf of any Lender) may reasonably request (including Cost Reports), subject to confidentiality requirements required by law, including under any Healthcare Laws*; provided,* that, (i) to the extent that Parent Holdings, Holdings, any Borrower, any Subsidiary or any Healthcare Facility is subject to HIPAA (whether directly or by contract) it shall use reasonable best efforts to provide such information consistent with HIPAA and the HITECH Act including, without limitation, pursuant to regulations that may permit disclosure under its health care operations (as defined in HIPAA, 45 C.F.R. §164.501), subject to the HIPAA minimum necessary requirement set forth in 45 C.F.R. §164.502(b); and (ii) to the extent that Parent Holdings, Holdings, any Borrower, any Subsidiary or any Healthcare Facility is a "covered entity" under HIPAA, none of them shall by contract prohibit disclosure by any of the other of them to Agent that is not otherwise prohibited by applicable law, including, but not limited to HIPAA and the HITECH Act;

(l)        concurrently with any delivery of financial statements under clause (c) above, a summary and analysis of the financial condition and results of operations of Borrowers and the Subsidiaries for such period, as compared to amounts for the previous period and budgeted amounts and volume trends with respect to census and pricing;

(m)        as soon as available and in any event within fifteen (15) days after the end of each calendar month, and at such other times as Agent may reasonably require, a Borrowing Base Certificate, certified on behalf of Borrowers by a Responsible Officer of Borrower Representative, setting forth the Borrowing Base of Borrowers as at the end of the most-recently ended fiscal month or as at such other date as Agent may reasonably require;

(n)        concurrently with the delivery of the Borrowing Base Certificate as of the end of any calendar month, (i) a monthly trial balance showing Accounts outstanding aged from the applicable discharge date as follows: 1 to 30 days, 31 to 60 days, 61 to 90 days, 91 to 120 days, 121 days to 150 days, 151 days to 180 days, and 181 days or more, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion and (ii) a report reflecting any action, suit, proceeding, dispute, set-off, deduction, defense or counterclaim that is asserted in writing by an Account Debtor with respect to any Accounts in excess of $250,000 in the aggregate (excluding adjustments in the Ordinary Course of Business permitted under the credit and collection policies of Borrowers);

(o)        (i) at the time of delivery the financial statements under clause (c) or (d) above and (ii) as Agent may otherwise request in its Permitted Discretion, copies of the most recent bank account statements of Borrowers and the Subsidiaries,

(p)        as Agent may request from time to time (together with a copy of all or any part of such delivery requested by any Lender in writing after the Closing Date), (i) collateral reports,

Error! Unknown document property name.

including all additions and reductions (cash and non-cash) with respect to Accounts of Borrowers and (ii) agings of accounts payable, in each case accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion each of which shall be prepared by Borrowers as of the last day of the immediately preceding week or the date 2 days prior to the date of any request;

(q)     to Agent, at the time of delivery of each of the monthly financial statements delivered pursuant to Section 4.2(c):

(i)     a reconciliation of the most recent Borrowing Base Certificate, general ledger and month-end accounts receivable aging of each Borrower to such Borrower's general ledger and monthly financial statements delivered pursuant to Section 4.2(c), in each case, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(ii)    a reconciliation of the accounts payable aging to each Borrower's general ledger and monthly financial statements delivered pursuant to Section 4.2(c), in each case, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iii)   a reconciliation of the accounts receivable aging to each Borrower's general ledger and monthly financial statements delivered pursuant to Section 4.2(c), in each case, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion;

(iv)    a reconciliation of the outstanding Revolving Loans as set forth in the monthly loan account statement provided by Agent to each Borrower's general ledger and monthly financial statements delivered pursuant to Section 4.2(c), in each case, accompanied by such supporting detail and documentation as shall be requested by Agent in its reasonable discretion; and

(v)     a report on all applicable state survey activity (and any material negative report received with respect thereto or any denial of payment and civil monetary penalties) and a statistical report, including admissions and episodes (Medicare and total), recertification rates, annual recertifications, statistics, metrics, aging reports, other key performance indicators and such other information as may be reasonably requested by Agent.

4.3     Notices of Material Events.  Borrower Representative will furnish to Agent and each Lender written notice of the following promptly after any Financial Officer or executive officer of any Borrower obtains actual knowledge thereof:

(a)     the occurrence of any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of any action (other than the Chapter 11 Cases), suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Parent Holdings, Holdings, any Borrower or any Subsidiary thereof or any Healthcare Facility that involves a reasonable probability of an adverse determination and which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

29

(c)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred (for which liability remains unsatisfied), could reasonably be expected to result in material liability to any of the Loan Parties;

(d)     the payment or incurrence of severance obligations in excess of $100,000 in the aggregate, or the termination or layoff of a material number of employees of any Borrower, or Borrowers taken as a whole, including terminations or layoffs that would require the provision of a notice to employees under the Working Adjustments and Retraining ("WARN") Act;

(e)     the institution of any investigation or proceeding against Parent Holdings, Holdings, any Borrower or any Subsidiary thereof or any Healthcare Facility that involves a reasonable probability of the suspension or termination of any Medicaid Provider Agreement, Medicaid Certification, Medicare Provider Agreement or Medicare Certification or that involves a reasonable probability of their exclusion from participation in any federal or state healthcare program, or with regard to Parent Holdings, Holdings, any Borrower, any Subsidiary thereof, any Healthcare Facility or any employee of any of them if related to his or her employment position, the receipt of a subpoena, civil investigative demand or the commencement of a special audit, related to an investigation for fraud or the filing of a false claim;

(f)     any notice of a material violation of any Healthcare Law, or any notice of a loss or threatened loss of any material accreditation, loss of participation in any material Medical Reimbursement Program or loss of any material applicable health care license;

(g)     the failure of any Healthcare Facility to meet the requirements in 42 C.F.R. §412.23(e) to qualify as a long-term care hospital after its first complete cost reporting period, including the requirement with respect to such Healthcare Facility's average length of stay in its most recently completed cost reporting period;

(h)     any (i) validation review, program integrity review, revocation, suspension, or termination proceedings with respect to any Loan Party or (ii) material reduction to any rate for reimbursement under any agreement with any obligor or any matter that could reasonably be expected to have a material impact on (x) any Borrower's rights to reimbursement under any agreement with, and the amount of any related payments from, any Account Debtor or (y) the Net Value Factor of a material amount of Eligible Accounts of any Borrower;

(i)     if the Accounts owing by any Account Debtor (other than a Governmental Payor) and its Affiliates to Borrowers exceed twenty percent (20%) of all Accounts owing by all Account Debtors as of any date;

(j)     any other development (other than the filing of the Chapter 11 Cases and the material events set forth on Schedule C) that results in, or would reasonably be expected to result in, a Material Adverse Effect;

(k)     the occurrence or the proposal of any "Specified Transaction" described in clause (a) or (b) of the definition thereof or any other "Disposition" or any Subsidiary or substantial portion of DIP Collateral that is subject to a bona fide offer of purchase (together with all documentation with respect to such occurrence or proposal); and

Error! Unknown document property name.

(l)     promptly following the distribution or filing thereof, (A) a copy of each Cost Report or any other material report submitted to or filed with any Governmental Authority, and (B) all press releases and other statements made available by any Borrower to the public concerning developments in its business;

(m)     promptly after the furnishing thereof, copies of any report furnished by Borrowers to the Committee or any other statutory committee appointed in the Chapter 11 Cases, or any other party under any Other Debt Obligations not otherwise required to be furnished by Borrowers pursuant to this Agreement;

(n)     promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice in reasonable detail regarding any material activities and developments regarding Borrowers' efforts to consummate a Specified Sale or Asset Sale;

(o)     promptly following the receipt or sending thereof by a Borrower, copies of all bona fide written proposals, term sheets in connection with any proposed Asset Sale or Specified Sale and other material correspondence and documentation regarding such Asset Sale, Specified Sale, or other restructuring transaction, including but not limited to drafts of acquisition documents and proposed bankruptcy motions and orders (and other drafts as may reasonably be requested by Agent) prepared in connection with the contemplated consummation of any proposed Asset Sale;

(p)     promptly (and in no event later than one Business Days following its obtaining actual knowledge or receipt thereof) notify Agent and provide its counsel with complete description, including copies of any material communication to or from any Governmental Authority or any licensing entity;

(q)     promptly, and in any event within two Business Days after becoming aware of the occurrence thereof, notice of any change in the professional engagements or outsourcing of services by Borrowers;

(r)     promptly (and to the extent practicable, within one Business Day of such request) such other information respecting the Receivables and the other DIP Collateral (including equipment, inventory, and real property), or the condition or operations, financial or otherwise, of any Borrower, or the Budget or any proposed budget or any line items reflected therein, as Agent or any of the Lenders may from time to time reasonably request; and

(s)     any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in such certification.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of Borrower Representative setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

4.4     Information Regarding DIP Collateral.

(a)     Borrower Representative will furnish to Agent prompt written notice of any change (i) in any Loan Party's legal name, as reflected in its organization documents, (ii) in any Loan Party's jurisdiction of organization or organizational form and (iii) in any Loan Party's identity, Federal Taxpayer Identification Number or organization number, if any, assigned by the jurisdiction of its

Error! Unknown document property name.

organization.  Borrowers agree not to effect or permit any change referred to in clauses (i) through (iii) of the preceding sentence unless all filings have been made, or will have been made within any statutory period, under the UCC or otherwise that are required in order for Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the DIP Collateral for the benefit of the Secured Parties.  Borrowers also agree promptly to notify Agent if any damage to or destruction of DIP Collateral that is uninsured and has a fair market value exceeding $150,000 occurs.

(b)     Upon the request of Agent, Borrowers shall as soon as reasonably practical deliver to Agent an updated Perfection Certificate certified by a Financial Officer reflecting all changes since the Closing Date or, if applicable, the date of the most recent certificate delivered pursuant to this Section, or otherwise confirming that there has been no change in such information.

(c)     Each Borrower shall maintain and implement administrative and operating procedures (including, without limitation, an ability to recreate records evidencing Accounts and related contracts and pertinent documentation with respect to all other DIP Collateral in the event of the destruction of the originals thereof), and keep and maintain all documents, books, records and other information reasonably necessary or advisable for collecting all Accounts (including, without limitation, records adequate to permit the identification of each Account and all Collections of and adjustments to each existing Account) and for providing the Receivable Information.

(d)     Borrower Representative shall consent to, and direct each Financial Advisor, including each investment bank advising on an Asset Sale, to make itself available, participate in direct communications with and cooperate with reasonable informational requests from  the Agent.

4.5     Existence; Conduct of Business.  Each of Parent Holdings, Holdings and Borrowers will, and each Borrower will cause each of the Subsidiaries and the Healthcare Facilities to continue to operate the business and provide the services of Borrowers as in effect prior to the Filing Date (subject to any changes in the business resulting from the filing of the Chapter 11 Cases and the material events set forth on Schedule C), including to do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, contracts, certifications, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names, except to the extent that the failure to do so (other than in the case of maintaining any Loan Party's existence) would not reasonably be expected to result in a Material Adverse Effect; *provided*, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 5.3 or any sale of assets permitted under Section 5.5, in each case, to the extent that such transaction is permitted under the Orders.

4.6     Payment of Obligations.  Each Borrower will, and will cause each of its Subsidiaries to, pay its material Tax liabilities, before the same shall become delinquent, except where (a) the validity or amount thereof is being contested in good faith by appropriate actions and (b) such Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP.

4.7     Maintenance of Properties.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Borrower will, and will cause each of its Subsidiaries to, keep and maintain all property in good working order and condition, ordinary wear and tear excepted.

4.8     Insurance.  Each Borrower will, and will cause each of its Subsidiaries and the Healthcare Facilities to, maintain, with financially sound and reputable insurance companies (which may

32

include self-insurance) (a) insurance in such amounts and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations (including medical malpractice insurance) and (b) all insurance required to be maintained pursuant to the DIP Security Documents. Each Borrower will furnish to the Lenders, upon the reasonable request of Agent, information in reasonable detail as to the insurance so maintained.

4.9     <u>ERISA</u>. Borrower Representative will furnish to Agent and each Lender promptly following the receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that any Loan Party or any ERISA Affiliate may request with respect to any Multiemployer Plan; *provided*, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, then, upon reasonable request of Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and Borrower Representative shall provide copies of such documents and notices to Agent promptly after receipt thereof.

4.10     <u>Books and Records; Inspection and Audit Rights</u>. Each of Parent Holdings, Holdings and each Borrower will, and will cause each of its Subsidiaries to, keep books of record and account in accordance with GAAP. Each of Parent Holdings, Holdings and each Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by Agent (accompanied by representatives of any Lender that shall elect to participate) upon reasonable prior notice (or without notice in the event a Default or Event of Default has occurred and is continuing), to visit and inspect its properties during normal business hours, to conduct field examinations, to audit, examine and make extracts and copies from its books and records, to evaluate and make physical verifications of any DIP Collateral in any manner and through any medium that Agent considers advisable and to discuss its affairs, finances and condition with its officers and independent accountants (subject to customary access agreements), all at such reasonable times during normal business hours and as often as reasonably requested (subject to confidentiality requirements imposed by law or agreements), in each instance, at the Loan Parties' expense; *provided*, that to the extent required by any laws or regulations, including any Healthcare Laws, each of Parent Holdings, Holdings and each Borrower shall, and shall cause each of its Subsidiaries and the Healthcare Facilities to, use reasonable best efforts to permit such access consistent with Healthcare Laws, including, without limitation, pursuant to regulations that may permit disclosure under its health care operations (as defined in HIPAA) subject to the HIPAA minimum necessary requirement.

4.11     <u>Compliance with Laws</u>. Each of Parent Holdings, Holdings and each Borrower will, and will cause each of its Subsidiaries and the Healthcare Facilities to comply with all laws, rules or regulations, including, without limitation, the Orders and all orders entered into by the Bankruptcy Court during the Chapter 11 Cases, the Trading With the Enemy Act, Foreign Assets Control Regulations, the Executive Order, the Patriot Act, the FCPA, any Healthcare Laws, all Environmental Laws and orders of any Governmental Authority applicable to it, its operations or its property, and all laws, rules and regulations of Governmental Authorities as they may apply to the licensing of professional and other health care providers employed by Parent Holdings, Holdings, each Borrower, each Subsidiary and each Healthcare Facility and a Healthcare Facility's contracts with Contract Providers, except, in each case, where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

4.12     <u>Use of Proceeds</u>. Borrowers shall use the proceeds of the Revolving Loan solely (i) to fund operating expenses, working capital and general corporate purposes consistent with the Budget and the Financing Orders, (ii) to fund the costs and expenses of administering the Chapter 11 Cases

consistent with the Budget and the Financing Orders, and (iii) to assume the Existing Debt, which shall be deemed to constitute obligations hereunder pursuant to the Final Order.  No part of the proceeds of any Revolving Loans will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations U and X.

4.13    [Reserved].

4.14    Further Assurances.

(a)    Parent Holdings, Holdings and Borrowers agree to provide to Agent, from time to time upon reasonable request, evidence reasonably satisfactory to Agent as to the perfection and priority of the Liens created or intended to be created by the DIP Security Documents and the Financing Orders.

(b)    If any material asset (including any real property or improvements thereto or any interest therein) that has an individual fair market value of more than $100,000 is acquired by any Borrower or any Subsidiary Loan Party after the Closing Date or owned by an entity at the time it becomes a Subsidiary Loan Party (in each case other than assets constituting DIP Collateral under the Security Agreement that become subject to the Lien of the DIP Security Agreement upon acquisition thereof), Borrower Representative will (x) notify Agent thereof, and (y) if such asset is comprised of real property, deliver to Agent promptly an updated Schedule 3.5(c) reflecting the addition of such asset.  If requested by Agent or the Required Lenders, Borrowers will cause such asset to be subjected to a Lien securing the Obligations and will take, and cause the Subsidiary Loan Parties to take, at the expense of the Loan Parties, such actions as shall be necessary or reasonably requested by Agent to grant and perfect such Liens, including, without limitation, the actions described in paragraph (a) of this Section.

(c)    [Reserved].

4.15    [Reserved].

4.16    Healthcare Licenses.

(a)    Each of Parent Holdings, Holdings and each Borrower and the Healthcare Facilities will, and will cause each of its Subsidiaries to, (i) obtain and maintain all material licenses, permits, certifications and approvals of all applicable Governmental Authorities as are required for the conduct of its business as currently conducted on the date hereof and herein contemplated, including, without limitation, Medicaid Certifications and Medicare Certifications, (ii) ensure that billing policies, arrangements, protocols and instructions will comply in all material respects with reimbursement requirements under Medicare, Medicaid and other Medical Reimbursement Programs and will be administered by properly trained personnel and (iii) ensure that each Healthcare Facility is duly accredited by the Joint Commission.

(b)    Each Borrower has in place and shall maintain a compliance program for its Subsidiaries and the Healthcare Facilities that is reasonably designed to provide effective internal controls that promote adherence to, and prevent and detect material violations of, any Healthcare Laws applicable to its Subsidiaries and the Healthcare Facilities, which compliance program includes the implementation of internal audits and monitoring on a regular basis to monitor compliance therewith and with such regulations.

Error! Unknown document property name.

(c)     Each Borrower, Parent Holdings, Holdings and the Subsidiaries that is a "covered entity" under HIPAA and each Healthcare Facility has in place and Borrowers shall cause each of them to (i) maintain in effect policies and procedures that materially comply with HIPAA and the HITECH Act as applicable to any of Parent Holdings, Holdings, each Borrower and any of its Subsidiaries and any Healthcare Facilities and (ii) comply in all material respects with such policies and procedures.

4.17     Cash Management Systems.

(a)     On the Closing Date and continuing thereafter, Borrowers shall maintain (i) the Lockbox Accounts, the Concentration Accounts and the Master Disbursement Account with the Approved Banks, and (ii) the cash management systems, in each case established and implemented pursuant to the Prepetition Credit Agreement.  For the avoidance of doubt, Borrowers shall cause all payors on the Receivables to continue to send payments to the existing designated Lockbox Accounts.

(b)     Each Borrower covenants and agrees that all invoices (and, if provided by Borrowers, return envelopes) to be sent to Account Debtors shall set forth only the address of a Lock Box as a return address for payment of Accounts by check, and only a Lockbox Account with respect to wire transfers for payment of Accounts.

(c)     All amounts in the Collection Account shall be applied (and allocated) by Agent to the Obligations in accordance with Section 1.8, with any excess amounts transferred to a master disbursement account at Capital One (the "Master Disbursement Account").

(d)     The Loan Parties shall not maintain cash on deposit in disbursement accounts in excess of outstanding checks and wire transfers payable from such accounts and amounts necessary to meet minimum balance requirements, except that the Loan Parties may maintain cash on deposit in the Master Disbursement Account.

(e)     Each deposit, securities, commodity or similar accounts maintained by a Loan Party is set forth on Schedule 4.17(e).  Each Loan Party shall confirm and maintain each Control Agreement with respect to each of its deposit, securities, commodity or similar accounts maintained by such Person (including Lockbox Accounts and the Concentration Account, but excluding any payroll account, any withholding Tax account, any fiduciary account, any zero balance disbursement account, any Excluded Account and any Segregated Governmental Account).

(f)     In addition, in order to segregate and to facilitate perfection of Agent's security interest in funds received from Governmental Payors making payments under Medicare or Medicaid, the Loan Parties agree to (a) segregate Collections made from Governmental Payors making payments under Medicare or Medicaid, from Collections made from all other Account Debtors and customers of the applicable Loan Parties, including, without limitation, by (i) notifying (to the extent not already making directed payments) all payors (other than Governmental Payors making payments under Medicare or Medicaid) then instructed to make payments to such Loan Parties' Deposit Accounts to make payments to a Deposit Account subject to a Control Agreement, and (ii) notifying all Governmental Payors making payments under Medicare or Medicaid to make payments to a Segregated Governmental Account, and (b) cause each applicable depository to enter into, a "sweep" agreement (a "Sweep Agreement") with respect to each Segregated Governmental Account pursuant to which such depository will agree to sweep amounts deposited therein on daily basis to a Lockbox Account of the Loan Parties subject to a Control Agreement in favor of Agent as and when funds clear and become available in accordance with such depository's customary procedures, each with such financial institution and each

Error! Unknown document property name.

in form and substance reasonably acceptable to Agent.  No Loan Party may change any sweep instruction set forth in such Sweep Agreement without the prior written consent of Agent.  Agent agrees and confirms that Loan Parties will have sole dominion and "control" (within the meaning of Section 9-104 of the UCC and the common law) over each Segregated Governmental Account and all funds therein and Agent disclaims any right of any nature whatsoever to control or otherwise direct or make any claim against the funds held in any Segregated Governmental Account from time to time.

(g)     To the extent any Person, whether a Governmental Payor or otherwise, remits payments to an incorrect Deposit Account or otherwise makes payments not in accordance with the provisions of this Section or an applicable Loan Party's payment direction, such Loan Party shall contact such Person and use its commercially reasonable efforts to redirect payment from such Person in accordance with the terms hereof.  If such Borrower does not promptly (and in any event, within five Business Days from Agent's request) take such actions or such similar actions as Agent may request, then Agent (or its assigns or designees), may to the maximum extent permitted by law, execute and deliver such notices, contact such Account Debtors to convey such instructions or directions, or take such similar actions as Agent may, in its discretion, deem appropriate.

(h)     If an Event of Default is continuing, Agent may exercise sole dominion and control over the Master Disbursement Account.  All zero balance disbursement accounts will be linked to the Master Disbursement Account.

(i)     Agent shall have full access to the Lockbox Accounts, including (i) direct access to all information concerning the balance of and transactions involving such Lockbox Accounts, and (ii) in Agent's sole discretion, the institution of such automatic notifications to Agent with respect to such Lockbox Accounts (or any of them) as Agent may request from the applicable depositary bank.

(j)     The L/C Issuer shall maintain a deposit account, account # 7057506187 at Capital One Bank, National Association (the "Cash Collateral Account"), over which the L/C Issuer shall have full dominion, for the deposit any cash collateral required to be provided under this Agreement (including, without limitation, pursuant to Section 1.1(b)(iv)).

4.18    Agent Calls.

Promptly following each delivery of a certificate of a Financial Officer under clause (d) of Section 4.2, Borrower Representative shall conduct a call with Agent to discuss the financial condition and results of operations of Borrowers and the Subsidiaries.

4.19    Subsidiaries.  No Borrower will form or suffer to permit any Foreign Subsidiary or any Unrestricted Subsidiary (other than the Unrestricted Subsidiaries in existence on the Filing Date).

4.20    Accounts.

(a)     Borrowers shall administer and service the Accounts (1) in compliance in all material respects at all times with all legal requirements and the terms and conditions of this Agreement, (2) in accordance with industry standards for servicing receivables of the type included in the DIP Collateral to the extent that such standards do not conflict with the terms and conditions of this Agreement, and (3) in a manner consistent in all material respects with its credit and collection policies and procedures as in effect on the Closing Date (subject to clause (b) below) or otherwise satisfactory to Agent. Borrowers shall maintain electronic data processing services for monitoring, administering, and

Error! Unknown document property name.

collecting the Accounts in accordance with the foregoing standards and shall, within five Business Days of the deposit of any checks, other forms of cash deposits, or other written matter into a Lock Box, post such information, including non-adjustments, to its electronic data processing services.

(b)    Borrowers shall not change in any material respect their existing policies and procedures with respect to the administration and servicing of accounts receivable (including, without limitation, the amount and timing of write-offs) without the prior written consent of Agent; *provided*, that, that the prior written consent of Agent shall not be required (but Borrowers shall provide notice to Agent) with respect to those changes required by applicable Requirements of Law.

(c)    Borrowers agree and acknowledge that Agent may engage a back-up servicer in its Permitted Discretion to perform such duties as agreed to with Agent, including, without limitation, review of each Borrowing Base Certificate and related reports and review the billing and monitoring of the electronic data processing services used by Borrowers for monitoring, administering, and collecting the Accounts.  Each Borrower agrees to (i) deliver to such back-up servicer the information required to be set forth in the Borrowing Base Certificates and related reports in hard copy and in an agreed upon electronic format to allow it to load into its system certain information in order to provide such services, (ii) provide access to and direct communication between such back-up servicer and the internal professionals and outside consultants and advisers and outsource firms of Borrowers in charge of the billing, collection and reporting operations, and (iii) provide such records, computer access and other information as shall be necessary or desirable, in the judgment of any such back-up servicer, to perform such responsibilities.  Each Borrower agrees to pay on demand all reasonable costs and expenses of Agent in connection with the engagement and activities of such back-up servicer.

4.21    <u>Financial Advisors</u>.  Borrowers shall continue to engage financial consultants and other advisors, reasonably acceptable to Agent, for a scope of services reasonably acceptable to Agent (a "<u>Financial Advisor</u>").  Agent acknowledges that BRG and Houlihan Lokey are acceptable Financial Advisors.

4.22    <u>Collections Services</u>.  Borrowers shall (i) maintain, retain and consult with Agent regarding the maintenance and retention of adequate management (taking into account the departure and replacement of employees in the ordinary course business), staffing and third party consultants, and shall have developed a satisfactory plan to oversee and implement the billing and collection of Receivables in a manner reasonably acceptable to Agent, including obtaining approval by Agent of any significant "bulk" compromises on Receivables; (ii) consult with and provide Agent (and its consultants) with access to and direct communication with the internal professionals and outside consultants and advisers and outsource firms of Borrowers providing the billing, collection and reporting operations,  (iii) provide prompt notice to Agent of any significant changes to the personnel engaged in the billing, collection and reporting of Receivables, outside consultants and advisers and outsource firms; and (iv) if deemed necessary and required by Agent, engage a "hot" backup servicer for Receivables (acceptable to Agent with instructions to communicate with and provide information directly to Agent upon its request) and have such backup servicer in place and in a position to perform full billing and collection functions, including without limitation, with full access to the hardware and software necessary to provide full billing and collection functions, if requested to do so.

4.23    <u>The Budget</u>.  Borrowers shall make payments and expenditures, including from the Filing Date Cash and the proceeds of the Revolving Loans, solely to make payments to the Persons in a

**Error! Unknown document property name.**

manner generally consistent with both the Budget and the Financing Orders (except as may be approved by Agent in its sole discretion), subject to Permitted Variances.

4.24    [Reserved].

4.25    [Reserved].

4.26    The Financing Orders.  Each Borrower shall comply with the Financing Orders and take all actions necessary or appropriate to ensure that:

(a)    The Liens granted to Agent and the Lenders shall be deemed valid and perfected by entry of the Interim Order and the Final Order, as the case may be;

(b)    The Liens, lien priorities, administrative expense claim priorities and other rights and remedies granted to Agent pursuant to this Agreement, the Interim Order, the Final Order or the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of Agent's superpriority administrative expense claim and Lien provided for herein and therein, and the administrative expense claim priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion to cases under chapter 7 of the Bankruptcy Code of the Chapter 11 Cases, or by any other act or omission whatsoever.  Without limiting the generality of the foregoing, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission;

(i)    except to the extent that the Carve-Out has priority over the Obligations, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same to cases under chapter 7 of the Bankruptcy Code or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of Agent or the Lender against Borrowers in respect of any Obligations; and

(ii)    the Liens granted to Agent and the Lenders shall constitute valid and perfected first priority Liens on all of the DIP Collateral of Borrowers, subject only to (x) Permitted Liens and (y) Permitted Encumbrances, as to which the Liens granted to Agent shall be subordinate and junior, and shall be prior to all other Liens, now existing or hereafter arising.

4.27    Milestones.

(a)    By June 10, 2019 (or upon such later date as agreed in writing between Borrowers and Agent), Borrowers shall have entered into binding asset purchase agreement(s) with one or more prospective purchasers (subject to only customary conditions precedent, not including financing conditions) for the sale of all or substantially all of the assets of Borrowers, on such terms reasonably acceptable to Agent.

(b)    By July 3, 2019, the Bankruptcy Court shall have entered an order or orders approving bidding procedures for the Specified Sale, which such order or orders shall be in form and substance reasonably acceptable to Agent.

(c)    By August 16, 2019, the Bankruptcy Court shall have entered orders approving the sale of all or substantially all of the assets of Borrowers, on such terms reasonably acceptable to

38

Agent (the "<u>Specified Sale Order</u>") which orders shall be in form and substance reasonably acceptable to Agent.

(d)    By September 27, 2019 (the "<u>Projected Sale Date</u>"), the transactions contemplated in the Specified Sale Order shall have been consummated.

**ARTICLE V.**
**NEGATIVE COVENANTS**

Each Loan Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Revolving Loan or other Obligation (other than (i) contingent indemnification obligations arising under the Loan Documents to the extent no claim giving rise thereto has been asserted, and (ii) Letter of Credit Obligations that have been cash collateralized in accordance with the terms hereof) shall remain unpaid or unsatisfied:

5.1    <u>Indebtedness; Certain Equity Securities.</u>

(a)    Each Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness outstanding under the Prepetition Facility Documents;

(ii)    Indebtedness outstanding under the Prepetition Term Facility Documents;

(iii)    Indebtedness created under the Loan Documents (including any Guarantees thereof);

(iv)    Indebtedness arising prior to the Filing Date and set forth on <u>Schedule 5.1</u>;

(v)    Indebtedness of any Loan Party and owed to any other Loan Party that is subordinate to the Obligations and incurred in the Ordinary Course of Business, and any Indebtedness of any Loan Party owed to any other Loan Party in the amounts and on the dates of distribution set forth in the Budget, in each case, and set forth on <u>Schedule 5.1</u>; *provided,* that (i) any such Indebtedness owed by a Loan Party is subordinated to the Obligations pursuant to the Affiliate Subordination Agreement and (ii) Indebtedness of any Subsidiary that is not a Loan Party to any Borrower or any Subsidiary Loan Party shall be subject to <u>Section 5.4(j)</u>;

(vi)    Indebtedness of any Borrower (including any Capital Lease Obligation) incurred to finance the acquisition, construction or improvement of any fixed or capital assets in the amounts set forth in the Budget;

(vii)    Guarantees by any Borrower of Indebtedness of any other Borrower or any Subsidiary, by any Subsidiary of Indebtedness of any other Subsidiary and by any Subsidiary Loan Party of Indebtedness of any Borrower arising prior to the Filing Date as set forth on <u>Schedule 5.1</u>; *provided,* that (x) such Indebtedness is otherwise permitted under this <u>Section 5.1</u> and (y) there are (and no Loan Party shall enter into) Guarantees of Indebtedness of any Subsidiary that is not a Loan Party;

39

(viii)    Indebtedness arising prior to the Filing Date and owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to any Borrower or any Subsidiary, pursuant to reimbursement or indemnification obligations to such person in the amounts and on the dates of distribution set forth in the Budget*; provided,* that upon the incurrence of Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than 30 days following such incurrence;

(ix)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business or other cash management services in the Ordinary Course of Business*; provided,* that (i) such Indebtedness (other than credit or purchase cards) is extinguished within ten (10) Business Days of its incurrence and (ii) such Indebtedness in respect of credit or purchase cards is extinguished within thirty (30) days from its incurrence;

(x)    Indebtedness arising from agreements of any Borrower or any Subsidiary providing for indemnification, adjustment of purchase or acquisition price or similar obligations, in each case, incurred or assumed in connection with a Disposition permitted hereunder, other than Guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary in connection with such Disposition;

(xi)    Indebtedness arising prior to the Filing Date and set forth on <u>Schedule 5.1</u> in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations, in each case provided in the Ordinary Course of Business, including those incurred to secure health, safety and environmental obligations in the Ordinary Course of Business;

(xii)    all premium (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in paragraphs (i) through (x) above and paragraphs (xii) through (xix) below;

(xiii)    cash management obligations and other Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case, in connection with cash management and Deposit Accounts;

(xiv)    Indebtedness representing deferred compensation to employees of LifeCare Holdings incurred in the Ordinary Course of Business; and

(xv)    Indebtedness (other than indebtedness for borrowed money) at any time not exceeding $50,000;

(b)    Each Borrower will not, nor will it permit any Subsidiary to, issue any preferred stock or other preferred Equity Interests, other than (i) Non-Cash Pay Preferred Stock of LifeCare Holdings issued to Holdings and pledged pursuant to the Security Agreement and (ii) preferred stock or other preferred Equity Interests of a Subsidiary (other than a member of the HHC Group), issued to a Loan Party and pledged pursuant to the Security Agreement.

**Error! Unknown document property name.**

(c)    Capital Expenditures. Each Borrower will not, nor will it permit any Subsidiary to make any Capital Expenditures, except for those Capital Expenditures in the amount and on the dates of distribution set forth in the Budget.

5.2    Liens. Each Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(a)    Liens created under the Prepetition Loan Documents, the Loan Documents, the Financing Orders;

(b)    Liens created under the Prepetition Term Facility Documents and subordinated to the Obligations;

(c)    Permitted Encumbrances;

(d)    any Lien existing on the date hereof and set forth on Schedule 5.2; and

(e)    Liens on fixed or capital assets acquired, constructed or improved by any Borrower or any Subsidiary; provided, that (i) such Liens secure Indebtedness relating to Capital Expenditures set forth in the Budget and permitted pursuant to Section 5.1(c), (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the greater of (A) the cost of acquiring, constructing or improving such fixed or capital assets, including transaction costs incurred in connection therewith and (B) the fair market value of such fixed or capital assets, and (iv) such Liens shall not apply to any other Property of any Borrower or any other Subsidiary (other than proceeds); provided, that individual financings of equipment provided by a single lender may be cross-collateralized to other financings of equipment provided solely by such lender.

5.3    Fundamental Changes.

(a)    Each Borrower will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing, (i) any Subsidiary may merge into a Borrower in a transaction in which a Borrower is the surviving corporation, (ii) any Borrower may merge into another Borrower in a transaction in which a Borrower is the surviving corporation; provided, that if LifeCare Holdings is party to such merger, then the surviving entity shall be LifeCare Holdings, (iii) any Subsidiary may liquidate or dissolve if Borrower Representative determines in good faith that such liquidation or dissolution is in the best interests of Borrowers and is not materially disadvantageous to the Lenders and Agent consents to such liquidation or dissolution (such consent not to be unreasonably withheld); and (iv) any asset sale permitted by Section 5.5(i) may be effected through the merger of a Subsidiary of a Borrower with a third party; provided, that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 5.4.

(b)    Neither Parent Holdings or Holdings will conduct, transact or otherwise engage at any time in any business or business activity, acquire any assets, incur any Indebtedness, or suffer to

41

exist any Liens on its assets other than (i) ownership and acquisition of the Equity Interests by Parent Holdings in Holdings, together with activities directly related thereto, (ii) ownership and acquisition of the Equity Interests by Holdings in LifeCare Holdings, together with activities directly related thereto, (iii) performance of its obligations under and in connection with the Loan Documents, the Prepetition Facility, the Financing Orders and the other agreements contemplated hereby and thereby, (iv) actions required by law to maintain its existence, (v) the payment of dividends and Taxes, (vi) the issuance of and the performance of obligations in respect of its Equity Interests, and (vii) activities and liabilities incidental to its maintenance and continuance and the ownership of Holdings, LifeCare Holdings and its Subsidiaries and to the foregoing activities.  Notwithstanding anything to the contrary contained in herein, (A) Parent Holdings shall at all times own directly 100% of the Equity Interests of Holdings and (B) Parent Holdings shall not sell, dispose of, grant a Lien on or otherwise transfer its Equity Interests in Holdings (other than pursuant to the Loan Documents), (C) Holdings shall at all times own directly 100% of the Equity Interests of LifeCare Holdings and (D) Holdings shall not sell, dispose of, grant a Lien on or otherwise transfer its Equity Interests in LifeCare Holdings (other than pursuant to the Loan Documents and the Prepetition Term Facility Documents).

      5.4    <u>Investments, Loans, Advances, Guarantees and Acquisitions</u>.  Each Borrower will not, and will not permit any of its Subsidiaries to, make, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Investment, except Investments approved by the Bankruptcy Court (as required), including:

      (a)    Investments that were Permitted Investments when made prior to the Filing Date;

      (b)    Investments existing on, or contractually committed as of, the Filing Date and set forth on <u>Schedule 5.4</u>;

      (c)    Guarantees existing as of the Filing Date constituting Indebtedness permitted by <u>Section 5.1</u> and listed on <u>Schedule 5.4</u>;

      (d)    So long as no Default or Event of Default is continuing, Investments by any Loan Party in any Affiliate in the Ordinary Course of Business;

      (e)    Investments (including debt obligations and equity securities) received in connection with the bankruptcy or reorganization of, or settlement of delinquent Accounts and disputes with, customers and suppliers, in each case in the Ordinary Course of Business;

      (f)    accounts receivable, security deposits and prepayments arising and extensions of trade credit in the Ordinary Course of Business and any assets and securities received in satisfaction or partial satisfaction thereof from financially troubled Account Debtors to the extent reasonably necessary to prevent or limit loss and any prepayments and other credits to suppliers in the Ordinary Course of Business;

      (g)    Investments consisting of non-cash consideration received in respect of sales, transfers or other dispositions of assets to the extent permitted by the final proviso to <u>Section 5.5</u>;

      (h)    Investments resulting from pledges and deposits referred to in <u>Section 5.2(b)</u> and <u>5.2(e)</u>; and

Error! Unknown document property name.

(i)        Investments relating to existing cash management operations in the ordinary course of business and otherwise permitted pursuant to <u>Section 5.7(ii)</u>.

Notwithstanding the foregoing, on and after the Closing Date, no Borrower nor any of its Subsidiaries shall form, acquire or otherwise make any Investment in any Person that, as a result of such Investment, would be or become a Subsidiary, including a Foreign Subsidiary.

5.5        <u>Asset Sales</u>.   No Borrower shall, or suffer or permit any of its Subsidiaries to, consummate an Asset Sale or enter into an agreement contemplating the consummation of an Asset Sale, nor will any Borrower permit any of its Subsidiaries to issue any additional Equity Interests in such Subsidiary, except:

(a)        (x) sales of inventory, (y) sales of used, surplus, obsolete or worn-out equipment or other worn-out Property and Permitted Investments in the Ordinary Course of Business and (z) sales, leases or other dispositions of inventory of any Borrower and its Subsidiaries determined by the management of Borrower Representative to be no longer useful or necessary in the operation of the business of any of Borrowers or any of the Subsidiaries;

(b)        sales, transfers and dispositions from one Loan Party to another Loan Party;

(c)        sales, transfers and dispositions of defaulted or other accounts receivable in connection with the compromise, settlement or collection thereof consistent with past practice, *provided,* that any compromise or settlement in excess of $100,000 shall be subject to the approval of Agent;

(d)        dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceedings of, any property or asset of any Borrower or any Subsidiary;

(e)        non-exclusive licensing and cross-licensing arrangements involving any technology or Intellectual Property of any Borrower or any Subsidiary in the Ordinary Course of Business; and

(f)        sales, transfers, other dispositions or abandonment of Intellectual Property in the Ordinary Course of Business; or

(g)        Specified Sales; *provided* if in excess of $50,000 in total consideration, such Specified Sale shall be approved in writing by the Agent;

*provided*, that (y) all sales, transfers, leases and other dispositions permitted hereby shall be made for cash and Permitted Investments consideration in cash and (2) dispositions of Permitted Investments and sale and leaseback transactions shall be made for 100% cash and Permitted Investments consideration), (z) all sales, transfers, leases and other dispositions permitted hereunder and all sales of Permitted Investments shall be made for fair value; and *provided, further,* that the Net Proceeds from all Asset Sales shall be deposited solely in the Collection Account and shall be subject to the prepayment requirements set forth in <u>Section 1.6</u> hereof.

**Error! Unknown document property name.**

5.6    <u>Rate Contracts</u>.  Each Borrower will not, and will not permit any of its Subsidiaries to, enter into or suffer or permit to any Rate Contract, except for Rate Contracts entered into in the Ordinary Course of Business prior to the Filing Date and set forth on <u>Schedule 5.6</u>.

5.7    <u>Restricted Payments; Certain Payments of Indebtedness</u>

(a)    Each Borrower will not, and will not permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except that

(i)    Subsidiaries of any Borrower may declare and pay dividends or distributions ratably (or in a manner more favorable to Borrowers or Subsidiaries) with respect to their capital stock;

(ii)    LifeCare Holdings may pay dividends or distributions to Holdings at any time that no Default or Event of Default has occurred and is continuing in such amounts as are expressly identified in the Budget and as may be necessary to permit Holdings or Parent Holdings to pay its expenses and liabilities incurred in the ordinary course (other than payments in respect of Indebtedness or Restricted Payments), including (A) payment of franchise Taxes and other fees, in each case, required to maintain its legal and corporate existence and (B) to the extent deducted from net income in calculating consolidated net income, to pay for general corporate and overhead expenses (including salaries and other compensation of employees) which are attributable or allocable to the ownership and operations of Borrowers and the Subsidiaries; provided, that the amount thereof (excluding amounts paid pursuant to clause (A) above) does not exceed $250,000 in any calendar year;

(iii)    noncash repurchases of Equity Interests deemed to occur upon exercise of stock options if such Equity Interests represent a portion of the exercise price of such options; and

(iv)    Borrower or any Subsidiary may make Restricted Payments to Holdings at any time that no Default or Event of Default has occurred and is continuing in such amounts as are expressly identified in the Budget (A) in amounts required for Holdings or Parent Holdings to pay federal, state and local income Taxes imposed directly on Holdings or Parent Holdings to the extent such Taxes are attributable to the income of Borrowers and the Subsidiaries (including, without limitation, by virtue of Holdings or Parent Holdings being the common parent of a consolidated or combined Tax group of which Borrowers and/or the Subsidiaries are members); *provided, however*, that the amount of any such dividends or distributions (plus any Taxes payable directly by Borrowers and the Subsidiaries) shall not exceed the amount of such Taxes that would have been payable directly by LifeCare Holdings had LifeCare Holdings been the common parent of a separate tax group that included only Borrowers and the Subsidiaries, and (B) to pay any reasonable fees or expenses related to unsuccessful debt or equity offerings of Holdings or Parent Holdings.

(b)    Each Borrower will not, and will not permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

Error! Unknown document property name.

(i)        payment of Indebtedness created under the Loan Documents or the Prepetition Facility; and

(ii)        payment of Indebtedness on the dates and in the amounts set forth in the Budget.

(c)        Each Borrower will not, and will not permit any Subsidiary to, furnish any funds to, make any Investment in, or provide other consideration to any other Person (including any Unrestricted Subsidiary) and for the purpose of enabling such Person to effectuate transactions expressly permitted under Section 5.7 or Section 5.8.

5.8        Transactions with Affiliates.  Each Borrower will not, and will not permit any Subsidiary to, sell, lease or otherwise transfer any Property to, or purchase, lease or otherwise acquire any Property from, or otherwise engage in any other transactions with, any of its Affiliates, except:

(a)        transactions that are at prices and on terms and conditions not less favorable to such Borrower or such Subsidiary than could be obtained on an arm's-length basis from a Person who is not such an Affiliate;

(b)        any Restricted Payment expressly permitted pursuant to the terms of Section 5.7;

(c)        (i) transactions solely between or among Borrowers and the other Subsidiary Loan Parties, (ii) transactions solely between or among the members of the HHC Group, and (iii) transactions in the Ordinary Course of Business for shared services (which, for the avoidance of doubt, would not include the incurrence of any indebtedness for borrowed money or the transfer or exchange of any material amount of assets) between or among Borrowers and/or the other Subsidiary Loan Parties, on the one hand, and one or more members of the HHC Group, on the other hand, that are no more favorable to the members of the HHC Group than for Borrowers and the other Subsidiary Loan Parties party thereto;

(d)        any employment agreements entered into by any Borrower or any of its Subsidiaries in the Ordinary Course of Business;

(e)        the payment of compensation, reasonable fees and reimbursement of expenses to, and indemnity provided on behalf of, directors, officers, consultants and employees of Holdings, of any Borrower and of the Subsidiaries;

(f)        transactions with Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the Ordinary Course of Business in a manner consistent with past practice; and

(g)        the entry into and performance of any tax sharing agreement permitted by Section 5.7(a)(v).

5.9        Restrictive Agreements.  Each Borrower will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its Property securing the Obligations, or (b) the

45

ability of any Subsidiary to pay dividends or distributions with respect to any shares of its capital stock or to make or repay loans or advances to any Borrower or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; *provided*, that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or any Term Facility Document as in effect on the date hereof or as amended or modified in accordance with the Intercreditor Agreement, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on Schedule 5.9 (and shall not apply to any extension or renewal of, or any amendment or modification not expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any asset pending such sale, *provided* such restrictions and conditions apply only to the Subsidiary or asset that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the Property securing such Indebtedness and the proceeds thereof, (v) clause (a) of the foregoing shall not apply to customary provisions in leases or other agreements restricting the assignment thereof, (vi) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to any Indebtedness incurred by a Subsidiary prior to the date on which such Subsidiary was acquired by a Borrower (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (vii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement related to the refinancing of Indebtedness; *provided*, that the terms of any such restrictions or conditions are not materially less favorable to the Lenders than the restrictions or conditions contained in the predecessor agreements, (viii) the foregoing shall not apply to customary net worth provisions contained in real property leases or licenses of intellectual property and other similar agreements entered into in the Ordinary Course of Business, so long as Borrower Representative has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of Borrowers and the Subsidiaries to meet their ongoing obligations, (ix) the foregoing shall not apply to customary restrictions and conditions contained in the document relating to any Lien, so long as (A) such Lien is permitted under Section 5.2 and such restrictions or conditions relate only to the specific asset subject to such Lien, and (B) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 5.9, (x) the foregoing shall not apply to customary provisions in joint venture agreements, and (xi) the foregoing shall not apply to the provisions of the definitive documentation for HHC Permitted Indebtedness which is incurred in accordance with the terms of this Agreement.

5.10   Change in Business. Except for any Permitted Business, engage in any material line of business substantially different from those lines of business conducted by Borrowers and the Subsidiaries on the date hereof.

5.11   Fiscal Year. None of Parent Holdings, Holdings nor Borrowers shall change its fiscal year for accounting and financial reporting purposes to end on any date other than December 31.

5.12   Amendment of Material Documents. Each Borrower will not, and will not permit any Subsidiary to, (i) waive, supplement, modify, amend, terminate or release any indenture, instrument or agreement pursuant to which any Material Indebtedness of Parent Holdings, Holdings, any Borrower or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would increase the obligations of the obligor or confer additional rights on the holder of such Indebtedness in a manner materially adverse to the Lenders or (ii) amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational

46

documents if, in each case referred to above, such amendment, modification or waiver, taken as a whole, is adverse in any material respect to the interests of the Lenders.

5.13     Partnerships, Etc.  Each Borrower will not, and will not permit itself, Parent Holdings, Holdings or any Guarantor to, become a general partner in any general or limited partnership or joint venture, other than any Subsidiary the sole assets of which consist of its interest in such partnership or joint venture.

5.14     Sale and Leaseback Transactions.  Each Borrower will not, and will not permit any of its Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, except as approved in writing by Agent.

5.15     Account Matters.  No Loan Party shall:

(a)     except at the direction of Agent, terminate, or suffer or permit the termination of, any of the Lock Boxes or the Lockbox Accounts, or make any change or replacement: (1) in the instructions contained in any notice to Account Debtors or otherwise, (2) regarding payments with respect to Accounts to be made to the Lock Boxes or the Lockbox Accounts, or (3) regarding payments to be made to Agent;

(b)     except in accordance with its credit and collection policy, (1) compromise, adjust, extend, satisfy, subordinate, rescind, set off, waive, amend, or otherwise modify, or permit or agree to any deviation from, the terms and conditions of any Account or materially or adversely modify or waive any term or condition of any contract related thereto; or (2) change, modify, or rescind any payment direction contained in any invoice or previously delivered notice to Account Debtors; or

(c)     take any action which would allow, result in, or cause any Eligible Accounts to be evidenced by an "instrument" within the meaning of the UCC of the applicable jurisdiction.

5.16     Modifications of the Financing Orders.  Borrowers shall not at any time seek, consent to or suffer to exist any modification, stay, vacation or amendment of any of the Financing Orders, as the case may be, except for modifications and amendments agreed to by Agent.

5.17     Entry of the Final Order.  Borrower Representative shall use its best efforts to ensure that the Final Financing Order Date shall take place as soon as practical, and in all events no later than June 6, 2019.

5.18     Prohibition on Priming of Liens of the Lender.  Except with respect to the Carve-Out and subject to the entry of the Final Order, Borrowers shall not permit any person to surcharge the DIP Collateral under § 506(c) of the Bankruptcy Code or to obtain a Lien with respect to the DIP Collateral which is equal or senior to the Lien of Agent and the Lenders hereunder.  Except as expressly provided in this clause, the prohibition on surcharging or priming of Liens of Agent and the Lenders on the DIP Collateral will survive the termination of this Agreement.  Upon the termination of this Agreement, Borrowers agree that the Bankruptcy Court will retain jurisdiction over the DIP Collateral for the limited purpose of enforcing this clause.

5.19     Press Releases.  No Borrower shall make any press release or public announcement concerning this Agreement, the Lenders or Agent without the prior consent of Agent to the contents

47

thereof, unless a press release or public announcement is required by law or order of the Bankruptcy Court.

## ARTICLE VI.
## FINANCIAL COVENANTS

Each Loan Party covenants and agrees that, so long as any Lender shall have any Commitment hereunder, or any Revolving Loan or other Obligation (other than contingent indemnification Obligations to the extent no claim giving rise thereto has been asserted) shall remain unpaid or unsatisfied:

6.1    <u>Permitted Variances</u>.  As of any date of determination, actual Availability shall be not less than projected Availability in the Budget by more than $600,000.  For any Budget Testing Period, as reported in the most recent Budget delivered pursuant to <u>Section 2.1(f)</u> or <u>Section 4.1(a)</u>, as applicable, (1) Projected Total Cash Receipts shall not be less than the relevant Variance Percentage of Projected Actual Total Cash Receipts set forth in the Budget for such Budget Testing Period; and (2) the Actual Total Operational Disbursements shall not exceed the relevant Variance Percentage of Projected Total Operational Disbursements set forth in the Budget for such Budget Testing Period, and (3) Actual Total Cash Receipts minus Actual Total Disbursements ("<u>Cumulative Net Cash Flow</u>") shall not be less than $3,000,000 less than Projected Total Cash Receipts for such Budget Testing Period (collectively the variances described in this <u>Section 6.1</u>, "<u>Permitted Variances</u>").

For the purposes of this Section 6.1, the "Variance Percentage" means (i) 115% for the First Budget Testing Period, (ii) 112.5% for the Second Testing Period, and (iii) 110% for each Budget Testing Period thereafter.

6.2    <u>Average Length of Stay</u>.  Except for Excluded Facilities, each Healthcare Facility (or group of Healthcare Facilities under a single provider number with Medicare), shall not experience more than one calendar month commencing from March, 2019 in which it failed to maintain an average length of stay equal to or greater than 25 days (or as Agent may otherwise consent based on the applicable Requirement of Law related to a change of ownership of any Healthcare Facility).

6.3    <u>Monthly Revenues</u>.  Monthly revenues (as reported by Borrower Representative on or prior to the fifth Business Day of each calendar month) shall not be less than 92% of the projected monthly revenues set forth in the Budget for such prior calendar month.

## ARTICLE VII.
## EVENTS OF DEFAULT

7.1    <u>Events of Default</u>.  Any of the following shall constitute an "Event of Default":

(a)    Borrowers shall fail to pay any principal of any Revolving Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    Borrowers shall fail to pay any interest on any Revolving Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article VII) payable under this Agreement or any other Loan Document when and as the same shall become due and payable and such failure shall continue unremedied for a period of three Business Days;

48

(c)        (i) any representation or warranty made or deemed made by Parent Holdings, Holdings, any Borrower or any Subsidiary in or in connection with any Loan Document (other than the Borrowing Base Certificates) or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made or (ii) any information contained in any Borrowing Base Certificate is untrue or incorrect in any material respect;

(d)        Parent Holdings, Holdings or any Borrower shall fail to observe or perform any covenant, condition or agreement contained in Sections 4.2(a), 4.4 (with respect to the existence of Parent Holdings, Holdings and each Borrower), 4.11, 4.12, 4.19, 4.20 or in Article V or Article VI;

(e)        any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b) or (d) of this Article VII), and such failure shall continue unremedied for a period of ten (10) days, after notice thereof from Agent or the Required Lenders to Borrower Representative (which notice will promptly be given at the request of any Lender);

(f)        Parent Holdings, Holdings, any Borrower or any Subsidiary shall make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, except to the extent expressly set forth in the Budget;

(g)        [Reserved].

(h)        event or condition exists with respect to any Material Indebtedness, or an Order has been submitted in the Bankruptcy Court, under which any such Debt shall be, or shall be required to be, prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to repay, redeem, purchase or defease such Debt shall be required to be made, in each case prior to the stated maturity thereof;

(i)        one or more judgments for the payment of money in an aggregate amount in excess of $500,000 (net of amounts covered by insurance where the insurance carrier has not denied coverage) shall be rendered against Parent Holdings, Holdings, any Borrower, any Subsidiary and the same shall remain undischarged for a period of 45 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of Parent Holdings, Holdings, any Borrower or any Subsidiary to enforce any such judgment

(j)        (i) an ERISA Event shall have occurred that, alone or together with any other ERISA Events that have occurred for which liability remains unsatisfied, would reasonably be expected to result in a Material Adverse Effect; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan(s); (iii) the PBGC shall institute proceedings to terminate any Pension Plan(s); (iv) any Loan Party or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (v) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to result in a Material Adverse Effect;

Error! Unknown document property name.

(k)    This Loan Documents and the Financing Orders shall for any reason fail or cease to create or fail or cease to be a valid and perfected security interest in favor of Agent in the DIP Collateral, senior and prior to all Liens other than the Carve-Out, and free and clear of all Liens other than Permitted Encumbrances;

(l)    Except in connection with the consummation of a Specified Sale approved by Agent, any Borrower shall have entered into any transaction or agreement which could reasonably be expected to result in a Change of Control; or a Change of Control shall have occurred;

(m)    This Agreement, the DIP Security Agreement, the DIP Acknowledgements, the Prepetition Parent Guaranty (as acknowledged by the Holdings Guaranty Acknowledgement), the Intercreditor Agreement (as acknowledged by the Intercreditor Acknowledgement), or any other Loan Document for any reason shall cease to be valid and binding on any Loan Party or in full force and effect (other than in accordance with its terms), or any Loan Party or Guarantor shall assert in writing that this Agreement, the DIP Security Agreement, or any other Guarantee of the Obligations has ceased to be or is not enforceable;

(n)    Any material Healthcare Facility is not eligible for transfer as an "LTACH Facility" under applicable law and regulation due to the failure of such Healthcare Facility to maintain an average length of stay equal to or greater than 25 days for any five months over a six-month period;

(o)    Bankruptcy Events of Default.

(i)    The Interim Order is not entered within three Business Days following the Filing Date;

(ii)    The Final Order Date shall not have occurred within thirty (30) days after the Interim Order Date;

(iii)    An order shall be entered by the Bankruptcy Court converting the Chapter 11 Cases to a case or cases under chapter 7 of the Bankruptcy Code;

(iv)    A proposed plan of reorganization is filed by Borrowers (or, if exclusivity has terminated, by any party), which plan does not provide for the Full Payment of the Obligations as of the effective date of such plan or which plan is not reasonably acceptable Agent;

(v)    An order confirming a plan of reorganization is entered that does not require Full Payment of the Obligations as of the effective date of such plan or which plan is not reasonably acceptable to Agent;

(vi)    An order shall be entered by the Bankruptcy Court with respect to the Chapter 11 Cases (i) appointing a chapter 11 trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers under section 1106(b)) of the Bankruptcy Code;

(vii)    An order shall be entered by the Bankruptcy Court amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying this Agreement and the rights of Agent and Lenders hereunder or the Financing Orders, without the prior written consent of Agent and the Lenders;

Error! Unknown document property name.

(viii)    An order with respect to the Chapter 11 Cases shall be entered without the express prior written consent of Agent (i) to revoke, vacate, reverse, stay, modify, supplement or amend this Agreement, any Loan Document, the Interim Order or the Final Order, as the case may be, or (ii) to permit any claim against or obligation of Borrowers (now existing or hereafter arising, of any kind or nature whatsoever) to have priority equal or superior to the priority of Agent and the Lenders in respect of the Obligations, except for the Carve-Out;

(ix)    Any Borrower or third party attempts in any way to invalidate, reduce or otherwise impair any of the Lender Groups' rights, claims or liens under this Agreement and the Financing Orders, or any such rights, claims or liens shall, for any reason, cease to be valid;

(x)    An order shall be entered by the Bankruptcy Court that subjects the DIP Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code;

(xi)    Any Borrower makes payment on, makes an application to make payment on or supports, directly or indirectly, or does not actively contest in good faith any application by another Person to make payment on, any material prepetition claim (other than ordinary course expenses as provided for in the Budget and approved by the Bankruptcy Court) without the prior written consent of Agent and the Lenders;

(xii)    An order shall be entered by the Bankruptcy Court granting any creditor material relief from the automatic stay to exercise rights with respect to property of the estate having a value of more than $50,000 or which has a material effect on the ability of any Borrower to operate the business consistent with current practice;

(xiii)    Breach of any obligation of Borrowers set forth in this Agreement or in the Orders;

(xiv)    Revolving Loans or the Carve-Out are utilized to prosecute actions, claims, demands or causes of action against Agent or the Lenders or the Prepetition Lender Parties or to object to or contest in any manner or to raise any defense in any pleading as to the validity, perfection, priority or enforceability of the Obligations, the Existing Debt, or of the rights, claims, Liens and security interests granted to Agent or the Lenders under this Agreement and the Financing Orders, or of the rights, claims, Liens and security interests granted to the Prepetition Lender Parties under the Prepetition Loan Documents and the Financing Orders; *provided, however*, that up to an aggregate of $20,000 of the Professional Fee Escrow Account may be used by the Committee inquire into and investigate these matters.

(xv)    As of any date of determination, any Borrower is found to have been overpaid by any Governmental Payor during any period covered by an audit conducted by CMS or any other Governmental Authority, or any Governmental Payor otherwise asserts that Borrowers have been overpaid, and (i) such overpayment is not repaid within fifteen days of its due date or reserved for in a manner reasonably acceptable to Agent, or any Governmental Authority takes action on account of such overpayment (including through an offset or recoupment) or (ii) such Governmental Payor asserts an offset or recoupment of such overpayment or other amounts in an amount greater than $500,000 in excess of the overpayments listed on Schedule I-A on the Filing Date.

(xvi)    An application for any of the orders described in clauses (ii), (v), (vi), (vii), (viii), (ix), (xi), (xiii) or (xiv) of this Section 7.1(m) shall be made by any Person, including the

Error! Unknown document property name.

Committee or any other statutory committee appointed in the Chapter 11 Cases, and such application either (x) is supported, directly or indirectly, by any of Borrowers or any Affiliate of Borrowers, (y) is not being actively contested by Borrowers in good faith, or (z) is granted by the Bankruptcy Court.

(xvii)    Borrowers shall have failed to satisfy any of the Milestones set forth in Section 4.27 hereof, without the prior written waiver of the Lender Group.

(xviii)    There shall have occurred any event, or any condition shall exist, which has had or resulted in (i) the material impairment of the ability of Borrowers to meet their obligations substantially as set forth in the Budget or to otherwise perform their obligations in connection with this Agreement; (ii) the imposition of any obligation on any Lender Group, compliance with which would materially impair such Person's ability to receive its contemplated economic benefits hereunder; or (iii) the material impairment of the validity or enforceability of, or the rights, claims, liens, remedies or benefits available to Agent and the Lender Group under, the Financing Orders, this Agreement or any other Loan Document.

(xix)    Borrowers shall have used the DIP Loans or any other extension of credit by the Lender Group under this Agreement in a manner not in substantial accordance with the Budget subject to Permitted Variances.

7.2    Remedies.  Upon the occurrence and during the continuance of any Event of Default, Agent may, and shall at the request of the Required Lenders:

(a)    declare all or any portion of the Commitment of each Lender to make Revolving Loans suspended or terminated, whereupon such Commitments shall forthwith be suspended or terminated;

(b)    declare all or any portion of the unpaid principal amount of all outstanding Revolving Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Loan Party;

(c)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law; and/or

(d)    replace Borrowers in their performance of any or all of its servicing responsibilities with respect to the Accounts and appoint another Person to succeed Borrowers in the performance of such servicing responsibilities (which replacement may be effectuated through the outplacement to a third-party collection firm obligated to use commercially reasonable efforts to maximize collections in accordance with the provisions of Article 9 of the UCC), in which event Borrowers shall immediately transfer to any successor servicer designated by Agent all records, computer access and other information as shall be necessary or desirable, in the judgment of any such successor servicer, to perform such responsibilities;

provided, however, that upon the occurrence of any event specified in subsection 7.1(a) above, the obligation of each Lender to make Revolving Loans shall automatically terminate and the unpaid principal amount of all outstanding Revolving Loans and all interest, fees and other amounts as

Error! Unknown document property name.

aforesaid shall automatically become due and payable without further act of Agent, any Lender or the L/C Issuer and without presentment, demand, protest or other action.

7.3     <u>Rights Not Exclusive</u>.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

7.4     <u>Attorney-In-Fact</u>.  Each Loan Party hereby irrevocably designates and appoints Agent, for the benefit of the Lenders, to the extent permitted by applicable law and regulation, as that Loan Party's attorney-in-fact, which irrevocable power of attorney is coupled with an interest, with authority, during the continuance of an Event of Default (and to the extent not prohibited under applicable law and regulations) to do any of the following:  (1) endorse or sign such Loan Party's name to remittances, invoices, assignments, checks (other than, absent a court order, payments from Governmental Entities), drafts or other instruments or documents in respect of the DIP Collateral; (2) notify third parties to make payments on the DIP Collateral directly to Agent; (3) bring suit in such Loan Party's name and settle or compromise any Accounts as Agent or Required Lenders may, in their discretion, deem appropriate and (4) to take any action and to execute any instrument consistent with the terms of this Agreement and the other Loan Documents which Agent may deem necessary or advisable to accomplish the purposes hereof.

**ARTICLE VIII.**
**THE AGENT**

8.1     <u>Appointment and Duties</u>.

(a)     <u>Appointment of Agent</u>.  Each Lender hereby appoints WOHCF (together with any successor Agent pursuant to <u>Section 8.9</u>) as Agent hereunder and authorizes Agent to (i) execute and deliver the DIP Acknowledgements and the Loan Documents, and accept delivery thereof on its behalf from any Loan Party, (ii) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent under the Intercreditor Agreement and such Loan Documents and (iii) exercise such powers as are incidental thereto.

(b)     <u>Duties as Collateral and Disbursing Agent</u>.  Without limiting the generality of <u>clause (a)</u> above, Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders and the L/C Issuers with respect to all payments and collections arising in connection with the Loan Documents (including in the Chapter 11 Cases), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in the Chapter 11 Cases (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the DIP Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to Agent and the other Secured Parties with respect to the DIP Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise and (vii) execute any amendment, consent or

Error! Unknown document property name.

waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver; *provided, however*, that Agent hereby appoints, authorizes and directs each Lender and L/C Issuer to act as collateral sub-agent for Agent, the Lenders and the L/C Issuers for purposes of the perfection of Liens with respect to any Deposit Account maintained by a Loan Party with, and cash and Permitted Investments held by, such Lender or L/C Issuer, and may further authorize and direct the Lenders and the L/C Issuers to take further actions as collateral sub-agents for purposes of enforcing such Liens or otherwise to transfer the DIP Collateral subject thereto to Agent, and each Lender and L/C Issuer hereby agrees to take such further actions to the extent, and only to the extent, so authorized and directed.

(c)  Limited Duties.  Under the Loan Documents, Agent (i) is acting solely on behalf of the Secured Parties (except to the limited extent provided in subsection 1.3(b) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined term "Agent", the terms "agent", "Agent" and "collateral agent" and similar terms in any Loan Document to refer to Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender, L/C Issuer or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and each Secured Party, by accepting the benefits of the Loan Documents, hereby waives and agrees not to assert any claim against Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2  Binding Effect.  Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3  Use of Discretion.

(a)  Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided,* that Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Agent to liability or that is contrary to any Loan Document or applicable Requirement of Law; and

(b)  Agent shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or its Affiliates that is communicated to or obtained by Agent or any of its Affiliates in any capacity.

(c)  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and

Error! Unknown document property name.

proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Lenders and the L/C Issuer; *provided,* that the foregoing shall not prohibit (i) Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) the L/C Issuer from exercising the rights and remedies that inure to its benefit (solely in its capacity as L/C Issuer) hereunder and under the other Loan Documents, (iii) any Lender from exercising setoff rights in accordance with <u>Section 9.11</u> or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or other debtor relief law; and provided further that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (A) the Required Lenders shall have the rights otherwise ascribed to Agent pursuant to <u>Section 7.2</u> and (B) in addition to the matters set forth in <u>clauses (ii)</u>, <u>(iii)</u> and <u>(iv)</u> of the preceding proviso and subject to <u>Section 9.11</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

8.4     <u>Delegation of Rights and Duties</u>.  Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article VIII to the extent provided by Agent.

8.5     <u>Reliance and Liability.</u>

(a)     Agent may, without incurring any liability hereunder, (i) rely on the Register to the extent set forth in <u>Section 1.3</u>, (ii) consult with any of its Related Parties and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Loan Party) and (iii) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)     None of Agent and its Related Parties shall be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party, Parent Holdings, Holdings, each Borrower and each other Loan Party hereby waives and shall not assert (and each of Parent Holdings, Holdings and each Borrower shall cause each other Loan Party to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Party (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.  Without limiting the foregoing, Agent:

(i)     shall not be responsible or otherwise incur liability for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Parties selected with reasonable care (other than employees, officers and directors of Agent, when acting on behalf of Agent);

(ii)     shall not be responsible to any Lender, L/C Issuer or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or

Error! Unknown document property name.

the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)    makes no warranty or representation, and shall not be responsible, to any Lender, L/C Issuer or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Loan Party or any Related Party of any Loan Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Loan Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by Agent in connection with the Loan Documents; and

(iv)    shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Loan Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from Borrower Representative, any Lender or L/C Issuer describing such Default or Event of Default clearly labeled "notice of default" (in which case Agent shall promptly give notice of such receipt to all Lenders);

and, for each of the items set forth in clauses (i) through (iv) above, each Lender, L/C Issuer, Parent Holdings, Holdings and each Borrower hereby waives and agrees not to assert (and each of Parent Holdings, Holdings and each Borrower shall cause each other Loan Party to waive and agree not to assert) any right, claim or cause of action it might have against Agent based thereon.

(c)    Each Lender and L/C Issuer (i) acknowledges that it has performed and will continue to perform its own diligence and has made and will continue to make its own independent investigation of the operations, financial conditions and affairs of the Loan Parties and (ii) agrees that is shall not rely on any audit or other report provided by Agent or its Related Parties (an "Agent Report"). Each Lender and L/C Issuer further acknowledges that any Agent Report (i) is provided to the Lenders and L/C Issuers solely as a courtesy, without consideration, and based upon the understanding that such Lender or L/C Issuer will not rely on such Agent Report, (ii) was prepared by Agent or its Related Parties based upon information provided by the Loan Parties solely for Agent's own internal use, (iii) may not be complete and may not reflect all information and findings obtained by Agent or its Related Parties regarding the operations and condition of the Loan Parties.  Neither Agent nor any of its Related Parties makes any representations or warranties of any kind with respect to (i) any existing or proposed financing, (ii) the accuracy or completeness of the information contained in any Agent Report or in any related documentation, (iii) the scope or adequacy of Agent's and its Related Parties' due diligence, or the presence or absence of any errors or omissions contained in any Agent Report or in any related documentation, and (iv) any work performed by Agent or Agent's Related Parties in connection with or using any Agent Report or any related documentation.

(d)    Neither Agent nor any of its Related Parties shall have any duties or obligations in connection with or as a result of any Lender or L/C Issuer receiving a copy of any Agent Report. Without limiting the generality of the forgoing, neither Agent nor any of its Related Parties shall have any responsibility for the accuracy or completeness of any Agent Report, or the appropriateness of any

Error! Unknown document property name.

Agent Report for any Lender's or L/C Issuer's purposes, and shall have no duty or responsibility to correct or update any Agent Report or disclose to any Lender or L/C Issuer any other information not embodied in any Agent Report, including any supplemental information obtained after the date of any Agent Report.  Each Lender and L/C Issuer releases, and agrees that it will not assert, any claim against Agent or its Related Parties that in any way relates to any Agent Report or arises out of any Lender or L/C Issuer having access to any Agent Report or any discussion of its contents, and agrees to indemnify and hold harmless Agent and its Related Parties from all claims, liabilities and expenses relating to a breach by any Lender or L/C Issuer arising out of such Lender's or L/C Issuer's access to any Agent Report or any discussion of its contents.

8.6     Agent Individually.  Agent and its Affiliates may make loans and other extensions of credit to, acquire Equity Interests of, engage in any kind of business with, any Loan Party or Affiliate thereof as though it were not acting as Agent and may receive separate fees and other payments therefor.  To the extent Agent or any of its Affiliates makes any Revolving Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender", "Revolving Lender", "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include, without limitation, Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Required Lenders.

8.7     Lender Credit Decision.

(a)     Each Lender and each L/C Issuer acknowledges that it shall, independently and without reliance upon Agent, any Lender or L/C Issuer or any of their Related Parties or upon any document (including any offering and disclosure materials in connection with the syndication of the Revolving Loans) solely or in part because such document was transmitted by Agent or any of its Related Parties, conduct its own independent investigation of the financial condition and affairs of each Loan Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by Agent to the Lenders or L/C Issuers, Agent shall not have any duty or responsibility to provide any Lender or L/C Issuer with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Loan Party or any Affiliate of any Loan Party that may come in to the possession of Agent or any of its Related Parties.

(b)     If any Lender or L/C Issuer has elected to abstain from receiving MNPI concerning the Loan Parties or their Affiliates, such Lender or L/C Issuer acknowledges that, notwithstanding such election, Agent and/or the Loan Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Revolving Loans to the credit contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; *provided,* that if such contact is not so identified in such questionnaire, the relevant Lender or L/C Issuer hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to Agent and the Loan Parties upon request therefor by Agent or the Loan Parties. Notwithstanding such Lender's or L/C Issuer's election to abstain from receiving MNPI, such Lender or L/C Issuer acknowledges that if such

Error! Unknown document property name.

Lender or L/C Issuer chooses to communicate with Agent, it assumes the risk of receiving MNPI concerning the Loan Parties or their Affiliates.

8.8    <u>Expenses; Indemnities; Withholding</u>.

(a)    Each Lender agrees to reimburse Agent and each of its Related Parties (to the extent not reimbursed by any Loan Party) promptly upon demand, severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Loan Party) that may be incurred by Agent or any of its Related Parties in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including, without limitation, preparation for and/or response to any subpoena or request for document production relating thereto) or otherwise) in respect of, or legal advice with respect to its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify Agent and each of its Related Parties (to the extent not reimbursed by any Loan Party), severally and ratably, from and against Liabilities (including, to the extent not indemnified pursuant to <u>Section 8.8(c)</u>, Taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against Agent or any of its Related Parties in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any Related Document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by Agent or any of its Related Parties under or with respect to any of the foregoing; *provided, however*, that no Lender shall be liable to Agent or any of its Related Parties to the extent such liability has resulted primarily from the gross negligence or willful misconduct of Agent or, as the case may be, such Related Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)    To the extent required by any applicable law, Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding Tax.  If the IRS or any other Governmental Authority asserts a claim that Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding Tax with respect to a particular type of payment, or because such Lender failed to notify Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding Tax ineffective, or for any other reason), or Agent reasonably determines that it was required to withhold Taxes from a prior payment but failed to do so, such Lender shall promptly indemnify Agent fully for all amounts paid, directly or indirectly, by such Agent as Tax or otherwise, including penalties and interest, and together with all expenses incurred by Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding Tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which Agent is entitled to indemnification from such Lender under this <u>Section 8.8(c)</u>.

8.9    <u>Resignation of Agent</u>.

Error! Unknown document property name.

(a)        Agent may resign at any time by delivering notice of such resignation to the Lenders and Borrowers, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this <u>Section 8.9</u>.  If Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Agent. If, after 30 days after the date of retiring Agent's notice of resignation, no successor Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Agent may, on behalf of the Lenders, appoint a successor Agent from among the Lenders.  Each appointment under this <u>clause (a)</u> shall be subject to the prior consent of Borrowers, which may not be unreasonably withheld but shall not be required during the continuance of an Event of Default.

(b)        Effective immediately upon its resignation, (i) the retiring Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of Agent until a successor Agent shall have accepted a valid appointment hereunder, (iii) the retiring Agent and its Related Parties shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Agent was, or because such Agent had been, validly acting as Agent under the Loan Documents and (iv) subject to its rights under <u>Section 8.3</u>, the retiring Agent shall take such action as may be reasonably necessary to assign to the successor Agent its rights as Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Agent, a successor Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Agent under the Loan Documents.

8.10    <u>Release of DIP Collateral or Guarantors</u>.  Each Lender and L/C Issuer hereby consents to the release and hereby directs Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following:

(a)        any Subsidiary Loan Party from its obligations as a Borrower or a guaranty of any Obligation, as applicable, if all of the Equity Interests of such Subsidiary owned by any Loan Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent); and

(b)        any Lien held by Agent for the benefit of the Secured Parties against (i) any DIP Collateral that is sold, transferred, conveyed or otherwise disposed of by a Loan Party in a transaction permitted by the Loan Documents (including pursuant to a waiver or consent), (ii) any Property subject to a Lien permitted hereunder in reliance upon <u>subsection 5.2(d)</u> or <u>5.2(q)</u>, or (iii) all of the DIP Collateral and all Loan Parties, upon (A) termination of the Revolving Loan Commitments, (B) payment and satisfaction in full of all Revolving Loans, all L/C Reimbursement Obligations and all other Obligations under the Loan Documents that Agent has theretofore been notified in writing by the holder of such Obligation are then due and payable, (C) deposit of cash collateral with respect to all contingent Obligations (or, as an alternative to cash collateral in the case of any Letter of Credit Obligation, receipt by Agent of a back-up letter of credit), in amounts and on terms and conditions and with parties satisfactory to Agent and each Indemnitee that is, or may be, owed such Obligations (excluding contingent Obligations (other than L/C Reimbursement Obligations) as to which no claim has been asserted) and (D) to the extent requested by Agent, receipt by Agent and the Secured Parties of liability releases from the Loan Parties each in form and substance acceptable to Agent.

Each Lender and L/C Issuer hereby directs Agent, and Agent hereby agrees, upon receipt of at least five (5) Business Days' advance notice from Borrower Representative, to execute and deliver or file

Error! Unknown document property name.

such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this Section 8.10.

8.11   Additional Secured Parties.  The benefit of the provisions of the Loan Documents directly relating to the DIP Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender or L/C Issuer party hereto as long as, by accepting such benefits, such Secured Party agrees, as among Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by Agent, shall confirm such agreement in a writing in form and substance acceptable to Agent) this Article VIII and Sections 9.3, 9.9, 9.10, 9.11, 9.17, 9.23 and 10.1 (and, solely with respect to L/C Issuers, subsection 1.1(b)) and the decisions and actions of Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; *provided*, *however*, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 8.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the DIP Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) each of Agent, the Lenders and the L/C Issuers party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the DIP Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the DIP Collateral or under any Loan Document.

8.12   Credit Bid.  The holders of the Obligations hereby irrevocably authorize Agent, acting at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the DIP Collateral in satisfaction of all or some of the Obligations pursuant to a deed in lieu of foreclosure, strict foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including Sections 363, 1123 or 1129 thereof, or any similar applicable Laws in any other jurisdictions to which any Loan Party is subject, or (b) at any sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent of, or at the direction of) Agent (whether by judicial action or otherwise) in accordance with any applicable Laws. In connection with any such credit bid and purchase, the Obligations owed to the holders thereof shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle(s) used to consummate such purchase).  In connection with any such credit bid (i) Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle(s); *provided*, that any actions by Agent with respect to such acquisition vehicle(s), including any disposition of the assets or Equity Interests thereof shall be taken at the direction of the Required Lenders, irrespective of the termination of this Agreement and (ii) to the extent that any Obligations that are assigned to an acquisition vehicle are not used to acquire DIP Collateral for any reason (whether as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt which is credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the holders of

60

the Obligations pro rata and the Equity Interests or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled without the need for any Lender or any acquisition vehicle to take any further action.

8.13    <u>Additional Titles</u>.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document, the Documentation Agent shall not have any duties or responsibilities, nor shall the Documentation Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Documentation Agent.

## ARTICLE IX.
## MISCELLANEOUS

9.1    <u>Amendments and Waivers.</u>

(a)    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by Agent, the Required Lenders (or by Agent with the consent of the Required Lenders), and Borrowers, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given*; provided,* that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders directly affected thereby (or by Agent with the consent of all the Lenders directly affected thereby), in addition to Agent and the Required Lenders (or by Agent with the consent of the Required Lenders) and Borrowers, do any of the following:

(i)    increase or extend the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>subsection 7.2(a)</u>);

(ii)    postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Lenders (or any of them) or L/C Issuer hereunder or under any other Loan Document;

(iii)    reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of the Required Lenders) or the amount of interest payable in cash specified herein on any Revolving Loan, or of any fees or other amounts payable hereunder or under any other Loan Document, including L/C Reimbursement Obligations;

(iv)    amend or modify <u>subsection 1.8(c)</u> or <u>(d)</u>;

(v)    change the percentage of the Commitments or of the aggregate unpaid principal amount of the Revolving Loans which shall be required for the Lenders or any of them to take any action hereunder;

(vi)    amend this <u>Section 9.1</u> or the definition of Required Lenders or any provision providing for consent or other action by all Lenders; or

Error! Unknown document property name.

(vii)    discharge any Loan Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the DIP Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents;

it being agreed that all Lenders shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (v), (vi) and (vii).

(b)    No amendment, waiver or consent shall, unless in writing and signed by Agent or the L/C Issuer, as the case may be, in addition to the Required Lenders or all Lenders directly affected thereby, as the case may be (or by Agent with the consent of the Required Lenders or all the Lenders directly affected thereby, as the case may be), affect the rights or duties of Agent or the L/C Issuer, as applicable, under this Agreement or any other Loan Document.

(c)    [Reserved].

(d)    [Reserved].

(e)    Notwithstanding anything to the contrary contained in this Section 9.1, (i) Borrower Representative may amend Schedule 3.13 upon notice to Agent, and (ii) Agent and Borrower Representative may amend or modify this Agreement and any other Loan Document to (1) cure any ambiguity, omission, defect or inconsistency therein, and (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional Property for the benefit of the Secured Parties or join additional Persons as Loan Parties; *provided,* that no Accounts of such Person shall be included as Eligible Accounts until a field examination with respect thereto has been completed to the satisfaction of Agent, including the establishment of Reserves required in Agent's Permitted Discretion.

9.2    Notices.

(a)    Addresses.    All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, (ii) emailed to the email address set forth on the applicable signature page hereto (with respect to any delivery to Agent, as directed by Agent) as may be available and reasonably acceptable to Agent prior to such posting, or (iii) addressed to such other address as shall be notified in writing (A) in the case of Borrowers and Agent, to the other parties hereto and (B) in the case of all other parties, to Borrower Representative and Agent.  Transmissions made by electronic mail to Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of Agent applicable at the time and previously communicated to Borrower Representative, and (z) if receipt of such transmission is acknowledged by Agent.

(b)    Effectiveness.    All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, and (iv) if delivered by email, on the Business Day such email is received in accordance with the standard procedures applicable to email established by Agent; *provided, however*, that no communications to Agent pursuant to Article I shall be effective until received by Agent.

Error! Unknown document property name.

(c)      Each Lender shall notify Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its Lending Office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as Agent shall reasonably request.

### 9.3    Electronic Transmissions.

Each of Agent, Lenders, each Loan Party and each of their Related Parties, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, electronic transmissions in connection with any Loan Document and the transactions contemplated therein. Each Loan Party and each Secured Party hereto acknowledges and agrees that the use of electronic transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of electronic transmissions.

### 9.4    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. No course of dealing between any Loan Party, any Affiliate of any Loan Party, Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

### 9.5    Costs and Expenses.

Subject to the limitations of Section 4.9, any action taken by any Loan Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of Agent or Required Lenders, shall be at the expense of such Loan Party, and neither Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Loan Party or any Subsidiary of any Loan Party therefor except as expressly provided therein. In addition, subject to the limitations of Section 4.9, Borrowers agree to pay or reimburse upon demand (a) Agent for all reasonable documented out-of-pocket costs and expenses (including all wire transfer and other bank charges incurred in connection with this Agreement) incurred by it or any of its Related Parties, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Professional Costs of Agent, the cost of environmental audits, collateral audits and appraisals, background checks and similar expenses, (b) Agent for all reasonable documented costs and expenses incurred by it or any of its Related Parties in connection with internal audit reviews, field examinations and collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by Agent for its examiners), (c) each of Agent, its Related Parties, and L/C Issuer for all reasonable documented costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the DIP Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including, without limitation, preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including the Chapter 11 Cases) related to any Loan Party, any Subsidiary of any Loan Party, Loan Document,

63

Obligation or Transaction, including Professional Costs, and (d) fees and disbursements of Professional Costs of one law firm on behalf of all Lenders (other than Agent) incurred in connection with any of the matters referred to in clause (c) above.

       9.6      <u>Indemnity.</u>

       (a)      Each Loan Party agrees to indemnify, hold harmless and defend Agent, each Lender, each L/C Issuer and each of their respective Related Parties, counsel and other advisors, and successors and permitted assigns (each such Person being an "<u>Indemnitee</u>") from and against all Liabilities (including brokerage commissions, fees and other compensation) that may be imposed on, incurred by or asserted against any such Indemnitee in any matter relating to or arising out of, in connection with or as a result of (i) this Agreement, any Loan Document, any Obligation (or the repayment thereof), any Letter of Credit, the use or intended use of the proceeds of any Revolving Loan or the use of any Letter of Credit or any securities filing of, or with respect to, any Loan Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Loan Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any electronic transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Parties, any holders of securities or creditors (and including Professional Costs in any case), whether or not any such Indemnitee, Related Party, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "<u>Indemnified Matters</u>"); *provided, however*, that no Loan Party shall have any liability under this Section 9.6 to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.  Furthermore, each of Borrowers and each other Loan Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Loan Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Party.

       (b)      Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities, including those arising from, or otherwise involving, any Property of any Loan Party or any Related Party of any Loan Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Property or natural resource or any Property on or contiguous to any Real Property of any Loan Party or any Related Party of any Loan Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor-in-interest to any Loan Party or any Related Party of any Loan Party or the owner, lessee or operator of any Property of any Related Party through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Agent or following Agent or any Lender having become the successor-in-interest to any Loan Party or any Related Party of any Loan Party and (ii) are attributable solely to acts of such Indemnitee.

Error! Unknown document property name.

9.7     <u>Marshaling; Payments Set Aside</u>.  No Secured Party shall be under any obligation to marshal any Property in favor of any Loan Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from any Borrower, from any other Loan Party, from the proceeds of the DIP Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided*, that any assignment by any Lender shall be subject to the provisions of Section 9.9, and provided further that no Borrower may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Agent and each Lender.

9.9     <u>Assignments and Participations; Binding Effect.</u>

(a)     <u>Binding Effect</u>.  This Agreement shall become effective when it shall have been executed by Parent Holdings, Holdings, Borrowers, the other Loan Parties signatory hereto and Agent and when Agent shall have been notified by each Lender that such Lender has executed it.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, Parent Holdings, Holdings, Borrowers, the other Loan Parties hereto (in each case except for <u>Article VIII</u>), Agent, each Lender and each L/C Issuer receiving the benefits of the Loan Documents and, to the extent provided in <u>Section 8.11</u>, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in <u>Section 8.9</u>), none of Parent Holdings, Holdings, any Borrower, any other Loan Party, any L/C Issuer or Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(b)     <u>Right to Assign</u>.  Each Lender may sell, transfer, negotiate or assign (a "<u>Sale</u>") all or a portion of its rights and obligations hereunder (including all or a portion of its Commitments and its rights and obligations with respect to Revolving Loans and Letters of Credit) to (i) any existing Lender, (ii) any Affiliate or Approved Fund of any existing Lender, or (iii) any other Person acceptable (which acceptance shall not be unreasonably withheld or delayed) to Agent and, with respect to Sales of Revolving Loan Commitments, each L/C Issuer that is a Lender and, as long as no Event of Default is continuing, Borrower Representative (which acceptances shall be deemed to have been given unless an objection is delivered to Agent within five (5) Business Days after notice of a proposed sale is delivered to Borrower Representative) (each an "<u>Eligible Assignee</u>")*; provided, however*, that (u) such Sales must be ratable among the obligations owing to and owed by such Lender with respect to the Revolving Loans, (v) for each Revolving Loan, the aggregate outstanding principal amount (determined as of the effective date of the applicable Assignment) of the Revolving Loans, Commitments and Letter of Credit Obligations subject to any such Sale shall be in a minimum amount of $1,000,000, unless such Sale is made to an existing Lender or an Affiliate or Approved Fund of any existing Lender, is of the assignor's (together with its Affiliates and Approved Funds) entire interest in such facility or is made with the prior consent of Borrower Representative (to the extent required) and Agent, (w) such Sales shall be effective only upon the acknowledgement in writing of such Sale by Agent, (x) interest accrued prior to and through the date of any such Sale may not be assigned, and (y) no assignment may be made to any bona fide competitors (and their Affiliates) of the Borrower Group specified in writing as a "Disqualified

Error! Unknown document property name.

Lender" by Borrower Representative to Agent on or prior to the Closing Date or, with the written approval of Agent, on any date after the Closing Date; the list of such persons shall be available to any Lender upon its reasonable request.  Notwithstanding anything to the contrary in the foregoing, in no event may a Lender make or accept a Sale to a Loan Party, an Affiliate of a Loan Party, a holder of Subordinated Debt or an Affiliate of such a holder.

(c)    Procedure.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to Agent an Assignment via an electronic settlement system designated by Agent (or, if previously agreed with Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, any tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to Agent, unless waived or reduced by Agent; provided, that (i) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (ii) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one assignment fee of $3,500 shall be due in connection with such Sale (unless waived or reduced by Agent).  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with clause (iii) of subsection 9.9(b), upon Agent (and Borrower Representative, if applicable) consenting to such Assignment, from and after the effective date specified in such Assignment, Agent shall record or cause to be recorded in the Register the information contained in such Assignment.  Any assigning Lender shall continue to be entitled to the benefits (and to have the obligations) of a Lender under Article X with respect to facts and circumstances occurring prior to the effective date of the Sale.

(d)    Effectiveness.  Subject to the recording of an Assignment by Agent in the Register pursuant to subsection 1.3(b), (i) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, and (ii) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the termination of the Commitments and the Full Payment of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

(e)    Grant of Security Interests.  In addition to the other rights provided in this Section 9.9, each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Revolving Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Board), without notice to Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)    Participants and SPVs.  In addition to the other rights provided in this Section 9.9, each Lender may, (x) with notice to Agent, grant to an SPV the option to make all or any part of any

Error! Unknown document property name.

Revolving Loan that such Lender would otherwise be required to make hereunder (and the exercise of such option by such SPV and the making of Revolving Loans pursuant thereto shall satisfy the obligation of such Lender to make such Revolving Loans hereunder) and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from Agent or Borrowers, sell participations to one or more Persons in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to the Revolving Loans and Letters of Credit)*; provided, however*, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) no such SPV or participant shall have a commitment, or be deemed to have made an offer to commit, to make Revolving Loans hereunder, and, except as provided in the applicable option agreement, none shall be liable for any obligation of such Lender hereunder, (ii) such Lender's rights and obligations, and the rights and obligations of the Loan Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X (subject to the requirements and the limitations therein, including in <u>Section 10.1(f)</u>) to the same extent as if it were a Lender and had acquired its interest by Sale), and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Revolving Loans funded by such SPV to the extent provided in the applicable option agreement and set forth in a notice provided to Agent by such SPV and such Lender, provided, however, that in no case (including pursuant to <u>clause (A)</u> or <u>(B)</u> above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document, and (iii) the consent of such SPV or participant shall not be required (either directly, as a restraint on such Lender's ability to consent hereunder or otherwise) for any amendments, waivers or consents with respect to any Loan Document or to exercise or refrain from exercising any powers or rights such Lender may have under or in respect of the Loan Documents (including the right to enforce or direct enforcement of the Obligations), except for those described in <u>clauses (ii)</u> and <u>(iii)</u> of <u>subsection 9.1(a)</u> with respect to amounts, or dates fixed for payment of amounts, to which such participant or SPV would otherwise be entitled and, in the case of participants, except for those described in <u>clause (vi)</u> of <u>subsection 9.1(a)</u>.  No party hereto shall institute (and Borrowers, Parent Holdings and Holdings shall cause each other Loan Party not to institute) against any SPV grantee of an option pursuant to this <u>clause (f)</u> any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV*; provided, however*, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to be reimbursed by such SPV for any such Liability).  The agreement in the preceding sentence shall survive the termination of the Commitments and the Full Payment of the Obligations.  Notwithstanding anything contained herein to the contrary, no participation may be sold to any bona fide competitors (and their Affiliates) of the Borrower Group specified in writing as a "Disqualified Lender" by Borrower Representative to Agent on or prior to the Closing Date or, with the written approval of Agent, on any date after the Closing Date.  The applicable Lender, acting solely for this purpose as a non-fiduciary agent of Borrowers (solely for tax purposes), shall maintain a register on which it enters the name and address of (i) each SPV (other than any SPV that is treated as a disregarded entity of the granting Lender for U.S. federal income tax purposes) that has exercised its option pursuant to <u>Section 9.9(f)</u> and (ii) each participant, and the amount of each such SPV's and participant's interest in such Lender's rights and/or obligations (including but not limited to such Lender's rights to principal and stated interest under or with respect to any applicable Loan Document) under this Agreement (the "<u>Participant Register</u>"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a

**Error! Unknown document property name.**

participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary in connection with a tax audit or other proceeding to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of the applicable rights and/or obligations of such Lender under this Agreement.

9.10    Non-Public Information; Confidentiality.

(a)    Non-Public Information. Each of Agent, each Lender and L/C Issuer acknowledges and agrees that it may receive material non-public information ("MNPI") hereunder concerning the Loan Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state security laws and regulations).

(b)    Confidential Information. Each of Agent, each Lender and each L/C Issuer and Agent agrees to use all reasonable efforts to maintain, in accordance with its customary practices, the confidentiality of information obtained by it pursuant to any Loan Document and designated in writing by any Loan Party as confidential, except that such information may be disclosed (i) with Borrower Representative's consent, (ii) to Related Parties of such Lender or Agent, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) available to such Lender, L/C Issuer or Agent or any of their Related Parties, as the case may be, from a source (other than any Loan Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority (including any regulatory authority), (v) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Loan Parties, (vi) to current or prospective assignees, SPVs (including the investors or prospective investors therein) or participants, in each case to the extent such assignees, investors, participants, counterparties or Related Parties agree to be bound by provisions substantially similar to the provisions of this Section 9.10 (and such Person may disclose information to their respective Related Parties in accordance with clause (ii) above), (vii) to any other party hereto, and (viii) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding to which such Lender, L/C Issuer or Agent or any of their Related Parties is a party or bound, or to the extent necessary to respond to public statements or disclosures by Loan Parties or their Related Parties referring to a Lender, L/C Issuer or Agent or any of their Related Parties. In the event of any conflict between the terms of this Section 9.10 and those of any other Contractual Obligation entered into with any Loan Party (whether or not a Loan Document), the terms of this Section 9.10 shall govern.

(c)    Tombstones. Each Loan Party consents to the publication by Agent or any Lender of any press releases, tombstones, advertising or other promotional materials (including, without limitation, via any Electronic Transmission) relating to the financing transactions contemplated by this Agreement using such Loan Party's name, product photographs, logo or trademark.  Agent or such

Error! Unknown document property name.

Lender shall provide a draft of such press release, tombstone, advertising or other promotional materials to Borrower Representative for review and comment prior to the publication thereof.

(d)     Press Release and Related Matters.  No Loan Party shall, and no Loan Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Loan Party) using the name, logo or otherwise referring to Agent, any Lender or of any of their respective Affiliates, the Loan Documents or any transaction contemplated herein or therein to which WOHCF or any of its affiliates is party without the prior written consent of Agent and the applicable Person or such Affiliate except to the extent required to do so under applicable Requirements of Law and then, only after consulting with Agent and the applicable Person.

(e)     Distribution of Materials to Lenders and L/C Issuers.   The Loan Parties acknowledge and agree that the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Loan Parties hereunder (collectively, the "Borrower Materials") may be disseminated by, or on behalf of, Agent, and made available, to the Lenders and the L/C Issuers by email.

(f)     Material Non-Public Information.  The Loan Parties hereby agree that if either they, any parent company or any Subsidiary of the Loan Parties has publicly traded equity or debt securities in the U.S., they shall (and shall cause such parent company or Subsidiary, as the case may be, to) (i) identify in writing, and (ii) to the extent reasonably practicable, clearly and conspicuously mark such Borrower Materials that contain only information that is publicly available or that is not material for purposes of U.S. federal and state securities laws as "PUBLIC". The Loan Parties agree that by identifying such Borrower Materials as "PUBLIC" or publicly filing such Borrower Materials with the Securities and Exchange Commission, then Agent, the Lenders and the L/C Issuers shall be entitled to treat such Borrower Materials as not containing any MNPI for purposes of U.S. federal and state securities laws. The Loan Parties further represent, warrant, acknowledge and agree that the following documents and materials shall be deemed to be PUBLIC, whether or not so marked, and do not contain any MNPI: (A) the Loan Documents, including the schedules and exhibits attached thereto, and (B) administrative materials of a customary nature prepared by the Loan Parties or Agent (including, Notices of Borrowing, Notices of Conversion/Continuation and any similar requests or notices that are emailed). Before distribution of any Borrower Materials, the Loan Parties agree to execute and deliver to Agent a letter authorizing distribution of the evaluation materials to prospective Lenders and their employees willing to receive MNPI, and a separate letter authorizing distribution of evaluation materials that do not contain MNPI and represent that no MNPI is contained therein.

9.11    Set-off; Sharing of Payments.

(a)     Right of Setoff.  Each of Agent, each Lender, each L/C Issuer and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Loan Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by Agent, such Lender, such L/C Issuer or any of their respective Affiliates to or for the credit or the account of any Borrower or any other Loan Party against any Obligation of any Loan Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such

69

Obligation and even though such Obligation may be unmatured.  No Lender or L/C Issuer shall exercise any such right of setoff without the prior consent of Agent or Required Lenders. Each of Agent, each Lender and each L/C Issuer agrees promptly to notify Borrower Representative and Agent after any such setoff and application made by such Lender or its Affiliates*; provided, however*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 9.11 are in addition to any other rights and remedies (including other rights of setoff) that Agent, the Lenders, the L/C Issuer, their Affiliates and the other Secured Parties, may have.

(b)    Sharing of Payments, Etc.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Loan Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any DIP Collateral or "proceeds" (as defined under the applicable UCC) of DIP Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of Borrowers, applied to repay the Obligations in accordance herewith)*; provided, however*, that (i) if such payment is rescinded or otherwise recovered from such Lender or L/C Issuer in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender or L/C Issuer without interest and (ii) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Loan Party in the amount of such participation.

9.12    Counterparts; Facsimile and Electronic Signature.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13    Severability.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14    Captions.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15    Independence of Provisions.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

Error! Unknown document property name.

9.16    <u>Interpretation</u>.  This Agreement is the result of negotiations among and has been reviewed by counsel to Loan Parties, Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or Agent merely because of Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17    <u>No Third Parties Benefited</u>.  This Agreement is made and entered into for the sole protection and legal benefit of Borrowers, the Lenders, the L/C Issuers party hereto, Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18    <u>Governing Law and Jurisdiction</u>.

(a)    <u>Governing Law</u>.  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT, AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL, IN ACCORDANCE WITH SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAWS PRINCIPLES THEREOF THAT WOULD CALL FOR THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION, EXCEPT THAT THE BANKRUPTCY COURT SHALL HAVE JURISDICTION OVER THIS AGREEMENT.

(b)    <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, each Borrower and each other Loan Party executing this Agreement hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts*; provided,* that nothing in this Agreement shall limit the right of Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan Documents.  The parties hereto (and, to the extent set forth in any other Loan Document, each other Loan Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    <u>Service of Process</u>.  Each Loan Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States of America with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of Borrower Representative specified herein (and shall be effective when such mailing shall be effective, as provided therein).  Each Loan Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**Error! Unknown document property name.**

(d)      Non-Exclusive Jurisdiction.  Nothing contained in this Section 9.18 shall affect the right of Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Loan Party in any other jurisdiction.

9.19    Waiver of Jury Trial.  THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY.  THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20    Entire Agreement; Release; Survival.

(a)      THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY LOAN PARTY AND ANY LENDER OR ANY L/C ISSUER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENT OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)      Execution of this Agreement by the Loan Parties constitutes a full, complete and irrevocable release of any and all claims which each Loan Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the subject matter of this Agreement and the other Loan Documents.  In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Each Borrower and each other Loan Party signatory hereto hereby waives, releases and agrees (and shall cause each other Loan Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)      (i) Any indemnification or other protection provided to any Indemnitee pursuant to this Section 9.20, Sections 9.5 (Costs and Expenses) and 9.6 (Indemnity) and Article VIII (Agent) and Article X (Taxes, Yield Protection and Illegality) and (ii) the provisions of Section 8.1 of the Security Agreement, in each case, shall (x) survive the termination of the Commitments and the payment in full of all other Obligations and (y) with respect to clause (i) above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21    Patriot Act.  Each Lender that is subject to the Patriot Act hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender to identify each Loan Party in accordance with the Patriot Act.

9.22    [Reserved].

Error! Unknown document property name.

9.23    <u>Creditor-Debtor Relationship</u>.  The relationship between Agent, each Lender and the L/C Issuer, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor.  No Secured Party has any fiduciary relationship or duty to any Loan Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Loan Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.24    <u>Actions in Concert</u>.  Notwithstanding anything contained herein to the contrary, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights against any Loan Party arising out of this Agreement or any other Loan Document (including exercising any rights of setoff) without first obtaining the prior written consent of Agent or Required Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the other Loan Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

**ARTICLE X.**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

10.1    <u>Taxes</u>.

(a)    Except as required by any Requirement of Law, each payment by any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes.

(b)    If any Taxes shall be required by any Requirement of Law to be deducted or withheld from or in respect of any amount payable under any Loan Document to any Secured Party (i) if such Tax is an Indemnified Tax, then the sum payable by Borrowers or other Loan Party shall be increased as necessary to ensure that, after all required deductions or withholding for Indemnified Taxes are made (including deductions applicable to any increases to any amount under this <u>Section 10.1</u>), such Secured Party receives the amount it would have received had no such deductions been made, (ii) the relevant withholding agent shall make such deductions, (iii) the relevant withholding agent shall timely pay the full amount deducted to the relevant Taxing authority or other authority in accordance with applicable Requirements of Law and (iv) within 30 days after such payment is made, the relevant Loan Party shall deliver to Agent an original or certified copy of a receipt evidencing such payment or other evidence of payment reasonably satisfactory to Agent.

(c)    In addition, Borrowers agree to pay, and authorize Agent to pay in their name, any stamp, documentary, excise or property Tax, charges or similar levies imposed by any applicable Requirement of Law or Governmental Authority and all Liabilities with respect thereto (including by reason of any delay in payment thereof), in each case arising from the execution, delivery or registration of, or otherwise with respect to, any Loan Document or any transaction contemplated therein (collectively, "<u>Other Taxes</u>").  Within 30 days after the date of any payment of Other Taxes by any Loan Party, Borrower Representative shall furnish to Agent, at its address referred to in <u>Section 9.2</u>, the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment reasonably satisfactory to Agent.

(d)    The Loan Parties shall reimburse and indemnify, within 30 days after receipt of demand therefor (with copy to Agent), each Secured Party for all Indemnified Taxes (including any Indemnified Taxes imposed by any jurisdiction on amounts payable under this <u>Section 10.1</u>) paid by such Secured Party and any Liabilities arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted.  A certificate of the Secured Party (or of Agent on

Error! Unknown document property name.

behalf of such Secured Party) claiming any compensation under this clause (d), setting forth the amounts to be paid thereunder and delivered to Borrower Representative with copy to Agent, shall be conclusive, binding and final for all purposes, absent manifest error.  In determining such amount, Agent and such Secured Party may use any reasonable averaging and attribution methods.

(e)     Any Lender claiming any additional amounts payable pursuant to this <u>Section 10.1</u> shall use its commercially reasonable efforts (consistent with its internal policies and Requirements of Law) to change the jurisdiction of its Lending Office if such a change would reduce any such additional amounts (or any similar amount that may thereafter accrue) and would not, in the sole determination of such Lender, subject such Lender to any unreimbursed cost or expense or be otherwise disadvantageous to such Lender.

(f)     (i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrowers and Agent, at the time or times reasonably requested by Borrowers or Agent, such properly completed and executed documentation reasonably requested by Borrowers or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrowers or Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrowers or Agent as will enable Borrowers or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs <u>(f)(ii)</u>, <u>(iii)</u> or <u>(iv)</u> of this <u>Section</u>) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender;

(ii)     Each Non-U.S. Lender Party that, at any of the following times, is entitled to an exemption from United States withholding Tax or is subject to such withholding Tax at a reduced rate under an applicable Tax treaty, shall (w) on or prior to the date such Non-U.S. Lender Party becomes a "Non-U.S. Lender Party" hereunder, (x) on or prior to the date on which any such form or certification expires or becomes obsolete, (y) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this <u>clause (i)</u> and (z) from time to time if requested by Borrower Representative or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower Representative (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of each of the following, as applicable: (A) Forms W-8ECI (claiming exemption from U.S. withholding Tax because the income is effectively connected with a U.S. trade or business), W-8BEN or W-8BEN-E (claiming exemption from, or a reduction of, U.S. withholding Tax under an income Tax treaty) and/or W-8IMY (together with appropriate forms, certifications and supporting statements) or any successor forms, (B) in the case of a Non-U.S. Lender Party claiming exemption under Sections 871(h) or 881(c) of the Code, Form W-8BEN or W-8BEN-E (claiming exemption from U.S. withholding Tax under the portfolio interest exemption) or any successor form and a certificate in form and substance acceptable to Agent that such Non-U.S. Lender Party is not (1) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (2) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code or (3) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code or (C) any other applicable document prescribed by the IRS certifying as to the entitlement of such Non-U.S. Lender Party to such exemption from United States withholding Tax or reduced rate with respect to all payments to be made to such

Error! Unknown document property name.

Non-U.S. Lender Party under the Loan Documents.  Unless Borrower Representative and Agent have received forms or other documents satisfactory to them indicating that payments under any Loan Document to or for a Non-U.S. Lender Party are not subject to United States withholding Tax or are subject to such Tax at a rate reduced by an applicable Tax treaty, the Loan Parties and Agent shall withhold amounts required to be withheld by applicable Requirements of Law from such payments at the applicable statutory rate, subject to the other provisions of this <u>Article X</u>.

(iii)      Each U.S. Lender Party shall (A) on or prior to the date such U.S. Lender Party becomes a "U.S. Lender Party" hereunder, (B) on or prior to the date on which any such form or certification expires or becomes obsolete, (C) after the occurrence of any event requiring a change in the most recent form or certification previously delivered by it pursuant to this <u>clause (f)</u> and (D) from time to time if requested by Borrower Representative or Agent (or, in the case of a participant or SPV, the relevant Lender), provide Agent and Borrower Representative (or, in the case of a participant or SPV, the relevant Lender) with two completed originals of Form W-9 (certifying that such U.S. Lender Party is entitled to an exemption from U.S. backup withholding Tax) or any successor form.

(iv)      Each Lender having sold a participation in any of its Obligations or identified an SPV as such to Agent shall collect from such participant or SPV the documents described in this <u>clause (f)</u> and provide them to Agent.

(v)      If a payment made to a Non-U.S. Lender Party would be subject to United States federal withholding Tax imposed by FATCA if such Non-U.S. Lender Party fails to comply with the applicable reporting requirements of FATCA, such Non-U.S. Lender Party shall deliver to Agent and Borrower Representative any documentation under any Requirement of Law or reasonably requested by Agent or any Borrower sufficient for Agent or such Borrower to comply with their obligations under FATCA and to determine that such Non-U.S. Lender has complied with such applicable reporting requirements.

(g)      If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

**Error! Unknown document property name.**

(h)       Each party's obligations under this Section 10.1 shall survive the resignation or replacement of Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

10.2    <u>Increased Costs and Reduction of Return</u>.

(a)       If any Lender or L/C Issuer shall determine that, due to either (i) the introduction of, or any change in, or in the interpretation of, any Requirement of Law or (ii) the compliance with any guideline or request from any central bank or other Governmental Authority (whether or not having the force of law), in the case of either <u>clause (i)</u> or <u>(ii)</u> subsequent to the date hereof, there shall be any increase in the cost to such Lender or L/C Issuer of agreeing to make or making, funding or maintaining any Revolving Loans at the LIBOR Index Rate or of Issuing or maintaining any Letter of Credit, then Borrowers shall be liable for, and shall from time to time, within thirty (30) days of demand therefor by such Lender or L/C Issuer (with a copy of such demand to Agent), pay to Agent for the account of such Lender or L/C Issuer, additional amounts as are sufficient to compensate such Lender or L/C Issuer for such increased cost*s; provided,* that Borrowers shall not be required to compensate any Lender or L/C Issuer pursuant to this <u>subsection 10.2(a)</u> for any increased costs incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies Borrower Representative, in writing of the increased costs and of such Lender's or L/C Issuer's intention to claim compensation thereof*; provided,* further, that if the circumstance giving rise to such increased costs is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)       If any Lender or L/C Issuer shall have determined that:

(i)        the introduction of any Capital Adequacy Regulation;

(ii)       any change in any Capital Adequacy Regulation;

(iii)      any change in the interpretation or administration of any Capital Adequacy Regulation by any central bank or other Governmental Authority charged with the interpretation or administration thereof; or

(iv)      compliance by such Lender or L/C Issuer (or its Lending Office) or any entity controlling the Lender or L/C Issuer, with any Capital Adequacy Regulation;

(v)       affects the amount of capital required or expected to be maintained by such Lender or L/C Issuer or any entity controlling such Lender or L/C Issuer and (taking into consideration such Lender's or such entities' policies with respect to capital adequacy and such Lender's or L/C Issuer's desired return on capital) determines that the amount of such capital is increased as a consequence of its Commitment(s), loans, credits or obligations under this Agreement, then, within thirty (30) days of demand of such Lender or L/C Issuer (with a copy to Agent), Borrowers shall pay to such Lender or L/C Issuer, from time to time as specified by such Lender or L/C Issuer, additional amounts sufficient to compensate such Lender or L/C Issuer (or the entity controlling the Lender or L/C Issuer) for such increase*; provided,* that Borrowers shall not be required to compensate any Lender or L/C Issuer pursuant to this <u>subsection 10.2(b)</u> for any amounts incurred more than 180 days prior to the date that such Lender or L/C Issuer notifies Borrower Representative in writing of the amounts and of such Lender's or L/C Issuer's intention to claim compensation thereof*; provided,* further, that if the

Error! Unknown document property name.

event giving rise to such increase is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(c)     Notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a change in a Requirement of Law under subsection (a) above and/or a change in a Capital Adequacy Regulation under subsection (b) above, as applicable, regardless of the date enacted, adopted or issued.

10.3     Funding Losses.  Borrowers agree to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of:

(a)     the failure of Borrowers to make any payment or mandatory prepayment of principal of any Revolving Loan (including payments made after any acceleration thereof); or

(b)     the failure of Borrowers to make any prepayment after it has given a notice in accordance with Section 1.5.

10.4     Inability to Determine Rates.

(a)     If Agent shall have determined in good faith that the LIBOR Index Rate with respect to a proposed Revolving Loan does not adequately and fairly reflect the cost to the Lenders of funding or maintaining such Revolving Loan, Agent will forthwith give notice of such determination to Borrower Representative and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Revolving Loans hereunder shall be suspended until Agent revokes such notice in writing. Upon receipt of such notice, Borrower Representative may revoke any Notice of Borrowing then submitted by it.

(b)     If at any time Agent determines (which determination shall be conclusive absent manifest error), or the Required Lenders notify Agent (with, in the case of the Required Lenders, a copy to Borrowers) that (i) Agent has determined, or Required Lenders have determined, that adequate and reasonable means do not exist for ascertaining the LIBOR Index Rate and such circumstance is unlikely to be temporary, or (ii) Intercontinental Exchange, as the administrator of the London Inter-bank Offered Rate, or a Governmental Authority that supervises the Intercontinental Exchange in such capacity has made a public statement identifying a specific date after which London Inter-bank Offered Rate shall no longer be used for determining interest rates for loans, then, reasonably promptly after such determination by Agent, Agent may propose, and Borrower Representative shall agree to, an amendment to this Agreement to replace the LIBOR Index Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark, if any, incorporated therein) (and such proposed rate, a "LIBOR Successor Rate"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. New York City time on the fifth Business Day after Agent shall have posted such proposed amendment to all Lenders and Borrowers.

10.5     Reserves on Revolving Loans.  Borrowers shall pay to each Lender, as long as such Lender shall be required under regulations of the Board to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as "Eurocurrency liabilities"), additional costs on the unpaid principal amount of each Revolving Loan equal to actual costs of such reserves allocated to such Revolving Loan by such Lender (as determined by such Lender in good

77

faith, which determination shall be conclusive absent manifest error), payable on each date on which interest is payable on such Revolving Loan provided Borrower Representative shall have received at least fifteen (15) days' prior written notice (with a copy to Agent) of such additional interest from the Lender.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest shall be payable fifteen (15) days from receipt of such notice.

10.6    <u>Certificates of Lenders</u>.    Any Lender claiming reimbursement or compensation pursuant to this Article X shall deliver to Borrower Representative (with a copy to Agent) a certificate setting forth in reasonable detail the amount payable to such Lender hereunder and such certificate shall be conclusive and binding on Borrowers in the absence of manifest error.

**Error! Unknown document property name.**

## ARTICLE XI.
## DEFINITIONS

11.1     Defined Terms.  The following terms have the following meanings:

"Acceptable Plan" means a proposed plan of reorganization filed by Borrowers (or, if exclusivity has terminated, by any party), which provides for the Full Payment of the Obligations as of the effective date of such plan and is otherwise acceptable to the Lender Group in form and substance.

"Account Debtor" means the customer of a Borrower who is obligated on or under an Account.

"Accounts" means all accounts, instruments, general intangibles and health-care-insurance receivables (as such terms are defined in the UCC), all other obligations for the payment of money and goodwill, whether now existing or hereafter arising, including all payments due from the rendition of services or sale of goods to a patient by a Borrower in the Ordinary Course of Business, including those based on a cost report settlement or expected settlement, and all proceeds of any of the foregoing, in each case, including rights of payment arising out of the rendition of medical, surgical, diagnostic or other professional medical services or the sale of medical products by each Borrower in the ordinary course of its business, including all third-party reimbursable portions or third-party directly payable portions of health-care-insurance receivables or general intangibles owing (or in the case of Unbilled Receivables and DNFB Receivables, to be owing) by an Account Debtor, including all rights to reimbursement under any agreements with and payments from Account Debtors, patients or other Persons, together with all books, records, ledger cards, data processing records, computer software, and other property at any time used or useful in connection with, evidencing, embodying, referring to, or relating to any of the foregoing.

"Actual Total Disbursements" means, for any period, Borrowers' actual total disbursements of the type included in the line item "Total Disbursements" in the Budget for such period.

"Actual Total Operational Disbursements" means, for any period, Borrowers' actual total disbursements of the type included in the line item "Total Operating Disbursements" in the Budget for such period.

"Actual Total Professional Fee Disbursements" means Borrowers' actual disbursements for Allowed Professional Fees, as reflected in the Budget as a line item.

"Additional Amount" means as of any date of determination, (i) during the Interim Period, $2,700,000, and (ii) at all times on and after the Final Order Date, an amount equal to 10% of the Expected Net Value of all Eligible Accounts, but in no event exceeding $2,700,000.

"Adjusted Commitment Amount" means, in connection with any Disposition, the adjusted maximum Aggregate Revolving Loan Commitment set forth in the revised and adjusted Budget presented by Borrower Representative and approved by Agent that reflects such Disposition on a pro forma basis and the related application of Net Proceeds under Section 1.6(c).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

79

"Affiliate Subordination Agreement" means an Affiliate Subordination Agreement substantially in the form of Exhibit 11.1(a) pursuant to which intercompany obligations and advances owed by any Loan Party are subordinated to the Obligations.

"Agent" means WOHCF in its capacity as the administrative agent and the collateral agent for the Lenders hereunder.

"Agent Report" has the meaning assigned to such term in Section 8.5(c).

"Aggregate Revolving Loan Commitment" means the combined Revolving Loan Commitments of the Lender, which shall on the Filing Date equal the sum of (i) $42,700,000, *plus* (ii) the Incremental DIP Commitment, as such amount may be reduced from time to time pursuant to this Agreement.

"Agent Report" has the meaning assigned to such term in the Preamble.

"Allowed Professional Fees" means all unpaid fees and expenses (excluding any Asset Sale fee which will be paid from the proceeds of a consummated sale, and any success fees) incurred by Professional Persons.

"Applicable Margin" means LIBOR Index Rate plus 8.50% per annum.

"Approved Bank" means any commercial bank that is (a) organized under the laws of the United States, any state thereof or the District of Columbia, (b) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (c) has Tier 1 capital (as defined in such regulations) in excess of $250,000,000.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"Asset Sale" means any sale, lease, conveyance, transfer or other disposition by any Borrower or Borrowers or any Guarantor to a third party of assets constituting part of the DIP Collateral, including any Equity Interests owned by it (including by way of merger or consolidation of a Subsidiary or sale-leaseback transaction or any Specified Transaction).

"Assignment" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), accepted by Agent, substantially in the form of Exhibit 11.1(b) or any other form approved by Agent.

"Availability" means, as of any date of determination, the amount by which (a) the Maximum Revolving Loan Balance, exceeds (b) the aggregate outstanding principal balance of Revolving Loans.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended and codified as 11 U.S.C. §§101 et seq.

Error! Unknown document property name.

"Bankruptcy Court" has the meaning assigned to such term in the Preamble.

"Base Rate" means, for any day, an interest rate equal to the greater of (a) one percent (1.00%) per annum and (b) the LIBOR Index Rate, as adjusted as of each LIBOR Index Adjustment Date.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" or "Borrowers" has the meaning assigned to such term in the Preamble.

"Borrower Group" means collectively Borrowers, Holdings and Parent Holdings.

"Borrower Materials" has the meaning assigned to such term in Section 9.10(e).

"Borrower Representative" has the meaning assigned to such term in Section 1.12.

"Borrowing" means a borrowing hereunder consisting of Revolving Loans made by the Lenders to or for the benefit of a Borrower pursuant to Article I.

"Borrowing Base" means, as of any date of determination by Agent, from time to time, an amount equal to the sum of (i) the Incremental DIP Commitment, *plus* (ii) 85% of the Expected Net Value of Eligible Accounts (other than Unbilled Receivables), *plus* (iii) 50% of the Expected Net Value of Eligible Accounts that are Unbilled Receivables, each as determined by Agent at such time, as determined in Agent's good faith discretion, *plus* (iv) the Additional Amount, and *minus* (v) the amount of the Carve-Out payable under the Budget during such Budget Testing Period (excluding escrowed amounts held in the Professional Fee Escrow Account), all as indicated in the most recent Borrowing Base Certificate and Budget; *provided,* that Availability in the Borrowing Base from Eligible Accounts based on Cost Reports from Medicare shall not exceed $2,500,000.

"Borrowing Base Certificate" means a certificate of Borrower Representative on behalf of each Borrower, in substantially the form of Exhibit 11.1(c) hereto, duly completed as acceptable to Agent in its Permitted Discretion.

"Budget" means the rolling, week-by-week cash flow projection and budget for Borrowers for the period through the Projected Sale Date in substantially the form attached hereto as Exhibit I, including but not limited to forecasts of revenues (set forth in a schedule thereto), "due to"/"due from" underpayment/overpayment amounts with any Governmental Payor arising under Medical Reimbursement Programs (including amounts indicated in Costs Reports) and listed on Schedule I-A, receipts, expenses, disbursements (including those related to restructuring expenses and expenses arising on account of the Chapter 11 Cases, including Allowed Professional Fees), accounts receivable, Availability, cash flows and applicable assumptions, prepared by management and/or the Financial Advisor and/or management of Borrowers.   The Budget (i) shall be supported by details as may reasonably be requested by Agent, and (ii) shall be compared to actual cash flows on (at least) a weekly basis with proposed revisions (x) on at least a monthly basis, and (y) at least five Business Days prior to

Error! Unknown document property name.

the proposed consummation of any Disposition, by Borrower Representative and in all cases in form and substance approved by Agent in writing. Following the approval of Agent of any proposed updated and revised Budget, such updated and revised budget shall become the "Budget" hereunder.

"Budget Testing Period" means with respect to actual disbursements and net cash flow, (i) first, the period commencing on the Filing Date through May 17, 2019 (the "First Budget Testing Period"), (ii) second, the period commencing on the Filing Date through May 24, 2019 (the "Second Budget Testing Period"), and (iv) thereafter, each rolling four-week period.

"Business Day" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York City *provided* that if such day relates to any fundings, disbursements, settlements, and payments in respect of any Revolving Loan accruing interest based upon the LIBOR Index Rate, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Revolving Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in deposits in Dollars in the London interbank market.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any Lender or of any corporation controlling a Lender.

"Capital Expenditures" means, for any period, without duplication, the additions to property, plant and equipment and other capital expenditures of Borrowers and their consolidated Subsidiaries for such period, determined in accordance with GAAP.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (except for temporary treatment of construction-related expenditures under EITF 97-10 "The Effects of Lessee Involvement in Asset Construction" that will be treated as operating leases upon a sale and leaseback transaction within 180 days after the completion of construction thereof), and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP. Notwithstanding the foregoing, all liabilities under or in respect of any lease outstanding on the Closing Date and classified by Borrowers as an operating lease on the Closing Date will not constitute a Capital Lease Obligation and shall continue to be treated as operating leases and shall not constitute a Capital Lease Obligation, in each case, for purposes of the covenants set forth herein and all defined terms as used therein.

"Carve-Out" has the meaning assigned to such term in paragraph 38 of the Interim Order.

"Carve-Out Trigger Notice" has the meaning assigned to such term in paragraph 38 of the Interim Order.

"Cash Collateral Account" has the meaning assigned to such term in Section 4.17(j).

"Cash Collateral Account Funding Date" means the date on which the Cash Collateral Account is initially fully funded to an amount equal to the Letter of Credit Obligations pursuant to the requirements set forth in Section 1.1(b)(iv).

Error! Unknown document property name.

"<u>CHAMPVA</u>" means, collectively, the Civilian Health and Medical Program of the Department of Veterans Affairs, a program of medical benefits covering retirees and dependents of former members of the armed services administered by the United States Department of Veterans Affairs, and all laws, rules, regulations, manuals, orders, or requirements pertaining to such program.

"<u>Change in Control</u>" means:

(a)    Holdings ceases to be a direct wholly-owned subsidiary of Parent Holdings or LifeCare Holdings ceases to be a direct wholly-owned Subsidiary of Holdings;

(b)    any other Borrower ceases to be a direct or indirect wholly-owned Subsidiary of LifeCare Holdings, except pursuant to a transaction permitted under <u>Section 5.3</u> or <u>5.5</u>;

(c)    any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than the Closing Date Equity Holders (i) shall have acquired beneficial ownership of more than 35% on a fully diluted basis of the aggregate voting power represented by the outstanding Equity Interests of Parent Holdings, and (ii) shall have acquired beneficial ownership of a greater percentage on a fully diluted basis of the aggregate voting power represented by the outstanding Equity Interests of Holdings, as compared to the percentage on a fully diluted basis of such aggregate voting power held by the Closing Date Equity Holders; or

(d)    occupation of a majority of the seats (other than vacant seats) on the board of directors of Holdings by Persons who were neither (i) nominated by the board of directors of Holdings, (ii) appointed by Persons so nominated or (iii) designated by any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than Closing Date Equity Holders.

"<u>Chapter 11 Cases</u>" means the cases under chapter 11 of the Bankruptcy Code commenced on the Filing Date by each of Borrowers pending in the Bankruptcy Court.

"<u>Closing Date</u>" means May 8, 2019, being the date that this Agreement is executed by all the parties and on which the conditions specified in <u>Section 2.1</u> are satisfied (or waived in accordance herewith).

"<u>Closing Date Equity Holders</u>" means the Persons that (i)(a) are subject to the LLC Agreement and (b) (x) held Equity Interests, or options for the purchase of Equity Interests, of Parent on May 31, 2013, or (y) are controlled by one or more Persons referred to in clause (x) above and (ii) their Affiliates.

"<u>CMS</u>" means the Centers for Medicare and Medicaid Services of HHS, any successor thereof and any predecessor thereof, including the United States Health Care Financing Administration.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collection Account</u>" means Agent's account number 4762526333 maintained at Wells Fargo Bank, National Association (ABA #121000248) or such other bank account designated by Agent from time to time.

"<u>Collections</u>" means all cash collections, wire transfers, electronic funds transfers and other cash proceeds of Accounts (including the proceeds of any sale, assignment or disposition of Accounts) and Net Proceeds from Dispositions.

**Error! Unknown document property name.**

"Commitment" means each Lender's Revolving Loan Commitment.

"Commitment Percentage" means, as to any Lender, the percentage equivalent of such Lender's Revolving Loan Commitment, divided by the Aggregate Revolving Loan Commitment; *provided*, that following acceleration of the Revolving Loans, such term means, as to any Lender, the percentage equivalent of the principal amount of the Revolving Loans held by such Lender, divided by the aggregate principal amount of the Revolving Loans held by all Lenders.

"Committed Amount" means (i) from the period commencing on the Interim Order Date until the Final Order Date, the Interim DIP Commitment, and (ii) on and following the Final Order Date, the Aggregate Revolving Loan Commitment then in effect.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Concentration Account" means a concentration account in Borrower Representative's name which shall be established and maintained at [_____] or another Approved Bank.

"Contract Provider" means any Person or any employee, agent or subcontractor of such Person who provides professional health care services under or pursuant to any contract with any Loan Party.

"Contractual Obligations" means, as to any Person, any provision of any security (whether in the nature of Equity Interests or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Loan Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any Deposit Account, securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to Agent, among Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (within the meaning of Articles 8 and 9 under the applicable UCC) over such account to Agent.

"Cost Reports" means any cost reports filed in connection with any Medicaid Provider Agreement or Medicare Provider Agreement.

"Default" means any event or condition that constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

Error! Unknown document property name.

"<u>Deposit Account</u>" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>DIP Acknowledgements</u>" means collectively the Intercreditor Acknowledgement and the Holdings Guaranty Acknowledgment.

"<u>DIP Collateral</u>" has the meaning assigned to such term in the Financing Orders.

"<u>DIP Commitment</u>" means (i) prior to the entry of the Final Order, the Incremental DIP Commitment and (ii) following the entry of the Final Order, an amount not to exceed the Incremental DIP Commitment plus the "Commitment" under the Prepetition Credit Agreement.

"<u>DIP Facility</u>" has the meaning assigned to such term in the <u>Preamble</u>.

"<u>DIP Fee Letter</u>" means that certain agent fee letter agreement, dated as of the Closing Date, between Borrowers and Agent such letter may be amended, modified or supplemented from time to time in accordance with its terms.

"<u>DIP Lien</u>" shall mean Agent's first priority Lien in the DIP Collateral and superpriority administrative expense claim, as further defined in the DIP Security Agreement and the Financing Orders, senior in priority to all Liens other than Permitted Liens.

"<u>DIP Security Agreement</u>" means that certain Security Agreement, dated as of the Filing Date, executed by Parent Holdings, Holdings, Borrowers and the Subsidiary Loan Parties thereto in favor of Agent for the benefit of the secured parties thereto, as amended, restated and/or modified from time to time.

"<u>DIP Security Documents</u>" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Intercreditor Agreement, the Control Agreements, the Sweep Agreements, and each other security agreement or other instrument or document executed and delivered pursuant to <u>Section 4.12</u> or <u>4.13</u> of the Agreement, or pursuant to the DIP Security Agreement to secure the Obligations.

"<u>Disposition</u>" means any Asset Sale, Issuance or Extraordinary Receipt, and any other disposition or sale of DIP Collateral (whether equity or other material asset or assets) outside the ordinary course of business of Borrowers; *provided*, that prior to an Event of Default, any Asset Sale or series of Asset Sales of equipment, inventory and miscellaneous assets in the ordinary course of business and in an aggregate amount of $100,000 shall not constitute a "Disposition" hereunder.

"<u>DNFB Receivable</u>" means an Account recorded on the books and records of a Borrower as "discharged not final billed" in respect of which the relevant customer or patient has been discharged from the Healthcare Facility, the goods have been provided, the services rendered, to the relevant customer or patient, rights to payment thereon have accrued, but the invoice has not been rendered to the applicable Account Debtor.

"<u>Dollars</u>", "<u>dollars</u>" and "<u>$</u>" each mean lawful money of the United States of America.

**Error! Unknown document property name.**

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Electronic Transmission" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail.

"Eligibility Criteria" means the criteria and basis for determining whether an Account will be deemed by Agent to qualify as an Eligible Account, all as set forth below, as such Eligibility Criteria may be modified from time to time as determined by Agent in its Permitted Discretion upon notice to Borrower Representative:

(1)     The information provided by any Borrower with respect to each such Account is complete and correct and all documents, attestations, and agreements relating thereto that have been delivered to Agent are true and correct.

(2)     All information set forth in the bill and supporting claim documents with respect to such Account is true, complete and correct; if additional information is requested by the Account Debtor, Borrower Representative has or will promptly provide the same, and if any error has been made with respect to such information, Borrower Representative will promptly correct the same and, if necessary, rebill such Account.

(3)     Other that with respect to Unbilled Receivables and DNFB Receivables, Borrowers have billed the applicable Account Debtor within thirty (30) days of the Last Service Date and have delivered to such Account Debtor all requested supporting claim documents with respect to such Account and no amounts with respect to such Account have been paid as of the date and time of the inclusion of such Account in the Borrowing Base. Borrowers have, or have the right to use, valid identification numbers and licenses to generate valid Accounts.

(4)     Borrowers' Cost Reports with respect to such Account for all cost reporting periods ending on or before the date of the last audited cost report have been examined and audited by (A) as to Medicaid, the applicable state agency or other CMS designated agent or agents of such state agency, charged with such responsibility, or (B) as to Medicare, the Medicare intermediary or other CMS designated agents charged with such responsibility; and there is no basis for any Governmental Authority to assert an offset with respect to such Account against any Borrower, except as otherwise indicated on the relevant Borrowing Base Certificate submitted by Borrower Representative.

(5)     Each such Account (A) has not yet been paid and is payable in an amount not less than its Expected Net Value, by the Account Debtor or Account Debtors identified by a Borrower in its records as being obligated to do so, (B) is based on an actual and bona fide rendition of services or sale of goods to the patient by a Borrower in the Ordinary Course of Business, (C) is not in respect of goods that are placed on consignment, guarantied sale, cash-on-delivery, bill-and-hold basis, or other terms by reason of which the payment by the Account Debtor is conditional or with respect to goods, (D) unless deemed eligible by Agent in its sole discretion, does not represent a PIP Payment or a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to a Borrower's completion of further performance under such contract or is

86

subject to the equitable lien of a surety bond issuer, (E) is denominated and payable only in U.S. dollars in the United States, (F) is an account or general intangible within the meaning of the UCC of the state in which such Borrower is incorporated or formed, and is not evidenced by any instrument or chattel paper, (G) shall be subject to a patient consent form approved by Agent and executed by the applicable patient, (H) is net of any contractual allowances, deductible limitations, commissions, fees, or other discounts, (I) does not cover any treatment for alcohol, drug or substance abuse, workers' compensation claims (other than any workers' compensation claims deemed eligible by Agent in its sole discretion) or personal injury claims, (J) the Account Debtor of which is not disputing payment obligations owing with respect to any other Accounts (except for disputes in the Ordinary Course of Business and not representing more than 20% of the Dollar amount of all Accounts outstanding by such Account Debtor), and (K) satisfies all applicable requirements of, and was originated and processed in accordance with, the billing and collection requirements of the applicable Account Debtor.  There are no payors other than the Account Debtor or Account Debtors identified in Borrowers' records as the payors primarily liable on such Account.

(6)     Each such Account (A) is not the subject of any action, suit, proceeding or dispute (pending or threatened), setoff, counterclaim, defense, abatement, suspension, deferment, deductible, reduction or termination by the Account Debtor thereof (except for statutory rights of Governmental Authorities that are not pending or threatened), and (B) is not within 45 days of the statutory limit for collection applicable to the Account Debtor thereof and is not aged more than 150 days from its Last Service Date (or as otherwise limited by Agent based on any Borrower's reporting capabilities).

(7)     Each such Account is not (A) due from any Governmental Authority based on any cost report settlement or expected settlement or (B) pending Medicaid approval by the applicable Governmental Authority.

(8)     No Borrower has a Guaranty of, letter of credit providing credit support for, or collateral security for, such Account, other than any such guaranty, letter of credit, or collateral security as has been assigned to Agent, and any such guaranty, letter of credit, or collateral security is not subject to any Lien in favor of any other Person.

(9)     (A) The goods and services constituting the basis for such Account were medically necessary for the customer or patient, and the customer or patient has received such goods and services and (B) such Account does not represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services.

(10)    The fees charged for the goods and services constituting the basis for such Account are consistent with the usual, customary, and reasonable fees charged by other similar medical providers for the same or similar goods in Borrowers' community and in the community in which the patient resides.

(11)    The Account Debtor with respect to each such Account (A) is not currently the subject of any bankruptcy, insolvency or receivership proceeding, nor is it unable to make payments on its obligations when due, (B) is located and organized under the laws of

Error! Unknown document property name.

the United States of America or a state or territory therein, (C) is not a natural Person, subsidiary, employee or agent or other Person that is an Affiliate of any Borrower, (D) is not a Sanctioned Person or Sanctioned Entity, (E) is not the Account Debtor of any Account that was a Defaulted Account in the past 12 months, and (F) is an insurer with a credit quality acceptable to Agent/which has a debt rating equivalent to "A" or higher or a Governmental Authority.  For purposes hereof, "<u>Defaulted Account</u>" means an Account as to which the Account Debtor thereof or any other Person obligated thereon has taken any action, or suffered any event to occur, of the type described in Sections 7.01(h) and 7.01(i).

(12)    The financing of such Accounts hereunder is made in good faith and without actual intent to hinder, delay or defraud present or future creditors of any Borrower.

(13)    Any insurance policy, contract or other instrument obligating an Account Debtor to make payment with respect to such Account (A) does not contain any provision prohibiting the grant of a Lien in such payment obligation from the patient to Borrowers, or from Borrowers to Agent, (B) has been duly authorized and, together with such Account, constitutes the legal, valid and binding obligation of the Account Debtor in accordance with its terms, (C) together with such Account, does not contravene in any material respect any requirement of law applicable thereto, and (D) was in full force and effect and applicable to the customer or patient at the time the goods or services constituting the basis for such Account were sold or performed.

(14)    The insurance policy, contract or other instrument obligating a Governmental Authority to make payment with respect to such Account (A) has been duly authorized and, together with the applicable Account, constitutes the legal, valid and binding obligation of the Governmental Authority in accordance with its terms, (B) together with the applicable Account, does not contravene in any material respect any requirement of law applicable thereto, and (C) was in full force and effect and applicable to the customer or patient at the time the goods or services constituting the basis for such Account were sold or performed.

(15)    No consents by any third party to the grant of a security interest in such Account are required other than consents previously obtained in writing by Borrowers, a copy of each such consent having been provided to Agent.

(16)    The inclusion of such Account in the Borrowing Base would not increase the total aggregate gross value of all Accounts in the Borrowing Base for any Account Debtor (or class of Account Debtors) listed below, as a percentage of the total Expected Net Value of Accounts of all Account Debtors in the Borrowing Base, above the corresponding percentages listed below:

| Account Debtor | Maximum Eligibility |
|---|---|
| Medicare and Medicare Managed Care | 55% |
| Medicaid and Medicaid Managed Care | 15% |

Error! Unknown document property name.

| | |
|---|---|
| Blue Cross/Blue Shield | 15% |
| All Commercial Insurance Account Debtors, HMOs, and PPOs | 50% |
| any single AAA rated (non-governmental) Account Debtor | 10% |
| any single AA rated (non-governmental) Account Debtor | 2% |
| any single A rated (non-governmental) Account Debtor | 1.5% |
| any single BBB rated (non-governmental) Account Debtor | 1.0% |
| any single unrated (non-governmental) Account Debtor | 0.5% |

(17)     Unless specifically verified by Borrowers and accepted by Agent, the Expected Net Value of each Eligible Account is in an amount not in excess of $500,000.

(18)     If the percentage of Eligible Accounts aged over 150 days at any point in time is greater than 50% of the total Eligible Accounts, the dollar amount of Eligible Accounts over the aforementioned percentage will not be considered Eligible Accounts.

(19)     Agent maintains a first priority Lien on the Account and no other Lien which is in effect on the applicable Funding Date exists or has been made with respect to or granted in any such Account except for the second and third priority Liens in effect on the Closing Date securing the Term Facility Obligations.

(20)     Each such Account, regardless of whether otherwise eligible, is not due from an Account Debtor for which 50% or more of the total amount of Accounts due from such Account Debtor are not Eligible Accounts.

(21)     Such Account has not been originated by a Person which is subject to an agreement to be sold.

(22)     Such Account has not otherwise been determined to be unacceptable by Agent in its Permitted Discretion, upon the delivery of prior or contemporaneous notice (oral or written) of such determination to Borrower Representative.

"Eligible Accounts" means Accounts of each Borrower that satisfy the Eligibility Criteria, as determined by Agent in its Permitted Discretion.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to protection of the environment, natural resources, human health and safety from exposure to Hazardous Materials or the presence, Release of Hazardous Materials, or the generation, manufacture, processing, distribution,

89

Error! Unknown document property name.

use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability"  means any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to:  (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Holder" means any Person owning Equity Interests in Parent Holdings.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person of whatever nature, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) of the Code.

"ERISA Event" means (a) the failure of any Plan of any of the Loan Parties or their ERISA Affiliates to comply with any material provisions of ERISA and/or the Code (and applicable regulations under either) or with the material terms of the Plan; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any Reportable Event; (d) the failure of any Loan Party or any ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (e) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (f) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the incurrence of the Loan Parties or any of their ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (h) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (i) the failure by any Loan Party or any ERISA Affiliate to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (j) the incurrence by the Loan Parties or any of their ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (k) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a

90

Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA); or (l) the failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA.

"<u>Event of Default</u>" has the meaning assigned to such term in <u>Section 7.1</u>.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended.

"<u>Excluded Account</u>" means, collectively, Deposit Accounts of Borrower Representative maintained at Citizens Bank, N.A. in the Commonwealth of Pennsylvania and at PNC Bank, N.A. in the State of North Carolina with an aggregate balance at any time not in excess of $100,000.

"<u>Excluded Facilities</u>" means (i) the Healthcare Facilities operated by New LifeCare Hospitals of Chester County LLC and New LifeCare Hospitals of Milwaukee LLC, and (ii) such other Healthcare Facilities proposed for closure by the Borrower Representative and consented by Agent (such consent not unreasonably withheld).

"<u>Excluded Tax</u>" means with respect to any Secured Party (a) Taxes measured by net income (including branch profits Taxes) and franchise Taxes imposed in lieu of net income Taxes, in each case (i) imposed as a result of such Secured Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that are Other Connection Taxes; (b) withholding Taxes to the extent that the obligation to withhold amounts existed on the date that such Person became a "Secured Party" under this Agreement in the capacity under which such Person makes a claim under <u>Section 10.1(b)</u> or designates a new Lending Office, except in each case to the extent such Person is a direct or indirect assignee (other than pursuant to <u>Section 9.22</u>) of any other Secured Party that was entitled, at the time the assignment to such Person became effective, to receive additional amounts under <u>Section 10.1(b)</u>; (c) Taxes that are attributable to the failure by any Secured Party to deliver the documentation required to be delivered pursuant to <u>Section 10.1(f)</u>, and (d) any United States federal withholding Taxes imposed under FATCA.

"<u>Executive Order</u>" has the meaning assigned to such term in <u>Section 3.20</u>.

"<u>Existing Debt</u>" has the meaning assigned to such term in the <u>Preamble</u>.

"<u>Expected Net Value</u>" means, with respect to any Eligible Account, the sum of (a) (i) the gross unpaid amount of such Account on the date of creation thereof, *multiplied by* (ii) the Net Value Factor.

"<u>Extraordinary Receipt</u>" means the receipt by any Borrower or Guarantor of cash receipts not in the ordinary course of business, including, without limitation, (i) tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance, (iv) condemnation awards, (v) contract claims, and (vi) indemnity payments.

"<u>FATCA</u>" means sections 1471, 1472, 1473 and 1474 of the Code, the United States Treasury Regulations promulgated thereunder and published guidance with respect thereto.

"<u>FCPA</u>" has the meaning assigned to such term in <u>Section 3.23</u>.

**Error! Unknown document property name.**

"Filing Date" has the meaning assigned to such term in the Preamble.

"Filing Date Cash" means cash held in Borrowers' operating accounts on the Filing Date.

"Final Order" means an order of the Bankruptcy Court, in form acceptable to Agent in its sole discretion, approving this Agreement and the other Loan Documents, as such order may be amended, modified or supplemented from time to time with the express written consent of Agent and the approval of the Bankruptcy Court, which order (i) shall be in full force and effect, (ii) has not been vacated, modified (without the express written consent of Agent as set forth hereinbefore), reversed, or stayed, and (iii) no appeal from said order has been filed in which Agent's or the Lender's lack of good faith has been raised.

"Final Order Date" means the date (which shall take place as soon as practicable but no later than June 6, 2019) on which the Final Order has been duly entered by the Bankruptcy Court.

"Financial Advisor" has the meaning assigned to such term in Section 4.21.

"Financial Covenants" means the covenants set forth in Article VI.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of Borrower Representative.

"Financing Orders" means the Interim Order and the Final Order, and any orders of the Bankruptcy Court modifying any of the foregoing in accordance with the Loan Documents.

"First Budget Testing Period" has the meaning set forth in the definition of Budget Testing Period.

"First-Day Orders" means the orders filed by Borrowers with the Bankruptcy Court on the Filing Date in the form attached hereto as Exhibit III or otherwise in form acceptable to Agent in its sole discretion as such orders may be amended, modified or supplemented from time to time with the express written consent of Agent and the approval of the Bankruptcy Court, which order (i) shall be in full force and effect, (ii) has not been vacated, modified (without the express written consent of Agent as set forth hereinbefore), reversed, or stayed, and (iii) no appeal from said order has been filed in which Agent's or the Lender's' lack of good faith has been raised.

"Foreign Assets Control Regulations" has the meaning assigned to such term in Section 3.20.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Full Payment" means, with respect to the Obligations, the indefeasible payment in full in cash thereof, including any interest, fees, expenses and other charges payable hereunder. No Obligations will be deemed to have been paid in full until all Obligations (other than unasserted contingent indemnification obligations) has been fully paid in cash and all Revolving Commitments have expired or been expressly terminated in writing and a full release in favor of the Lender Parties provided.

"Funding Date" means any Business Day during the term of this Agreement on which a Revolving Loan is made at the request of Borrower Representative in accordance with the provisions of this Agreement and the Financing Orders.

Error! Unknown document property name.

"GAAP" means generally accepted accounting principles in the United States of America.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including, but not limited to any Medicare or Medicaid contractors, intermediaries or carriers, or any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"Governmental Payor" means Medicare, Medicaid, TRICARE, CHAMPVA, any state health plan adopted pursuant to Title XIX of the Social Security Act, any other state or federal health care program and any other Governmental Authority which presently or in the future maintains a Medical Reimbursement Program.

"Government Official" means (a) an executive, official, employee or agent of a governmental department, agency or instrumentality, (b) a director, officer, employee or agent of a wholly or partially government-owned or -controlled company or business, (c) a political party or official thereof, or candidate for political office or (iv) an executive, official, employee or agent of a public international organization (e.g., the International Monetary Fund or the World Bank).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation*; provided,* that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets or any Investment permitted under this Agreement.

"Guarantors" means Parent Holdings, Holdings and any Subsidiary Loan Parties that are not Borrowers.

"Hazardous Materials" means (i) any petroleum products or byproducts, radon gas, asbestos, toxic mold, urea formaldehyde foam insulation, polychlorinated biphenyls, potentially infectious medical waste, chlorofluorocarbons and all other ozone-depleting substances; or (ii) any chemical, material, substance or waste that is prohibited, limited, defined or regulated as a "hazardous" or "toxic" material, substance or waste by or pursuant to any applicable Environmental Law.

"Healthcare Facility" or "Healthcare Facilities" means the hospitals, medical office buildings and other healthcare facilities directly or indirectly owned or leased by Parent Holdings, Holdings, any Borrower or any of the Subsidiaries.

Error! Unknown document property name.

"Healthcare Laws" means all laws, including those relating to (a) fraud and abuse (including without limitation the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder:  the federal Anti-Kickback Statute  (42 U.S.C. § 1320a-7b(b)); the civil False Claims Act (31 U.S.C. § 3729 et seq.); Sections 1320a-7 and 1320a-7a and 1320a-7b of Title 42 of the United States Code; (b) the licensure or regulation of healthcare providers, suppliers, professionals, facilities or payors; (c) patient health care; (f) quality, safety certification and accreditation standards and requirements; (d) HIPAA; (e) certificates of need, operations and authority; (f) laws regulating fee splitting or the provision of free or discounted care or services; (g) Medicare Regulations; (h) Medicaid Regulations,  and (i) any and all other applicable federal, state or local Healthcare Laws, rules, codes, statutes, regulations, manuals, orders, ordinances, statutes, policies, professional or ethical rules, administrative guidance and requirements, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"HHC Group" means, collectively, LifeCare Home Health Acquisition LLC, LifeCare Home Health Intermediate Sub LLC, LifeCare Haven Holdings LLC, LifeCare Florida Holdings LLC, Complete Home Care of Broward County, LLC, Complete Home Care of The Palm Beaches, LLC, Complete Home Care Nurse Registry, LLC, LifeCare Fusion Home Health LLC, Haven Home Health LLC, Beyondfaith Homecare & Rehab, LLC, Beyondfaith Homecare & Rehab of Graham, LLC, Beyondfaith Homecare & Rehab of Abilene, L.L.C., Beyondfaith Homecare & Rehab of Ft. Worth, L.L.C., Beyondfaith Homecare & Rehab of Dallas, L.L.C., 27 HHA, Inc., Care First Home Care, LLC, Select Home Care Las Vegas South, LLC, and each of their respective subsidiaries in existence as of the Closing Date.

"HHC Permitted Indebtedness" has the meaning assigned to such term in the Prepetition Credit Agreement.

"HHS" means the United States Department of Health and Human Services.

"HIPAA" means the (a) Health Insurance Portability and Accountability Act of 1996; (b) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (c) any state and local laws regulating the privacy and/or security of individually identifiable information, including state laws providing for notification of breach of privacy or security of individually identifiable information, in each case with respect to the laws described in clauses (a), (b) and (c) of this definition, as the same may be amended, modified or supplemented from time to time, any successor statutes thereto, any and all rules or regulations promulgated from time to time thereunder, including the HITECH Act.

"HITECH Act" means the Health Information Technology for Economic and Clinical Health Act of 2009 provisions of the American Recovery and Reinvestment Act of 2009 related to privacy and security of health information, and all regulations and guidance promulgated thereto.

"Holdings" means Hospital Acquisition Intermediate Sub LLC, a Delaware limited liability company directly owning all of the Equity Interests of Lifecare Holdings.

"Holdings Guaranty Acknowledgment" means a Consent and Acknowledgement to the Prepetition Holdings Guaranty executed and delivered by Holdings, in form and substance satisfactory to Agent.

"Inactive Subsidiary" means a Subsidiary that (a) conducts no business operations, (b) has total assets with a fair market value of not more than $500,000 individually and, together with all other

Error! Unknown document property name.

Inactive Subsidiaries, not more than $2,000,000 in the aggregate and (c) has no Indebtedness outstanding.  Borrower Representative shall designate in writing to Agent prior to the Closing Date and from time to time thereafter as requested by Agent the Subsidiaries which constitute the "Inactive Subsidiaries."  Notwithstanding the foregoing, no Subsidiary will be an "Inactive Subsidiary" hereunder if such Subsidiary guarantees Indebtedness under the Term Facility Agreements, any Permitted Subordinated Indebtedness or any Refinancing Indebtedness in respect thereof or to refinance any Revolving Loans.

"Incremental DIP Advances" means Revolving Loans initially funded on the basis of (and in no event exceeding) the Incremental DIP Commitment; *provided* that no Revolving Loans shall be funded on the basis of the Incremental DIP-Supplemental Commitment until the occurrence of Incremental DIP-Supplemental Trigger Date.  Revolving Loans funded as Incremental DIP Advances shall continue to be considered Incremental DIP Advances for all purposes hereunder even if availability under the Borrowing Base becomes available after the making of such Revolving Loan.

"Incremental DIP Commitment" means, as of any date of determination, the sum of the Incremental DIP-Base Commitment *plus* the Incremental DIP-Supplemental Commitment; *provided*, that except with respect to the reductions of Incremental DIP Commitment pursuant to Section 1.6(d)(iv), availability under the Borrowing Base and the Aggregate Revolving Loan Commitment shall not consider or include the Incremental DIP-Supplemental Commitment in calculations thereunder until the occurrence of the Incremental DIP-Supplemental Trigger Date.

"Incremental DIP-Base Commitment" means, as of any date of determination, $10,000,000 *minus* mandatory reductions in the Incremental DIP Commitment pursuant to Section 1.6(d)(iv).

"Incremental DIP-Supplemental Commitment" means, as of any date of determination, $5,000,000 *minus* mandatory reductions in the Incremental DIP Commitment pursuant to Section 1.6(d).

"Incremental DIP-Supplemental Trigger Date" the date of the timely fulfillment of the Milestone set forth in Section 4.27(c).

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) earn-out obligations until such obligations become due and payable and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business) to the extent the same would be required to be shown as a liability on a balance sheet prepared in accordance with GAAP, (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) the maximum amount (after giving effect to all reductions and drawings that have been reimbursed) of all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) the principal component of all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable

therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Matters" has the meaning assigned to such term in Section 9.6(a).

"Indemnified Taxes" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or account of any obligation of any Loan Party under any Loan Document, and (ii) to the extent not otherwise described in (i), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.6(a).

"Insolvent" with respect to any Multiemployer Plan, means the condition that such Multiemployer Plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property" has the meaning assigned to such term in the Security Agreement.

"Intellectual Property Security Agreement" has the meaning assigned to such term in the Security Agreement.

"Intercreditor Acknowledgement" means a Consent and Acknowledgement to the Intercreditor Agreement in form and substance satisfactory to Agent, executed and delivered by each party to the Intercreditor Agreement, which such Consent and Acknowledgement shall include from each party thereto: (i) their consent to the DIP Facility, including this Agreement and the Orders (including priming Liens in the Term Facility Priority Collateral (as defined in the Intercreditor Agreement)), and (ii) an acknowledgment (x) of the continued binding obligations and enforceability of the Intercreditor Agreement, as modified by the terms of the DIP Facility, and (y) that this Agreement and the DIP Facility constitutes a "DIP Financing" (as defined in the Intercreditor Agreement) subject to the Intercreditor Agreement.

"Intercreditor Agreement" means the Intercreditor Agreement dated as of August 10, 2018 among Credit Suisse AG, Cayman Island Branch, Second Term Facility Agent, GLAS Trust Company LLC, as Priming Term Facility Agent, WOHCF, as ABL Agent (as defined therein) and the other persons from time to time party thereto.

"Interest Payment Date" means: (a) the first Business Day of each calendar month during the term hereof commencing June 3, 2019; and (b) the Termination Date.

"Interim DIP Advances" means the Revolving Loans funded following the entry of the Interim Order and prior to the entry of the Final Order in an amount not to exceed the Interim DIP Commitment.

"Interim DIP Commitment" means $10,000,000.

"Interim Order" means the order of the Bankruptcy Court in the form attached hereto as Exhibit II or otherwise in form acceptable to Agent in its sole discretion as such order may be amended, modified or supplemented from time to time with the express written consent of Agent and the approval of the Bankruptcy Court, which order (i) shall be in full force and effect, (ii) has not been vacated, modified (without the express written consent of Agent as set forth hereinbefore), reversed, or stayed, and (iii) no appeal from said order has been filed in which Agent's or the Lender's' lack of good faith has been raised.

Error! Unknown document property name.

"<u>Interim Period</u>" means the period commencing on the Interim Order Date and ending immediately prior to the Final Order Date.

"<u>Interim Order Date</u>" means the date on which each of the following shall have occurred: (i) the Interim Order shall have been duly entered by the Bankruptcy Court on or before the date that is three Business Days after the Filing Date and shall be in full force and effect, and (ii) Agent shall have determined that all conditions set forth in <u>Section 2.1</u> shall have been duly satisfied or waived by Agent.

"<u>Investment</u>" means purchasing, holding or acquiring (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, or making or permitting to exist any loans or advances (other than commercially reasonable extensions of trade credit) to, guaranteeing any obligations of, or making or permitting to exist any investment in, any other Person, or purchasing or otherwise acquiring (in one transaction or a series of transactions) any assets of any Person constituting a business unit. The amount, as of any date of determination, of any Investment shall be the original cost of such Investment (including any Indebtedness of a Person existing at the time such Person becomes a Subsidiary in connection with any Investment and any Indebtedness assumed in connection with any acquisition of assets) and minus (x) the amount, as of such date, of any portion of such Investment repaid to the investor in cash or property as a repayment of principal or a return of capital (including pursuant to any sale or disposition of such Investment), as the case may be, and (y) the amount of any dividend or distribution paid to the investor in cash with respect to such Investment, but without any other adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment. In determining the amount of any Investment or repayment involving a transfer of any property other than cash, such property shall be valued at its fair market value at the time of such transfer.

"<u>IRS</u>" means the Internal Revenue Service of the United States and any successor thereto.

"<u>Issuance</u>" means the issuance by any Borrower or Guarantor of Debt (other than existing Permitted Debt), or the issuance by any Borrower or any Guarantor of any Equity Interest.

"<u>Issue</u>" means, with respect to any Letter of Credit, to issue, extend the expiration date of, renew (including by failure to object to any automatic renewal on the last day such objection is permitted), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "Issued" and "Issuance" have correlative meanings.

"<u>Joint Commission</u>" means the entity formerly known as the Joint Commission on Accreditation of Healthcare Organizations.

"<u>Last Service Date</u>" means, with respect to any Eligible Account, the date set forth on the related invoice or statement as the most recent date on which services, goods or merchandise were provided by the applicable Borrower to the related patient or customer.

"<u>Lender</u>" or "<u>Lenders</u>" has the meaning assigned to such term in the <u>Preamble</u>.

"<u>Lender Group</u>" means (1) the Lender and Agent, and (2) each of their respective agents and delegates identified from time to time to effectuate this Agreement.

Error! Unknown document property name.

"Lending Office" means, with respect to any Lender, the account, office or offices of such Lender specified as its "Lending Office" beneath its name on the applicable signature page hereto, or such other account, office or offices of such Lender as it may from time to time notify Borrower Representative and Agent.

"L/C Issuer" means Capital One, National Association.

"L/C Reimbursement Date" has the meaning assigned to such term in Section 1.1(b)(v).

"L/C Reimbursement Obligation" means, at all times prior to the Cash Collateral Account Funding Date for any Letter of Credit, the obligation of Borrowers to the L/C Issuer thereof or to Agent, as and when matured, to pay all amounts drawn under such Letter of Credit.

"Letter of Credit" means each documentary or standby letters of credit set forth on Schedule 1.1(b) Issued for the account of a Borrower by the L/C Issuer under the Prepetition Credit Agreement.

"Letter of Credit Fee" has the meaning assigned to such term in Section 1.7(c).

"Letter of Credit Obligations" means, as of any date of determination, all outstanding obligations incurred by Agent and Lenders at the request of Borrower Representative on behalf of a Borrower, whether direct or indirect, contingent or otherwise, due or not due, in connection with the Issuance of the Letters of Credit by the L/C Issuer, including without limitation, all L/C Reimbursement Obligations outstanding as of any date of determination.  The amount of such Letter of Credit Obligations shall equal the maximum amount that may be payable by Agent and Lenders thereupon or pursuant thereto; *provided*, that at all times on and following the Cash Collateral Account Funding Date, reimbursement of all Letter of Credit Obligations (when such obligations become due and payable) shall be payable solely from amounts available in the Cash Collateral Account as provided in Section 1.1(b)(iv).

"Liabilities" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, commissions, charges, disbursements and expenses (including, without limitation, those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"LIBOR Index Adjustment Date" means the date of the first Incremental DIP Advance, and the first day of each 30 day-period commencing thereafter, as long as any Obligations remain outstanding.

"LIBOR Index Rate" means, as of any LIBOR Index Adjustment Date, the greater of (i) 2.50%, and (ii) the rate *per annum* (rounded upwards, if necessary, to the next highest one-hundred-thousandth of a percentage point) for deposits in Dollars for a period equal to three months, which appears on the LIBOR01 Page on the date which is two (2) Business Days prior to the LIBOR Index Adjustment Date. Notwithstanding the foregoing, on the day that is two (2) Business Days before the commencement of any LIBOR Index Adjustment Date, if (a) any affected Lender notifies Agent and Borrower Representative that such interest rate does not adequately and fairly reflect the cost to such Lenders of funding their respective Revolving Loans, as applicable, or any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Revolving Loans whose interest is determined by reference to

Error! Unknown document property name.

such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing or (b) Agent shall have determined that reasonable means do not exist for ascertaining the applicable LIBOR Index Rate, then, in each case, Agent shall, as soon as practicable thereafter give written notice of such determination to Borrower Representative and Lenders, and the LIBOR Index Rate made after receipt of such notice or after such determination until the circumstances giving rise to such notice or determination no longer exist, shall be deemed to be a comparable successor or alternative rate that is reasonably determined by Agent in light of the prevailing market practices and Lenders' costs of funds (or, if Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Index Rate exists, in such other manner of administration as Agent determines in consultation with Borrower Representative).

"LIBOR01 Page" means the applicable Bloomberg screen (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market).

"LIBOR Successor Rate" has the meaning assigned to such term in Section 10.4(b).

"LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the interest period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the reasonable discretion of Agent, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by Agent in a manner substantially consistent with market practice (or, if Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as Agent reasonably determines in consultation with Borrower Representative).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"LifeCare Entities" has the meaning assigned to such term in the Preamble.

"LifeCare Holdings" has the meaning assigned to such term in the Preamble.

"LLC Agreement" means that certain Limited Liability Company Agreement of Parent Holdings dated as of May 31, 2013.

"Loan Documents" means this Agreement, the DIP Acknowledgements, the DIP Security Documents, the DIP Fee Letter, the Budget, each Weekly Report and all documents delivered to Agent and/or any Lender in connection with any of the foregoing.

"Loan Parties" means Parent Holdings, Holdings, Borrowers and any other Subsidiary Loan Party.

Error! Unknown document property name.

"Lock Box" shall mean lock boxes associated with each Lockbox Account.

"Lockbox Account" shall mean the Borrowers' accounts with account numbers ending (i) x4280 (ii) x4298, (iii) x4413, (iv) x4405, (v) x8806, (vi) x2118 and (vii) x8057, in each case with JPMorgan Chase Bank.

"Mandatory Prepayment Amounts" has the meaning assigned to such term in Section 1.6(c).

"Margin Stock" has the meaning assigned to such term in Regulation U of the Board.

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, assets, liabilities or financial condition of Holdings and Borrowers taken as a whole, recognizing that Borrowers have filed the Chapter 11 Cases and the events set forth on Schedule C, (ii) the ability of any Loan Party to meet its obligations substantially as set forth in the Budget or to otherwise perform any of its obligations under the Loan Documents to which it is a party (iii) the rights and remedies of Agent or the Lenders under the Loan Documents or (iv) the validity or enforceability of, or the rights, claims, Liens, remedies or benefits available to Agent or the Lender under, the Orders, this Agreement or any other Loan Document.

"Material Indebtedness" means Indebtedness (other than the Revolving Loans), of any one or more of Parent Holdings, Holdings, any Borrower and any Subsidiary in an aggregate principal amount exceeding $500,000.

"Maximum Revolving Loan Balance" has the meaning assigned to such term in Section 1.1(a).

"Medicaid" means that program under Title XIX of the Social Security Act, which provides federal grants to states for medical assistance, as set forth at Section 1396, et seq. of Title 42 of the United States Code, as amended, and any successor statute thereto.

"Medicaid Certification" means certification by CMS or a state agency or entity under contract with CMS that health care providers are in compliance with all the conditions of participation set forth in the Medicaid Regulations.

"Medicaid Provider Agreement" means an agreement entered into between a state agency or other such entity administering the Medicaid program and a health care provider under which the health care provider agrees to provide services for Medicaid patients in accordance with the terms of the agreement and Medicaid Regulations.

"Medicaid Regulations" means, collectively, (i) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting the medical assistance program established by Title XIX of the Social Security Act and any statutes succeeding thereto; (ii) all applicable provisions of all federal rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in clause (i) above and all federal administrative, reimbursement and other guidelines of all Governmental Authorities having the force of law promulgated pursuant to or in connection with the statutes described in clause (i) above; (iii) all state statutes and plans for medical assistance enacted in connection with the statutes and provisions described in clauses (i) and (ii) above; and (iv) all applicable provisions of all rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with the statutes described in clause (iii) above and all state administrative, reimbursement and other guidelines of all Governmental Authorities having

Error! Unknown document property name.

the force of law promulgated pursuant to or in connection with the statutes described in clause (ii) above, in each case as may be amended, supplemented or otherwise modified from time to time.

"Medical Reimbursement Programs" means a collective reference to the Medicare, Medicaid and TRICARE programs and any other health care program operated by or financed in whole or in part by any foreign or domestic federal, state or local government and any other non-government funded third party payor programs.

"Medicare" means that government-sponsored entitlement program under Title XVIII of the Social Security Act, which provides for a health insurance system for eligible elderly and disabled individuals, as set forth at Section 1395, et seq. of Title 42 of the United States Code, as amended, and any successor statute thereto.

"Medicare Certification" means certification by CMS or a state agency or entity under contract with CMS that the health care operation is in compliance with all the conditions of participation set forth in the Medicare Regulations.

"Medicare/Medicaid Reserve" means, as of any date of determination, an amount, which in Agent's Permitted Discretion, reserved in respect of (1) any retroactive settlements estimated to be due and owing to Governmental Authorities (which amount, in Agent's good faith credit judgment, may be equal to or less than such amount), or (2) payment plans that have been established with the appropriate Governmental Authority (which amount, in Agent's Permitted Discretion, may equal (x) so long as no Default or Event of Default exists as of such date of determination, a specific number of installments under such payment plans or (y) in the event that a Default or Event of Default exists as of such date of determination 100% of the amounts due under such payment plans).    The Medicare/Medicaid Reserve may include reserves to reflect adjustments necessary to limit and eliminate overpayments relating to PIP Payments arising from time to time.

"Medicare Provider Agreement" means an agreement entered into between a state agency, CMS or other such entity administering the Medicare program and a health care operation under which the health care operation agrees to provide services for Medicare patients in accordance with the terms of the agreement and Medicare Regulations.

"Medicare Regulations" means, collectively, all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere) affecting the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act and any statutes succeeding thereto; together with all applicable provisions of all rules, regulations, manuals and orders and administrative, reimbursement and other guidelines having the force of law of all Governmental Authorities (including, without limitation, HHS, CMS, the OIG, or any person succeeding to the functions of any of the foregoing) promulgated pursuant to or in connection with any of the foregoing having the force of law, as each may be amended, supplemented or otherwise modified from time to time.

"MNPI" has the meaning assigned to such term in Section 9.10(a).

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

Error! Unknown document property name.

"<u>Net Cash Flow</u>" means the net result of cash receipts and disbursements included in the line item "Net Cash Flow" set forth in the Budget.

"<u>Net Proceeds</u>" means, with respect to any event, including any Disposition, (a) the cash proceeds actually received in respect of such event including (i) any cash received in respect of any debt instrument or equity security received as non-cash proceeds, but only as and when received (excluding, for the avoidance of doubt, any interest payments), (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, net of (b) the sum of (i) all fees and out-of-pocket expenses (including underwriting discounts and commissions and collection expenses) paid or payable by Parent Holdings, Holdings, Borrowers and the Subsidiaries to third parties (including Affiliates, if permitted by <u>Section 5.8</u>) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made by Parent Holdings, Holdings, Borrowers and the Subsidiaries as a result of such event to repay Indebtedness (other than Term Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event, and (iii) the amount of all Taxes paid (or reasonably estimated to be payable) by Parent Holdings, Holdings, Borrowers and the Subsidiaries (*provided*, that such amounts withheld or estimated for the payment of Taxes shall, to the extent not utilized for the payment of Taxes, be deemed to be Net Proceeds received when such nonutilization is determined), and the amount of any reserves established by Parent Holdings, Holdings, Borrowers and the Subsidiaries to fund contingent liabilities reasonably estimated to be payable, in each case that are directly attributable to such event (*provided*, that any reversal of any such reserves will be deemed to be Net Proceeds received at the time and in the amount of such reversal), in each case as determined reasonably and in good faith by a Financial Officer.

"<u>Net Value Factor</u>" means, initially, the percentages reflected in the Borrowing Base Certificate, as such percentages may be adjusted, upwards or downwards, in the Permitted Discretion of Agent, based on actual or projected collection experience.

"<u>Non-Cash Pay Preferred Stock</u>" means preferred stock or other preferred securities or membership interests of Parent Holdings, Holdings or LifeCare Holdings which (i) are not mandatorily redeemable, in whole or part, or required to be repurchased or reacquired, in whole or part, by Holdings, any Borrower or any Subsidiary, and which do not require any payment of cash dividends or distributions (it being understood that accrued dividends shall be permitted), in each case, prior to the date that is six months after the Termination Date (other than upon an Event of Default, Asset Sale or Change of Control, provided, that any such payment is subject to the Full Payment of the Revolving Loans and the other Obligations that are accrued and payable and termination of the Commitments hereunder), (ii) are not secured by any assets of Parent Holdings, Holdings, any Borrower or any Subsidiary, (iii) are not guaranteed by Parent Holdings, Holdings, any Borrower or any Subsidiary and (iv) are not exchangeable or convertible into Indebtedness of Parent Holdings, Holdings, any Borrower or any Subsidiary, except at the option of a Borrower and subject to compliance with <u>Section 5.1(a)</u>, or any preferred stock or other Equity Interests (other than common equity of Holdings or other Non-Cash Pay Preferred Stock).

"<u>Non-U.S. Lender Party</u>" means each of Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is not a United States person as defined in Section 7701(a)(30) of the Code.

Error! Unknown document property name.

"Notice of Borrowing" means a notice given by Borrower Representative to Agent pursuant to Section 1.4, in substantially the form of Exhibit 11.1(d) hereto.

"Obligations" means, collectively, all Revolving Loans, and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Loan Party to any Lender, Agent, any L/C Issuer, any other Person required to be indemnified, that arises under this Agreement or any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired (including, but not limited to, interest and fees that accrue after or would accrue but for the commencement of any bankruptcy or insolvency proceeding under the Bankruptcy Code, regardless of whether allowed or allowable in such proceeding or subject to an automatic stay under the Bankruptcy Code or similar laws).   After entry of the Final Order, and pursuant thereto, "Obligations" shall include Existing Debt.

"Orders" means the First-Day Orders, the Financing Orders, and any orders of the Bankruptcy Court modifying any of the foregoing in accordance with the Loan Documents.

"OFAC" means the United States Department of Treasury's Office of Foreign Assets Control and any successor thereto.

"OIG" means the Office of the Inspector General of HHS.

"Ordinary Course of Business" means, in respect of any transaction involving any Loan Party, the ordinary course of business of such Loan Party, as undertaken by such Loan Party in accordance with past practices or reasonable extensions of such past practices, as applicable, or otherwise undertaken by such Loan Party in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"Other Connection Taxes" means with respect to any Secured Party, Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Tax (other than connections arising from such Secured Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Debt Obligations" means the Indebtedness, including purchase money security and equipment lease debt, set forth on Schedule B hereto.

"Other Taxes" has the meaning assigned to such term in Section 10.1(c).

"Overadvance" has the meaning assigned to such term in Section 1.1(a).

"Parent Holdings" means Hospital Acquisition LLC, a Delaware limited liability company directly owning all of the Equity Interests of Holdings.

 "Participant Register" has the meaning assigned to such term in Section 9.9(f).

Error! Unknown document property name.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pension Plan" means any Plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA.

"Permitted Business" means the ownership and operation of long-term acute care hospitals, rehabilitation facilities, skilled nursing facilities, behavioral facilities, other specialized hospitals and related activities, and any business reasonably related, incidental or ancillary thereto.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Encumbrances" means each of the following Liens:

a)    Liens representing a Second-Lien Collateral interest of the Term Facility Parties with respect to the Term Facility Obligations to the extent imposed prior to the Filing Date; *provided*, that such Liens are (i) expressly subordinate to the Agent's Lien securing the Obligations in the manner set forth in the Financing Orders, and (ii) subject to the Intercreditor Agreement and the Intercreditor Acknowledgement;

b)    Liens imposed by law or any Governmental Authority for Taxes, assessments or other governmental charges or levies that are not yet due or are being contested in compliance with Section 4.5;

c)    carriers', warehousemen's, mechanics', materialmen's, landlord's, repairmen's, construction and other like Liens imposed, arising in the Ordinary Course of Business and securing obligations that are not overdue by more than 60 days or are being contested in compliance with Section 4.5;

d)    pledges and deposits made in the Ordinary Course of Business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

e)    easements, zoning restrictions, rights-of-way, legal non-conforming uses and similar encumbrances on real property imposed by law or arising in the Ordinary Course of Business that do not materially interfere with the ordinary conduct of business of any Borrower or any Subsidiary*; provided,* that this clause (f) shall apply only to zoning restrictions that are not violated by the current use or occupancy of the Real Property or the ordinary conduct of business of any Borrower or any Subsidiary;

f)    liens and other encumbrances shown as exceptions in the title insurance policies insuring the Real Property;

g)    pledges and deposits securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the

104

benefit of) insurance carriers providing property, casualty or liability insurance to any Borrower or any Subsidiary;

h) Liens disclosed by the title insurance policies delivered on or prior to the Closing Date and any replacement, extension or renewal of any such Lien; *provided*, that such replacement, extension or renewal Lien shall not cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal; *provided, further*, that the Indebtedness and other obligations secured by such replacement, extension or renewal Lien are permitted by this Agreement;

i) any interest or title of a lessor under any leases or subleases entered into (and to the extent imposed following the Filing Date, permitted to be entered into hereunder) by any Borrower or any Subsidiary in the Ordinary Course of Business (and to the extent imposed following the Filing Date, permitted to be entered into hereunder);

j) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business, or (iii) relating to purchase orders and other agreements entered into with customers of any Borrower or any Subsidiary in the Ordinary Course of Business;

k) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

l) licenses of Intellectual Property granted in the Ordinary Course of Business;

m) Liens and other encumbrances of any Borrower or any Subsidiary (other than Liens on Receivables) securing Indebtedness (other than indebtedness for borrowed money) at any time not exceeding $50,000;

n) Liens arising from precautionary UCC financing statements in connection with operating leases;

o) Liens (other than Permitted Encumbrances) permitted under Section 5.2; and

p) Permitted Liens;

*provided*, that, other than with respect to Permitted Liens, the term "Permitted Encumbrances" shall not include (i) any Lien on Receivables, or (ii) any Lien securing Indebtedness (other than pursuant to clause a) of this definition).

"Permitted Investments" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing or allowing for liquidation at the original par value at the option of the holder within two years from the date of acquisition thereof;

Error! Unknown document property name.

(b)    Investments in commercial paper (other than commercial paper issued by Holdings, any Borrower, any Equity Holders or any of their Affiliates) maturing within one year from the date of acquisition thereof and having, at such date of acquisition, a rating of at least A-1 (or the equivalent thereof) from S&P or P-1 (or the equivalent thereto) by Moody's;

(c)    Investments in certificates of deposit, banker's acceptances, time deposits or overnight bank deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market Deposit Accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $250,000,000;

(d)    fully collateralized repurchase agreements for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above;

(e)    securities with maturities of two years or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, having one of the two highest rating categories obtainable from either Moody's or S&P;

(f)    Investments in money market funds that comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (e) above; and

(g)    shares of restricted mutual funds whose investment guidelines restrict substantially all of such funds' investments to those satisfying the provisions of clauses (a) through (e) above.

"Permitted Liens" means any of the following Liens recognized by the Bankruptcy Court:

(a)    Liens securing the Obligations and the Prepetition Obligations; and

(b)    Liens imposed in connection with the Carve-Out;

*provided*, in no event shall Permitted Liens include any Lien against the Receivables Collateral except for Permitted Receivables Liens.

"Permitted Receivables Liens" means each of the following Liens, to the extent valid, enforceable and non-avoidable as of the Filing Date:

(1)    Liens securing the Obligations;

(2)    Liens imposed in connection with the Carve-Out; and

(3)    Liens securing the Term Facility Obligations that are subordinate to the Liens securing the Obligations pursuant to the terms and conditions set forth in the Financing Orders or other orders of the Bankruptcy Court, the Intercreditor Agreement and the Intercreditor Acknowledgement.

Error! Unknown document property name.

"<u>Permitted Subordinated Indebtedness</u>" means Indebtedness of any Borrower that (i) does not mature, and is not subject to mandatory repurchase, redemption or amortization (other than pursuant to customary asset sale or change in control provisions approved by Agent, such approval not to be unreasonably withheld or delayed), in each case, prior to the date that is six months after the later of (a) the Termination Date and (b) the Latest Maturity Date (as defined in the Term Facility Agreements), (ii) is not secured by any assets of Parent Holdings, Holdings, any Borrower or any Subsidiary, (iii) is not exchangeable or convertible into Indebtedness of Parent Holdings, Holdings, any Borrower or any Subsidiary (other than Permitted Subordinated Indebtedness) or any preferred stock or other Equity Interests (other than common equity or Non-Cash Pay Preferred Stock, provided that any such exchange or conversion, if effected, would not result in a Change in Control) and (iv) is, together with any Guarantee thereof by any Subsidiary, subordinated to the Obligations pursuant to a written instrument delivered, and reasonably satisfactory, to Agent.

"<u>Permitted Variances</u>" has the meaning assigned to such term in <u>Section 6.1</u>.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>PIP Payments</u>" means scheduled periodic interim payments under Medicare.

"<u>Plan</u>" means any employee benefit plan as defined in Section 3(3) of ERISA (other than a Multiemployer Plan), including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such Plan were terminated, would under Section 4062 or Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Post-Carve Out Trigger Notice Cap</u>" has the meaning assigned to such term in paragraph 38 of the Interim Order.

"<u>Prepetition Agent</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Prepetition Credit Agreement</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Prepetition Facility</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Prepetition Lender Parties</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Prepetition Lenders</u>" has the meaning set forth in the <u>Preamble</u>.

"<u>Prepetition Loan Documents</u>" means the Prepetition Credit Agreement and all "Loan Documents" referenced therein.

"<u>Prepetition Parent Guaranty</u>" means the Parent Guaranty, made by Holdings in favor of Agent on behalf of the Secured Parties, dated as of August 10, 2018.

"<u>Prepetition Priming Facility</u>" means the credit facility provided under the Prepetition Priming Term Loan Credit Agreement.

Error! Unknown document property name.

"<u>Prepetition Priming Facility Documents</u>" means the Prepetition Priming Term Loan Credit Agreement and any other agreement, document or instrument evidencing the Prepetition Priming Facility or any Indebtedness thereunder or any obligations in respect thereof or any Liens securing such Indebtedness and obligations (including any "Loan Documents" and "Security Documents", in each case as defined in the Prepetition Priming Term Loan Credit Agreement), in each case, as amended, restated, modified, renewed, refunded, replaced in any manner (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

"<u>Prepetition Priming Facility Obligations</u>" means all obligations of every nature from time to time owed by Holdings or any of its Subsidiaries to Prepetition Priming Term Facility Agent or any other agent (including any former agent) or any lender or other creditor under any Prepetition Priming Facility Documents, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to any Borrower or any of their Subsidiaries, would have accrued on any such obligations, whether or not a claim is allowed against any Borrower or any of their Subsidiaries for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

"<u>Prepetition Priming Term Facility Agent</u>" means GLAS Trust Company LLC, in its capacities as administrative agent and as collateral agent under the Prepetition Priming Term Loan Credit Agreement, for the benefit of the lenders thereunder, including its successors and assigns including any replacement or successor agent successors thereto.

"<u>Prepetition Priming Term Loan Credit Agreement</u>" means (a) that certain Prepetition Priming Term Loan Credit Agreement, dated as of August 10, 2018, by and among Borrowers, as borrowers, the other Guarantors hereunder party thereto as borrowers or guarantors and the Priming Term Facility Agent and the lenders party thereto, as amended, restated, modified, renewed, refunded, replaced in any manner (whether upon or after termination or otherwise), extended or refinanced in whole or in part from time to time in accordance with the Intercreditor Agreement, and (b) any other credit agreement, loan agreement, promissory note or other agreement or instrument evidencing or governing the terms of any Refinancing Indebtedness with respect to the Indebtedness and other obligations outstanding under the Priming Term Loan Credit Agreement or any subsequent Priming Term Loan Credit Agreement, unless such instrument expressly provides that it is not intended to be, and is not, a Priming Term Loan Credit Agreement hereunder, subject to the limitations set forth herein and in the Intercreditor Agreement.

"<u>Prepetition Obligations</u>" means "Obligations" as such term is defined in the Prepetition Credit Agreement.

"<u>Prepetition Second Term Facility Agents</u>" means (x) Seaport Loan Products LLC, in its capacity as administrative agent and (y) Wilmington Trust, National Association, in their capacities as co-administrative agents and collateral agent pursuant to the Prepetition Second Term Facility Agreement, for the benefit of the lenders thereunder, including its successors and assigns including any replacement or successor agent successors thereto.

"<u>Prepetition Second Term Facility Agreement</u>" means (a) that certain Credit Agreement dated as of May 31, 2013, by and among LifeCare Holdings, as borrower, the other Loan Parties hereunder party thereto as loan parties or guarantors and the Term Facility Agent and the lenders party thereto, as amended on the date hereof, and as it may be further amended, restated, modified, renewed, refunded,

replaced in any manner (whether upon or after termination or otherwise), extended or refinanced in whole or in part from time to time in accordance with the Intercreditor Agreement, and (b) any other credit agreement, loan agreement, promissory note or other agreement or instrument evidencing or governing the terms of any Refinancing Indebtedness with respect to the Indebtedness and other obligations outstanding under the Prepetition Second Term Facility Agreement or any subsequent Prepetition Second Term Facility Agreement, unless such instrument expressly provides that it is not intended to be, and is not, a Prepetition Second Term Facility Agreement hereunder, subject to the limitations set forth herein and in the Intercreditor Agreement.

"Prepetition Second Term Facility Documents" means the Prepetition Second Term Facility Agreement and any other agreement, document or instrument evidencing the Second Term Facility Agreement or any Indebtedness thereunder or any obligations in respect thereof or any Liens securing such Indebtedness and obligations (including any "Loan Documents" and "Security Documents", in each case as defined in the Prepetition Second Term Facility Agreement), in each case, as amended, restated, modified, renewed, refunded, replaced in any manner (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

"Prepetition Second Term Facility Obligations" means all obligations of every nature from time to time owed by Holdings or any of its Subsidiaries to Term Facility Agent or any other agent (including any former agent) or any lender or other creditor under any Term Facility Documents, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to Borrowers or any of their Subsidiaries, would have accrued on any such obligations, whether or not a claim is allowed against any Borrower or any of their Subsidiaries for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise.

"Prepetition Security Agreement" means that certain Security Agreement, dated as of August 10, 2018,  executed by Holdings, Borrowers and the Subsidiary Loan Parties thereto in favor of Agent, for the benefit of the secured parties thereto, as amended, restated and/or modified from time to time.

"Prepetition Security Documents" means, collectively, the Security Agreement, the Intellectual Property Security Agreements, the Mortgages, the Intercreditor Agreement, the Control Agreements, the Sweep Agreements, and each other security agreement or other instrument or document executed and delivered pursuant to Section 4.12 or 4.13 of the Prepetition Credit Agreement, or pursuant to the Prepetition Security Agreement to secure any of the Prepetition Obligations.

"Prepetition Term Facility" means the Prepetition Term Loans and related commitments provided under the Prepetition Term Facility Agreements.

"Prepetition Term Facility Agreements" means, collectively, the Prepetition Second Term Facility Agreement and the Prepetition Priming Term Loan Credit Agreement.

"Prepetition Term Facility Documents" means, collectively, the Prepetition Second Term Facility Documents and the Prepetition Priming Facility Documents.

"Prepetition Term Loans" means all loans made pursuant to the Prepetition Term Facility Agreements.

Error! Unknown document property name.

"Prime Rate" means at all times prior to the Cash Collateral Account Funding Date, the rate of interest from time to time announced by Capital One, National Association at its principal office as its prime commercial lending rate (it being understood that such prime commercial rate is a reference rate and does not necessarily represent the lowest or best rate being charged by Capital One to any customer and such rate is set by Capital One based upon various factors including Capital One's costs and desired return, general economic conditions and other factors).

"Professional Costs" means and includes all reasonable documented fees and disbursements of professional advisors to Agent, including any accounting firm or law firm or other external counsel.

"Professional Expenses" means the professional fees and expenses of attorneys, accountants, financial advisors and consultants retained by Borrowers, the Committee and any other statutory committee appointed in the Chapter 11 Cases, and/or the patient care ombudsman appointed in the Chapter 11 Cases pursuant to sections 327, 328, 333 and 1103 of the Bankruptcy Code in accordance with the Budget.

"Professional Fee Escrow Account" means an escrow account with an escrow agent selected by Borrowers, to which Borrowers shall cause to be transferred on the Tuesday of each week, commencing after the approval of the Interim Order, an amount equal to the lesser of (x) the actual fees and expenses of Professional Persons, and (y) the fees and expenses of the Professional Persons set forth in the Budget.

"Professional Persons" means persons or firms retained by Borrowers, the Committee, and any patient care ombudsman appointed in the Chapter 11 Cases, solely to the extent that such persons or firms have been retained under sections 327, 328, 333 or 1103 of the Bankruptcy Code, as applicable, pursuant to an order of the Bankruptcy Court.

"Projected Sale Date" has the meaning assigned to such term in Section 4.27(d).

"Projected Total Disbursements" means the aggregate amount of projected receipts set forth in the Budget line item titled "Total Disbursements".

"Projected Total Cash Receipts" means the aggregate amount of projected receipts set forth in the Budget line item titled "Total Cash Receipts".

"Projected Total Operating Disbursements" means the aggregate amount of projected disbursements set forth in the Budget line item titled "Total Operating Disbursements".

"Prohibited Transaction" has the meaning assigned to such term in Section 406 of ERISA and Section 4975(c) of the Code.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"Rate Contracts" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code or in Section 1a(47) of the Commodity Exchange Act) and any other agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or

value or any similar transaction or any combination of these transactions; *provided,* that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any Borrower or the Subsidiaries shall be a Rate Contract.

"Real Property" means the real properties owned or leased by Holdings, any Borrower or any Subsidiary set forth on Schedule 3.5(c), as the same may be supplemented from time to time by Borrower Representative in accordance with the provisions hereof.

"Receivable Information" means the following information (together with any other information relating to the Receivables provided by any Borrower to Agent from time to time), as the same may be modified by Agent in its Permitted Discretion in consultation with Borrowers from time to time:

(a)     customer information;

(b)     contract-related information;

(c)     if available, product classification information concerning goods sold;

(d)     Account Debtor required information (i.e., information provided in the ordinary course of business to any specified Account Debtor or any other information required to be provided to an Account Debtor pursuant to any agreement, contract or other arrangement with such Account Debtor); and

(e)     billing information (i.e., all information provided by Borrowers on invoices to Account Debtors and any other information required to be provided pursuant to Borrowers' credit and collection policy and a detailed copy of the bill).

"Receivables" means all accounts, instruments, general intangibles, health-care-insurance receivables and all other obligations for the payment of money and goodwill, whether now existing or hereafter arising, including, without limitation, all payments due from any Receivables including those based on a cost report settlement or expected settlement, and all proceeds of any of the foregoing, in each case, including rights of payment arising out of the rendition of medical, surgical, diagnostic or other professional medical services or the sale of medical products by each Borrower in the ordinary course of its business, including all third-party reimbursable portions or third-party directly payable portions of health-care-insurance receivables or general intangibles owing (or in the case of Unbilled Receivables, to be owing) by an obligor, including all rights to reimbursement under any agreements with and payments from obligors, patients or other Persons, together with all books, records, ledger cards, data processing records, computer software, and other property at any time used or useful in connection with, evidencing, embodying, referring to, or relating to any of the foregoing.

"Receivables Collateral" means the following assets of each Borrower, whether now existing or hereafter acquired, and wherever located:

(a)     all Receivables, whether now owned or hereafter acquired;

(b)     to the maximum extent permitted by law, each Lender Lockbox and each Lockbox Account, and amounts held therein;

Error! Unknown document property name.

(c)       all money and cash;

(d)       all Records relating to items (a) through (c) above;

(e)       all payment-related general intangibles and all Contracts necessary for the collection of Receivables, including, without limitation, all Medicare and Medicaid provider agreements and provider numbers and licenses; and

(f)       all proceeds of any kind or nature of the foregoing.

"Refinancing Indebtedness" means Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to extend, renew, replace or refinance existing Indebtedness ("Refinanced Debt"); *provided,* that (i) such extending, renewing, replacing or refinancing Indebtedness is in an original aggregate principal amount not greater than the aggregate principal amount of, and unpaid interest on, the Refinanced Debt plus the amount of any premiums paid thereon and fees and expenses associated therewith, (ii) such Indebtedness has a maturity and a weighted average life equal to or greater than that of the Refinanced Debt and in the case of Permitted Subordinated Indebtedness such Indebtedness has a maturity that is greater than the date that is six months after the later of (a) the Termination Date and (b) the Latest Maturity Date (as defined in the Term Facility Agreements), (iii) if the Refinanced Debt or any Guarantees thereof are subordinated to the Obligations, such Indebtedness and Guarantees thereof are subordinated to the Obligations on terms no less favorable in any significant respect to the holders of the Obligations than the subordination terms of such Refinanced Debt or Guarantees thereof (and no Loan Party that has not guaranteed such Refinanced Debt Guarantees such Indebtedness), (iv) such Indebtedness contains covenants and events of default and is benefited by Guarantees (if any) which, taken as a whole, are determined in good faith by the board of directors of Borrower Representative not to be materially less favorable to the Lenders than the covenants and events of default of or Guarantees (if any) in respect of such Refinanced Debt, (v) if such Refinanced Debt or any Guarantees thereof are secured, such Indebtedness and any Guarantees thereof are either unsecured or secured only by such assets as secured the Refinanced Debt and Guarantees thereof, (vi) if such Refinanced Debt and any Guarantees thereof are unsecured, such Indebtedness and Guarantees thereof are also unsecured, (vii) such Indebtedness is issued only by the issuer of such Refinanced Debt and (viii) the proceeds of such Indebtedness are applied promptly after receipt thereof to the repayment of such Refinanced Debt.

"Register" has the meaning assigned to such term in Section 1.3(b).

"Regulation S-X" means Regulation S-X under the Securities Act of 1933, as amended.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, controlling persons, members and advisors of such Person and of each of such Person's Affiliates.

"Release" means any actual or threatened release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"Reorganization" means, with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event" means any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to DOL Reg. § 4043 or otherwise.

"Required Lenders" means at any time (a) any two or more Lenders then holding more than fifty percent (50%) of the sum of the Aggregate Revolving Loan Commitments then in effect or (b) if the Aggregate Revolving Loan Commitments have terminated, any two or more Lenders then holding more than fifty percent (50%) of the sum of the aggregate unpaid principal amount of Revolving Loans then outstanding and outstanding Letter of Credit Obligations; *provided,* that (i) if there is only one Lender, "Required Lenders" shall mean such Lender; (ii) for purposes of this definition, at all times following the Cash Collateral Account Funding Date, the L/C Issuer shall not be considered a Lender for the purpose of this definition; and (iii) for purposes of this definition, Lenders that are Affiliates of one another shall be considered as one Lender.

"Requirement of Law" means, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means, with respect to the Borrowing Base (i) reserves established by Agent from time to time against Eligible Accounts pursuant to Section 1.10, (ii) Medicare/Medicaid Reserves, (iii) such other reserves against Eligible Accounts or Availability that Agent may, in its Permitted Discretion, establish from time to time, including, without limitation, reserves related to (v) finalized cost settlements, (w) accrued liabilities of any Healthcare Facility in excess of the 25 percent patient referral limit under Title XIX of the Social Security Act, (x) RAC audits, (y) ZPIC audits, and (z) cost report accruals, and (vi) at any time that the Borrowing Base is less than $20,000,000, a reserve that Agent may establish (including at the request of any Lender) to establish, in Agent's Permitted Discretion, as reasonably necessary to preserve its collateral coverage at such time.  Without limiting the generality of the foregoing, Reserves established to ensure the payment of accrued interest expenses or Indebtedness shall be deemed to be an exercise of Agent's Permitted Discretion.

"Responsible Officer" means the chief executive officer or the president of Borrower Representative or any other Borrower (as the context may require) or any other officer having substantially the same authority and responsibility; or, with respect to compliance with Financial Covenants or delivery of financial information, a Financial Officer of Borrower Representative or any other Borrower (as the context may require) or any other officer having substantially the same authority and responsibility.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Parent Holdings, Holdings, any Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation, termination or amendment of any Equity Interests in Parent Holdings, Holdings, any Borrower or any Subsidiary or of any option, warrant or other right to acquire any such Equity Interests in Parent Holdings, Holdings, any Borrower or any Subsidiary.

"Revolving Lender" means each Lender with a Revolving Loan Commitment (or if the Revolving Loan Commitments have terminated, who hold Revolving Loans.)

Error! Unknown document property name.

"Revolving Loan" has the meaning assigned to such term in Section 1.1(a).

"Revolving Loan Commitment" has the meaning assigned to such term in Section 1.1(a).

"S&P" means Standard & Poor's Ratings Group, Inc.

"Sale" has the meaning assigned to such term in Section 9.9(b).

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to Sanctions.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

"Sanctions" means any sanctions administered or enforced by the OFAC, the United Nations Security Council or any other relevant sanctions authority.

"Scheduled Termination Date" means November 6, 2019.

"Second Budget Testing Period" has the meaning set forth in the definition of Budget Testing Period.

"Second-Lien Collateral" has the meaning assigned to such term in the Intercreditor Agreement.

"Secured Party" means Agent, each Lender, each L/C Issuer, each other Indemnitee and each other holder of any Obligation of Borrowers or any other Loan Party.

"Settlement Date" has the meaning assigned to such term in Section 1.9(b).

"Segregated Governmental Account" means a Deposit Account of a Borrower maintained in accordance with the requirements of Section 4.16, the funds on deposit in which include the direct proceeds of Medicare and Medicaid payments made by Governmental Payors; *provided, however*, that from and after the 90th day after the Closing Date, "Segregated Governmental Account" shall only include such Deposit Accounts if the only funds on deposit in such account are the direct proceeds of Medicare and Medicaid payments made by Governmental Payors.

"Social Security Act" means the Social Security Act as set forth in Title 42 of the United States Code, as amended, and any successor statute thereto, as interpreted by the rules and regulations issued thereunder, in each case as in effect from time to time.  References to sections of the Social Security Act shall be construed also to refer to any successor sections.

"Specified Facilities" means any of the watchlist Healthcare Facilities of the Loan Parties located in Mechanicsburg, PA or Pittsburgh, PA or any of the closed Healthcare Facilities of the Loan Parties located in Monroeville, PA, Ruston, LA, Shreveport, LA (Main Campus) and McAllen, TX.

"Specified Sale" has the meaning assigned to such term in Section 4.27(a).

Error! Unknown document property name.

"Specified Sale and Leaseback" means a sale and leaseback transaction permitted by Section 5.14(a).

"Specified Sale Order" has the meaning assigned to such term in Section 4.27(c).

"Specified Transaction" means (a) any asset disposition involving all or substantially all of the assets of or all of the Equity Interests of any Subsidiary of a Borrower or any division, product line or facility used for operations of a Borrower or any of the Subsidiaries, or (b) the closure or discontinuing of operations of any Specified Facility.

"SPV" means any special purpose funding vehicle identified as such in a writing by any Lender to Agent.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of LifeCare Holdings or any other Borrower (including any other Borrower that is such a subsidiary).  Notwithstanding the foregoing (except for the definition of Unrestricted Subsidiary contained herein), an Unrestricted Subsidiary that is not a Loan Party, and (y) other than with respect to the pledge of their equity interests pursuant to the DIP Security Agreement, any member of the HHC Group, shall be deemed not to be a Subsidiary for purposes of this Agreement.

"Subsidiary Loan Party" means each Subsidiary in which LifeCare Holdings directly or indirectly owns at least 66- 2/3% of the voting or economic interest.

"Sweep Agreement" has the meaning assigned to such term in Section 4.17(f).

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including backup withholding) imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Facility Obligations" means, collectively, the Prepetition Second Term Facility Obligations and the Prepetition Priming Facility Obligations.

"Term Facility Agreements" has the meaning assigned to such term in the Prepetition Credit Agreement.

"Termination Date" means the earlier to occur of: (a) the Scheduled Termination Date; and (b) the date on which the Aggregate Revolving Loan Commitment shall terminate in accordance with the provisions of this Agreement.

"Trading With the Enemy Act" has the meaning assigned to such term in Section 3.20.

**Error! Unknown document property name.**

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Revolving Loans and the use of the proceeds thereof, (b) the filing and performance by each Loan Party of the Financing Orders, (c) the transactions related to or entered into in connection with the foregoing, and (d) the payment of fees, premiums, charges, costs and expenses in connection with the foregoing.

"TRICARE" means, collectively, a program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Departments of Defense, Health and Human Services and Transportation, and all laws applicable to such programs.

"UCC" means the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

"Unbilled Receivable" means an Account in respect of which the goods have been provided, or the services rendered, to the relevant customer or patient, rights to payment thereon have accrued, but the invoice has not been rendered to the applicable Account Debtor; *provided,* that a DNFB Receivables shall not be considered an Unbilled Receivable.

"United States" and "U.S." each means the United States of America.

"Unrestricted Subsidiary" means Hospital Acquisition Sub II LLC and Hospital Acquisition MI LLC and LifeCare Michigan Holdings, Inc.

"U.S. Lender Party" means each of Agent, each Lender, each L/C Issuer, each SPV and each participant, in each case that is a United States person as defined in Section 7701(a)(30) of the Code.

"Weekly Report" means a report to Agent, certified as accurate by Borrower Representative and in substantially the form attached hereto as Exhibit 11.1(e) or otherwise in form and substance reasonably acceptable to Agent, containing the Actual Total Operational Disbursements, actual Cumulative Net Cash Flow, Borrowing Base and Availability for the applicable Budget Testing Period, together with a variance analysis with respect to such Actual Total Operational Disbursements and actual Cumulative Net Cash Flow for such Budget Testing Period measured against the Budget, in form and substance acceptable to Agent.

"wholly owned" means with respect to a subsidiary of a Person, a subsidiary of such Person all of the outstanding Equity Interests of which (other than (a) director's qualifying shares and (b) shares issued to foreign nationals to the extent required by applicable law) are owned by such Person and/or by one or more wholly owned subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

"WOHCF" has the meaning set forth in the Preamble.

11.2     Other Interpretive Provisions.

(a)     Defined Terms.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any

Error! Unknown document property name.

certificate or other document made or delivered pursuant hereto.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall" Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  For the avoidance of doubt, the initial payments of interest and fees relating to the Obligations (other than amounts due on the Closing Date) shall be due and paid on the first day of the first month or quarter, as applicable, following the entry of the Obligations onto the operations systems of Agent, but in no event later than the first day of the second month or quarter, as applicable, following the Closing Date.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(c)    Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments, thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(d)    Laws.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(e)    [Reserved].

11.3    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided*, that (a) notwithstanding anything to the contrary herein, all accounting or financial

Error! Unknown document property name.

terms used herein shall be construed, and all financial computations pursuant hereto shall be made, without giving effect to any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Financial Accounting Standard having a similar effect) to value any Indebtedness or other liabilities of Parent Holdings, Holdings, any Borrower or any of the Subsidiaries at "fair value", as defined therein and (b), if Borrower Representative notifies Agent that Borrower Representative requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if Agent notifies Borrower Representative that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein or in the other Loan Documents, any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall not be treated as Indebtedness or as a capital lease and shall continue to be treated as an operating lease (and any future lease that would be treated as an operating lease for purposes of GAAP if it were in effect on the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any actual or proposed change in GAAP after the date hereof.

      11.4   <u>Payments</u>.  Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Loan Party or any L/C Issuer.  Any such determination or redetermination by Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Loan Party and no other currency conversion shall change or release any obligation of any Loan Party or of any Secured Party (other than Agent and its Related Parties) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

**[Signature Pages Follow.]**

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

BORROWERS:

LIFECARE HOLDINGS LLC, as Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____
FEIN: _____

[OTHER BORROWERS]

Address for notices:
5340 Legacy Drive, Suite 150
Plano, Texas 75024
Attention: Erik C. Pahl, General Counsel
Facsimile:

BORROWER REPRESENTATIVE:

LIFECARE HOLDINGS LLC, as Debtor and Debtor-in-Possession

By: _____
Name: _____
Title: _____
FEIN: _____

Address for notices:
5340 Legacy Drive, Suite 150
Plano, Texas 75024
Attention: Erik C. Pahl, General Counsel
Facsimile:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

WHITE OAK HEALTHCARE FINANCE, LLC, as Agent and as a Lender

By: _____
Name: _____
Title: _____

Address for Notices:

White Oak Healthcare Finance, LLC
900 Third Avenue, 18th Floor
New York, NY 10022
Email Address: jdufour@whiteoakhcf.com
Attention:  Healthcare Portfolio Management

with a copy to (which shall not constitute notice):

King & Spalding LLP
1185 Avenue of the Americas
New York, NY 10036
Email Address: tnovetsky@kslaw.com
Attention: Terry D. Novetsky, Esq.

with a copy to (which shall not constitute notice):

Cortland Capital Market Services
225 W. Washington Street, 9th Floor
Chicago, IL 60606
Email Address:
CortlandABLServices@cortlandglobal.com
legal@cortlandglobal.com
Attention: Agency Services- White Oak Healthcare Finance, LLC

[Signature Page to Credit Agreement]

**Schedule A**
**Borrowers**

1. New LifeCare Hospitals LLC
2. New LifeCare Hospitals of Chester County LLC
3. New LifeCare Hospitals of Milwaukee LLC
4. New LifeCare Hospitals of North Carolina LLC
5. New LifeCare Hospitals of Pittsburgh LLC
6. New LifeCare Management Services LLC
7. New NextCare Specialty Hospital of Denver LLC
8. New LifeCare REIT 1 LLC
9. New LifeCare Hospitals of Mechanicsburg LLC
10. New Pittsburgh Specialty Hospital LLC
11. New LifeCare Hospitals of Dayton LLC
12. New LifeCare Hospitals of Northern Nevada LLC
13. New LifeCare Hospitals of South Texas LLC
14. New LifeCare Hospitals of North Texas LLC
15. New San Antonio Specialty Hospital LLC
16. New LifeCare REIT 2 LLC
17. New LifeCare Hospital at Tenaya LLC
18. New LifeCare Hospitals of Sarasota LLC
19. LifeCare Behavioral Health Hospital of Pittsburgh LLC
20. LifeCare Pharmacy Services LLC

Schedule 1.1(a)
Revolving Loan Commitments

| Lender | Base Revolving Commitment | Incremental DIP-Base Commitment | Incremental DIP-Supplemental Commitment | Revolving Loan Commitment |
|---|---|---|---|---|
| White Oak Healthcare Finance, LLC | $42,700,000 | $10,000,000 | $5,000,000 | **$57,700,000** |

Schedule 1.1(b)
Existing Letters of Credit

| Loan Party | Beneficiary | Issuing Bank | L/C Number | Outstanding Amount | Expiration Date |
|---|---|---|---|---|---|
| LifeCare Holdings, Inc. | American Casualty Co of Reading, PA, Inc. | Capital One | 30099086 | $944,000.00 | 5/31/2019 |
| LifeCare Holdings, Inc. | MPT of Dallas LTACH, L.P. | Capital One | 30004867 | $4,007,735.76 | 5/31/2019 |
| LifeCare Holdings, Inc. | Welltower, Inc. | Capital One | 30004866 | $2,250,000.00 | 5/31/2019 |
| LifeCare Holdings, Inc. | Steadfast Insurance Company – Zurich | Capital One | 30099113 | $150,000.00 | 5/31/2019 |
| LifeCare Holdings, Inc. | State of Louisiana Patients' Compensation Fund | Capital One | 30099152 | $125,000.00 | 9/3/2019 |
| LifeCare Holdings, Inc. | Sentry Insurance A Mutual Company | Capital One | 30099124 | $2,475,000.00 | 8/10/2019 |

## **Exhibit B**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hospital Acquisition LLC, *et al.,*[1] | ) | Case No. 19-10998 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Re: Docket No. ___** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion ("**DIP Motion**") of Hospital Acquisition LLC ("**Hospital Acquisition**")[2] and certain of its affiliates, including LifeCare Holdings LLC ("**LifeCare Holdings**") (each a borrower, and together with LifeCare Holdings, collectively, the "**Borrowers**"), and Hospital Acquisition Intermediate Sub LLC ("**Holdings**"), as guarantor, who are each debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), seeking entry of an order (this "**Interim Order**")

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094). The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

[2]    Hospital Acquisition is a guarantor of the obligations under the DIP Facility.

01:24475658.1

pursuant to sections 105, 361, 362, 363, 364(c)(l), 364(c)(2), 364(c)(3), 364(d), 364(e), and 507 of title 11 of the United States Code ("**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware ("**Local Rules**"), *inter alia*:

(i)        authorizing the Debtors to obtain senior secured, postpetition financing on a superpriority basis consisting of a senior secured superpriority revolving credit facility ("**DIP Facility**")  pursuant to the terms and conditions of that certain *Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**DIP Agreement**"), by and among the Borrowers, Holdings (as guarantor), White Oak Healthcare Finance, LLC, as administrative agent, collateral agent and lender thereto (in such capacities, the "**DIP Agent**" or "**DIP Lender**"), substantially in the form of **Exhibit A**, attached to the DIP Motion[3];

(ii)        authorizing the Debtors to execute and deliver the DIP Agreement, the Intercreditor Consent and Acknowledgment (as herein defined), and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents (as defined in the DIP Agreement) and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, in accordance with the terms hereof and thereof, collectively, and together with the DIP Agreement, the "**DIP**

---

[3]    Subject to the entry of the Final Order, all Existing Debt (as defined herein) and all accrued and unpaid interest thereon and fees and expenses shall be fully-rolled into the DIP Facility and shall constitute DIP Obligations (as defined herein).

**Documents**") and to perform such other acts as may be necessary, desirable or appropriate in connection with the DIP Documents;

(iii)        granting to the DIP Lender on account of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Documents (collectively, and including all "Obligations" as defined in the DIP Agreement, the "**DIP Obligations**") allowed superpriority administrative expense claim status in each of the Cases and any Successor Cases (as defined herein), subject only to the Carve Out (as defined below);

(iv)        granting to the DIP Lender under the DIP Documents, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("**Cash Collateral**"), which liens shall be subject to the priorities set forth herein;

(v)        subject to the Final Order, authorizing the Debtors to cash collateralize the letters of credit issued pursuant to the Prepetition Facility (as defined below) pursuant to the terms of the Prepetition Loan Documents (as defined below);

(vi)        authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, this Interim Order and the DIP Documents;

(vii)        vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Documents and this Interim Order, including the turnover of cash collateral by the Borrowers to the Prepetition Lender (as defined herein) in repayment of the Existing Debt (as defined herein) owing under the Prepetition Facility;

(viii)    authorizing the Debtors to use, on the terms described herein, the Prepetition Collateral (as defined herein), including the Term Facility Priority Collateral as defined in the Revolving Intercreditor Agreement (as defined herein);

(ix)    providing adequate protection to the Prepetition Term Facility Lender Parties (as defined herein) for any diminution in value of their interests in the Term Facility Priority Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Term Facility Priority Collateral, and the priming of their respective interests in the Term Facility Priority Collateral (including by the Carve Out) ("**Diminution in Value**"); and

(x)    scheduling a final hearing ("**Final Hearing**") to consider the relief requested in the DIP Motion, on a final basis, and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the exhibits attached thereto, the *Declaration of Geoffrey Coutts In Support of Debtors' Motion For Interim and Final Orders (I) Authorizing Debtors To Obtain Postpetition Financing and Use Cash Collateral; (II) Granting Priming Liens and Providing Super Priority Claims, (III) Granting Adequate Protection to Prepetition Secured Parties; and (iv) Prescribing the Form and Manner of Notice and Setting the Time for the Final Hearing* ("**DIP Declaration**") and the *Declaration of James Murphy, Chief Executive Officer of Hospital Acquisition LLC, in Support of Chapter 11 Petitions and First Day Motions* ("**First Day Declaration**"), the DIP Documents, and the evidence submitted and arguments made at the interim hearing held on May 8, 2019 ("**Interim Hearing**");

and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and all parties-in-interest, and is essential for the preservation and continued operation of the Debtors' businesses and the maximization of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

**BASED UPON THE FOREGOING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.    **Filing Date**.  On May 6, 2019 ("**Filing Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    **Jurisdiction and Venue**.  This Court has jurisdiction over the Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Delaware ("**U.S. Trustee**") has not yet appointed an official committee of unsecured creditors in these Cases pursuant to section 1102 of the Bankruptcy Code ("**Committee**").

E.    **Notice**.  Notice of the DIP Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the DIP Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order is required.

F.    **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 41 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows (paragraphs F(i) through F(xiii) below are referred to herein, collectively, as the "**Debtors' Stipulations**"):

(i)    *Prepetition Facility*.  Pursuant to that certain Credit Agreement, dated as of August 10, 2018 (as amended, modified and supplemented prior to the Filing Date, the "**Prepetition Credit Agreement**", and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "**Prepetition Loan**

**Documents**"), among LifeCare Holdings as the borrower representative, the other borrowers party thereto from time to time, Holdings as guarantor, and White Oak Healthcare Finance, LLC, as administrative agent, collateral agent and lender party thereto (in such capacities, the "**Prepetition Agent**" or the "**Prepetition Lender**") the Prepetition Lender provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Borrowers pursuant to the Prepetition Loan Documents ("**Prepetition Facility**").

(ii)    *Existing Debt*. The Prepetition Facility provided the Borrowers with, among other things, up to $40,000,000 aggregate principal amount of Revolving Loan Commitments (as defined in the Prepetition Credit Agreement), including letters of credit obligations.  As of the Filing Date, the Borrowers under the Prepetition Facility were truly and justly indebted to the Prepetition Lender pursuant to the Prepetition Loan Documents, without defense, counterclaim, or offset of any kind, and the aggregate principal amount outstanding under the Prepetition Facility was approximately $26,721,070.08 in outstanding revolving loans and approximately $9,448,735.49 in issued and outstanding letter of credit obligations (collectively, together with accrued and unpaid interest, outstanding letters of credit and bankers' acceptances, any reimbursement obligations (contingent or otherwise) in respect of letters of credit and bankers' acceptances, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, yield maintenance fee, early termination fee, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrowers' obligations or Holdings' obligations (as guarantor) pursuant to, or secured

by, the Prepetition Loan Documents, including all "Obligations" as defined in the Prepetition Credit Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code (the "**Existing Debt**").

(iii)    *Prepetition Revolving Liens and Prepetition Revolving Collateral.* As more fully set forth in the Prepetition Loan Documents and the DIP Motion, prior to the Filing Date, the Borrowers and Holdings granted to the Prepetition Lender, a security interest in and continuing lien on ("**Prepetition Revolving Liens**") the Collateral as defined in the Prepetition Credit Agreement ("**Prepetition Revolving Collateral**").

(iv)    *Prepetition Term Facility Agreements.*  (a) Pursuant to that certain Credit Agreement, initially dated as of May 31, 2013 (as amended, modified and supplemented from time to time prior to the Filing Date, the "**Prepetition Second Term Facility Agreement**", and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "**Prepetition Second Term Facility Documents**"), among LifeCare Holdings as the borrower, Hospital Acquisition Intermediate Sub LLC as "Holdings" and the other guarantors party thereto,[5] and the lenders that are parties thereto from time to time ("**Prepetition Second Term Facility Lenders**") and Seaport Loan Products LLC, as administrative agent (in such capacity, "**Seaport**"), and Wilmington Trust, National

---

[5]    The other guarantors are New LifeCare Hospitals LLC, New LifeCare Hospitals of Chester County LLC, New LifeCare Hospitals of Milwaukee LLC, New LifeCare Hospitals of North Carolina LLC, New LifeCare Hospitals of Pittsburgh LLC, New LifeCare Management Services LLC, New NextCare Specialty Hospital of Denver LLC, New LifeCare REIT 1 LLC, New LifeCare Hospitals of Mechanicsburg LLC, New Pittsburgh Specialty Hospital LLC, New LifeCare Hospitals of Dayton LLC, New LifeCare Hospitals of Northern Nevada LLC, New LifeCare Hospitals of South Texas LLC, New LifeCare Hospitals of North Texas LLC, New San Antonio Specialty Hospital LLC, New LifeCare REIT 2 LLC, New LifeCare Hospital at Tenaya LLC, New LifeCare Hospitals of Sarasota LLC, LifeCare Behavioral Health Hospital of Pittsburgh LLC, LifeCare Pharmacy Services LLC (collectively with LifeCare Holdings, Holdings, as guarantor, and the other Loan Parties, the "**Prepetition Term Facilities Loan Parties**").

Association, as co-administrative agent and collateral agent for the Prepetition Second Term Facility Lenders (in such capacities, and together with Seaport, the "**Prepetition Second Term Facility Agents**" and together with the Prepetition Second Term Facility Lenders, the "**Prepetition Second Term Facility Lender Parties**"), the Prepetition Second Term Facility Lenders provided credit and other financial accommodations to LifeCare Holdings pursuant to the Prepetition Second Term Facility Documents ("**Prepetition Second Term Facility**"), and (b) pursuant to that certain Credit Agreement, dated as of August 10, 2018 (as amended, modified and supplemented from time to time prior to the Filing Date, the "**Prepetition Priming Term Loan Credit Agreement**",[6] and together with all documents, instruments, agreements, schedules and exhibits executed and/or delivered in connection therewith, the "**Prepetition Priming Facility Documents**," and with the Prepetition Second Term Facility Documents, the "**Prepetition Term Facility Documents**"), among the Prepetition Term Facilities Loan Parties, and the lenders that are parties thereto from time to time (the "**Prepetition Priming Term Facility Lenders**," and with the Prepetition Second Term Facility Lenders, the "**Prepetition Term Facility Lenders**") and Glas Trust Company LLC, as administrative agent and collateral agent for the Prepetition Priming Term Facility Lenders (in such capacity, the "**Prepetition Priming Term Facility Agent**" and together with the Prepetition Priming Term Facility Lenders, the "**Prepetition Priming Term Facility Lender Parties**"),[7] the Prepetition Priming Term Facility Lenders provided credit and other financial accommodations to LifeCare Holdings

---

[6]   The Prepetition Second Term Facility Agreement and the Prepetition Priming Term Loan Credit Agreement shall be referred to collectively as the "**Prepetition Term Facilities Agreements**".

[7]   The Prepetition Second Term Facility Agents and the Prepetition Priming Term Facility Agent shall be referred to collectively as the "**Prepetition Term Facility Agents**". The Prepetition Second Term Facility Lender Parties and the Prepetition Priming Term Facility Lender Parties shall be referred to herein as the "**Prepetition Term Facility Lender Parties**."

pursuant to the Prepetition Priming Facility Documents ("**Prepetition Priming Facility**," and with the Prepetition Second Term Facility, the "**Prepetition Term Facilities**").

        (v)    *Prepetition Priming Facility Obligations*. The Prepetition Priming Facility provided the Borrower (as defined in the Prepetition Priming Term Loan Credit Agreement) with a term loan facility in the aggregate amount of $15,000,000. As of the Filing Date, the Prepetition Term Facilities Loan Parties were truly and justly indebted to the Prepetition Priming Term Facility Lenders pursuant to the Prepetition Priming Facility Documents, without defense, counterclaim, or offset of any kind, and the aggregate principal amount outstanding under the Prepetition Priming Facility was no less than $7,656,642.60 (collectively, together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, yield maintenance fee, early termination fee, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of LifeCare Holdings' or the guarantors' obligations pursuant to, or secured by, the Prepetition Priming Facility Documents, including all "Obligations" as defined in the Prepetition Priming Term Loan Credit Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition Priming Facility Obligations**").

        (vi)    *Prepetition Second Term Facility Obligations*. The Prepetition Second Term Facility provided the Borrower (as defined in the Prepetition Second Term Facility

Agreement) with a term loan facility in the aggregate amount of $200,000,000.  As of the Filing

Date, the Prepetition Term Facilities Loan Parties were truly and justly indebted to the

Prepetition Second Lien Term Facility Lenders pursuant to the Prepetition Second Term Facility

Documents, without defense, counterclaim, or offset of any kind, and the aggregate principal

amount outstanding under the Prepetition Second Term Facility was not less than

$140,947,579(collectively, together with accrued and unpaid interest, any fees, expenses and

disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees,

appraisers' fees and financial advisors' fees, and related expenses and disbursements), treasury,

cash management, bank product and derivative obligations, indemnification obligations,

guarantee obligations, yield maintenance fee, early termination fee, and other charges, amounts

and costs of whatever nature owing, whether or not contingent, whenever arising, accrued,

accruing, due, owing, or chargeable in respect of any of LifeCare Holdings' or the guarantors'

obligations pursuant to, or secured by, the Prepetition Second Term Facility Documents,

including all "Obligations" as defined in the Prepetition Second Term Facility Agreement, and

all interest, fees (including amendment fees), prepayment premiums, costs and other charges

allowable under section 506(b) of the Bankruptcy Code, the "**Prepetition Second Term Facility**

**Obligations**" and, together with the Prepetition Priming Term Facility Obligations, the

"**Prepetition Term Facilities Obligations**").

(vii)    *Prepetition Term Facilities Liens and Prepetition Term Facilities*

*Collateral*.  As more fully set forth in the Prepetition Term Facility Documents and the DIP

Motion, prior to the Filing Date, each of the Prepetition Term Facilities Obligors granted to the

Prepetition Term Facility Agents, for the benefit of themselves and the Prepetition Term Facility

Lenders, a security interest in and continuing lien on ("**Prepetition Term Facilities Liens**") the

Collateral as defined in the Prepetition Term Facilities Agreements ("**Prepetition Term Facilities Collateral**," and with the Prepetition Revolving Collateral, the "**Prepetition Collateral**").

(viii)    *Priority of Prepetition Liens; Intercreditor Agreements.*    The Prepetition Agent, the Prepetition Term Facility Agents, and others are parties to that certain Intercreditor Agreement dated as of August 10, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms from time to time, the "**Revolving Intercreditor Agreement**"), which governs the respective rights, interests, obligations, priority and positions of the Prepetition Lender and the Prepetition Term Facility Lender Parties with respect to the assets and properties of the Debtors and other obligors.    Additionally, the Prepetition Priming Term Agent, the Prepetition Second Term Facility Agents and others are parties to that certain Term Loan Intercreditor Agreement, dated as of August 10, 2018 (as amended, restated, supplemented, or otherwise modified in accordance with its terms from time to time prior to the Petition Date, the "**Term Loan Intercreditor Agreement**" and, together with the Revolving Intercreditor Agreement, the "**Intercreditor Agreements**"), which governs the respective rights, interests, obligations, priority and positions of the Prepetition Priming Term Facility Lender Parties and the Prepetition Second Term Facility Lender Parties with respect to the assets and properties of the Debtors and other obligors.    Each of the Borrowers and Holdings acknowledged and agreed to the Intercreditor Agreements.

(ix)    *Validity, Perfection, and Priority of Prepetition Revolving Liens and Existing Debt.*    The Debtors acknowledge and agree that (a) the Prepetition Revolving Liens on the Prepetition Revolving Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair

consideration and reasonably equivalent value; (b) the Prepetition Revolving Liens were senior in priority over any and all other liens on the Prepetition Revolving Collateral other than valid and unavoidable Permitted Encumbrances (as defined in the Prepetition Loan Documents) specified in the Prepetition Loan Documents; (c) the Existing Debt constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Revolving Liens or Existing Debt exist, and no portion of the Prepetition Revolving Liens or Existing Debt is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Lender or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Facility; (f) the Debtors have waived, discharged, and released any right to challenge any of the Existing Debt, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Existing Debt; and (g) the aggregate value of the Prepetition Revolving Collateral exceeds the amount of the Existing Debt and the claims of the Prepetition Lender arising under, or secured by, the Prepetition Loan Documents constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

        (x)    *Validity, Perfection, and Priority of Prepetition Term Facilities Liens and Prepetition Term Facilities Obligations.*  The Debtors acknowledge and agree that (a) the Prepetition Term Facilities Liens on the Prepetition Term Facilities Collateral are valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Term Facility Agents (on behalf of the Prepetition Term Facility Lenders) for fair consideration and reasonably equivalent value; (b) subject to the priming of the Prepetition Term Facility Liens on the Prepetition Term Facility Collateral as provided herein and which has been consented to by the Prepetition Term Facility Lender Parties pursuant to that *Consent and Acknowledgment*, dated as of May 7, 2019, by and among the Debtors, the DIP Agent and the Prepetition Term Facility Agents ("**Intercreditor Consent and Acknowledgement**"), the Prepetition Term Facilities Liens were senior in priority over any and all other liens on the Prepetition Term Facilities Collateral other than valid and unavoidable Permitted Encumbrances (as defined in the Prepetition Term Facility Documents) specified in the Prepetition Term Facility Documents ("**Prepetition Term Loan Permitted Prior Liens**"); (c) the Prepetition Term Facilities Obligations are legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Prepetition Term Facility Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Facilities Liens or Prepetition Term Facilities Obligations exist, and no portion of the Prepetition Term Facilities Liens or Prepetition Term Facilities Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or

choses in action, including, without limitation, "lender liability" causes of action or avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Prepetition Term Facility Lender Parties or any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon or related to the Prepetition Term Facilities; and (f) the Debtors have waived, discharged, and released any right to challenge any of the Prepetition Term Facilities Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Prepetition Term Facilities Obligations.

(xi)    *No Control.*    None of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lenders controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted or is a control person or insider of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Documents, the Prepetition Facility, the Prepetition Loan Documents, the Prepetition Term Facilities and/or the Prepetition Term Facility Documents.

(xii)    *Cash Collateral.*    (a) All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, and (b) proceeds from the sale of the DIP Collateral and the Prepetition Collateral, constitutes Cash Collateral of the Prepetition Lender and the Prepetition Term Facility Agents (for the benefit of the Prepetition Term Facility Lender Parties).

(xiii)    *Default by the Debtors.*    The Debtors acknowledge and stipulate that (i) they are in default of their obligations under both the Prepetition Loan Documents and the Prepetition Second Term Facility Documents and (ii) an Event of Default has occurred under the

Prepetition Loan Documents and the Prepetition Second Term Facility Documents. Prior to the Filing Date, therefore, the revolving commitments under the Prepetition Facility were terminated, and interest was accruing on the Existing Debt at the default rate. In addition, as of March 30, 2019, due to the Debtors' failure to pay interest when due pursuant to the terms of the Prepetition Second Term Facility Agreement, interest was accruing on the Prepetition Second Term Facility Obligations at the default rate.

G.     **Permitted Encumbrances**. Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Encumbrance is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, except as expressly set forth herein, including without limitation in the Debtors' Stipulations set forth herein, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agent, the Prepetition Lender, the Prepetition Term Facility Lender Parties, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Encumbrance and/or security interests. The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Encumbrance; rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the DIP Liens as such claims had with respect to the Prepetition Revolving Liens under the Prepetition Loan Documents.

H.     **Findings Regarding Corporate Authority.** Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder and pursuant to this Interim Order.

I.     **Findings Regarding Postpetition Financing**

(i)      *Request for Postpetition Financing*.  The Debtors seek authority to (a) use Cash Collateral on the terms provided herein, and (b) enter into the DIP Facility on the terms provided herein and in the DIP Documents to refinance the Existing Debt, to administer their Cases, and to fund the Debtors' operations.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to the DIP Agent and be substantially in the form of the Interim Order, and with respect to any changes from the Interim Order, reasonably satisfactory to the Prepetition Term Facility Agents, and as it pertains to changes to Adequate Protection and use of Cash Collateral, in form and substance satisfactory to the Prepetition Term Facility Agents.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Priming of the Prepetition Term Facilities Liens*.  The priming of the Prepetition Term Facilities Liens on the Prepetition Term Facilities Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and creditors.  The Prepetition Term Facility Agents, for the benefit of themselves and the Prepetition Term Facility Lender Parties, are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any Diminution in Value of each of their respective interests in the Prepetition Term Facilities Collateral (including the Cash Collateral).

(iii)    *Need for Postpetition Financing*.  The Debtors have an immediate and critical need to obtain credit on an interim basis pursuant to the DIP Facility in order to, among other things, administer the Cases and preserve the value of their estates.  The ability of

the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.   The Debtors do not have sufficient available sources of working capital and financing to preserve the value of and operate their businesses or maintain their properties in the ordinary course of business simply by seeking the use of Cash Collateral.

(iv)   *No Credit Available on More Favorable Terms*.   The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.   Given their current financial condition, financing arrangements, and capital structure, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.   The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.   The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.   As described in the DIP Declaration, financing on a postpetition basis on better terms is not otherwise available without granting the DIP Lender: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in paragraph 6 hereof; (2) superpriority claims and liens; (3) the other protections set forth in this Interim Order; and (4) a full refinancing of the Existing Debt.

        (v)    *Use of Proceeds of the DIP Facility*.  As a condition to entry into the DIP Agreement, the extension of credit under the DIP Facility and the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Lender requires, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances as permitted in the DIP Agreement, and as set forth in paragraphs 19 and 20 hereof, the "**Budget**"),[8] solely for: (a) working capital and letters of credit, including, subject to the Final Order, the cash collateralization of letters of credits issued pursuant to the Prepetition Facility; (b) permitted payment of costs of administering the Cases, including any payments on account of the Adequate Protection described herein; (c) payment of such other prepetition obligations consented to by the DIP Agent in its sole discretion, and as approved by the Court; (d) payment of interest, fees and expenses (including without limitation, legal and other professionals' fees and expenses of the DIP Agent) and all other "Obligations" owed under the Prepetition Loan Documents and the DIP Documents; and (e) other general corporate purposes of the Debtors permitted by the Budget and the DIP Documents.

        (vi)    *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Agreement and the extension of credit under the DIP Facility, the Debtors and the DIP Lender have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of Prepetition Revolving Collateral in satisfaction of the Existing Debt

---

[8]    The initial Budget is attached to the DIP Agreement.

and the proceeds of the other DIP Collateral in accordance with this Interim Order and as provided in the DIP Documents.

J. **Adequate Protection of the Prepetition Term Facility Lender Parties.** The Prepetition Term Facility Agents, for the benefit of themselves and the Prepetition Term Facility Lender Parties, are each entitled to receive adequate protection to the extent of any Diminution in Value of their respective interests in the Prepetition Term Facilities Collateral as set forth in this Interim Order.  In addition, as a condition to the use of Cash Collateral after the occurrence of the DIP Repayment Event, the Debtors and Prepetition Term Facility Agents have agreed that as part of the adequate protection provided to the Prepetition Term Facility Lender Parties, proceeds of the DIP Collateral and the Prepetition Collateral shall be applied in a manner consistent with paragraph 16 of this Interim Order.

K. **Sections 506(c) and 552(b).**  In light of: (i) the DIP Lender's agreement that its liens and superpriority claims shall be subject to the Carve Out, (ii) the Prepetition Lender's agreement that its liens shall be subject to the obligations with respect to the Carve Out, and (iii) the Prepetition Term Facility Lender Parties' consent to the priming of the Prepetition Term Facilities Liens, (a) subject to entry of a Final Order, the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) subject to entry of a Final Order, the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L. **Good Faith of the DIP Lender.**

(i)      *Willingness to Provide Financing*.  The DIP Lender has indicated a willingness to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the DIP Facility and the DIP Documents, and the interest and fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, are appropriate for secured financing to debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the DIP Facility and the use of Cash Collateral to repay the Prepetition Facility were negotiated in good faith and at arms' length among the Debtors, the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties, with the assistance and counsel of their respective advisors.  The credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Lender and the Prepetition Lender within the meaning of section 364(e) of the Bankruptcy Code.

M.      **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

N.    **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to certain parties-in-interest, including: (i) the U.S. Trustee; (ii) those entities or individuals included on the Debtors' list of 30 largest unsecured creditors on a consolidated basis; (iii) counsel to the Prepetition Lender; (iv) counsel to the Prepetition Term Facility Agents; and (v) all other parties entitled to notice under the Local Rules.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the DIP Motion, the DIP Declaration, the First Day Declaration and the record before the Court with respect to the DIP Motion at the Interim Hearing, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED** that:

1.    **Interim Financing Approved.**  The DIP Motion is granted on an interim basis as set forth herein, the Interim Financing (as defined in paragraph 3 below) is authorized and approved, and the use of Cash Collateral to repay the Prepetition Facility on an interim basis is authorized, subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled.

**DIP Facility Authorization**

2.    **Authorization of the DIP Facility.**  The DIP Facility and the borrowings of the Interim Financing (as defined in paragraph 3 below) is hereby approved.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents

(including without limitation the Intercreditor Consent and Acknowledgement), and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined herein) described in and provided for by this Interim Order and the DIP Documents, including Hospital Acquisition (as guarantor) and Holdings (as guarantor) providing their joint and several guarantee of all of the DIP Obligations.  The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order and the DIP Documents, the principal, interest, fees, costs, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and payable and without need to obtain further Court approval, including, without limitation, closing fees, arrangement fees, letter of credit fees (including issuance, fronting, and other related charges), unused facility fees, continuing commitment fees, backstop fees, servicing fees, audit fees, appraisal fees, liquidator fees, structuring fees, administrative agent's fees and collateral agent's fees, subject to paragraph 41 herein, the reasonable and documented fees, costs and disbursements of the DIP Agent's attorneys, advisors, accountants, and other consultants, whether or not such fees arose before or after the Filing Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding

obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms.

3.    **Authorization to Borrow.** To prevent immediate and irreparable harm to the Debtors' estates, from the entry of this Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the Termination Date (as defined herein), and subject to the terms, conditions, limitations on availability and reserves (as applicable) set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow under the DIP Facility, in an aggregate outstanding principal amount so that the outstanding balance of the DIP Facility (after taking into account the repayment of the Existing Debt as authorized under the Interim Order, but without regard to the issued and outstanding letter of credit obligations) shall not exceed $27,000,000 (the "**Interim Financing**"), incurred pursuant to, and in accordance with, this Interim Order and the DIP Documents.

4.    **DIP Obligations.** The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee appointed in the Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon entry of this Interim Order, the DIP Obligations will include all loans, letter of credit reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender, in each case, under, or secured by, the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owing under the DIP Documents, and all cash

management and bank product exposure and hedging exposure and obligations to the extent provided under the DIP Documents. Upon entry of this Interim Order and the occurrence of the Closing Date (as defined in the DIP Agreement), all letters of credit issued for the account of the Debtors under the Prepetition Credit Agreement shall continue in place and all obligations under or in connection with such letters of credit shall be subject to the DIP Agreement and shall constitute DIP Obligations. In particular, subject to the Final Order, the Debtors are authorized and directed to cash collateralize the letters of credit issued under the Prepetition Credit Agreement. The Debtors (including Hospital Acquisition and Holdings, as guarantors) shall be jointly and severally liable for the DIP Obligations. The DIP Obligations shall be due and payable, without notice or demand, on the Termination Date. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens (as defined below), and including, subject to paragraph 11 herein, in connection with any adequate protection provided to the Prepetition Term Facility Lender Parties) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5. **DIP Liens.** In order to secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)

of the Bankruptcy Code, the DIP Lender is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "**DIP Liens**") all personal and real property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors (the "**DIP Collateral**"), including without limitation: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock or equivalents of each of its subsidiaries), hedge agreements, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by the Debtors, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) all proceeds of actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of DIP Collateral; (d) subject to entry of a Final Order, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents (other than actions brought pursuant to section 549 of the Bankruptcy Code); (e) subject to entry of a Final Order, the Debtors' rights under section 506(c) and 550 of the Bankruptcy Code and the proceeds thereof;

and (f) all other DIP Collateral that was not otherwise subject to valid, perfected, enforceable, and unavoidable liens on the Filing Date.  For the avoidance of doubt, DIP Collateral that is of a type that would be Term Facility Priority Collateral (as defined in the Intercreditor Agreements) shall constitute DIP Collateral.

6.    **DIP Liens Priority.**

(a)    Except for the obligations with respect to the Carve Out, the DIP Liens securing the DIP Obligations are valid, automatically and properly perfected, non-avoidable liens on all DIP Collateral and shall have the following priorities:

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority perfected lien on, and security interest in, all DIP Collateral that is not subject to a valid, perfected, enforceable and unavoidable lien or security interest in existence as of the Petition

Date;

(ii)    a perfected lien on, and security interest in, all DIP Collateral, including without limitation the Term Loan Priority Collateral (as defined in the Revolving Intercreditor Agreement), which DIP Liens shall, pursuant to section 364(d) of the Bankruptcy Code, be priming liens senior in priority to all other liens on the DIP Collateral, including, without limitation, the Prepetition Term Facilities Liens;

(b)    Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Cases or any Successor Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case),

and/or upon the dismissal of any of the Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. Notwithstanding anything contained in this Interim Order to the contrary, the DIP Liens held by the DIP Lender shall be (i) subject to the obligations with respect to the Carve Out, (ii) junior to the Permitted Encumbrances as set forth in the Prepetition Loan Documents, and (iii) junior to the liens held by the Prepetition Lender with respect to the Prepetition Revolving Collateral.

7.     **DIP Superpriority Claims.** Upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "**DIP Superpriority Claim**") for all DIP Obligations. Except for the obligations with respect to the Carve Out, the DIP Superpriority Claim shall have priority over any and all other obligations, liabilities and indebtedness of each Debtor, including without limitation any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Superpriority Claim.

8.     **No Obligation to Extend Credit.**  The DIP Lender shall have no obligation to make any loan or advance under the DIP Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent in accordance with the terms of the DIP Agreement.  There are no new letters of credit being issued under the DIP Agreement.

9.     **Use of Proceeds of DIP Facility.**  From and after the Filing Date, the Debtors shall use advances of credit under the DIP Facility in accordance with the Budget (subject to such variances as permitted in this Interim Order and in the DIP Agreement), only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the terms and conditions in this Interim Order and the DIP Documents.

10.     **Use of Cash Collateral.**  The Debtors are authorized and directed to use Cash Collateral relating to the Prepetition Revolving Collateral to repay the Existing Debt.  All other Cash Collateral may be used by the Debtors provided that such use is in accordance with the Budget.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Facility, the DIP Documents, and in accordance with the Budget.

11.     **Adequate Protection Liens.**  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Term Facility Lender Parties in the Prepetition Term Facilities Collateral against any Diminution in Value of such interests in the Prepetition Term Facilities Collateral, the Debtors hereby grant to the Prepetition Term Facility Agents, for the benefit of themselves and the Prepetition Term Facility Lender Parties, continuing, valid, binding, enforceable, non-avoidable, and automatically and

properly perfected postpetition security interests in and liens on the DIP Collateral (the "**Adequate Protection Liens**").

12.     **Priority of Adequate Protection Liens.**

(a)     The Adequate Protection Liens are valid, automatically and properly perfected, non-avoidable liens that shall be subject and subordinate to the Carve Out and shall otherwise be junior only to the DIP Liens, the Prepetition Revolving Liens held by the Prepetition Lender in the Prepetition Revolving Collateral, and the Permitted Encumbrances. The Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the Debtors' assets.

(b)     Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases. The Adequate Protection Liens shall not be subject to (i) section 510(c) of the Bankruptcy Code with respect to the obligations owed to the Prepetition Term Facility Lender Parties, and (ii) sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Adequate Protection Liens.

13.     **Prepetition Term Facility Adequate Protection Priority Claim.**  As further adequate protection of the interests of the Prepetition Term Facility Lender Parties in the Prepetition Term Facilities Collateral against any Diminution in Value of such interests in the Prepetition Term Facilities Collateral, the Prepetition Term Facility Agents, on behalf of themselves and the Prepetition Term Facility Lender Parties, are hereby granted as and to the

extent provided by section 507(b) of the Bankruptcy Code an allowed priority administrative expense claim in each of the Cases and any Successor Cases (the "**Prepetition Term Facility Adequate Protection Priority Claim**").

14.    **Priority of the Prepetition Term Facility Adequate Protection Priority Claim.**  Except as set forth herein, the Prepetition Term Facility Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 506(c) (subject to entry of the Final Order), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 of the Bankruptcy Code; *provided, however*, that the Prepetition Term Facility Adequate Protection Priority Claim shall be subject and subordinate to the Carve Out, junior to the DIP Superpriority Claim, and subject to the lien priorities set forth herein.

15.    **Professional Fees of Prepetition Term Facility Lender Parties.**  As additional adequate protection, the Debtors shall pay the reasonable and documented accrued fees and expenses of (i) Ropes & Gray LLP, in its capacity as counsel to the Prepetition Priming Term Facility Lenders, in an amount not to exceed $55,000 per month, (ii) one local counsel retained by the Prepetition Priming Term Facility Lenders, in an amount not to exceed $10,000 per month, (iii) Thompson Hine LLP, in its capacity as counsel to the Prepetition Priming Term Facility Agent, in an amount not to exceed $20,000 per month, (iv) Shearman & Sterling LLP, in its capacity as counsel to the Prepetition Second Term Facility Agent, in an amount not to exceed $110,000 per month, (v) one local counsel retained by the Prepetition Second Term Facility Agent, in an amount not to exceed $10,000 per month, and (vi) Stout Risius Ross Advisors,

LLC, in its capacity as financial advisors to the Prepetition Second Term Facility Agent, in an amount not to exceed $30,000 per month (collectively, the "**Prepetition Term Facility Lender Parties Advisors**"); provided, however, that if a Prepetition Term Facility Lender Parties Advisor's documented fees and expenses in any month (a) are less than its designated limit, then the difference between the designated amount and the actual amount shall roll over to the following month and (b) exceed its designated limit, then any such excess amounts may be paid in subsequent months so long as the Debtors' payment in the subsequent month does not exceed the monthly payment cap (including any rollover from the prior amounts).  Professionals for the Prepetition Priming Term Facility Agent and the Prepetition Second Term Facility Agents shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide copies of its invoices (which shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee, counsel for the DIP Agent, and counsel for a Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  Any objections raised by the Debtors, the U.S. Trustee, the DIP Agent or a Committee (if appointed) with respect to the Debtors' payment of the amounts in such invoices must be filed with the Court and served within ten (10) days of such party's receipt of such invoice, and any such objection shall be subject to resolution by the Court.  Pending such resolution, the

undisputed portion of any such invoice will be paid promptly by the Debtors.  In addition, as part of the adequate protection provided to the Prepetition Term Facility Lender Parties hereunder, and subject to the rights preserved in paragraph 41 below, the Debtors are authorized to pay the Prepetition Term Facility Agents pursuant to the Interim Order a sum not greater than $531,000 for pre-Filing Date services rendered to the Prepetition Term Facility Agents.

16. **Use of Collateral Proceeds.**  As further adequate protection, and subject to the rights preserved in paragraph 41 below, as of and commencing on the date of the Interim Hearing, and subject to the Carve Out, all net proceeds of the DIP Collateral and Prepetition Collateral, including whether sold in the ordinary course, liquidated or otherwise, shall be applied as follows: (i) *first*, to permanently reduce the Existing Debt until indefeasibly paid in full in cash (including provision for contingent obligations); (ii) *second*, to reduce the DIP Obligations until indefeasibly paid in full in cash (including provision for contingent obligations); (iii) *third*, to indefeasibly pay in full in cash all Prepetition Priming Facility Obligations due and owing under the Prepetition Priming Facility Documents, and (iv) *fourth*, to pay the Prepetition Second Term Facilities Obligations due and owing under the Prepetition Second Term Facility Documents.

17. **Adequate Protection Reservation.**  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Term Facility Lender Parties hereunder is insufficient to compensate for any Diminution in Value during the Cases or any Successor Cases.  Additionally, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Term Facility Lender Parties to request additional or different forms of adequate protection that, until the DIP Facility and the Existing Debt have

been indefeasibly paid in full and in cash (a "**DIP Repayment Event**"), is junior to the DIP Liens and the DIP Obligations.

**Provisions Common to DIP Financing**

18.    **Amendment of the DIP Documents.**    The DIP Documents may from time to time be amended, modified, or supplemented by the parties thereto, upon consultation by the Debtors with the Prepetition Term Facility Agents, without further order of the Court if the amendment, modification, or supplement is (a) immaterial or non-adverse to the Debtors and (b) in accordance with the DIP Documents.    It is expressly understood when this Interim Order refers to consultation by the Debtors with the Prepetition Term Facility Agents, that such consultation does not provide the Prepetition Term Facility Agents with approval rights in respect of the subject matter being discussed.    In the case of a material amendment, modification, or supplement to the DIP Documents that is adverse to the Debtors' estates, the Debtors shall provide notice (which shall be provided through electronic mail) to counsel to the Prepetition Term Facility Agents, counsel to a Committee (if appointed) and the U.S. Trustee (collectively, the "**Notice Parties**"), each of whom shall have five (5) days from the date of such notice to object in writing to such amendment, modification or supplement.    If all Notice Parties indicate that they have no objection to the amendment, modification or supplement (or if no objections are timely received), the Debtors may proceed to execute the amendment, modification or supplement, which shall become effective immediately upon execution.    If a Notice Party timely objects to such amendment, modification or supplement, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification or supplement.    Any material modification, amendment or supplement that becomes effective in accordance with this paragraph 18 shall be filed with the Court.

19. **Budget Maintenance.** The use of borrowings and letters of credit under the DIP Facility shall be in accordance with the Budget and this Interim Order, as described in paragraph 20 below, depicting on a weekly and line by line basis, (a) projected cash receipts, (b) projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Debtors' professionals and advisors), asset sales and any other fees and expenses relating to the DIP Documents), (c) projected net cash flow, (d) projected Borrowing Base and Availability (each as defined in the DIP Agreement), and (e) total available liquidity, each for the term of the DIP Facility that shall be in form and substance satisfactory to, and approved by the DIP Agent in its sole discretion prior to the Closing Date. The Budget shall be updated on the seventh (7th) business day of each month and may be further updated and revised by the Debtors from time to time, in each case, in form and substance approved by the DIP Lender with all changes subject to the satisfaction and approval of the DIP Lender, and upon approval of such revised budget, it shall become the Budget. In connection with delivery of an updated Budget, the Debtors shall clearly identify to the DIP Lender any changes made from the prior Budget, with an appropriate explanation as to the need for all changes or changes in the Debtors' expectations, which changes shall in all respects be satisfactory to the DIP Lender. On the third business day of each week and as provided in the DIP Agreement, the Debtors shall deliver to the DIP Agent and the Prepetition Term Facility Agents a variance analysis with respect to the Debtors' actual cash receipts, collections and disbursements during the prior week measured on a line item basis against the Budget and indicate whether it is in compliance with the Budget and the terms of the DIP Facility, in each case in form and substance satisfactory to the DIP Lender. No updated, modified or supplemented budget shall be effective until so approved and once approved shall be deemed the

"Budget" and the Debtors shall endeavor to consult with the Prepetition Term Facility Agents prior to agreeing to material changes to the Budget, but such consultation by the Debtors will not confer approval rights to the Budget on the Prepetition Term Facility Agents; *provided, however* that in the event that the DIP Agent and the Debtors cannot agree as to an updated, modified or supplemented budget, the prior approved Budget shall continue in effect, with weekly details for any periods to be derived in a manner reasonably satisfactory to the DIP Agent from the budget prepared by the Debtors (and approved by the DIP Agent in its sole discretion prior to the Closing Date) for these Cases. A copy of any Budget (or updated Budget) shall be delivered to counsel to the Prepetition Term Facility Agents, counsel for a Committee (if appointed) and the U.S. Trustee promptly after (or if) it has been approved by the DIP Agent. In connection with the reconciliation set forth above, the Debtors shall represent that they are, and for all relevant times, expect to be in compliance with the Budget.

20. **Budget Compliance.** The Debtors shall not, without the consent of the DIP Agent and consultation with the Prepetition Term Facility Agents: (a) pay any expenses or make any other operating disbursements other than as set forth in the Budget, subject to Permitted Variances (as defined in the DIP Agreement), and (b) permit aggregate cash receipts, for any time period, to be less than the levels set forth in the Budget for the corresponding period, subject to Permitted Variances. The Debtors shall, (i) furnish to the DIP Agent and the Prepetition Term Facility Agents an updated Budget on the seventh Business Day of each month, which Budget (A) shall be supported by details on a facility basis, and (B) shall be compared to actual cash flows on (at least) a weekly basis with proposed revisions (x) on at least a monthly basis, and (y) at least five Business Days prior to the proposed consummation of any Disposition; (ii) on the third Business Day of each week on a rolling basis, deliver to the DIP Agent and the

Prepetition Term Facility Agents, a Weekly Report (as defined in the DIP Agreement) reflecting the prior weeks' variances, together with a variance analysis, with respect to Borrowers actual cash receipts, collections and disbursements during the prior week measured on a line item basis against the Budget and indicate whether it is in compliance with the Budget and the terms of the DIP Facility; and (iii) not later than the fifth Business Day immediately prior to any proposed Disposition, the Debtors shall provide the DIP Agent and the Prepetition Term Facility Agents with a fully updated Budget reflecting on a projected basis such proposed Disposition and its impact, including the impact on the Borrowing Base, the proposed reduced Revolving Loan Commitments in connection with the proposed Disposition, and such other information and reporting as requested by DIP Agent, which information shall also be provided by the Debtors to the Prepetition Term Facility Agents.

21.    **Modification of Automatic Stay.**    The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claim, and Prepetition Term Facility Adequate Protection Priority Claim; (b) permit the Debtors to perform such acts as the DIP Agent, the Prepetition Agent and the Prepetition Term Facility Agents each may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; and (d) authorize the Debtors to pay, and the DIP Lender and the Prepetition Lender to retain and apply, payments made in accordance with the terms of this Interim Order and the DIP Documents. In particular, the Debtors are authorized and

directed to turn over the proceeds of the Prepetition Revolving Collateral to the Prepetition Lender in repayment of the Prepetition Facility.

22. **Perfection of DIP Liens and Adequate Protection Liens.** This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or mortgage) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Adequate Protection Liens, or to evidence or entitle the DIP Lender and the Prepetition Term Facility Lender Parties to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Term Facility Agents are authorized to file, in the applicable registries of deeds and other appropriate public records, as it in its sole discretion deems necessary or advisable, (i) notice of this Interim Order, and (ii) such financing statements, security agreements, mortgages, leasehold mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, leasehold mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Filing Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Term Facility Agents all such financing statements, mortgages, leasehold mortgages, notices, and other documents as the

DIP Agent or the Prepetition Term Facility Agents may reasonably request.  Each of the DIP Agent and the Prepetition Term Facility Agents, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instrument.  To the extent that the Prepetition Agent or a Prepetition Term Facility Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other collateral documents or relevant Prepetition Term Facility Document, then automatically and without further action, (i) the DIP Agent shall be deemed to be a secured party under such documents, (ii) the DIP Facility, together with any refinancings or replacements thereof, shall be deemed to be secured obligations under such documents, and (iii) the applicable provisions of such documents shall apply to the DIP Facility; all as fully and completely as if the DIP Agent was an original secured party in such documents and the DIP Facility was an original secured obligation in such documents.  To the extent any of the Prepetition Term Facility Agents are listed as loss payee, lender loss payee, mortgagee or additional insured under any of the Debtors' insurance policies, the DIP Agent shall also be deemed to be the secured party under such documents or to be the loss payee, lender loss payee, mortgagee or additional insured, as applicable.

23.    **No Transfers to HHC Group**.  As an additional form of adequate protection to the Prepetition Term Facility Agents, the Debtors agree not to transfer any cash or property to any member of the HHC Group (as defined in the DIP Agreement) without first obtaining the written consent of the DIP Agent and the Prepetition Term Facility Agents.

24.    **Protections of Rights of DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties.**

(a)    Unless the DIP Agent, the Prepetition Agent or the Prepetition Term Facility Agents, as applicable, shall have provided their prior written consent, or all DIP Obligations, all Existing Debt (excluding contingent indemnification obligations for which no claim has been asserted) and all Prepetition Term Facilities Obligations have been, or contemporaneously will be, indefeasibly paid in full in cash and the lending commitments under the DIP Facility have terminated, in any of these Cases or any Successor Cases, the Debtors shall neither seek entry of, nor support any motion or application seeking entry of, and otherwise shall object to any motion or application seeking entry of, any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral, Prepetition Revolving Collateral or the Prepetition Term Facilities Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, the DIP Superpriority Claims, the Prepetition Revolving Liens, the Adequate Protection Liens, and/or the Prepetition Term Facility Adequate Protection Priority Claim; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iii) subject to the entry of a Final Order, except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor or any creditor's taking any setoff against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code; or (iv) any modification of any of the DIP Lender's, the Prepetition Lender's

or the Prepetition Term Facility Lender Parties' rights under this Interim Order, the DIP Documents, the Prepetition Loan Documents or the Prepetition Term Facility Documents, as applicable, with respect to any DIP Obligations, Existing Debt or the Prepetition Term Facilities Obligations.  It shall be an Event of Default under the DIP Documents and this Interim Order, and terminate the Debtors' use of Cash Collateral, if, in any of these Cases or any Successor Cases, any order is entered granting any of the relief enumerated in provisions (i) through (iv) of the previous sentence.

(b)     No Debtor shall object to the DIP Lender credit bidding up to the full amount of the applicable outstanding DIP Obligations, including any accrued interest and expenses, in any sale of any DIP Collateral, whether such sale is effectuated through section 363 or section 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

25.     **Credit Bidding.**  In connection with any sale process authorized by the Court, (i) the DIP Lender and (ii) subject to entry of a Final Order and to the rights preserved in paragraph 41, the Prepetition Agent, the Prepetition Term Facility Lender Parties, or any assignee or designee of any of the foregoing, shall be authorized to credit bid, consistent with the applicable DIP Documents and/or Prepetition Loan Documents, some or all of their claims for their respective priority collateral (each a "**Credit Bid**") pursuant to section 363(k) of the Bankruptcy Code, subject to the provision of consideration sufficient to satisfy the Carve Out and any senior liens on the collateral that is subject to the Credit Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion.  Each of the Prepetition Lender, the Prepetition Term Facility Lender Parties, and the DIP Lender shall be

deemed a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by Credit Bid.

26.     **Proceeds of Subsequent Financing.**  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c), or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full of all DIP Obligations, and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, and such facilities are secured by any DIP Collateral, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this Interim Order and the DIP Documents.

27.     **Cash Collection.**

(a)     From and after the date of the entry of this Interim Order, all collections and proceeds of any DIP Collateral or Prepetition Collateral or services provided by any Debtor and all Cash Collateral (except as otherwise set forth in the DIP Agreement) that shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition Loan Documents or Prepetition Term Facility Documents (or in such other accounts as are designated by the DIP Agent from time to time) (collectively, the "**Cash Collection Accounts**"), which accounts (except as otherwise set forth in the DIP Agreement) shall be subject to the sole dominion and control of the DIP Agent; *provided* that

upon the occurrence of a DIP Repayment Event, the Debtor and the DIP Agent shall effectuate the assignment of the dominion and control over the Cash Collection Accounts to the Prepetition Term Facility Agents (the "**Transition**").  For the avoidance of doubt, the Prepetition Term Facility Lender Parties shall have a junior and subordinate interest in such Cash Collection Accounts until the occurrence of a DIP Repayment Event, upon which time the Prepetition Term Facility Lender Parties shall have a first priority security interest in such Cash Collection Accounts.

(b)    Until the occurrence of a DIP Repayment Event, all proceeds and other amounts in the Cash Collection Accounts shall be remitted to the DIP Agent for application in accordance with the DIP Documents and this Interim Order.  Specifically, that means the proceeds of the Prepetition Revolving Collateral shall be used to repay the Prepetition Facility and the proceeds of the remaining DIP Collateral shall be applied to repay the DIP Facility. Indefeasible payment shall include the concept that any obligations that the DIP Lender and the Prepetition Lender have with respect to the Carve Out have been fully satisfied.  With respect to repayments of the DIP Facility, the net cash proceeds of the sale of equity or material interests outside the ordinary course of business shall be applied as follows:  *first*, as a permanent reduction of the DIP Obligations made after the Filing Date to the extent that such DIP Obligations exceed the amount owed to the Prepetition Lender as of the Filing Date ("**Incremental DIP Advances**"); *second*, the remaining DIP Obligations shall be permanently reduced dollar for dollar until the DIP Obligations outstanding shall equal the adjusted amount of maximum DIP Obligations (such reduction amounts to be set forth in and consistent with the revised Budget that shall be provided by the Borrowers and reflecting the sale of equity or material assets or such other circumstance resulting in such prepayment) and otherwise

43

consistent with the DIP Agreement.  Upon the occurrence a DIP Repayment Event, all proceeds and other amounts in the Cash Collection Accounts shall be disbursed in accordance with this Interim Order, the Budget and such further orders of the Court.  Unless otherwise agreed to in writing by the DIP Agent, or otherwise provided for herein, the Debtors shall maintain no accounts except those identified in any cash management order entered by the Court (a "**Cash Management Order**").  The Debtors and the financial institutions where the Debtors' Cash Collection Accounts are maintained (including those accounts identified in any Cash Management Order) are authorized and directed to remit, without offset or deduction, funds in such Cash Collection Accounts upon receipt of any written direction to that effect from the DIP Agent, and following the Transition, only upon written direction from the Prepetition Term Facility Agents.

28.    **Maintenance of DIP Collateral.**    The Debtors shall take all steps necessary to preserve, maintain and maximize the value of the DIP Collateral, including but not limited to: (a) insure the DIP Collateral as required under the DIP Facilities, the Prepetition Loan Documents or the Prepetition Term Facility Documents, as applicable; and (b) maintain the cash management system which has been agreed to by the DIP Agent.

29.    **Disposition of DIP Collateral.**    The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Agent or from any order of this Court) and after prior consultation with the Prepetition Term Facility Agents (which consultation shall not constitute approval rights), except as otherwise permitted by the DIP Documents or otherwise ordered by the Court.

30. **Termination Date.** On the Termination Date (as defined herein): (a) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the applicable DIP Facility will terminate, other than as required in paragraph 38 with respect to the Carve Out, all treasury and cash management, hedging obligations and bank product obligations constituting Obligations (as defined in the DIP Agreement) shall be cash collateralized, and all letters of credit and bankers' acceptances outstanding that are not otherwise cash collateralized shall be cash collateralized in an amount equal to 102% of the face amount thereof or as otherwise required by the letter of credit issuer; (b) all authority to use Cash Collateral shall cease, *provided, however*, that during the Remedies Notice Period (as defined herein), the Debtors may use Cash Collateral to pay payroll obligations (other than severance), sales taxes and other necessary expenses that are deemed critical to keeping the Debtors' business operating subject to the DIP Agent's reasonable consent and all in accordance with the Budget; and (c) upon the expiration of the Remedies Notice Period and satisfaction of the Carve Out funding obligations set forth in paragraph 38, the DIP Agent shall be entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order (including paragraph 32). For the purposes of this Interim Order, **Termination Date**" shall mean the "Termination Date" as defined in the DIP Agreement.

31. **Events of Default.** The occurrence of any of the following events, unless waived by the DIP Agent in writing and in accordance with the terms of the DIP Agreement, shall constitute an event of default (an "**Event of Default**") of this Interim Order: (i) the failure of the Debtors to perform or meet any of the terms, provisions, covenants, or obligations under this Interim Order (which will be subject to a three (3) business day cure period to the extent that the Debtors' failure to comply with the terms, provisions, covenants, or obligations under this

Interim Order, which the Debtors failed to comply with, can be reasonably cured during such time period), including the failure to comply with the Milestones (as defined in section 4.27 of the DIP Agreement attached to the DIP Motion), or (ii) the occurrence of an "Event of Default" under the DIP Agreement.

32.    <strong><u>Rights and Remedies Upon Event of Default</u></strong>.

(a)    Immediately upon the occurrence and during the continuation of an Event of Default under any of the DIP Documents or this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the DIP Agent may declare (any such declaration shall be referred to herein as a "**Termination Declaration**") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable (including the cash collateralization of all outstanding letters of credit in accordance with the DIP Documents to the extent not already done), (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, subject to the obligations with respect to the Carve Out, and (iii) termination of the DIP Facility and any other DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Prepetition Term Facility Agents, counsel to a Committee (if appointed), and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the DIP Lender is hereby modified so that three (3) days after the date a Termination Declaration is delivered (the "**Remedies Notice Period**") the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and this

Interim Order to satisfy the DIP Obligations, DIP Superpriority Claim and DIP Liens, subject to the Carve Out.  During the Remedies Notice Period, the Debtors, a Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court.  Unless the Court orders otherwise, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order.  Upon expiration of the Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein, in the DIP Documents and as otherwise available at law without further order of or application or motion to the Court.

(b)    Following the occurrence of a DIP Repayment Event, and immediately upon the occurrence and during the continuation of an Cash Collateral Termination Event under this Interim Order, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the Prepetition Term Facility Agents may declare (any such declaration shall be referred to herein as a "**Cash Collateral Termination Declaration**") that the Debtors' authorization to use Cash Collateral has terminated.  The Cash Collateral Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to a Committee (if appointed), and the U.S. Trustee.  The automatic stay in the Cases otherwise applicable to the Prepetition Term Facility Agents is hereby modified so that three (3) days after the date a Cash Collateral Termination Declaration is delivered (the "**Cash Collateral Remedies Notice Period**") the Prepetition Term Facility Agents shall be entitled to exercise their rights and remedies in accordance with the Prepetition Term Facility Documents and this Interim Order to satisfy the Prepetition Term Facility Obligations, Adequate Protection Superpriority Claim and the Adequate Protection Liens, subject to the Carve Out.

During the Cash Collateral Remedies Notice Period, the Debtors, a Committee (if appointed) and/or any party in interest shall be entitled to seek an emergency hearing within the Cash Collateral Remedies Notice Period with the Court.  Unless the Court orders otherwise, the automatic stay, as to the Prepetition Term Facility Agents, shall automatically be terminated at the end of the Cash Collateral Remedies Notice Period without further notice or order.  Upon expiration of the Cash Collateral Remedies Notice Period, the Prepetition Term Facility Agents shall be permitted to exercise all remedies set forth herein, in the Prepetition Term Facility Documents and as otherwise available at law without further order of or application or motion to the Court.

33.    **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.**  The DIP Lender (in its capacity as such and in its capacity as DIP Agent) has acted at arms' length and in good faith in connection with this Interim Order and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, any modification, amendment, reversal or vacatur by subsequent order of this Court or any other court shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

34.    **DIP and Other Expenses; Procedures for Payment of DIP Lender's Professional Fees and Expenses.**  The Debtors are authorized and directed to pay all reasonable and documented prepetition and postpetition fees and expenses of the DIP Lender in connection with the DIP Facilities (as such may change from time to time), as provided in the DIP Documents.  Payment of all professional fees and expenses of the DIP Lender addressed in this

Interim Order (including the Revolving Advisors) shall not be subject to allowance by the Court. Professionals for the DIP Lender shall not be required to comply with the U.S. Trustee fee guidelines, however any time that such professionals seek payment of fees and expenses from the Debtors, each professional shall provide copies of its invoices (which shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to the U.S. Trustee,  and counsel for a Committee (if appointed) contemporaneously with the delivery of such fee and expense statements to the Debtors.  Any objections raised by the Debtors, the U.S. Trustee,  or a Committee (if appointed) with respect to the Debtors' payment of the amounts in such invoices must be filed with the Court and served within ten (10) days of such party's receipt of such invoice, and any such objection shall be subject to resolution by the Court.  Pending such resolution, the undisputed portion of any such invoice will be added to the DIP Obligations and paid promptly by the Debtors.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs and expenses, including fees and expenses of counsel, of the DIP Lender and the Prepetition Lender incurred on or prior to such date without the need for any professional engaged by the DIP Lender or the Prepetition Lender to first deliver a copy of its invoice as provided for herein.

   35. **Indemnification.**  The Debtors shall indemnify and hold harmless the DIP Lender in accordance with the terms and conditions of the DIP Agreement.

36. **Proofs of Claim.** Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Cases or any Successor Cases to the contrary, the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties will not be required to file proofs of claim in any of the Cases or Successor Cases for any claims arising under the DIP Documents, the Prepetition Loan Documents or Prepetition Term Facility Documents, as applicable. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Lender, the Prepetition Lender, and the Prepetition Term Facility Lender Parties with regard to all claims arising under the DIP Documents, the Prepetition Loan Documents or the Prepetition Term Facility Documents, as applicable. Notwithstanding the foregoing, the Prepetition Lender and the Prepetition Term Facility Agents are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) proofs of claim and/or aggregate or master proofs of claim in each of the Cases or Successor Cases for any claim described herein (with any such aggregate or master proof of claim filed in the Cases deemed to be filed in all Cases of the Debtors and asserted against all of the Debtors). Any proof of claim filed by the Prepetition Lender and/or the Prepetition Term Facility Agents shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by the Prepetition Lender or the Prepetition Term Facility Agents. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall not apply to any claim of the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

37.    **Rights of Access and Information; Financial Reporting.**    The Prepetition Term Facility Agents, as an additional form of adequate protection, shall have the same rights of access, information and financial reporting as afforded to the DIP Lender herein and under the DIP Loan Documents.   Without limiting the rights of access and information afforded the DIP Lender under the DIP Documents, the Debtors and their agents and advisors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Lender, the Prepetition Term Facility Agents, and their respective advisors reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents, including, without limitation, (a) upon reasonable advance notice, permit the DIP Agent and/or the Prepetition Term Facility Agents to conduct, at their discretion and at the Debtors' cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals at reasonable times in respect of any or all of the DIP Collateral; and (b) reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers and consultants, to cooperate, consult with, directly communicate with and provide to the DIP Agent, the Prepetition Term Facility Agents and their respective advisors all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors.

38.    **Carve Out.**

(a)    Subject to the terms and conditions set forth herein, the DIP Liens, the DIP Superpriority Claims, the Prepetition Revolving Liens, the Prepetition Term Facilities Liens, the Adequate Protection Liens and the Prepetition Term Facility Adequate Protection Claim shall all be subject to the payment of the following fees and expenses (the "**Carve Out**"):

(i)　　　Allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of this Court, and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

(ii)　　　on account of unpaid Court-allowed fees and expenses of a trustee appointed under section 726(b) of the Bankruptcy Code in an amount not to exceed $10,000,

(iii)　　　to the extent allowed at any time, whether by interim or final order, procedural order, or any other order of the Court, all accrued and unpaid fees, costs and expenses (including any sale transaction fee payable out of the proceeds of a consummated sale, and after indefeasible payment in full of the DIP Obligations, any restructuring or success based fee) ("**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors (the "**Debtor Professionals**"), any official committee of unsecured creditors appointed in the Cases (the "**Committee**" and, such retained persons or firms, the "**Committee Professionals**"), and any patient care ombudsman appointed in the Cases (the "**Ombudsman**" and, together with the Debtor Professionals and the Committee Professionals, the "**Professional Persons**") at any time prior to the delivery of a Carve Out Trigger Notice; *provided, however*, that each Professional Person must be retained under sections 327, 328, 333 or 1103 of the Bankruptcy Code, as applicable, at any time, whether prior to or after the delivery of a Carve Out Trigger Notice; *provided further* that the obligations of the DIP Lender with respect to the Carve Out for legal fees, costs and expenses prior to the delivery of the Carve Out Trigger Notice (as defined herein) shall be limited in all respects to the aggregate amount required to be funded into the Professional Fee Escrow Account (as defined herein) as set forth herein prior to the earlier of (a)

the occurrence of the DIP Repayment Event , and (b) the date of the delivery of a Carve Out Trigger Notice. (such amount shall be referred to as the "**DIP Lender Carve Out Amount**",

(iv)     to the extent allowed at any time, whether by interim or final order, procedural order, or any other order of the Court, Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $350,000 incurred after the delivery of a Carve Out Trigger Notice (the amount set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"); );

(v)     The term "**Carve Out Trigger Notice**" shall mean a written notice delivered by e-mail transmission (or other electronic means) by the DIP Agent or, following a DIP Repayment Event and termination of the DIP Facility, the Prepetition Term Facility Agents, to the Debtors, the Debtors' lead restructuring counsel, the U.S. Trustee and counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default, or following the DIP Repayment Event  during the continuation of a Cash Collateral Termination Event (as defined below), stating that the Post-Carve Out Trigger Notice Cap has been invoked; *provided*, that until a DIP Repayment Event has occurred, the Carve Out Trigger Notice shall be delivered within three (3) business day after a determination by (i) the Debtors and the DIP Agent that there is no remaining availability under the DIP Facility and (ii) the DIP Agent that no further advances shall be made to the Debtors such that the funding of the Professional Fee Escrow Account (as defined herein) cannot be made;

(b)     On the Monday of each week after the week of the Filing Date, and subject to the Budget, unless otherwise agreed to by the DIP Agent, the Debtors shall cause to be transferred into an escrow account (the "**Professional Fee Escrow Account**") with an escrow

agent selected by the Debtors an amount equal to the estimate of the fees and expenses of such Professional Persons set forth in the Budget for that week. If the Budget does not list the Professional Person, or the weekly amount for such Professional Person, then there shall be no obligation to fund the Professional Fee Escrow Account for such Professional Person. To the extent the budgeted amount deposited therein for such Professional Person for the prior month exceeds the actual fees and expenses incurred by such Professional Person for the prior month (the "**Excess Monthly Funding Amount**"), then the Excess Monthly Funding Amount shall be applied towards satisfaction of the Professional Fee Escrow Account funding obligations of the Debtors for such Professional Person for the subsequent month. Except as provided herein, the DIP Lender's obligations to fund the DIP Lender Carve Out Amount shall terminate upon the earlier of (a) the occurrence of the DIP Repayment Event and (b) delivery by the DIP Agent of a Carve Out Trigger Notice. Notwithstanding anything to the contrary herein, upon the delivery of a Carve Out Trigger Notice, the DIP Agent shall be required to transfer cash that is swept, received or foreclosed upon into the Professional Fee Escrow Account in an amount equal to (x) any unfunded portion of the Carve Out that was required to be funded to the Professional Fee Escrow Account for the period prior to the delivery of the Carve Out Trigger Notice, after taking into account any applicable Excess Monthly Funding Amount that may be owing for the period prior to the delivery of the Carve Out Trigger Notice, less (y) any unused retainer held by such Profession Persons (the "**Potential Stub Payment**"); For the avoidance of doubt, none of the Prepetition Term Facility Lender Parties shall be responsible for funding the Professional Fee Escrow Account. For the avoidance of doubt, the DIP Lender Carve Out Amount shall not apply in the event that the DIP Obligations are indefeasibly paid in full in cash;

(c)     The Prepetition Term Facility Lender Parties shall not be, and, except for funding the Professional Fee Escrow Account, none of the DIP Lender or the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the DIP Lender Carve Out Amount.  Nothing contained herein or otherwise shall be construed to obligate either of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.  Upon receipt of the Carve Out Trigger Notice, the Debtors shall provide notice by email to all Professional Persons, at the email addresses set forth in each Professional Person's notice of appearance filed with the Court (or, if there is no such notice of appearance, at such Professional Person's last known email address) informing them that such Carve Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Professional Persons is subject to and limited by the Carve Out.  Until such time as a DIP Repayment Event has occurred, Allowed Professional Fees of any Professional Person relating to the period prior to the delivery of a Carve Out Trigger Notice shall be paid solely from the Professional Fee Escrow Account and any retainer, as applicable.  After the occurrence of the DIP Repayment Event, Allowed Professional Fees of any Professional Fees relating to the period prior to the delivery of the Carve Out Trigger Notice shall first be paid from the Professional Fee Escrow Account and then paid in full from the proceeds of the Prepetition Facilities Collateral and/or the collateral securing the Adequate Protection Liens but solely as provided for in the Budget as set forth in Paragraph 49 hereof, and the Debtors shall no longer be required to fund the Professional Fee Escrow Account.

(d)        No advances under the DIP Facility, nor any Cash Collateral, nor any portion of the Carve Out may be used to prosecute actions, claims, demands or causes of action against the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties or to object to or contest in any manner, or to raise any defense in any pleading as to the validity, perfection, priority or enforceability of the Existing Debt, the Prepetition Revolving Liens, the Prepetition Term Facilities Liens and security interests in the collateral securing the Existing Debt, the DIP Liens and security interests granted to the DIP Lender in connection with the DIP Facility, or the DIP Obligations, or the Prepetition Term Facilities Liens and security interests in the Prepetition Term Facilities Collateral securing the Prepetition Term Facilities Obligations; *provided, however*, up to $20,000 of the Professional Fee Escrow Account may be used by the Committee (if appointed) to inquire into and investigate such matters.

(e)        Upon entry of the Final Order, other than the Carve Out, the DIP Facility shall not otherwise be subject to any carve-out for Professional Fees and no other costs or expenses of any kind, nature or description whatsoever shall be imposed against the DIP Collateral (or the Prepetition Lender or the DIP Lender with respect to the Prepetition Revolving Collateral or the DIP Collateral) under sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise.

(f)        For the avoidance of doubt nothing contained in the forgoing provisions shall be deemed or construed to limit or prevent the Debtors from paying Allowed Professional Fees of Professional Persons prior to the delivery of a Carve Out Trigger Notice; provided that Professional Persons shall in the first instance be paid from any unused retainers and then from amounts deposited in the Professional Fee Escrow Account.

(g)     All amounts related to the Carve Out (other than amounts already funded into the Professional Fee Escrow Account) including without limitation the Potential Stub Payment shall be reserved for by the DIP Agent and shall reduce the availability under the DIP Facility.

39.     **Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out.** Except as provided in paragraph 38(d) hereof, the DIP Facility, the DIP Collateral, the Cash Collateral and the Carve Out may not be used in connection with: (a) preventing, hindering, or delaying any of the DIP Lender's, the Prepetition Lender's or the Prepetition Term Facility Lender Parties' permitted enforcement or realization upon any of the DIP Collateral or Prepetition Revolving Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Agent or as permitted by the DIP Documents, or following the occurrence of a DIP Repayment Event, using or seeking to use Cash Collateral or selling or otherwise disposing of Prepetition Collateral without the consent of the Prepetition Term Facility Agents or as permitted by the Prepetition Term Facility Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent, or following a DIP Repayment Event, using or seeking to use any insurance proceeds constituting Prepetition Collateral without the consent of the Prepetition Term Facility Agents; (d) incurring Indebtedness (as defined in the DIP Agreement) without the prior consent of the DIP Agent, except to the extent permitted under the DIP Agreement; (e) seeking to amend or modify any of the rights granted to the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties under this Interim Order, the DIP Documents, the Prepetition Loan Documents or the Prepetition Term Facility Documents, including seeking to use Cash Collateral and/or DIP Collateral or Prepetition Collateral on a

contested basis; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Prepetition Revolving Liens, Existing Debt, DIP Collateral (including Cash Collateral) or, as the case may be, the Prepetition Revolving Collateral, or the Prepetition Term Facilities Liens, the Prepetition Term Facilities Obligations, or the Prepetition Term Facilities Collateral or any other claims or liens, held by or on behalf of either of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against any of the DIP Lender, the Prepetition Lender, the Prepetition Term Facility Lender Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Revolving Liens, the Existing Debt, the Prepetition Term Facilities Liens, the Prepetition Term Facilities Obligations, or any other rights or interests of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Lender Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations, the Existing Debt or the Prepetition Term Facilities Obligations.

40.     **Payment of Compensation.**   Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Professional Person or shall affect the right of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents to object to the allowance and payment of such fees and expenses.  So long as an unwaived Event of Default or a DIP Repayment Event has not occurred, and in accordance with paragraph

38(f), nothing contained herein shall be deemed or construed to limit or prevent the Debtors from

paying Allowed Professional Fees of Professional Persons prior to the delivery of a Carve Out

Trigger Notice; provided that Professional Persons shall in the first instance be paid from any

unused retainers and then from amounts deposited in the Professional Fee Escrow Account.

41.    **Effect of Stipulations on Third Parties**.

(a)    *Generally*.  The admissions, stipulations, agreements, releases, and

waivers set forth in this Interim Order (collectively, the "**Prepetition Lien and Claim Matters**")

are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner

with expanded powers, any other estate representative, and all creditors and parties in interest

and all of their successors in interest and assigns, including, without limitation, a Committee (if

appointed), unless, and solely to the extent that, a party in interest that has sought and obtained

standing and the requisite authority to commence a Challenge (as defined below) (other than the

Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely filed

the pleadings, and timely commenced the proceeding required under the Bankruptcy Code and

Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the

Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 41 of this

Interim Order) challenging the Prepetition Lien and Claim Matters (each such proceeding or

pleading commencing a proceeding or other contested matter, a "**Challenge**") by no later than

(A) for a Committee, (if appointed), forty-five (45) days from the date of formation of a

Committee (if appointed), or (B) sixty (60) days following the entry of the Interim Order for any

other party in interest with requisite standing (the earlier to occur of (A) and (B), the "**Challenge**

**Deadline**"), as such applicable date may be extended in writing from time to time in the sole

discretion of the Prepetition Agent (with respect to the Prepetition Loan Documents), the

Prepetition Priming Term Facility Agent (with respect to the Prepetition Priming Term Facility Documents), or the Prepetition Second Term Facility Agents (with respect to the Prepetition Second Term Facility Documents), as applicable, or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal.  Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the tenth (10th) day after the appointment of the chapter 11 trustee or the conversion of the Case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause, and (2) if the Committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such Challenge.

        (b)      ***Binding Effect***.  To the extent no Challenge is properly and timely commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Prepetition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Prepetition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with

expanded powers, or other representative of the Debtors' estates.  Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Prepetition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Prepetition Lien and Claim Matters is expressly the subject of a properly and timely filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above. To the extent any such Challenge proceeding is properly and timely commenced, the Prepetition Lender, the Prepetition Priming Term Facility Agent or the Prepetition Second Term Facility Agents, as applicable, shall be entitled, subject to paragraph 41(a) herein, to payment of the reasonable related costs and expenses, including, but not limited to reasonable attorneys' fees, incurred under the Prepetition Loan Documents or the Prepetition Term Facility Documents, as applicable, in defending themselves in any such proceeding as adequate protection.  Upon a successful Challenge brought pursuant to this paragraph 41, the Court may fashion any appropriate remedy.

42.    **No Third Party Rights.**  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

43.    **Section 506(c) Claims.**  Subject to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Agent, the Prepetition Agent or the Prepetition Term Facility Lender Parties (as applicable), the DIP Collateral, the Prepetition Revolving Collateral, or the Prepetition Term Facility Collateral pursuant to sections 506(c)  and 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, the Prepetition Lender

or the Prepetition Term Facility Lender Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders.

44.    **No Marshaling/Applications of Proceeds.**    Subject to entry of a Final Order, the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, the Prepetition Revolving Collateral or the Prepetition Term Facilities Collateral, as the case may be.

45.    **Section 552(b).**    Subject to entry of a Final Order, the Prepetition Lender and the Prepetition Term Facility Lender Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Lender or the Prepetition Term Facility Lender Parties, with respect to proceeds, product, offspring or profits of any of the Prepetition Revolving Collateral or the Prepetition Term Facilities Collateral.

46.    **Access to Collateral.**    Upon expiration of the Remedies Notice Period, and absent entry of an order to the contrary, the DIP Lender and the Prepetition Lender (and upon a DIP Repayment Event, the Prepetition Term Facility Agents) shall be permitted to (a) access and recover any and all DIP Collateral, and (b) enter onto any leased premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee under such lease in connection with an orderly liquidation of the DIP Collateral; *provided*, *however*, that nothing herein shall relieve the Debtors of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent that accrues prior to delivery of the Termination Declaration through and including any assumption and/or rejection of any lease.  Nothing herein

shall require the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents to assume any lease as a condition to the rights afforded in this paragraph.

47. **Limits on Lender Liability.**  Subject to entry of a Final Order, nothing in this Interim Order, any of the DIP Documents, the Prepetition Loan Documents, or any other documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Cases.  The DIP Lender, the Prepetition Lender and the Prepetition Term Facility Agents shall not, solely by reason of having made loans under the DIP Facility or taken action pursuant to the terms of this Interim Order, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

48. **Insurance Proceeds and Policies.**  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Agents shall be, and shall be deemed to be, without any further action or notice, named as additional insured, lender loss payee, mortgagee and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral or

Prepetition Revolving Collateral or the Prepetition Collateral (which shall not include directors and officers policies).

49.    **Cash Collateral Termination Events.**    Following a DIP Repayment Event, upon written notice from the Prepetition Term Facility Agents to the Debtors and the Committee (if any) (e-mail to suffice), the occurrence and continuation of any of the following (unless waived by the Prepetition Term Facility Agents) shall constitute a "**Cash Collateral Termination Event**" under this Interim Order:

(i)    if by the date of the DIP Repayment Event, the Debtors, the Prepetition Term Facility Agents and the Committee, if any, have not agreed to the terms and conditions of the Debtors' continued consensual use of Cash Collateral, the adequate protection to be provided to the Prepetition Term Facility Agents, and the terms of a wind down budget (the "Wind Down Budget").  Upon (i) the agreement of the Debtors, the Prepetition Term Facility Agents and the Committee, if any, adequate protection for the continued consensual use of Cash Collateral and the Wind Down Budget, or (ii) approval of the non-consensual use of Cash Collateral and the Wind Down Budget by the Court following any emergency hearing pursuant to paragraph 33(b) hereto, the Wind Down Budget shall become the "Budget" for purposes of this Interim Order;

(ii)    other than in connection with payment in full in cash of the Prepetition Term Facilities Obligations, the bringing of a motion, taking of any action or the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto by or on behalf of the Debtors in the Cases: (a) to obtain postpetition financing, absent the consent of the Prepetition Term Facility Agents; (b) to grant any lien other than any Permitted Prior Liens,

absent the consent of the Prepetition Term Facility Agents; or (c) to use Cash Collateral in manner that is inconsistent with the terms of this Interim Order or the Budget;

(iii)    the Debtors' failure to comply with the Budget in accordance with this Interim Order;

(iv)    the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Prepetition Term Facilities Documents or this Interim Order without the written consent of the Prepetition Term Facility Agents or the filing of a motion to reconsider by the Debtors;

(v)    the allowance of any claim or claims under section 506(c) of the Bankruptcy Code against the Prepetition Term Facilities Collateral;

(vi)    the entry of an order in the Cases granting any other superpriority administrative claim or lien equal or superior to that granted to the Prepetition Term Facility Agents without the prior written consent of the Prepetition Term Facility Agents; or

(vii)    the entry of an order by the Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a lien on any Prepetition Term Facilities Collateral having a fair market value greater than $50,000.

For the avoidance of doubt, the Prepetition Term Facility Agents shall have no right to terminate the Debtors' use of Cash Collateral prior to the indefeasible payment in full in cash (including, in each case, provision for contingent obligations) of the Existing Debt and the DIP Obligations and the DIP Facility has been terminated.

50.    **Proposed Sale Transactions.**

(i)    the Debtors, their advisors and their investment bankers shall use commercially reasonable efforts to keep the DIP Lender and the Prepetition Term Facility Agents fully informed of all material activities and developments with respect to offers, bids, negotiations with third-parties, and analyses of any proposed transaction for the sale, transfer or acquisition of any Debtor or Debtors, or material assets of any Debtor or Debtors (a "**Sale Transaction**");

(ii)    the Debtors shall, as promptly as reasonably practicable, provide to the DIP Agent, the Prepetition Term Facility Agents and their respective counsel copies of all bona fide written proposals, term sheets in connection with any proposed Sale Transaction and other material correspondence and documentation in such regard promptly following receipt or sending thereof by the Debtors;

(iii)    the Debtors shall use commercially reasonable efforts to  keep the DIP Agent and the Prepetition Term Facility Agents reasonably informed of negotiations, terms and any analyses performed with respect to such proposed Sale Transactions;

(iv)    with respect to any bona fide proposed Sale Transaction (subject to compliance with related confidentiality requirements), the Debtors shall provide to the DIP Agent, the Prepetition Term Facility Agents and their respective counsel documentation believed to be close to final drafts of acquisition documents and proposed bankruptcy motions and orders (and other drafts as may reasonably be requested by the DIP Agent or the Prepetition Term Facility Agents) prepared in connection with the contemplated consummation of any proposed Sale Transaction;

(v)     the Debtors shall, as promptly as reasonably practicable, and in no event later than two (2) business days following actual knowledge or receipt thereof provide to the DIP Agent, the Prepetition Term Facility Agents and their respective counsel (A) a complete description, with copies of all relevant documentation, of any material communication to or from any Governmental Entity, including any from any licensing entity, and (B); all notices of setoffs, recoupments or any other settlements of amounts owed to or from Medicare;

(vi)     the Debtors shall consent and direct any financial advisor or investment bank advising on a proposed Sale Transaction, to participate in direct communications with the DIP Agent and the Prepetition Term Facility Agents (or their respective designees) upon reasonable requests made by the DIP Agent or the Prepetition Term Facility Agents, which shall include counsel to the Debtors, the DIP Agent and the Prepetition Term Facility Agents, as appropriate, and

(vii)     the Debtors shall inform the DIP Lender and the Prepetition Term Facility Agents of any professional engagements and outsourcing of services as promptly as reasonably practicable.

51.     **Joint and Several Liability.**    Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors (including Hospital Acquisition and Holdings, as guarantors) shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

52.     **No Superior Rights of Reclamation.**    Subject to entry of a Final Order, based on the findings and rulings herein regarding the integrated nature of the DIP Facility and the Prepetition Loan Documents, the right of a seller of goods to reclaim such goods under

section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien; rather, any such alleged claims arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the DIP Liens as such claim had with the Prepetition Revolving Liens.

53. **Rights Preserved.** Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents with respect to any person or entity other than Debtors or with respect to any other collateral owned or held by any person or entity other than the Debtors. The rights of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, without limitation, of: (a) the DIP Lender's, the Prepetition Lender's or the Prepetition Term Facility Agents' respective right to seek any other or supplemental relief in respect of the Debtors; (b) any of the rights of the DIP Lender, the Prepetition Lender and/or the Prepetition Term Facility Agents under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time, (iii) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iv) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (c) any other rights, claims or privileges

(whether legal, equitable or otherwise) of either of the DIP Lender, the Prepetition Lender or the Prepetition Term Facility Agents.

54.    **No Waiver by Failure to Seek Relief.**  The failure of the DIP Lender or Prepetition Lender or the Prepetition Term Facility Agents to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Loan Documents, the Prepetition Term Facility Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender, the Prepetition Lender, a Committee (if appointed) or any party in interest.

55.    **Binding Effect of Interim Order.**  Subject to paragraph 41, immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, the Prepetition Lender, the Prepetition Term Facility Lender Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Cases, any Successor Cases, or upon dismissal of any Case or Successor Case.

56.    **No Modification of Interim Order.**  Until and unless a DIP Repayment Event has occurred and, in the case of the Prepetition Term Facility Agents, until the indefeasible payment in full in cash of the Prepetition Term Facilities Obligations, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent, the Prepetition Agent, or the Prepetition Term Facility Agents (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or

hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c) (subject to entry of a Final Order), 507(a) or 507(b) of the Bankruptcy Code) in any of the Cases or Successor Cases, equal or superior to the DIP Superpriority Claim or Prepetition Term Facility Adequate Protection Priority Claim, other than the Carve Out; (b) without the prior written consent of the DIP Agent or the Prepetition Agent, for any order allowing use of Cash Collateral (other than as permitted during the Remedies Notice Period) resulting from DIP Collateral or Prepetition Revolving Collateral in a manner inconsistent with this Interim Order or the Final Order, as applicable; (c) without the prior written consent of the DIP Agent or the Prepetition Term Facility Agents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (d) without the prior written consent of the Prepetition Agent and the Prepetition Term Facility Agents, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Revolving Liens, the Prepetition Term Facilities Liens or Adequate Protection Liens.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent, the Prepetition Agent or the Prepetition Term Facility Agents, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent, the Prepetition Agent or the Prepetition Term Facility Agents.

57.   **Interim Order Controls.**  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

58.   **Discharge.**  The DIP Obligations, and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an

order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Lender and the Prepetition Lender, as applicable, has otherwise agreed in writing. None of the Debtors shall propose or support any plan of reorganization, or order confirming such plan, that is not conditioned upon the DIP Obligations being indefeasibly paid in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization) (a "**Prohibited Plan**") without the written consent of each of the DIP Lender and the Prepetition Lender, as applicable.   For the avoidance of doubt, the Debtors' proposal or support of a Prohibited Plan, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

59.    **Survival.**   The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Cases; (b) converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender, the Prepetition Lender and the Prepetition Term Facility Lender Parties granted pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in the Cases, in any Successor Cases, or following dismissal of the Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in

cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of the Prepetition Facility, all of the Existing Debt pursuant to the Prepetition Loan Documents and this Interim Order, have been indefeasibly paid in full in cash. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Cases, in any Successor Cases, following dismissal of the Cases or any Successor Cases, following termination of the DIP Documents and/or the indefeasible repayment in full in cash of the DIP Obligations.

60. **Final Hearing.** The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for _____, **2019, at __:__ _.m. (ET)** before the Honorable Brendan L. Shannon, United States Bankruptcy Judge at the United States Bankruptcy Court for the District of Delaware. On or before May _____, 2019, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the DIP Motion, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for a Committee (if appointed); (d) the Securities and Exchange Commission; and (e) the Internal Revenue Service. The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than on **May _____, 2019, at 4:00 p.m. (ET)**, which objections shall be served so as to be received on or before such date by: (i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, 2001 K Street NW, Washington, DC 20006, Attn: Scott L. Alberino and Kevin M. Eide, and 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Link Schultz; (ii) local

counsel to the Debtors, Young, Conaway, Stargatt & Taylor, LLP, Rodney Square, 1000 North

King Street, Wilmington, DE 19801, Attn: M. Blake Cleary; (iii) counsel to the DIP Agent and

the Prepetition Agent, King & Spalding LLP, 1185 Avenue of the Americas, New York, New

York 10036, Attn: Arthur Steinberg, and The Rosner Law Group LLC, 824 N. Market Street,

Suite 810, Wilmington DE 19801, Attn:   Frederick B. Rosner, Esq.; (iv) counsel to the

Prepetition Second Term Facility Agents, Shearman & Sterling LLP, 599 Lexington Avenue,

New York, New York 10022, Attn: Ned Schodek; (v) counsel to the Prepetition Priming Term

Facility Lenders, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York

10036, Attn: Matthew Roose; (vi) counsel to the Committee (if appointed); and (vii) Benjamin

A. Hackman, Esquire, Office of the United States Trustee, 844 N. King Street, Room 2207,

Lockbox 35, Wilmington DE, 19801.

61.    ***Nunc Pro Tunc* Effect of this Interim Order.**  This Interim Order shall

constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall

take effect and be enforceable *nunc pro tunc* to the Filing Date immediately upon execution

thereof.

62.    **Retention of Jurisdiction.**  The Court has and will retain jurisdiction to

enforce the terms of, any and all matters arising from or related to the DIP Facility, and/or this

Interim Order.


Dated:  May ___, 2019
        Wilmington, Delaware     _____
                                 BRENDAN L. SHANNON
                                 UNITED STATES BANKRUPTCY JUDGE