## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Hospital Acquisition LLC, *et al.*,[1] | Case No. 19-10998 (BLS) |
| Debtors. | Jointly Administered |
| | **Re: Docket Nos. 227, 294, 298 & 392** |
| | <u>Objection Deadline:</u> **July 25, 2019 at 4:00 p.m. (ET)** |

### NOTICE OF STALKING HORSE BID IN CONNECTION WITH DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (II) AN ORDER OR ORDERS <u>APPROVING THE SALE OF THE ASSETS</u>

**PLEASE TAKE NOTICE** that, on June 6, 2019, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed the *Debtors' Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Assets* (the "***Motion***") [Docket No. 227], pursuant to which the Debtors are seeking authorization to sell substantially all or any portion or combination of their assets (the "***Assets***") free and clear of liens, claims, encumbrances and other interests.

**PLEASE TAKE FURTHER NOTICE** that, in conjunction with the proposed sale of the Assets, the Debtors have implemented the Bidding Procedures[2] set forth in the Motion.  As set forth in the Bidding Procedures, the Debtors are permitted to enter into a Stalking Horse Agreement with a stalking horse bidder.  The Bidding Procedures further provide that, in the event that the Debtors select one or more parties to serve as a stalking horse bidder,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094).  The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

[2]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

upon such selection, the Debtors shall provide all parties on the Rule 2002 List, all parties expressing an interest in the Assets and all parties holding liens on such Assets, five (5) business days' notice of and an opportunity to object to the designation of such stalking horse bidder and disclosure of the Bid Protections, and absent objection, the Debtors may submit an order to the Court under certification of counsel approving the selection of such stalking horse bidder and such Bid Protections.

PLEASE TAKE FURTHER NOTICE that, on July 18, 2019, the Debtors entered into that certain asset purchase agreement (the "*APA*") by and between the Debtors and PAM Squared, LLC (the "*Stalking Horse Bidder*"), a copy of which is attached hereto as **Exhibit A**, and such agreement shall serve as the Stalking Horse Agreement for certain of the Assets at the Auction to be held on August 6, 2019 (to the extent the Debtors receive another Qualified Bid for such Assets prior to the Bid Deadline).  The APA provides for a purchase price of (i) $29.5 million in cash (subject to certain adjustments) and (ii) a $5 million subordinated promissory note payable over four years with an interest rate of 5.0% per annum.  Pursuant to the APA, the Debtors have agreed, subject to Court approval, to pay the Stalking Horse Bidder a break-up fee of $200,000 and an expense reimbursement not to exceed $250,000, under certain conditions (the "*PAM Bid Protections*").

PLEASE TAKE FURTHER NOTICE that any objections to the designation of the Stalking Horse Bidder or the PAM Bid Protections must be filed by no later than **July 25, 2019 at 4:00 p.m. (ET)** (the "*Objection Deadline*") and served on (i) counsel to the Debtors, (a) Akin Gump Strauss Hauer & Feld LLP, 2001 K Street, N.W., Washington, DC 20006, Attn: Scott L. Alberino, Esq. (salberino@akingump.com) and Kevin M. Eide, Esq. (keide@akingump.com) and 2300 N. Field Street, Suite 1800, Dallas, TX 75201, Attn: Sarah Link Schultz, Esq. (sschultz@akingump.com) and (b) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  M. Blake Cleary, Esq. (mbcleary@ycst.com); (ii) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE, 19801, Attn:  Benjamin A. Hackman, Esq. (Benjamin.A.Hackman@usdoj.gov); (iii) counsel to the DIP Lender, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036, Attn:   Arthur Steinberg, Esq. (asteinberg@kslaw.com) and Terry D. Novetsky, Esq. (tnovetsky@kslaw); (iv) counsel to the Prepetition Priming Term Loan Lenders, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Matthew M. Roose, Esq. (matthew.roose@ropesgray.com); (v) counsel to the Prepetition Priming Term Facility Agent, Thompson Hine LLP, 335 Madison Avenue, 12th Floor, New York, NY 10017, Attn: John H. Bae, Esq. (john.bae@thompsonhine.com), (vi) counsel to the Prepetition Second Term Facility Agent, Shearman & Sterling LLP, 599 Lexington Avenue, New York, NY 10022, Attn: Ned S. Schodek, Esq. (ned.schodek@shearman.com) and Jordan Wishnew, Esq. (jordan.wishnew@shearman.com); (vii) counsel to the Committee, (a) Greenberg Traurig LLP, 77 West Wacker Drive, Suite 3100, Chicago, IL 60601, Attn: Nancy A. Peterman, Esq. (petermann@gtlaw.com) and David D. Cleary, Esq. (clearyd@gtlaw.com) and (b) Bayard, P.A., 600 North King Street, Suite 400, Wilmington, DE 19801, Attn: Justin R. Alberto, Esq. (jalberto@bayardlaw.com) and Erin R. Fay, Esq. (efay@bayardlaw.com); and (viii) all parties that have requested notice in these chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that if no objections to the designation of the Stalking Horse Bidder or the PAM Bid Protections are filed and served prior to the Objection Deadline, the Debtors intend to submit an order to the Court under certification of counsel approving the selection of the Stalking Horse Bidder and the PAM Bid Protections.

**PLEASE TAKE FURTHER NOTICE** that if two or more Qualified Bids for the same Assets are received by the Bid Deadline, the Debtors will conduct an Auction on **August 6, 2019 at 10:00 a.m. (CT)**, at the offices of Akin Gump Strauss Hauer & Feld LLP, 2300 N. Field Street, Suite 1800, Dallas TX 75201, or such other place and time as the Debtors shall reasonably notify all Qualified Bidders, the Consultation Parties and all other parties entitled to attend the Auction.

[*Remainder of page intentionally blank*]

Dated:  July 18, 2019
       Wilmington, Delaware

*/s/ Betsy L. Feldman*

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
Jaime Luton Chapman (No. 4936)
Joseph M. Mulvihill (No. 6061)
Betsy L. Feldman (No. 6410)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

- and -

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Scott Alberino (admitted *pro hac vice*)
Kevin M. Eide (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, DC 20006
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288

Sarah Link Schultz (admitted *pro hac vice*)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

**<u>EXHIBIT A</u>**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**LIFECARE HOLDINGS LLC, AND**

**CERTAIN SUBSIDIARIES THEREOF
LISTED ON <u>EXHIBIT A</u>,**

**AS SELLERS,**

**AND**

**PAM SQUARED, LLC,**

**AS BUYER**

**July 18, 2019**

## TABLE OF CONTENTS

**ARTICLE I - DEFINITIONS**................................................................................................ 1
    **1.1**       Definitions ................................................................................................ 1

**ARTICLE II - TRANSACTIONS AT THE CLOSING**.................................................. 10
    **2.1**       Purchase and Sale .................................................................................. 10
    **2.2**       Excluded Assets ..................................................................................... 11
    **2.3**       Assumed Liabilities ............................................................................... 12
    **2.4**       Excluded Liabilities .............................................................................. 13
    **2.5**       Assignment of Contracts ....................................................................... 15
    **2.6**       Purchase Price ....................................................................................... 16
    **2.7**       Assumed Accounts Payable Adjustment................................................ 16
    **2.8**       Closing................................................................................................... 17
    **2.9**       Actions of Sellers at Closing ................................................................ 17
    **2.10**    Actions of Buyer at Closing ................................................................. 19

**ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS** .................................... 19
    **3.1**       Corporate Capacity, Authority and Consents ....................................... 19
    **3.2**       Binding Agreement ............................................................................... 20
    **3.3**       Subsidiaries ........................................................................................... 20
    **3.4**       Assets..................................................................................................... 20
    **3.5**       Licenses and Accreditations ................................................................. 21
    **3.6**       Regulatory Compliance ......................................................................... 21
    **3.7**       Compliance Program ............................................................................. 23
    **3.8**       Material Contracts ................................................................................. 23
    **3.9**       Real Property ......................................................................................... 24
    **3.10**    Insurance ............................................................................................... 24
    **3.11**    Employee Benefit Plans ........................................................................ 25
    **3.12**    Employee Relations ............................................................................... 26
    **3.13**    Litigation and Proceedings ................................................................... 26
    **3.14**    Third Party Reimbursement .................................................................. 27
    **3.15**    Tax Liabilities........................................................................................ 27
    **3.16**    Absence of Changes .............................................................................. 28
    **3.17**    Intellectual Property .............................................................................. 29
    **3.18**    Environmental ....................................................................................... 30
    **3.19**    Financial Statements.............................................................................. 30
    **3.20**    Brokers .................................................................................................. 31
    **3.21**    Affiliate Transactions ........................................................................... 31
    **3.22**    Bank Accounts ...................................................................................... 31
    **3.23**    Disclaimer of Warranties ...................................................................... 31

**ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER** ......................................... 31
    **4.1**       Capacity, Authority and Consents ........................................................ 31
    **4.2**       Binding Agreement ............................................................................... 32
    **4.3**       Litigation and Proceedings ................................................................... 32
    **4.4**       Availability of Funds ............................................................................ 32
    **4.5**       Solvency ................................................................................................ 33
    **4.6**       Representations of Sellers ..................................................................... 33

**ARTICLE V - COVENANTS OF THE PARTIES**.................................................................. 33

i

| | | |
|---|---|---|
| 5.1 | Access | 33 |
| 5.2 | Updates of Schedules | 33 |
| 5.3 | Operating Covenants | 34 |
| 5.4 | Negative Covenants | 34 |
| 5.5 | Bankruptcy Court Approval; Executory Contracts | 35 |
| 5.6 | Approvals | 35 |
| 5.7 | Notices | 35 |
| 5.8 | Post-Closing Filings and Access to Information | 36 |
| 5.9 | Employee Matters | 36 |
| 5.10 | Medical Staff | 38 |
| 5.11 | Misdirected Payments; Transitional Matters | 38 |
| 5.12 | Transition Medicare Payments and Treatment of Payments Received for Patients | 39 |
| 5.13 | Waiver of Bulk Sales Law Compliance | 41 |
| 5.14 | Closing of Financials | 41 |
| 5.15 | Financing | 41 |
| 5.16 | Exclusivity | 42 |
| 5.17 | Confidentiality; Restrictive Covenants | 43 |

**ARTICLE VI - CONDITIONS TO CLOSING ........................................................ 44**

| | | |
|---|---|---|
| 6.1 | Conditions to Obligations of Buyer and Sellers | 44 |
| 6.2 | Conditions to Obligations of Buyer | 44 |
| 6.3 | Conditions to Obligations of Sellers | 45 |

**ARTICLE VII - TERMINATION ........................................................................ 45**

| | | |
|---|---|---|
| 7.1 | Grounds for Termination | 45 |
| 7.2 | Breakup Fee and Expense Reimbursement | 47 |
| 7.3 | Effect of Termination | 47 |

**ARTICLE VIII - GENERAL PROVISIONS .......................................................... 48**

| | | |
|---|---|---|
| 8.1 | Survival | 48 |
| 8.2 | Certain Tax Matters | 48 |
| 8.3 | Additional Assurances | 49 |
| 8.4 | Choice of Law; Jurisdiction | 49 |
| 8.5 | WAIVER OF JURY TRIAL | 50 |
| 8.6 | Benefit, Assignment and Third Party Beneficiaries | 50 |
| 8.7 | Cost of Transaction | 50 |
| 8.8 | Waiver of Breach | 50 |
| 8.9 | Notice | 50 |
| 8.10 | Severability | 51 |
| 8.11 | Interpretation | 52 |
| 8.12 | Entire Agreement, Amendments and Counterparts | 52 |
| 8.13 | Personal Liability | 52 |
| 8.14 | Disclosure Generally | 52 |
| 8.15 | Public Announcements | 52 |
| 8.16 | Specific Performance | 53 |

## EXHIBITS

| | |
|---|---|
| **Exhibit A** | Seller Facilities |
| **Exhibit B** | Form of Bill of Sale |
| **Exhibit C** | Form of Assignment and Assumption |

**<u>Exhibit D</u>**             Form of Subordinated Promissory Note

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of July 18, 2019 (the "***Effective Date***"), by and among LifeCare Holdings LLC, a Delaware limited liability company (the "***Company***"), each direct or indirect subsidiary of the Company listed on **Exhibit A** (each, a "***Facility Seller***" and collectively with the Company, the "***Sellers***" and each, a "***Seller***") and PAM Squared, LLC, a Pennsylvania limited liability company (the "***Buyer***"). Sellers and Buyer are collectively referred to as the "***Parties***" and each individually as a "***Party***".

## RECITALS

**WHEREAS**, Sellers own (or lease, as applicable) and operate those certain long-term acute care hospitals identified on **Exhibit A** and the other businesses incident thereto (the "***Seller Facilities***");

**WHEREAS**, each Seller has filed voluntary petitions (collectively, the "***Bankruptcy Case***") pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

**WHEREAS**, the Parties intend that Buyer be designated as the initial bidder for the Seller Facilities ("***Stalking Horse Bidder***"), as such term is defined in the Sale Procedures Order;

**WHEREAS**, each Seller desires to sell and assign to Buyer, and Buyer desires to purchase from the applicable Seller, all of the Purchased Assets on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Permitted Encumbrances) in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of an Order of the Bankruptcy Court under, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, approving the sale of the Purchased Assets to Buyer.

**NOW, THEREFORE**, in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

## ARTICLE I - DEFINITIONS

1.1    **Definitions**.

As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"***Accounts Receivable***" means all accounts, notes, interest and other receivables of each Seller, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to inpatients and outpatients at the Seller Facilities, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided by the Seller Facilities whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Seller Facilities relating to Medicare, Medicaid, TRICARE and other third party patient claims of Sellers due from beneficiaries or governmental Third Party Payors.

1

"***Accrued PTO***" means obligations and liabilities with respect to accrued but unused paid time off, including any vacation and holiday pay hours (including employer FICA and any other estimated employer taxes thereon) but excluding any sick leave, in each case recorded by a Seller, pursuant to such Seller's standard policies with respect to those Facility Employees accepting employment with Buyer in accordance with Section 5.9 of this Agreement.

"***Actions***" means any claim, cause of action, litigation, action, suit, arbitration, proceeding, investigation, audit, inquiry, or right in action that has been brought by any Person.

"***Affiliate***" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. The term "***control***" used in the preceding sentence means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of equity interests, by Contract or otherwise.

"***Agreement***" means this Asset Purchase Agreement, as from time to time amended, restated, modified or otherwise supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"***Allocation Schedule***" is defined in Section 8.2(b).

"***Alternative Transaction***" means the sale, transfer or other disposition, directly or indirectly, including through an asset sale, share sale, merger, or other similar transaction, including any plan of reorganization or plan of liquidation, or resulting from the auction, of any material portion of the Purchased Assets or all or substantially all of the equity interests of any Sellers or any Subsidiary or parent companies owning any Purchased Assets, in a single transaction or a series of transactions, with one or more persons other than Buyer and/or its Affiliates (but excluding any such transaction or series of transaction involving the sale, transfer or other disposition of the HHC Business outside of the Bankruptcy Case).

"***AP Disagreement Notice***" is defined in Section 2.7(a).

"***Applicable State***" means each State listed on **Exhibit A** with respect to the applicable Seller Facility.

"***Article III Schedules***" is defined in ARTICLE III.

"***Assignment and Assumption***" is defined in Section 2.9(d).

"***Assumed Accounts Payable***" is defined in Section 2.3(a).

"***Assumed Contracts***" is defined in Section 2.5(a).

"***Assumed Liabilities***" is defined in Section 2.3.

"***Available Contracts***" is defined in Section 2.5(a).

"***Avoidance Actions***" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of Sellers arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"***Bankruptcy Case***" is defined in the Recitals.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 et seq.

"***Bankruptcy Court***" is defined in the Recitals.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure.

"***Bill of Sale***" is defined in Section 2.9(b).

"***Breakup Fee***" is defined in Section 7.2(b).

"***Business Transaction***" is defined in Section 5.16.

"***Buyer***" is defined in the Preamble.

"***Buyer Plans***" is defined in Section 5.9(b).

"***Capital Lease Liability***" means the aggregate amount of all obligations with respect to capital leases that are designated as Assumed Contracts as of the Closing Date pursuant to Section 2.5(a).

"***Cash Purchase Price***" is defined in Section 2.6(c).

"***Closing***" is defined in Section 2.8.

"***Closing Date***" is defined in Section 2.8.

"***Closing of Financials***" is defined in Section 5.14.

"***Closing Time***" is defined in Section 2.8.

"***CMS***" means the Centers for Medicare and Medicaid Services.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company***" is defined in the Preamble.

"***Contract***" means any contract, agreement, insurance policy, capitalized lease, license, sublicense, lease, sublease, sales order, purchase order, instrument or other binding commitment, whether written or oral.

"***Credit Agreement***" is defined in Section 4.4.

"***Credit Suisse***" is defined in Section 5.12(f).

"***Credit Suisse Side Letter Agreement***" is defined in Section 5.12(f).

"***Cure Amounts***" means the amount required to be paid with respect to each Assumed Contract to cure all defaults under such Assumed Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Buyer of each such Assumed Contract. Schedule 1.1(a) sets forth the estimated Cure Amounts as of the Effective Date.

"***Debt Financing***" is defined in Section 4.4.

"***Debt Financing Amendment***" is defined in <u>Section 4.4</u>.

"***Deposit***" is defined in <u>Section 2.6(a)</u>.

"***Deposit Escrow Agreement***" is defined in <u>Section 2.6(a)</u>.

"***Effective Date***" is defined in the Preamble.

"***Employee Benefit Plans***" is defined in <u>Section 3.11(a)</u>.

"***Encumbrances***" means any and all mortgages, liens, pledges, security interests, leases, subleases, rights of way, easements, licenses, rights of first refusal, options, restrictions, covenants, reservations or similar matters of record, or encroachments of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing.

"***End Date***" is defined in <u>Section 7.1(d)</u>.

"***Environmental Laws***" mean all Laws concerning pollution, public or worker health and safety, and protection of the environment.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" is defined in <u>Section 3.11(a)</u>.

"***Estimated Assumed Accounts Payable***" is defined in <u>Section 2.6(b)</u>.

"***Escrow Agent***" is defined in <u>Section 2.6(a)</u>.

"***Excluded Assets***" is defined in <u>Section 2.2</u>.

"***Excluded Contracts***" is defined in <u>Section 2.5(a)</u>.

"***Excluded Liabilities***" is defined in <u>Section 2.4</u>.

"***Expense Reimbursement***" is defined in <u>Section 7.2(b)</u>.

"***Facility Account Lien***" is defined in <u>Section 5.12(f)</u>.

"***Facility Employees***" means each individual employed by Seller and providing services to the Seller Facilities, including employees who are on leaves of absence.

"***Facility IP***" means all of the Intellectual Property primarily used in the operation of the Seller Facilities, including such Intellectual Property owned by Sellers or other Intellectual Property which is primarily used by Sellers in the operation of the Seller Facilities but owned by a third party.

"***Final Assumed Accounts Payable***" is defined in <u>Section 2.7(a)</u>.

"***Finalization Date***" is defined in <u>Section 2.7(b)</u>.

"***Finance Team***" is defined in <u>Section 5.14</u>.

"**_Fundamental Representations_**" means the representations and warranties set forth in Section 3.1 (Corporate Capacity, Authority and Consents) (other than Section 3.1(d) (with respect to Assumed Contracts)), Section 3.2 (Binding Agreement), Section 3.3 (Subsidiaries), Section 3.4 (Assets), Section 3.6 (Regulatory Compliance), Section 3.20 (Brokers), and Section 3.21 (Affiliate Transactions).

"**_Governing Documents_**" means, for any Person, such Person's Articles of Incorporation, Certificate of Formation, Certificate of Limited Partnership, Bylaws, Partnership Agreement, Limited Liability Company Agreement or other similar documents relating to the formation and/or governance of the business and affairs of such Person.

"**_Governmental Authority_**" means any federal, state, local, foreign or municipal government; any governmental or quasi-governmental authority; and any body exercising or entitled to exercise, any administrative, executive, judicial, regulatory, legislative or taxing authority, including any arbitrator (public or private).

"**_Government Reimbursement Programs_**" shall mean any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purposes of paying for health care services. Such programs include Medicare, Medicaid, TRICARE, and similar or successor programs with or for the benefit of designated federal or state residents.

"**_Healthcare Laws_**" means, collectively, any and all Laws governing the licensure or regulation of healthcare providers, professionals, or facilities, or payors or otherwise governing or regulating the provision of, or payment for, healthcare services, the sale of controlled substances or other pharmaceuticals, medical devices or supplies and the like. Without limiting the generality of the foregoing, Healthcare Laws include Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. § 1320a-7b(b), commonly referred to as the "Federal Anti-Kickback Statute", the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58, Section 1877 of the Social Security Act, as amended, the Medicare statute, 42 U.S.C. §§ 1395-1395lll, including without limitation 42 U.S.C. § 1395nn and related regulations, commonly referred to as "Stark Law," the federal False Claims Act, 31 U.S.C. § 3729 et seq., the Medicaid statute, 42 U.S.C. §§ 1396-1396w-5, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812, the mandatory and permissive exclusion authorities, 42 U.S.C. § 1320a-7, the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a, the administrative False Claims Law, 42 U.S.C. § 1320a-7b(a), the Conditions for Medicare Payment, 42 C.F.R. Part 424, the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d et seq., as amended, and all applicable implementing regulations, rules, ordinances and Orders, and any similar state and local statutes, regulations, rules, ordinances and Orders.

"**_HHC Business_**" means the business and operations of LifeCare Home Health Acquisition LLC and each of its direct and indirect Subsidiaries, but in no event including the Seller Facilities.

"**_HHS_**" means the U.S. Department of Health and Human Services.

"**_Intellectual Property_**" means all intellectual property or proprietary rights arising under the Laws of any jurisdiction throughout the world, including (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissues, divisions, continuations, continuations-in-part, renewals, extensions, and foreign counterparts and equivalents thereof, (ii) all trademarks, service marks, logos, trade names, corporate names, and other source identifiers whether registered or unregistered (as the case may be), as well as all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) registrations for internet domain names, (iv) all rights protected by copyright law, including rights in registered and unregistered works of authorship, all rights to copy, distribute, modify, publicly perform, and publicly display such works, and all applications, registrations, and renewals

5

in connection therewith, (v) all rights in trade secrets and confidential information, (vi) all rights in software, data, and collections of data, and (vii) all rights in websites, social media accounts, social media hashtags and identifiers, and all content used in or relating to the same.

"*Interim Period*" is defined in <u>Section 5.1</u>.

"*Inventory*" means all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables located at the Seller Facilities or used in connection with the operation of the Seller Facilities.

"*IRS*" means the Internal Revenue Service.

"*Knowledge*" of Sellers (and any similar expression, including the expression "Sellers' Knowledge") means, as to a particular matter, the actual knowledge after due inquiry of those individuals listed on <u>Schedule 1.1(c)</u>.

"*Latest Balance Sheet*" is defined in <u>Section 3.19(a)</u>.

"*Law*" means any federal, state, local or other statute, law (including common law), constitution, ordinance, regulation, rule, or Order of any Governmental Authority.

"*Leased Real Property*" is defined in <u>Section 3.9(b)</u>.

"*Lenders*" is defined in <u>Section 4.4</u>.

"*Lookback Date*" means January 1, 2017.

"*Material Adverse Effect*" means a change, development, event or occurrence that has or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the financial condition, properties, assets, liabilities, business, or results of operations of the Seller Facilities, taken as a whole, or would adversely affect the ability of Sellers to execute or deliver this Agreement, to perform any of their obligations under this Agreement or to consummate any of the transactions contemplated by this Agreement. Notwithstanding the foregoing, a Material Adverse Effect shall not include any change, development, event or occurrence resulting from: (i) any actual or proposed change in Law or accounting standards or the interpretation or implementation thereof; (ii) any change that is generally applicable to the healthcare industry or the long-term acute care hospital industry in the Applicable State; (iii) the entry into this Agreement or the announcement or pendency of the transactions contemplated hereby; (iv) any action taken by Sellers or their Affiliates that is required to be taken by this Agreement; (v) any omission to act or action taken with the express prior written consent of Buyer or its Affiliates; (vi) any change in general business, economic, geopolitical or financial market conditions; (vii) any national or international political event or occurrence, including acts of war or terrorism; (viii) any natural disaster or calamity; and (ix) any matters arising in connection with the filing or prosecution of the Bankruptcy Case; other than with respect to the foregoing clauses (i), (ii), (vi), (vii), and (viii), if such change, development, event or occurrence has or would reasonably be expected to have a disproportionate effect on the operation of the Seller Facilities relative to other businesses operating in the industry in which the Seller Facilities operate.

"*Material Contract*" is defined in <u>Section 3.8(a)</u>.

"*Medicare Provider Number*" is defined in <u>Section 5.12(a)</u>.

"***National Provider Identifier***" means the unique 10-digit identifier assigned to a healthcare provider by the National Plan and Provider Enumeration System.

"***OIG***" means the Office of the Inspector General of HHS.

"***Order***" means any award, writ, injunction, judgment, order, ruling, decision, directive, settlement or similar determination entered, issued, made or rendered by any Governmental Authority.

"***Ordinary Course of Business***" shall mean the operation of the Seller Facilities in the ordinary course consistent with past practice as well as (and subject to) the Bankruptcy Case and all Orders entered in connection therewith.

"***Party***" is defined in the Preamble.

"***Payor Agreements***" is defined in Section 3.14(b).

"***Permits***" means all licenses, permits, franchises, certificates, rights, registrations, approvals, authorizations, consents, provider numbers, waivers, exemptions, releases, variances, certificates of authority, accreditations, or Orders issued by any Governmental Authority.

"***Permitted Encumbrances***" means any (i) Encumbrances that relate to Taxes, assessments and governmental charges or levies not yet due or payable or that are being contested in good faith and for which adequate reserves have been made in accordance with GAAP; (ii) mechanic's, materialman's and similar statutory liens for sums incurred in the Ordinary Course of Business not yet due and payable or that are being contested in good faith; (iii) leasehold interests of the owners of Leased Real Property, (iv) zoning regulations and other Laws affecting the Leased Real Property which are imposed by any Governmental Authority having jurisdiction over such Leased Real Property (but excluding violations thereof); (v) existing easements, covenants, conditions, rights-of-way, restrictions and other encumbrances (other than monetary liens) set forth in title reports, title commitments, surveys or title policies which, taken individually or as a whole, do not materially impair the present ownership, use or operations of such properties; (vi) with respect to the Leased Real Property, (A) the terms, conditions, and provisions of Real Property Leases, (B) any lien, Encumbrance, or other matter affecting title to the fee estate underlying such Leased Real Property, (C) Encumbrances in favor of lessors under Real Property Leases, or encumbering the interests of such lessors (or other holders of superior interests), and (D) any right, title or interest of a lessor, sublessor or licensor under any of the Real Property Leases; (vii) any matter that would be revealed by a current ALTA/NSPS survey; (viii) matters arising as a result of acts or omissions of Buyer or any of its Affiliates; and (ix) those Encumbrances listed on Schedule 1.1(b).

"***Person***" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, or organization, including any Governmental Authority.

"***Post-Closing Receivables***" is defined in Section 5.12(d).

"***Pre-Closing Receivables***" is defined in Section 5.12(c).

"***Prepaid Assets***" means all advance payments, prepayments, prepaid expenses and deposits which were made with respect to the operation of the Seller Facilities, including deposits for leases and utilities.

"***Proceeding***" means any contest, application, assessment, suit, demand, claim, grievance, complaint, inquiry, notice of violation, hearing, request for information, audit or investigation, at law or in

equity, whether civil, criminal, administrative, by or before any Governmental Authority, arbitrator or mediator, or notice of any of the foregoing.

"***PTO Liability***" is defined in Section 5.9(a).

"***Purchase Price***" is defined in Section 2.6(c).

"***Purchased Assets***" is defined in Section 2.1.

"***Real Property Leases***" is defined in Section 3.9(b).

"***Record Retention Period***" means, with respect to each Seller Facility, the number of years which the applicable Seller is required to maintain medical records under applicable Law.

"***Representatives***" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, legal counsel, bankers and other representatives of such Person.

"***Restrictive Covenants***" is defined in Section 5.17(b).

"***Sale Hearing***" means any hearing set by the Bankruptcy Court to approve a sale pursuant to this Agreement.

"***Sale Order***" means an order of the Bankruptcy Court, in form and substance acceptable to Sellers and Buyer, approving, *inter alia*, (i) the sale of the applicable Purchased Assets to Buyer free and clear of any and all Encumbrances (other than Permitted Encumbrances), and (ii) the assumption and assignment of the Assumed Contracts by Buyer.

"***Sale Procedures Order***" means the order of the Bankruptcy Court approving the procedures for the sale of the Purchased Assets, dated June 27, 2019 [Docket No. 298].

"***Seller***" is defined in the Preamble.

"***Seller 401(k) Plans***" is defined in Section 5.9(b).

"***Seller Facilities***" is defined in the Recitals.

"***Sellers' Transition Receivables***" is defined in Section 5.12(e)(i).

"***Subordination Agreement***" is defined in Section 5.15(d).

"***Subordinated Promissory Note***" means that certain Subordinated Promissory Note by and among Buyer and Sellers, in substantially the form of **Exhibit D** attached hereto, in the aggregate principal amount of $5,000,000, which shall be subject to the Subordination Agreement.

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or together with one or more of its other Subsidiaries), owns, directly or indirectly, 50% or more of the capital stock or other equity interests the holders of which are (a) generally entitled to vote for the election of the board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

"***Tax***" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), intangible, escheat, unclaimed or abandoned property, national insurance, unemployment, disability, real property, personal property, sales, use, transfer, registration, value-added, alternative or add on minimum, estimated or other tax levy, duty, impost or similar charge imposed or collected by any Governmental Authority, including any interest, penalty or addition thereto, whether disputed or not.

"***Tax Returns***" means any return, report, statement, form or other document (including elections, declarations, amendments, schedules, information returns or attachments thereto) filed or required to be filed with any Governmental Authority with respect to Taxes.

"***Third Party Payor***" means any Person (including the Government Reimbursement Programs, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits) in the Applicable States, any health maintenance organization, or any employer authorized in accordance with applicable Law to self-insure its workers' compensation risk) that pays for or reimburses at least a portion of the health care expenses of its beneficiaries.

"***TPH Campus***" is defined in Section 2.1(g).

"***TPH Condition***" is defined in Section 2.1(g).

"***Transaction Agreements***" means each of this Agreement, the Assignment and Assumptions, the Bills of Sale, and the Escrow Agreement.

"***Transactions***" means, collectively, the transactions contemplated by the Transaction Agreements.

"***Transfer Consent***" is defined in Section 2.5(d).

"***Transfer Taxes***" is defined in Section 8.2(a).

"***Transferred Employees***" is defined in Section 5.9(a).

"***Transition Patients***" is defined in Section 5.12(e).

"***Transition Period***" is defined in Section 5.12(b).

"***Transition Period Invoices***" is defined in Section 5.12(b).

"***Transition Services***" is defined in Section 5.12(e).

"***WARN Act***" is defined in Section 3.12.

"***Welltower Master Lease***" means that certain Second Amended and Restated Master Lease Agreement among Health Care REIT, Inc., HCRI Texas Properties, Ltd., HCRI Pennsylvania Properties, Inc., HCRI Louisiana Properties, L.P., and LifeCare REIT 1, Inc. dated as of August 1, 2011, as may be amended from time to time.

## ARTICLE II - TRANSACTIONS AT THE CLOSING

2.1    **Purchase and Sale**.

Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, each Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall acquire, all of each Seller's right, title and interest to the following assets (all such assets other than the Excluded Assets, the "***Purchased Assets***"), free and clear of any and all Encumbrances other than the Permitted Encumbrances:

(a)    all equipment, furniture, furnishings, machinery, tools, supplies, telephones, office equipment, and leasehold improvements, in each case used in connection with the operation of the Seller Facilities;

(b)    all Inventory used in connection with the operation of the Seller Facilities (other than the portions of Inventory disposed of, or expended, as the case may be, by Sellers after the Effective Date and prior to the Closing in the Ordinary Course of Business);

(c)    all Prepaid Assets;

(d)    all intangible personal property owned by Sellers and primarily used in connection with the operation of the Seller Facilities, including all right, title and interest in and to all Facility IP, together with (i) all registrations and applications to register, and all rights to register, any of the foregoing, together with all renewals, extensions, and foreign counterparts of, and other registrations or applications claiming priority to, any of the foregoing, (ii) all royalties, income, and payments now owing or in the future due to the owner of any of the foregoing with respect to any of the foregoing, (iii) all damages and rights to sue and enforce any of the foregoing, including any damages and rights to sue for any past, present, or future infringement, dilution, misappropriation, or violation of any of the foregoing, (iv) all other proprietary rights and interests in any of the foregoing, (v) all data relating to any of the foregoing in any form or medium, and (vi) all copies and tangible embodiments of any of the foregoing, in any form or medium;

(e)    all financial, medical staff and personnel records used in connection with the operation of the Seller Facilities (including all equipment records, construction plans and specifications, medical and administrative libraries, documents, catalogs, books, records, files, operating manuals and current personnel records) and all patient and medical records used in connection with the operation of the Seller Facilities;

(f)    all insurance proceeds relating to the physical condition of the Purchased Assets, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing;

(g)    the Assumed Contracts; provided, that Buyer shall only purchase the applicable Seller's right, title and interest to the Contracts and Real Property Leases with respect to the Tahoe Pacific Hospitals – Meadows Campus (Reno, NV) Seller Facility (the "***TPH Campus***") to the extent a 12-month lease extension with respect to such Seller Facility is obtained at or prior to Closing (the "***TPH Condition***");

(h)    all assets that would otherwise be included in Sections 2.1(a) through (o) which are used in connection with the operation of the TPH Campus; provided, that Buyer shall only purchase the applicable Seller's right, title and interest to such assets with respect to the TPH Campus to the extent the TPH Condition is satisfied;

(i)    to the extent transferable, all Permits held by Sellers relating to the ownership, development and operation of the Seller Facilities, including the Medicare and Medicaid provider agreements for the Seller Facilities;

(j)      all claims or causes of action relating to or arising from any of the Purchased Assets, including, without limitation, any Avoidance Actions relating to or arising from any of the Purchased Assets;

(k)      all telephone and facsimile numbers, post office boxes and directory listings used in connection with the Seller Facilities;

(l)      to the extent permitted by applicable Law, all bank accounts relating to the Seller Facilities;

(m)      any receipts (i) relating to supplemental, disproportionate share or waiver payments, or Medicaid GME funding with respect to time periods prior to the Closing Time; (ii) relating to the Seller Cost Reports or Agency Settlements (whether resulting from an appeal by Sellers or otherwise) and other risk settlements with respect to time periods prior to the Closing Time, (iii) which result from Sellers' pursuit of one or more appeals pertaining to Medicare, Medicaid (including, without limitation, disproportionate share hospital program payments) or TRICARE with respect to periods prior to the Closing Time, (iv) relating to participation in any group purchasing organization (including any Tax refunds, rebates or fee sharebacks for purchases made prior to Closing) with respect to periods prior to the Closing Time or (v) with respect to "meaningful use" attestations;

(n)      to the extent transferable, Sellers' National Provider Identifiers relating to the Seller Facilities; and

(o)      all other rights, properties and assets of Sellers which are primarily used in connection with the operation of the Seller Facilities.

## 2.2      Excluded Assets.

The Purchased Assets shall specifically exclude the following assets, rights, business, claims or properties of Sellers (collectively, the "*Excluded Assets*"):

(a)      all intercompany receivables between Sellers and any of their respective Affiliates;

(b)      all of Sellers' assets owned, used or held for use by Sellers in connection with the operation of any long-term acute care hospital or facility other than the Seller Facilities, including, for the avoidance of doubt, all assets related to or used in connection with (i) the HHC Business and (ii) the long-term acute care hospitals operated by Sellers which do not constitute Seller Facilities;

(c)      all current and non-current cash and cash equivalents, securities, investments, endorsements, bond funds and other funds created by bond indentures, financial assurances and certificates of deposits;

(d)      assets and liabilities under medical malpractice risk pools and workers compensation and employee retirement programs;

(e)      all of Seller's or any of its Affiliates' proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses not used at the Seller Facilities;

(f)      all Excluded Contracts; provided, that the Contracts and Real Property Leases with respect to the TPH Campus shall constitute Excluded Contracts solely to the extent the TPH Condition is not satisfied;

(g)        the Intellectual Property set forth on Schedule 2.2(g);

(h)        computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials which are proprietary to Sellers or their Affiliates or used in connection with the operation of one or more of Sellers' or its Affiliates' health care facilities other than the Seller Facilities;

(i)        the sponsorship of and all assets maintained pursuant to or in connection with any Employee Benefit Plan or any other benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any of Sellers or any of their Affiliates or with respect to which any of Sellers or any of their Affiliates has any current or contingent liability or obligation;

(j)        all minute books and organizational records relating to Sellers and their Affiliates and all other books and records that a Seller is required by Law to retain in its possession; provided, that copies of such books and records shall be made available to Buyer upon reasonable request to the extent permitted by applicable Law;

(k)        all insurance policies and rights thereunder;

(l)        those pharmaceuticals that cannot, by Law, be sold by Sellers to Buyer;

(m)        all claims, rights, interests and proceeds with respect to state or local Tax payments, refunds, and credits (including but not limited to property Tax refunds and charity Tax credits) related to the operations of the Seller Facilities or the Purchased Assets with respect to periods ending prior to the Closing Time, and the right to pursue appeals of same;

(n)        all Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables and Sellers' Transition Receivables;

(o)        other than as set forth in Section 2.1(j), all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Sellers and their Affiliates with respect to periods prior to the Closing Time, and any payments, awards or other proceeds resulting therefrom;

(p)        peer review materials and any writings, documents and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, in each case, except to the extent related to the Assumed Liabilities;

(q)        all assets used in connection with the operation of the TPH Campus if the TPH Condition is not satisfied; and

(r)        the rights of Sellers and their Affiliates under this Agreement.

**2.3    Assumed Liabilities**.

Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, Sellers shall assign to Buyer and Buyer shall assume, perform and discharge only the following liabilities, obligations and duties of Sellers relating to the operation of the Seller Facilities (all such liabilities, collectively, the "***Assumed Liabilities***"):

(a)    all accounts payable relating to the Seller Facilities that are listed on Schedule 2.3(a) (which Schedule 2.3(a) may be updated from time to time prior to the Closing Date to add or remove any accounts payable relating to the Seller Facilities accrued or paid in the ordinary course of business consistent with past practice) (the amount of such payables as of the Closing Date, the "***Assumed Accounts Payable***");

(b)    all liabilities, obligations and duties of Sellers under the Assumed Contracts solely to the extent arising from and after the Closing Date (but excluding, without limitation, any liability or obligation relating to or arising out of such Assumed Contracts as a result of any breach by a Seller under such Assumed Contracts occurring prior to the Closing);

(c)    all Cure Amounts;

(d)    all liabilities, obligations and duties with respect to the Real Property Leases solely to the extent arising from and after the Closing Date (but excluding any liability or obligation relating to or arising out of the Real Property Leases as a result of any breach by a Seller under such Real Property Leases occurring prior to the Closing); provided that, Buyer shall only assume the liabilities, obligations and duties of Sellers under the Welltower Master Lease with respect to the San Antonio, Tanaya and Sarasota Seller Facilities; provided, further, that Buyer shall only assume the liabilities, obligations and duties of Sellers with respect to the TPH Campus to the extent the TPH Condition is satisfied;

(e)    all liabilities, obligations and duties related to or otherwise arising out of Buyer's employment of the Transferred Employees solely to the extent arising from and after the Closing Date, including all claims related to Transferred Employees on or after the Closing Date under any collective bargaining agreement to which Buyer is subject and all claims pursuant to the WARN Act relating solely to any action or inaction of Buyer with respect to the Transferred Employees;

(f)    the PTO Liability;

(g)    claims, recoupments, set-offs, adjustments and other liabilities relating to the Medicare and Medicaid provider agreements of the Seller Facilities;

(h)    the Capital Lease Liability;

(i)    all liabilities for Taxes with respect to the Purchased Assets solely related to, and arising out of, any taxable period (or portion thereof) beginning after the Closing Date;

(j)    all liabilities of Buyer to Sellers, their Affiliates, and their and their Affiliates' agents, advisors and representatives under the Transaction Agreements; and

(k)    other specifically assumed liabilities set forth in Schedule 2.3(k).

## 2.4    **Excluded Liabilities**.

Buyer shall not assume, and under no circumstances shall Buyer be obligated to pay, discharge, perform or assume any debt, obligation, expense or liability of Sellers or any Affiliates thereof other than the Assumed Liabilities (such debts, obligations, expenses or liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the foregoing, Buyer does not assume or agree to pay, discharge, perform or assume the debts, obligations, expenses or liabilities of Sellers with respect to, arising out of or relating to the following Excluded Liabilities:

(a)    any liabilities owed by a Seller to an Affiliate of Seller;

(b)     any liabilities arising from the Excluded Assets;

(c)     all trade and accounts payable other than the Assumed Accounts Payable;

(d)     (i) all Tax liabilities of Sellers whenever incurred and (ii) all Tax liabilities relating to the Purchased Assets for any taxable period (or portion thereof) ending on or prior to the Closing Date;

(e)     all indebtedness for borrowed money of Sellers (for avoidance of doubt, other than the Capital Lease Liability);

(f)     all guarantees of third party indebtedness made by Sellers and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit;

(g)     (i) all Proceedings pending on or before the Closing Date against Sellers or to the extent against or giving rise to liabilities or obligations of the Seller Facilities (even if instituted after the Closing Date) and (ii) all liabilities arising out of any Action commenced against any Seller or any predecessor or Affiliate of Sellers after the Closing, in each case, to the extent arising out of or relating to acts or omissions of Sellers prior to Closing;

(h)     all liabilities or obligations to any current or former owner of capital stock or other equity interests of Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of Sellers, any current or former holder of indebtedness for borrowed money of Sellers or, in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of Sellers;

(i)     the sponsorship of and any current or contingent liabilities or obligations at any time arising under, pursuant to, or in connection with any Employee Benefit Plan or any other benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored or contributed to or required to be contributed to by any of Sellers or any of their Affiliates, or with respect to which any of Sellers or any of their Affiliates has any current or contingent liability or obligation;

(j)     all liabilities pursuant to the WARN Act relating to any action or inaction of Sellers prior to or upon the Closing;

(k)     all costs, fees and expenses incurred by Sellers in connection with the administration of the Bankruptcy Case or the negotiation, execution and consummation of the transactions contemplated by this Agreement, including all liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by Sellers in connection with, resulting from or attributable to the transactions contemplated by this Agreement or the Bankruptcy Case;

(l)     all liabilities of Sellers or any predecessor or Affiliate of Sellers based upon such Person's acts or omissions occurring after the Closing;

(m)     all liabilities of Sellers to Buyer, its Affiliates, and its Affiliates' agents, advisors and representatives under the Transaction Agreements or otherwise;

(n)     all liabilities arising out of the ownership or operation of the Purchased Assets, Seller Facilities or the Business relating to Environmental Laws, to the extent arising from facts, conditions or circumstances first caused or first created prior to the Closing Date;

(o)      (i) all liabilities, obligations and duties under the Welltower Master Lease with respect to the Mechanicsburg and Ruston properties and (ii) to the extent the TPH Condition is not satisfied, all liabilities, obligations and duties with respect to such TPH Campus; and

(p)      all liabilities or obligations to the extent relating to the ownership, possession or use of the Excluded Assets, including executory Contracts and Real Property Leases that are not Assumed Contracts, or the ownership, possession or use of the Purchased Assets to the extent arising prior to the Closing Date.

**2.5**      **Assignment of Contracts**.

(a)      Schedule 2.5(a) sets forth a list of all executory Contracts and Real Property Leases relating to the Seller Facilities or the Purchased Assets to which one or more of Sellers are party (the "***Available Contracts***"), which Schedule 2.5(a) may be updated from time to time prior to the Sale Hearing to add or remove any Contracts inadvertently included or excluded from such schedule. Prior to the Sale Hearing or, with the consent of Sellers, at any later date prior to Closing, Buyer, in its sole discretion by written notice to Sellers, shall designate in writing which Available Contracts Buyer wishes Sellers to assume and assign to Buyer (the "***Assumed Contracts***"), subject to the right of Buyer, at any time prior to the Sale Hearing, to determine that any Available Contracts shall be an Assumed Contract or an Excluded Contract. All Available Contracts of Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "***Excluded Contracts***".

(b)      In the event of a dispute as of the Closing Date regarding assumption and assignment of, or the proposed Cure Amount to be paid in respect of, any Contract proposed to be an Assumed Contract as set forth in Schedule 2.5(a), Buyer shall have the right to designate any Assumed Contract as an Excluded Contract at any time prior to or following the Closing Date in the event any such dispute is not resolved to Buyer's satisfaction by entry of an Order of the Bankruptcy Court (or upon the consensual resolution of such dispute as may be agreed by Buyer and such counterparty). Upon an election by Buyer to designate such previously Assumed Contract as an Excluded Contract in accordance herewith, Buyer shall have no liability or other obligation whatsoever to Sellers or the counterparty to such contract, whether such liability or other obligation arises prior to or after the Closing Date.

(c)      To the maximum extent permitted by the Bankruptcy Code, Sellers shall use their best efforts to assume and transfer and assign all Purchased Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(d)      Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Sale Order. Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "***Transfer Consent***"), would constitute a breach or in any way adversely affect the rights of Buyer or Sellers thereunder and Buyer shall assume no obligations or liabilities under any such Purchased Asset except as set forth in the last sentence of this Section 2.5(d). Sellers shall advise Buyer in writing at least five (5) business days prior to the Closing with respect to any Purchased Asset which Sellers know or have substantial reason to believe will or may not be subject to assignment to Buyer hereunder at the Closing. Without in any way limiting Sellers' obligation to obtain all consents and waivers necessary for the sale, transfer, assignment and delivery of the Assumed Contracts and the Purchased Assets to Buyer hereunder, if such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted

15

and subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain the rights and benefits and assume the obligations thereunder in accordance with this Agreement.

(e)    At Closing, (i) Sellers shall, pursuant to the Sale Order and the Assignment and Assumptions and other transfer and assignment documents reasonably requested by Buyer, assume and assign, or cause to be assigned, to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned, (ii) subject to Section 2.5(b), Buyer shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as set forth in this Agreement, any filing with the Bankruptcy Court, as agreed to by Buyer and the contract counterparty, or as determined by the Bankruptcy Court), and (iii) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assignment and Assumptions.

## 2.6    Purchase Price.

(a)    Buyer shall deposit (or cause the deposit of) $500,000 (the "*Deposit*") within one business day following the Effective Date into an escrow account pursuant to that certain Escrow Agreement of even date herewith among JP Morgan Chase Bank, N.A. (the "*Escrow Agent*"), the Company and Buyer (the "*Deposit Escrow Agreement*"); provided that, the parties hereto agree that if the Bankruptcy Court (i) does not approve this Agreement within fifteen (15) business days following the Effective Date, or (ii) if the Bankruptcy Court does not approve this Agreement within five (5) business days of the hearing to approve such Agreement, Sellers and Buyer agree to instruct the Escrow Agent to remit the full amount of the Deposit to Buyer. At the Closing, the Deposit shall be credited towards payment of the Purchase Price and paid to Sellers. If this Agreement is terminated by the Company prior to Closing pursuant to Section 7.1(c) or Section 7.1(i), then within two business days of such termination, the Company and Buyer shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release from escrow the entire Deposit, by wire transfer of immediately available funds to an account designated by the Company to the Escrow Agent, to be retained by the Company. In all other circumstances, if this Agreement is terminated in accordance with the terms of this Agreement prior to Closing, then within two business days of such termination, the Company and Buyer shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release all funds held in escrow, including any interest or earnings thereon, by wire transfer of immediately available funds to an account designated by Buyer to the Escrow Agent.

(b)    The Company shall deliver to Buyer its good faith estimate of Assumed Accounts Payable not less than three (3) Business Days prior to Closing, and Buyer and the Company shall work in good faith to mutually agree on such estimate prior to the Closing (such mutually agreed-upon amount, the "*Estimated Assumed Accounts Payable*").

(c)    At the Closing, the aggregate consideration to be paid by Buyer for the Purchased Assets (the "*Purchase Price*"), in addition to the assumption of the Assumed Liabilities, shall be an amount equal to (i) cash (the "*Cash Purchase Price*") in the amount of $29,500,000, minus (A) the amount of the Deposit, minus (B) the PTO Liability, minus (C) the Capital Lease Liability, minus (D) the Expense Reimbursement, minus (E) the Cure Amounts, minus (F) the Estimated Assumed Accounts Payable (provided, that the deductions set forth in the foregoing (B)-(E) shall not exceed $12,000,000 in the aggregate), and (ii) the Subordinated Promissory Note.

## 2.7    Assumed Accounts Payable Adjustment.

(a)    Within forty-five (45) days following the Closing Date, Buyer shall prepare and deliver to the Company a statement setting forth Buyer's calculation of the Assumed Accounts Payable. Following

the Company's receipt of the Buyer's calculation of the Assumed Accounts Payable, and for the fifteen (15)-day period immediately thereafter, the Company and the Company' representatives and agents shall be permitted to review Buyer's books and records relating to Buyer's calculation and determination of Assumed Accounts Payable. Buyer's calculation of the Assumed Accounts Payable shall become final and binding upon the parties fifteen (15) days following the Company's receipt thereof, unless the Company gives written notice of disagreement (an "*AP Disagreement Notice*") to Buyer prior to such date. Any AP Disagreement Notice shall specify in reasonable detail the nature and dollar amount of any disagreement so asserted. If a timely AP Disagreement Notice is received by Buyer, then the Assumed Accounts Payable (as revised in accordance with clause (i) or (ii) below) shall become final and binding upon Buyer and Sellers on the earliest of (i) the date Buyer and the Company resolve in writing any differences they have with respect to the matters specified in the AP Disagreement Notice or (ii) the date all matters in dispute are finally resolved in writing by a court of competent jurisdiction in accordance with Sections 8.4 and 8.5 herein. During the fifteen (15) days following delivery of an AP Disagreement Notice, Buyer and the Company shall seek in good faith to resolve in writing any differences which they may have with respect to the matters specified in the AP Disagreement Notice. During such period, each party hereunder shall be permitted to review the other party's working papers relating to the calculation of the Assumed Accounts Payable. At the end of such fifteen (15)-day period, Buyer or the Company may submit such dispute to a court of competent jurisdiction in accordance with <u>Sections 8.4</u> and <u>8.5</u> herein. For purposes of this Agreement, "*Final Assumed Accounts Payable*" shall be the Assumed Accounts Payable as finally determined pursuant to this <u>Section 2.7(a)</u>.

(b)    Should the Estimated Assumed Accounts Payable exceed the Final Assumed Accounts Payable, then the Company shall be entitled to receive, and within three (3) Business Days after the Assumed Accounts Payable becomes final and binding on the parties (the "*Finalization Date*"), Buyer shall pay, such excess in cash to the Company by wire transfer of immediately available funds to an account designated by the Company.

(c)    Should the Final Assumed Accounts Payable exceed the Estimated Assumed Accounts Payable, within three (3) Business Days after the Finalization Date, the Company shall pay such excess, if any, in cash to Buyer by wire transfer of immediately available funds to an account designated by Buyer.

**2.8**    <u>**Closing**</u>.

Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated pursuant to this Agreement (the "*Closing*") shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York, on the later of (a) five business days after satisfaction of the conditions set forth in ARTICLE VI (other than those conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction of such conditions at the Closing), (b) sixty (60) days following the date of entry of the Sale Order (provided that the conditions set forth in ARTICLE VI have been satisfied (other than those conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction of such conditions at the Closing)), and (c) such other time or place as Buyer and Sellers may agree (the "*Closing Date*"). The Closing shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the applicable Seller Facility is located) on the Closing Date (the "*Closing Time*"). The Closing will take place remotely by electronic mail or other electronic exchange of documents, among and between the Parties and/or their respective counsel.

**2.9**    <u>**Actions of Sellers at Closing**</u>.

At the Closing and unless otherwise waived in writing by Buyer, Sellers shall deliver or cause to be delivered to Buyer the following:

(a)    the Purchased Assets by making the Purchased Assets available to Buyer at their present location;

(b)    a Bill of Sale in the form attached as **Exhibit B** ( the "*Bill of Sale*") executed by each Seller in favor of Buyer;

(c)    Credit Suisse Side Letter Agreement executed by Seller;

(d)    an Assignment and Assumption Agreement in the form attached as **Exhibit C** (the "*Assignment and Assumption*") executed by each Seller in favor of Buyer;

(e)    certificates of existence and good standing of each Seller from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date;

(f)    a non-foreign affidavit of each Seller, dated as of the Closing Date, in form and substance consistent with the Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(g)    certificates of title with respect to any vehicles included in the Purchased Assets duly executed by the applicable Seller;

(h)    certificates of an officer of the Company certifying the satisfaction of the conditions to Closing set forth in Section 6.2(a) and Section 6.2(b);

(i)    certificates of incumbency for the respective officers of Sellers executing this Agreement and the other Transaction Agreements;

(j)    evidence reasonably satisfactory to Buyer that Sellers have satisfied the length of stay requirements for each Seller Facility for the two year period preceding the Closing Date;

(k)    fully executed termination agreements for all management agreements (other than any management agreements that Buyer has designated as an Assumed Contract pursuant to Section 2.5(a)) with respect to the operation of the Seller Facilities, in a form reasonably satisfactory to Buyer and in full force and effect;

(l)    (i) fully executed lease extension with respect to the LifeCare Hospitals of Dayton (Miamisburg, OH) Seller Facility, in a form reasonably satisfactory to Buyer and in full force and effect or (ii) such other alternative lease arrangement in form and substance reasonably acceptable to Buyer;

(m)    fully executed lease extensions with respect to the LifeCare Hospitals of Shreveport – North Campus and Pierremont Campus (Shreveport, LA) Seller Facilities, in each case, in a form reasonably satisfactory to Buyer and in full force and effect;

(n)    evidence of the buyout or payoff of all obligations related to the Welltower Master Lease other than those obligations relating to the San Antonio, Tanaya and Sarasota Seller Facilities that are expressly assumed by Buyer hereunder and a fully executed lease related to such Seller Facilities subject to the Welltower Master Lease in a form reasonably satisfactory to Buyer and in full force and effect; and

(o)    copies of all medical records for the applicable Record Retention Period prior to the Closing and a patient index relating to the Seller Facilities, in each case in digital or electronic format.

**2.10**    **Actions of Buyer at Closing**.

At the Closing and unless otherwise waived in writing by the Company, Buyer shall deliver or cause to be delivered to Sellers the following:

(a)    the Cash Purchase Price, by wire transfer of immediately available funds to an account designated in writing by the Company;

(b)    a Bill of Sale executed by Buyer;

(c)    Credit Suisse Side Letter Agreement executed by Buyer and Credit Suisse;

(d)    an Assignment and Assumption executed by Buyer;

(e)    a Subordinated Promissory Note executed by Buyer;

(f)    copies of resolutions duly adopted by the Board of Directors (or similar governing body) of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement certified by an officer of Buyer;

(g)    certificates of existence and good standing of Buyer from the state of its incorporation or formation, dated the most recent practicable date prior to the Closing Date;

(h)    certificates of an officer of Buyer certifying the satisfaction of the conditions to Closing set forth in <u>Section 6.3(a)</u> and <u>Section 6.3(b)</u>; and

(i)    certificates of incumbency for the officer of Buyer executing this Agreement and the other Transaction Agreements.

**ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except to the extent a representation or warranty speaks as of another date, as of the Effective Date and as of the Closing Date, and except as set forth in the Schedules to this <u>ARTICLE III</u> ("***Article III Schedules***"), Sellers represent and warrant to Buyer the following:

**3.1**    **Corporate Capacity, Authority and Consents**.

Each Seller is duly organized and validly existing in good standing under the Laws of the state of its formation or incorporation with the requisite organizational power and authority to enter into this Agreement and each of the Transaction Documents, to perform its respective obligations hereunder and thereunder, to own, lease and operate its properties and to conduct its business as now being conducted. Each Seller is duly qualified or licensed to do business as a foreign entity and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified, licensed and in good standing would not, individually or in the aggregate, have a Material Adverse Effect. Sellers have made available to Buyer a complete and correct copy of the Governing Documents of each Seller as in effect on the Effective Date. Subject to the entry of the Sale Procedures Order or the Sale Order, the execution, delivery and performance of this Agreement and all other Transaction Agreements to which any Seller is or will become a party and the actions to be taken by each Seller in connection with the consummation of the Transactions:

(a)　　are within the organizational powers of such Seller, are not in contravention of applicable Law or the terms of the applicable Governing Documents;

(b)　　except as otherwise expressly herein provided or as set forth in Schedule 3.1(b), do not require any approval or consent of, or filing with, any Governmental Authority;

(c)　　will not violate any Order or Law to which such Seller or any of the Purchased Assets are subject;

(d)　　will not, with or without notice or lapse of time or both, result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any Material Contract to which any Facility Seller is a party or otherwise bound; and

(e)　　will not result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any properties or material assets of Sellers.

**3.2**　**Binding Agreement**.

The execution, delivery and performance of this Agreement and each of the Transaction Documents to which each Seller is or will become a party by each Seller and the consummation of the transactions contemplated hereby and thereby have been, or will be when delivered, duly authorized and approved by all requisite entity action of such Seller.  No other corporate or organizational proceedings on the part of Sellers are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Sellers are a party and the consummation of the transactions contemplated thereby.  Subject to the entry of the Sale Order, this Agreement and each other Transaction Agreement to which each Seller is or will become a party are and will constitute the valid and legally binding obligations of such Seller, and are and will be enforceable against such Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3**　**Subsidiaries**.

Except as set forth on Schedule 3.3, Facility Sellers have no Subsidiaries and do not own any interests in any other Person.

**3.4**　**Assets**.

(a)　　Sellers own valid and marketable title to, or possess valid leasehold interests in, all of the Purchased Assets. One or more Sellers have sole custody and control of all of the Purchased Assets, except with respect to any Permitted Encumbrances or as otherwise set forth on Schedule 3.4(a).

(b)　　Subject to the entry of the Sale Order, the Purchased Assets are free and clear of all Encumbrances except Permitted Encumbrances.

(c)　　Except as would not materially impair the present ownership, use or operations of the Purchased Assets, the Purchased Assets are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the Ordinary Course of Business.

(d)　　The Purchased Assets are sufficient for the continued conduct of the Seller Facilities after the Closing in substantially the same manner as currently conducted and constitute all of the assets,

including all Contracts, Permits and properties, necessary to operate the Seller Facilities as presently conducted.

**3.5**     **Licenses and Accreditations**.

(a)     Facility Sellers hold all Permits required to be held by them to own, occupy and operate the Seller Facilities as they are currently being operated, including, without limitation, all pharmacies, laboratories, and other ancillary service lines located at the Seller Facilities or operated for the benefit of the Seller Facilities for which a Facility Seller is required to hold separate Permits. Schedule 3.5(a) sets forth a list of such Permits (collectively, the "***Material Permits***"), and the corresponding number of licensed beds, that are material to the ownership and operation of the Seller Facilities, copies of which have been made available to Buyer, and all of which are valid and in full force and effect. All of the Material Permits are valid, binding and in full force and effect. Schedule 3.5(a) sets forth a list of all survey and inspection deficiencies of the Seller Facilities that have been identified by any Governmental Authority and are yet to be corrected. Sellers and the Seller Facilities, as applicable, are, and at all times since the Lookback Date have been, in material compliance with the terms of the Material Permits. There are no agreements entered into by any Facility Seller relating to any Material Permit that preclude or materially limit Facility Sellers from operating the Seller Facilities and carrying on the operations of the Seller Facilities as currently conducted. There is no pending or, to the Knowledge of Sellers, threatened Proceeding by or before any Governmental Authority to revoke, cancel, rescind, suspend, materially modify, or refuse to renew the Material Permits. To the Knowledge of Sellers, no event has occurred and no facts exist with respect to any Material Permit that would allow the suspension, revocation, or termination of same, nor have Sellers or the Seller Facilities received any written notice or written communication from any Governmental Authority regarding any material violation of any Material Permit. Sellers have delivered or made available to Buyers accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Sellers or the Seller Facilities since the Lookback Date in connection with the Permits owned or held by Facility Sellers.

(b)     Facility Sellers hold all certificate of need approvals necessary for Facility Sellers to own and operate the Seller Facilities and the Purchased Assets and to carry on the operations as currently conducted. Sellers and the Seller Facilities, as applicable, are, and at all times since the Lookback Date have been, in material compliance with the terms and conditions of any such certificates of need approvals. Each such certificate of need is valid and in good standing and not subject to meritorious challenge.

(c)     Schedule 3.5(c) sets forth an accurate and complete list of all Joint Commission accreditations and other accreditations held by Facility Sellers with respect to the Seller Facilities. All such accreditations are and shall be current and in full force and effect as of the Effective Date and as of the Closing Date. Except as otherwise disclosed in Schedule 3.5(c) and to Sellers' Knowledge, no event has occurred or other fact exists with respect to such accreditations that allows, or after notice or the lapse of time or both, would allow, for the revocation, material limitation or termination of any such accreditations. There is no pending or, to Sellers' Knowledge, threatened Proceeding by any accrediting body to revoke, cancel, rescind, suspend, restrict, materially modify, or non-renew any such accreditation. Sellers have delivered a copy of each Seller Facility's most recent Joint Commission accreditation reports and any reports, documents, or correspondence relating thereto to Buyer.

**3.6**     **Regulatory Compliance**.

(a)     Except as set forth on Schedule 3.6(a), Sellers, the Seller Facilities, and the Purchased Assets are, and since the Lookback Date have been, in compliance in all material respects with all applicable Laws including the Healthcare Laws.  Since the Lookback Date, no Seller has received any written notice

from any Governmental Authority regarding any actual or alleged violation of, or failure on the part of any Seller to comply in all material respects with, any applicable Law.

(b)    With respect to the Seller Facilities, since the Lookback Date, to the Knowledge of Sellers, Sellers have not been investigated by any Governmental Authority with respect to any alleged violation of Law, nor has any Seller or any Seller Facilities received any written, or to Sellers' Knowledge, oral communication from a Governmental Authority, Third Party Payor or patient that alleges the Seller Facilities or the Purchased Assets are not in material compliance with any Law, other than statements of deficiencies from a Governmental Authority received in the Ordinary Course of Business.

(c)    Facility Sellers are in compliance in all material respects, and at all times since the Lookback Date have been in compliance in all material respects, with the requirements to qualify each Seller Facility as a long term acute care hospital in accordance with all applicable Healthcare Laws, including, without limitation, the requirements set forth at 42 C.F.R. § 412.23(e). Each Seller Facility satisfies, and has satisfied, all requirements for exclusion from the Medicare prospective payment system specified in 42 C.F.R. § 412.1(a)(1) by complying with the requirements set forth at 42 C.F.R. § 412.23(e), and have provided Facility Seller with evidence of compliance with these requirements. Except as disclosed on Schedule 3.6(c), no Proceedings or surveys are pending or, to Sellers' Knowledge, threatened that relate to any Seller Facility status as a long term care hospital under 42 C.F.R. § 412.23(e). Except as disclosed on Schedule 3.6(c), no Seller Facility is subject to the special payment provisions for long term care hospitals specified in 42 C.F.R. §§ 412.534 and 412.536.

(d)    Without limiting the generality of the foregoing, to the Knowledge of Sellers, Sellers have not, directly or indirectly, offered, paid or received, or made arrangements to offer, pay or receive, any remuneration, in cash or in kind, to any past, present or potential customers, past or present suppliers, patients, medical staff members, contractors or Third Party Payors of the Seller Facilities in order to obtain business or payments from such Persons that would reasonably be expected to subject Sellers to any material damage or penalty in any civil, criminal or governmental litigation or proceeding. With respect to the Seller Facilities, to Sellers' Knowledge, none of the officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of Facility Sellers has been excluded from any Third Party Payor program or been subject to sanction or been convicted of a crime in connection with any state or federal healthcare program or under any Healthcare Laws, nor is any such exclusion or conviction pending or threatened.

(e)    With respect to the Seller Facilities, there are no pending or, to the Knowledge of Seller, threatened disciplinary or corrective actions or appeals involving physician applicants, active medical staff members or affiliated health professionals under the medical staff bylaws at each Seller Facility. Sellers have made available to Buyer copies of the bylaws, rules and regulations of the medical staff at each Seller Facility and its executive committee. Notwithstanding the foregoing provisions, Sellers shall not be required to disclose any information pursuant to this Section 3.6(e) where such disclosure is prohibited by Law or such disclosure would, or could reasonably be expected to, jeopardize any applicable privilege or protection including, without limitation, peer review or any other privilege which is available under applicable Law. No medical staff members of the Seller Facilities have had their privileges revoked, suspended, or reduced since the Lookback Date.

(f)    With respect to the Seller Facilities, Sellers have not, since the Lookback Date, made and are not in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, under the self-disclosure protocol established and maintained by the OIG, or under any United States Attorney or other Governmental Authority.

3.7     **Compliance Program**.

Seller Facilities have implemented compliance programs and have conducted their operations in material accordance with such compliance programs. The Company has made available to Buyer copies of the Seller Facilities' current compliance program materials, including: all program descriptions; compliance officer and committee descriptions; compliance committee meeting minutes and reports for the last two years; compliance policies; hotline and other logs or databases of compliance issues, reviews or investigations for the last two years; training and education materials; auditing and monitoring protocols; reporting mechanisms; and disciplinary policies. No Seller, with respect to the operations of the Seller Facilities (a) has reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (b) is a party to a Corporate Integrity Agreement with the OIG, (c) since the Lookback Date, has been served with any search warrant, subpoena, or civil investigation demand from any Governmental Authority related to the Seller Facilities' participation in any Governmental Reimbursement Program, or (d) has been to Seller's Knowledge a defendant in any *qui tam*/False Claims Act litigation. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.

3.8     **Material Contracts**.

(a)     Schedule 3.8(a) sets forth a complete list as of the Effective Date of the following Contracts to which a Seller is a party, in each case relating to the Seller Facilities (such Contracts set forth or required to be set forth on Schedule 3.8(a), the "***Material Contracts***" and each a "***Material Contract***"): (i) Contracts involving the lease of equipment or personal property that require payments by or to a Seller of greater than $200,000 during the remaining term or on an annual basis and any other capitalized lease obligations; (ii) employment Contracts; (iii) Contracts with respect to patents, trademarks, trade names or service names; (iv) collective bargaining agreements; (v) partnership or joint venture agreements, and any other Contracts relating to the ownership of, investments in or loans and advances to any Person, including minority equity investments; (vi) Contracts containing a covenant on the part of the Seller not to compete with respect to the operation of the Seller Facilities or which provide for "exclusivity" or any similar requirement in favor of any Person other than Sellers; (vii) Contracts with any hospitals, ambulatory surgery centers or other healthcare facilities; (viii) Contracts with any physicians or other providers of healthcare services; (ix) any other Contracts that involve payments, performance of services or provision of items in an amount exceeding $200,000 or that cannot be canceled by the applicable Seller, without penalty on 90 days' notice or less, (x) Contracts relating to the acquisition or disposition by any Seller outside the Ordinary Course of Business of any material assets or any material business (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise) to the extent any actual or contingent material obligations of any Seller thereunder remain in effect, (xi) Contracts with any Governmental Authority, (xii) Contracts relating to the settlement of any Proceeding which imposes any material payment or other material obligations of Sellers after the Effective Date, (xiii) Contracts relating to borrowed money or other indebtedness or the mortgaging, pledging or otherwise placing an Encumbrance on any material asset or group of material assets of Sellers or any letter of credit arrangements, or any guaranty therefor, (xiv) powers of attorney or other similar Contracts or grant of agency, (xv) Contracts (A) providing for the license or provision of any Intellectual Property for primary use in connection with the Seller Facilities (excluding Contracts for the licensing of any generally commercially-available, off-the-shelf software from third parties not exceeding $100,000), or (B) relating to the development of any Intellectual Property for primary use in connection with the Seller Facilities, or the settlement of any Intellectual Property-related dispute with respect to the Seller Facilities (excluding agreements entered into with employees and contractors in the Ordinary Course of Business); or (xvi) any other Contracts that are otherwise material to the assets, operations or financial condition of Sellers. The Company has made available to Buyer true and correct copies of all of the Material Contracts, in each case, together with all amendments, waivers or other changes thereto and Schedule 3.8(a) contains an accurate and complete description of all material terms of all oral Contracts referred to therein.

23

(b)      Except as set forth on Schedule 3.8(b), each Material Contract is in full force and effect and there are no defaults thereunder on the part of any party thereto, and none of Sellers is in material default in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any Material Contract to which it is a party or by which it or its property is bound, except as a result of the commencement of the Bankruptcy Case, the insolvency or financial condition of Seller or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code. Each Material Contract was entered into at arm's length and in the Ordinary Course of Business and, subject to the Sale Order and the assignment of each Material Contract by the applicable Seller in accordance with applicable Law, is a valid and binding obligation of the applicable Seller and, to the Knowledge of Sellers, the other parties thereto and is in full force and effect in accordance with its terms.

**3.9**    **Real Property**.

(a)      Facility Sellers do not own any real property.

(b)      Schedule 3.9(b) sets forth a description of all of Facility Sellers' leasehold interests in the real properties leased, subleased or licensed by, or for which a right to use or occupy has been granted to, Facility Sellers (collectively, the "***Leased Real Property***"). Schedule 3.9(b) also identifies with respect to the Leased Real Property, each Contract (including any amendment, modification or renewal thereof, and any guaranties entered into in connection therewith) under which such Leased Real Property is occupied or used (collectively, the "***Real Property Leases***"). The Company has made available to Buyer true and complete copies of all of such Real Property Leases.

(c)      Except as otherwise set forth in Schedule 3.9(c), (i) each Real Property Lease is in full force and effect and is the valid, binding and enforceable obligation of the applicable Facility Seller and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms; (ii) no Facility Seller has given or received written notice of any material default under a Real Property Lease that currently remains outstanding and uncured, except as a result of the commencement of the Bankruptcy Case, the insolvency or financial condition of Facility Seller or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code; (iii) no party to any Real Property Lease has exercised any termination rights with respect thereto; (iv) subject to the entry of the Sale Order, the assignment of the Real Property Leases to Buyer or any Affiliate thereof shall not require the consent of any other party to such Real Property Leases, will not result in a breach of or default under any Real Property Lease, or otherwise cause such Real Property Lease to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the Closing; (v) Facility Sellers' current possession and quiet enjoyment of the Leased Real Property under such Real Property Leases has not been disturbed; (vi) Facility Sellers do not currently owe any outstanding and unpaid brokerage commissions or finder's fees with respect to such Real Property Leases; (vii) the other party to any Real Property Leases is not an Affiliate of Facility Sellers; and (viii) there are no liens or encumbrances on the leasehold estate or interest created by any such Real Property Lease other than Permitted Encumbrances.

(d)      There do not exist any actual or, to the Knowledge of Sellers, threatened condemnation or eminent domain proceedings that materially affect any Leased Real Property, and no Facility Seller has received any notice, oral or written, of the intention of any Governmental Authority to take or use any Leased Real Property.

**3.10**    **Insurance**.

Attached as Schedule 3.10 is a list and description of all insurance policies, including all self-funded plans or trusts, maintained by or for the benefit of the Seller Facilities. All of such policies and plans or trusts are in full force and effect with no premium or contribution arrearage.

**3.11**    **Employee Benefit Plans**.

(a)    The term "*Employee Benefit Plans*" means collectively, each "employee pension benefit plan" and "employee welfare benefit plan" as those terms are defined in Section 3(2) and 3(1) of ERISA (whether or not subject to ERISA), employment, change in control, stock option or other equity-based compensation, phantom equity, employee stock ownership, employee stock purchase, deferred compensation, severance pay, vacation, bonus or other incentive or other benefit or compensation agreement, arrangement, Contract, plan, program or policy, currently maintained by, sponsored in whole or in part by, or contributed to by any of Sellers or their Affiliates or with respect to which any of Sellers or their Affiliates have any liability for the benefit of any current or former employees of the Seller Facilities and their respective dependents, spouses, or other beneficiaries. Schedule 3.11(a) sets forth a list of each Employee Benefit Plan. Sellers have provided Buyer with correct and complete copies of summaries of the material terms of each Employee Benefit Plan. The term "*ERISA Affiliate*" means each trade or business (whether or not incorporated) which, together with any of Sellers, is or at any relevant time was treated as a single employer for any purpose under (i) Section 414(b), (c), (m) or (o) of the Code, or (ii) Section 302 or Title IV of ERISA. Except as disclosed on Schedule 3.11(a), no Seller nor any ERISA Affiliate currently has or has ever had any current or contingent liability or obligation or an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) and 3(37)), or any current or contingent liability or obligation with respect to an employee pension benefit plan subject to Title IV of ERISA or the minimum funding requirements of Section 412 or 430 of the Code. Sellers have no obligation to provide retiree welfare benefit coverage to any Person currently or formerly associated with the Seller Facilities.

(b)    Except as disclosed on Schedule 3.11(b), all Employee Benefit Plans and the related trusts comply in all material respects with and have been established, maintained, funded, and administered in all material respects in compliance with (i) the applicable provisions of ERISA and the regulations promulgated thereunder, (ii) all applicable provisions of the Code relating to qualification and tax exemption under Code Sections 401(a) and 501(a) or otherwise applicable to secure tax-qualified treatment, (iii) all applicable Laws, and (iv) the terms of such Employee Benefit Plans. All contributions, premiums, and other payments required by and due under the terms of each Employee Benefit Plan have been timely paid in accordance with the terms of such Employee Benefit Plan and applicable Laws. Except as disclosed on Schedule 3.11(b), no Employee Benefits Plan is subject to any audit, investigation or examination by any Governmental Authority (including the IRS, Department of Labor and Pension Benefit Guaranty Corporation) and there are no Actions (other than routine claims for benefits) pending or to the Knowledge of Sellers, threatened with respect to any Employee Benefit Plan. Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code or otherwise for favorable tax treatment is so qualified and has received a favorable determination letter from the IRS or is a prototype plan that is subject to a favorable opinion letter from the IRS, and nothing has occurred that would reasonably be expected to cause the loss of the qualified status of any such Employee Benefit Plan.

(c)    Except as disclosed on Schedule 3.11(c), the consummation of the Transactions (including in combination with other events or circumstances) shall not (i) entitle any current or former employee or other service provider to severance pay, unemployment compensation, or any other material payment, (ii) accelerate the time of payment or vesting, or increase the amount of, compensation or benefits due to any current or former employee or other service provider, (iii) directly or indirectly cause any Seller Facility to transfer or set aside any material assets to fund any benefits under any Employee Benefit Plan, (vi) give rise to any material liability under any Employee Benefit Plan, or (v) limit or restrict the right to amend, terminate, or transfer any assets of, any Employee Benefit Plan on or after the Closing Date.  The consummation of the Transactions (including in combination with other events or circumstances) shall not result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code. No Seller Facility

has any obligation to gross-up, indemnify, or otherwise reimburse any current or former employee or other service provider for any tax incurred by such employee or service provider under Section 280G of the Code, Section 409A of the Code, or otherwise.

**3.12    Employee Relations**.

There is no pending or, to the Knowledge of Sellers, threatened employee strike, work stoppage, walkout, lockout, picketing or other material labor dispute concerning or involving the Facility Employees, and no such event has occurred since the Lookback Date. Except as set forth on Schedule 3.12, (a) no Facility Seller is a party to or bound by any collective bargaining agreement or other Contract or bargaining relationship with any labor union, labor organization, or employee representative body, and no such agreement or relationship is currently being negotiated with respect to the Facility Employees; (b) since the Lookback Date, no written or, to the Sellers' Knowledge, oral demand has been made for recognition by a labor organization by or with respect to any Facility Employees; (c) no union organizing activities by or with respect to any Facility Employees are taking place, and to the Knowledge of Sellers, no such activities have taken place since the Lookback Date; and (d) none of the Facility Employees is represented by any labor union or organization in connection with their employment with Facility Sellers. Facility Sellers have satisfied any notice and bargaining obligations with any labor union, labor organization, or employee representative body as required by applicable Law, collective bargaining agreement, or Contract in connection with the proposed transaction. Since the Lookback Date, Facility Sellers have promptly, thoroughly and impartially investigated all employment discrimination and sexual harassment allegations of, or against, any Facility Employee and, with respect to each such allegation with potential merit, Facility Sellers have taken prompt corrective action in accordance with applicable Law. Except as would not result in material liability, (i) each individual who is performing or since the Lookback Date has performed services for the business and who is or was classified and treated by Facility Sellers as an independent contractor or other non-employee service provider is and was properly classified and treated as such for all applicable purposes, and (ii) since the Lookback Date, Facility Sellers have fully and timely paid all wages, salaries, wage premiums, commissions, bonuses, severance payments, expense reimbursements, fees, and other compensation that has come due and payable to Facility Employees and other workers providing services to the business under applicable law, Contract or policy. Since the Lookback Date, Facility Sellers have not failed to provide advance notice of layoffs or terminations as required by the Worker Adjustment and Retraining Notification Act of 1988, as amended, and all similar state or local Laws (the "***WARN Act***"), and no actions that would require notice pursuant to the WARN Act are currently contemplated, planned, or announced. Schedule 3.12 sets forth a list of involuntary terminations by Facility Sellers in the ninety (90) days immediately preceding the Closing Date, including location, date, and number of employees impacted. The Facility Employees are sufficient in number and skill to allow Buyer to operate the business after the Closing Date in substantially the same manner as it was operated by Facility Sellers immediately prior to the Closing.

**3.13    Litigation and Proceedings**.

Except as set forth on Schedule 3.13, with respect to the Seller Facilities, there are no and since the Lookback Date there have been no Actions pending or, to the Knowledge of Sellers, threatened against Sellers or their Affiliates or any of their respective properties or assets, including the Purchased Assets, at law or in equity, or before or by any Governmental Authority. With respect to the Seller Facilities, no Seller has received written notice of, and with respect to the Seller Facilities and to the Knowledge of Sellers, there are no, Orders of a court of competent jurisdiction outstanding against any Seller or any of their respective properties or assets that materially restrict the operation of the Seller Facilities. There is no Action pending or, to the Knowledge of Sellers, threatened against Sellers or their Affiliates which seeks to prevent or delay consummation of the Transactions, seeks damages in connection with Transactions or would impair the ability of Sellers to perform their obligations under this Agreement.

**3.14**     **Third Party Reimbursement**.

(a)     The Seller Facilities are certified to participate in the Medicare, Medicaid and TRICARE programs with valid and current provider or supplier agreements under such programs. Except as set forth on Schedule 3.14(a) or as would not result in a Material Adverse Effect, the Seller Facilities are in compliance with the terms and conditions of participation in the Medicare, Medicaid and TRICARE programs and are not subject to any pending or, to the Knowledge of Sellers, threatened Actions with respect to participation in such programs, other than routine audits and investigations conducted through the Medicare Recovery Audit Contractor programs.   Schedule 3.14(a) sets forth a list of all National Provider Identifiers and all provider numbers of Facility Sellers with respect to the Seller Facilities under the Government Reimbursement Programs.

(b)     Schedule 3.14(b) sets forth a list of all provider agreement between Facility Seller and Seller Facilities, when applicable, and Third Party Payors ("*Payor Agreements*"). Sellers have delivered or made available accurate and complete copies of all such Payor Agreements to Buyer. Sellers and Seller Facilities are in material compliance with the terms, conditions, and provisions of the Payor Agreements, including, without limitation, requirements related to dual eligibility. To Sellers' Knowledge, no events or facts exist that jeopardize any Payor Agreement. There is no Proceeding pending, or, to Sellers' Knowledge, threatened, involving a Government Reimbursement Program or other Third Party Payor, that involves a Facility Seller or Seller Facilities' participation in any Government Reimbursement Programs or other Third Party Payor programs. Neither Sellers nor, to Sellers' Knowledge, any of their employees, officers, or directors have committed a violation of any Law relating to Government Reimbursement Programs or other Third Party Payor programs.

(c)     Since the Lookback Date, Facility Sellers and their Affiliates have timely filed all Cost Reports in respect of the Seller Facilities, and such reports accurately reflect, in all material respects, the information to be included thereon. Copies of all Facility Sellers' Cost Reports filed by or on behalf of a Facility Seller since the Lookback Date have been provided or made available to Buyer.  Except as set forth on Schedule 3.14(c) there are no pending Actions, adjustments or audits relating to such Cost Reports. To the Knowledge of Sellers, Facility Sellers are not subject to any pending but unassessed Medicare or Medicaid claim payment adjustments arising from the Seller Facilities, except to the extent Sellers have established reserves for such adjustments in accordance with Sellers' accounting policy for establishing any such reserves and that are reflected on the consolidated financial statements of Sellers.

**3.15**     **Tax Liabilities**.

(a)     All Tax Returns, including, without limitation, income Tax Returns, payroll Tax Returns, unemployment Tax Returns and franchise Tax Returns, for periods prior to and including the Closing Date which are required to be filed by Sellers with any Governmental Authority in respect of Sellers have been timely filed in the manner provided by Law, and each Tax Return is correct and complete in all material respects and accurately reflects in all material respects the Tax liabilities of Sellers for the periods or other matters covered by such Tax Return.

(b)     Except as set forth on Schedule 3.15(b), all Taxes owing by Sellers have been paid when due and there is no pending tax examination or audit or other Proceeding of, nor any action, investigation or claim asserted against Sellers by any taxing authority in respect of Sellers.

(c)     Since the Lookback Date, no claim has been made in writing by a Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that any Seller is or may be subject to taxation by that jurisdiction.

(d)     None of Sellers or Buyer will be required to include any amount in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481, as a result of transactions or events occurring, sales or receipts received, or accounting methods employed, prior to the Closing.

(e)     Sellers have not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f)     None of the Assumed Liabilities is an obligation to make a payment that will not be deductible under Section 280G of the Code. No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return or any state, local or non-U.S. equivalent thereof and (ii) has liability for the Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local, or foreign Law), as a transferee or successor, or by contract, or otherwise.

(g)     There are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the Purchased Assets.

**3.16**    **Absence of Changes**.

Except as expressly contemplated by this Agreement, as disclosed in the Financial Statements, as required in connection with the Bankruptcy Case or as otherwise disclosed in the Article III Schedules, (i) no Material Adverse Effect has occurred since December 31, 2018, and (ii) no Seller has, since December 31, 2018, (a) written off as uncollectible, or established any extraordinary reserve with respect to, any material account receivable or other material indebtedness of Seller; (b) amended or restated, or approved the amendment or restatement of, the Governing Documents of such Seller; (c) made, revoked or changed any material Tax election or method of Tax accounting, entered into any settlement or compromise of any material Tax liability, surrendered any right to claim a material Tax refund, entered into any closing agreement relating to Taxes, consented to any claim or assessment relating to Taxes or waived or extended the statute of limitations for any such claim or assessment; (d) settled or compromised any material pending or threatened Action; (e) sold, transferred, leased, optioned or otherwise disposed of any material assets except in the Ordinary Course of Business; (f) granted or incurred any obligation for any increase in the compensation of any of the Facility Employees (except (x) as required by applicable Law or the terms of an Employee Benefit Plan or (y) in the Ordinary Course of Business); (g) received any written notice from any Governmental Authority of any material liability, potential liability or claimed liability based on any violation of Law by a Seller; (h) instituted any material change in a Seller's accounting practices or methods (except as required by applicable Law or GAAP); (i) made any loans, advances or capital contributions to, or investments in, any other Person; (j) other than in the Ordinary Course of Business, terminated, entered into, amended in any material respect, or waived any material rights under, any Assumed Contract, (k) offered any new discount, rebate, chargeback, credit or other financial or contractual incentive outside the Ordinary Course of Business, (l)(A) delayed or postponed the payment of any accounts payable or commissions or agreed or negotiated with any party to extend the payment date of any accounts payable or commissions other than in the Ordinary Course of Business or (B) accelerated the collection of (or discount) any accounts or notes receivable other than in the Ordinary Course of Business; (m) incurred, created or became obligated with respect to any liabilities or obligations which constitute Assumed Liabilities outside the Ordinary Course of Business, (n) pledged any Purchased Assets or ownership interests of Sellers in any of the Seller Facilities as collateral, (o) discharged any current or non-current liabilities relating to the Seller Facilities which constitute Assumed Liabilities other than in the Ordinary Course of Business and on terms according to existing loan and/or note agreements of Sellers, (p) implemented any employee layoffs, early retirement programs, reductions in force, or other voluntary or involuntary employment termination programs affecting employees working in the Seller Facilities such that could require notice under the WARN Act, or transferred any employees from being employed by any of the Seller Facilities to being

employed by any other long-term acute care hospital or facility of Sellers or any of their Affiliates other than the Seller Facilities; (q) entered into, terminated, or modified any collective bargaining agreement or other Contract with any labor union, labor organization, or other employee representative body; or (r) agreed or committed to take any of the foregoing actions.

**3.17**    **Intellectual Property**.

(a)    Except as set forth on Schedule 3.17(a), with respect to the Seller Facilities: (i) Sellers have not received any written notice that the conduct of the business of the Seller Facilities is infringing on or has misappropriated or otherwise violated the Intellectual Property rights of any Person, and, to Seller's Knowledge, the conduct of the business of the Seller Facilities has not infringed, misappropriated, or otherwise violated the Intellectual Property rights of any Person, and (ii) to Sellers' Knowledge, there is no infringement or misappropriation, or other violation by any Person of the Facility IP.

(b)    Schedule 3.17(b) includes a true and complete list of all registered, issued, or applied for Intellectual Property included in the Facility IP (including domain name registrations).  All such Facility IP is subsisting and, to Sellers' Knowledge, valid and enforceable.  Facility Sellers own all right, title and interest in and to such Facility IP, free and clear of any Encumbrances, other than Permitted Encumbrances. Except as set forth in Schedule 3.17(b), the Facility IP includes all Intellectual Property owned by or licensed to Sellers or their Affiliates and primarily used in connection with, or necessary to operate, the Seller Facilities.

(c)    Since the Lookback Date, Sellers have (to the extent related to the Seller Facilities) used commercially reasonable efforts (i) to protect, maintain, and preserve the Facility IP, including the confidentiality of the material trade secrets that are included in the Facility IP, and (ii) to secure ownership of any Intellectual Property developed by employees or contractors in the course of their employment with, or engagement by, Sellers in connection with the business of the Seller Facilities.

(d)    Facility Sellers use, and at all times since the Lookback Date have used, commercially reasonable efforts to protect the confidentiality, integrity and security of the information technology and network and communications equipment, systems, software, and infrastructure owned by the Facility Sellers or provided by Affiliates or third parties and primarily used in connection with the Seller Facilities, (the "*Facilities Systems*") and to prevent any unauthorized use, access, interruption, or modification of the Facilities Systems.  Except as set forth in Schedule 3.17(d), such Facilities Systems (i) are sufficient for the current needs of the business of the Seller Facilities, and (ii) are in sufficiently good working condition to support the operation of the business of the Seller Facilities as presently conducted. Since the Lookback Date, there have been no unauthorized intrusions, failures, breakdowns, continued substandard performance, or other adverse events affecting any such Facilities Systems that have caused any substantial disruption of or interruption in or to the use of such Facilities Systems or to the business of the Seller Facilities. Sellers and their Affiliates maintain commercially reasonable disaster recovery and business continuity plans, procedures and facilities in connection with the operation of the business of the Seller Facilities, have taken commercially reasonable steps act in compliance therewith, and have taken commercially reasonable steps to test such plans and procedures on a periodic basis.

(e)    Sellers comply with, and at all times since the Lookback Date have complied with, in all material respects, all of the following, in each case to the extent relating to data privacy, protection, or security, consumer protection, security breach notification, or to the collection, use, processing, storage, protection, security, transfer, or disposal of personally identifiable information, protected health information, or other sensitive or protected data: (i) all applicable Laws and any related security breach notification requirements; (ii) Sellers' own respective rules, policies, and procedures; (iii) industry standards applicable to the industries in which the Seller Facilities operate or to which the Seller Facilities

are otherwise subject (including the Payment Card Industry Data Security Standard, if applicable); and (iv) applicable provisions of Contracts to which any Seller is bound (collectively, the "***Data Security Requirements***").  Neither the execution nor delivery of this Agreement nor the consummation of the Closing will result in a material breach or material violation of, or constitute a material default under, any Data Security Requirement. Since the Lookback Date, no Seller (to the extent related to the business of the Seller Facilities) has experienced any incident in which confidential or sensitive information, payment card data, personally identifiable information, protected health information, or other protected information relating to individuals was or may have been stolen or improperly accessed, including any breach of security and no Seller has been the subject of any claim, proceeding, or investigation by a Governmental Authority with respect thereto.

**3.18    Environmental.**

(a)    With respect to the Purchased Assets, Sellers are, and since the Lookback Date have been, in compliance in all material respects with all Environmental Laws, which compliance has included obtaining and complying in all material respects with all Permits required pursuant to Environmental Laws.

(b)    Sellers, with respect to the Purchased Assets, have not received any written notice regarding any actual or alleged material violation of, or material liability under, Environmental Laws, which remains unresolved.

(c)    With respect to the Purchased Assets, to the Sellers' Knowledge, no Seller or any other Person to the extent giving rise to liability for Sellers, has disposed of, released, exposed any Person to, or owned or operated any facility or property contaminated by any hazardous or toxic substance, material or waste in a manner that has given or would give rise to any material liabilities (contingent or otherwise) of any Seller pursuant to any Environmental Law.

(d)    Sellers have made available to Buyer copies of all material environmental audits, assessments and reports and all other material documents bearing on environmental, health or safety liabilities in their possession or control relating to the Purchased Assets.

**3.19    Financial Statements.**

(a)    Sellers have made available to Buyer (i) the audited consolidated balance sheet of Sellers with respect to the Seller Facilities as of December 31, 2017, and the related statements of income and cash flows (or the equivalent) for the fiscal years then ended; and (ii) the unaudited consolidated balance sheet of Sellers with respect to the Seller Facilities as of May 31, 2019 (the "***Latest Balance Sheet***"), and the related statements of income and cash flows (or the equivalent) for the five (5)-month period then ended (collectively, the "***Financial Statements***"). Each of the Financial Statements (including in all cases the notes thereto, if any) is accurate and complete, is consistent with the books and records of Sellers (which, in turn, are accurate and complete in all material respects), fairly presents, in all material respects, the financial condition and operating results of Sellers and has been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, subject in the case of the unaudited financial statements to normal year-end adjustments and the absence of footnote disclosures (none of which footnote disclosures would, alone or in the aggregate, be materially adverse to the business, operations, assets, liabilities, financial condition, operating results, value, cash flow or net worth of Sellers taken as a whole).

(b)    Except as set forth on Schedule 3.19(b), Sellers do not have or will not have any obligation or liability (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to Sellers, whether due or to become due and regardless of when or by whom asserted) arising out of any transaction entered at or prior to the date hereof, or any action or inaction at or prior to the date hereof, or

any state of facts existing at or prior to the date hereof, other than (a) liabilities reflected on the Latest Balance Sheet, (b) liabilities and obligations which have arisen after the date of the Latest Balance Sheet in the Ordinary Course of Business (none of which is a liability for breach of contract, breach of warranty, tort, infringement, violation of law, claim or lawsuit), (c) obligations under Material Contracts (but not liabilities for any breach of any such Material Contracts occurring on or prior to the Closing Date) and (d) liabilities and obligations that would not be material to the Purchased Assets.

**3.20**    **Brokers**.

Except for Houlihan Lokey Capital, Inc., no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

**3.21**    **Affiliate Transactions**.

Except as disclosed on Schedule 3.21, no officer, director, governing body member, stockholder, partner or Affiliate, as applicable, of Sellers or any predecessor or Affiliate of Sellers or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest is a party to any agreement, Contract, commitment or transaction with Sellers or has any interest in the Purchased Assets or any property, real or personal or mixed, tangible or intangible of Sellers or owns, or licenses (whether or not to Sellers), any assets or properties (tangible or intangible) used in the operation of the Seller Facilities or provides any service to the Seller Facilities.

**3.22**    **Bank Accounts**.

Schedule 3.22 lists all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) for Sellers.

**3.23**    **Disclaimer of Warranties**.

Notwithstanding anything in this Agreement to the contrary, except as expressly set forth in Article III hereof, the Purchased Assets will be sold by Sellers and purchased by Buyer "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to Leased Real Property, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the personal property and Inventory, any and all of which warranties (both express and implied) Sellers hereby disclaim.

### ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Effective Date and as of the Closing Date, except as set forth in the Schedules to this ARTICLE IV, Buyer represents and warrants to the Company and Sellers the following:

**4.1**    **Capacity, Authority and Consents**.

Buyer is duly organized and validly existing in good standing under the Laws of the state of its incorporation or formation with the requisite power and authority to enter into this Agreement, to perform its respective obligations hereunder and to conduct its business as now being conducted. The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Buyer is

or will become a party and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

(a)      are within the powers of Buyer, are not in contravention of applicable Law or the terms of the Governing Documents of Buyer and have been duly authorized by all appropriate action;

(b)      except as otherwise expressly herein provided or as set forth on <u>Schedule 4.1(b)</u>, do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c)      except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyer is a party or otherwise bound that could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement; and

(d)      will not violate any Law to which Buyer is subject.

**4.2      <u>Binding Agreement</u>**.

This Agreement and all other Transaction Agreements to which any Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of such Buyer, and are and will be enforceable against such Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3      <u>Litigation and Proceedings</u>**.

There are no Actions pending or, to Buyer's knowledge, threatened against any Buyer, or any governing Persons thereof, at Law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyer's ability to fulfill their obligations under this Agreement.

**4.4      <u>Availability of Funds</u>**. Buyer anticipates entering into an amendment (the "***Debt Financing Amendment***") to its existing credit agreement (the "***Credit Agreement***"), among Buyer and the agents, lenders (the "***Lenders***") and other parties party thereto) relating to the agreement of the Lenders to provide debt financing in immediately available funds for purposes of financing the transactions contemplated by this Agreement and the payment of related fees and expenses (the "***Debt Financing***") that would upon receipt thereof be sufficient to pay the Cash Purchase Price pursuant to <u>Section 2.6(c)</u> and all related fees and expenses in connection with the transactions contemplated by this Agreement that are required to be paid by Buyer on the Closing Date. Assuming the satisfaction of the conditions set forth in <u>Section 6.1</u> and <u>6.2</u>, Buyer has no reason to believe on the Closing Date that any portion of the Debt Financing will not be available to Buyer on a timely basis to consummate the transactions contemplated by this Agreement. Upon the funding of the Debt Financing, the proceeds of the Debt Financing and Buyer's cash on hand are sufficient to satisfy payment of the Cash Purchase Price and the payment by Buyer of all fees, costs, expenses and other amounts payable by Buyer hereunder or in connection with the transactions contemplated hereby, in each case that are payable as of the Closing Date. Buyer has sufficient cash on

hand or other readily available sources of funds, without giving effect to any Debt Financing or any capital contributions or otherwise, to pay the Deposit in full.

**4.5** <u>**Solvency**</u>.

Buyer is, and immediately after giving effect to the transactions contemplated by this Agreement (including the consummation of the Debt Financing and payment of all related fees and expenses) will be, Solvent for all purposes under federal bankruptcy and applicable state fraudulent conveyance transfer and fraudulent conveyance Laws. Buyer's payment of the Cash Purchase Price hereunder at the Closing will not render Buyer insolvent and does not constitute a fraudulent transfer or conveyance under such Law. "*Solvent*" means that, as of any date of determination: (a) the amount of the "fair saleable value" of the assets of the Buyer, taken as a whole, exceeds, as of such date, the sum of all "debts" of the Buyer, taken as a whole, including contingent liabilities, as such quoted terms are generally understood in accordance with applicable federal Law governing the insolvency of debtors; (b) the Buyer will not have, as of such date, an unreasonably small amount of capital for the operation of the Buyer; and (c) the Buyer will be able to pay its debts, including contingent liabilities, as they mature.

**4.6** <u>**Representations of Sellers**</u>.

Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 3.23</u>), and that Buyer is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Sellers other than as expressly set forth in <u>ARTICLE III</u>. Buyer acknowledges that it has examined, reviewed and inspected all matters which in Buyer's judgment bears upon the Purchased Assets and their value and suitability for Buyer's purposes and, except as affirmatively represented and warranted by Sellers in <u>ARTICLE III</u> and fraud with respect thereto, is relying solely on its own examination, review and inspection of the Purchased Assets.

## ARTICLE V - COVENANTS OF THE PARTIES

**5.1** <u>**Access**</u>.

From and after the Effective Date until the Closing or the earlier termination of this Agreement (the "*Interim Period*"), Sellers shall (a) provide Buyer and its Representatives reasonable access upon reasonable notice to and, as applicable, the right to inspect, the plants, properties, employees, books and records of the Seller Facilities and (b) furnish Buyer with such additional financial and operating data and other information as to the business and properties of the Seller Facilities as reasonably requested, including copies of the updated Financial Statements within thirty (30) days following each calendar month during the Interim Period; <u>provided</u>, <u>however</u>, that such access shall be coordinated through persons as may be designated in writing by the Company for such purpose. Notwithstanding the foregoing, all disclosures of information shall be consistent with all joint defense agreements and any other nondisclosure agreements entered into between the Parties. Buyer's right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Seller Facilities. Neither Buyer nor its authorized Representatives shall have any right to conduct environmental testing, sampling, or invasive investigations, without Sellers' written consent.

**5.2** <u>**Updates of Schedules**</u>.

After the Effective Date, and no later than five business days prior to the Closing Date, Sellers shall supplement or update any and all Article III Schedules with respect to any matter of which Sellers become aware which would cause a breach or inaccuracy of the representations and warranties set forth herein. No supplemental or amended disclosures pursuant to this <u>Section 5.2</u> shall (x) be deemed to amend or

supplement any of the Article III Schedules contemplated hereby, (y) be deemed to have cured any breach of any representation or warranty or covenant made in this Agreement or to satisfy any condition, or (z) limit or otherwise affect the remedies available hereunder to Buyer.

**5.3**     **Operating Covenants**.

During the Interim Period, except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or as required by this Agreement, applicable Law or a Bankruptcy Court Order, each Seller shall:

(a)     carry on its businesses in respect of the Seller Facilities in the Ordinary Course of Business in all material respects;

(b)     perform its obligations relating to or affecting the Seller Facilities in all material respects in the Ordinary Course of Business (including timely payment of accounts payable, purchasing and maintaining appropriate levels of Inventory based, with respect to such Inventory, on historical practices, maintenance of Sellers' books and records, performing all material maintenance and repairs, making capital expenditures and collecting Accounts Receivable);

(c)     keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Seller Facilities; and

(d)     use its commercially reasonable efforts to: (i) comply in all material respects with all Laws applicable to the Seller Facilities, (ii) keep in force all Permits necessary for the operation of the Seller Facilities, (iii) maintain and preserve its business organizations intact and retain the current Facility Employees (excluding terminations of employment in the Ordinary Course of Business other than with respect to the CEO, DON, DOR or other senior management of any Seller Facility); and (iv) maintain its relationships and goodwill with physicians, suppliers, customers and others having business relations with the Seller Facilities.

**5.4**     **Negative Covenants**.

During the Interim Period, except as required by Law or as expressly contemplated by this Agreement or as ordered by the Bankruptcy Court, Sellers shall not, with respect to the Seller Facilities, the Purchased Assets or the Assumed Liabilities, without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed):

(a)     amend, terminate or enter into any Contract, except with respect to any such Contract that is amended, terminated or entered into in the Ordinary Course of Business and that, over the term of such Contract involves less than $100,000 or can be terminated without cause by a Seller on 90 days' notice or less without penalty;

(b)     increase compensation payable or to become payable, increase benefits provided to, make any bonus payment to, or otherwise enter into one or more bonus agreements with, any Facility Employee, except (i) as required by applicable Law, Contract or the terms of an Employee Benefit Plan, (ii) in the Ordinary Course of Business in accordance with existing personnel policies and consistent with prior practice, or (iii) with respect to any retention bonuses which are to be paid in full prior to the Closing Date and for which Buyer will assume no liability or obligations with respect thereto;

(c)        sell, assign, lease or otherwise transfer or dispose of any Purchased Asset, any ownership interests of Sellers in any of the Seller Facilities, or any property, plant or equipment used in connection with the operation of the Seller Facilities, in each case except in the Ordinary Course of Business; or

(d)        take any action that, if taken after December 31, 2018, would violate Section 3.16 in any material respect.

**5.5        Bankruptcy Court Approval; Executory Contracts**.

(a)        Sellers and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption of the Assumed Liabilities are subject to (i) the receipt of higher and/or better bids at or prior to the auction (if any), and (ii) the entry of the Sale Order. Buyer acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Purchased Assets to prospective bidders, entertaining higher and/or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction in accordance with the Sale Procedures Order.

(b)        Sellers shall use their reasonable efforts to gain approval by the Bankruptcy Court of the (i) Breakup Fee and Expense Reimbursement consistent with the Sale Procedures Order, and (ii) purchase and sale of the Purchased Assets and the assumption and assignment of all Assumed Contracts contemplated hereby to the extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Procedures Order and Sale Order.  The Sale Procedures Order shall grant the Breakup Fee and Expense Reimbursement in favor of Buyer in accordance with Section 7.2 herein. Sellers shall serve on all non-Seller counterparties to all of the Assumed Contracts a notice specifically stating that a Seller may be seeking the assumption and assignment of such Assumed Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the proposed Cure Amounts stated in such notices, if any, which deadline shall not be less than five business days prior to the Sale Hearing.

(c)        From and after the Effective Date and until the Closing Date, Sellers shall make reasonable good faith efforts to consult and cooperate with Buyer regarding (i) any material pleadings, motions, notices, statements, applications, schedules, reports, or other papers to be filed or submitted by Sellers in connection with or related to this Agreement (including, without limitation, any pleadings relating to the Sale Procedures Order or Sale Order), (ii) any discovery taken in connection with the Sale Order (including any depositions), and (iii) any hearing relating to the Sale Order, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

**5.6        Approvals**.

The Company and Buyer shall each use, and shall each cause their Subsidiaries to use, commercially reasonable efforts to obtain all authorizations, consents, actions, orders, and approvals of, and to give all notices to and make all filings with, all Governmental Authorities and third parties that are, may be or become necessary for its execution and delivery of, and the performance of its obligations under, this Agreement and the consummation of the Transactions and will cooperate fully with the other Parties in promptly seeking to obtain all such authorizations, consents, actions, orders, and approvals, giving such notices, and making such filings.

**5.7        Notices**.

Without limiting the Parties' representations or warranties in this Agreement, the Company, on the one hand, and Buyer, on the other hand, shall promptly notify the other of (provided, that any matters

disclosed in any such notice and/or update (and not pursuant to Section 5.2) shall not be deemed to have (i) amended this Agreement, including any Article III Schedules, (ii) qualified any representations and warranties of Sellers or Buyer, as applicable, or (iii) cured any misrepresentation or breach of the representations or warranties or satisfied any conditions of Sellers or Buyer, as applicable, that otherwise might have existed hereunder by reason of such matter):

(a)        any notice or other communication received from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b)        any material notice or other material communication received from any Governmental Authority in connection with the Transactions;

(c)        any Proceeding commenced relating to the Seller Facilities or Purchased Assets of which it receives notice or any other fact, circumstance, event or action, the existence, occurrence or taking of which, individually or in the aggregate, (i) would reasonably be expected to have a Material Adverse Effect or a material adverse effect on Buyer's ability to consummate the Transactions, (ii) has resulted in, or would reasonably be expected to result in any material breach of a representation or warranty made by a party hereunder not being true and correct, or (iii) would reasonably be expected to result in the failure of any of the conditions set forth in ARTICLE VI to be satisfied; and

(d)        any Proceeding which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

**5.8    Post-Closing Filings and Access to Information**.

(a)        After the Closing, each of the Company and Buyer shall promptly deliver to the other party upon reasonable notice copies of any post-Closing filings, financial statements or reports that may be required to be prepared and delivered to any Governmental Authority as a result of the consummation of the transactions described herein, in each case at the sole cost and expense of the requesting party.

(b)        Each of the Company and Buyer acknowledges that, subsequent to the Closing, Sellers may need access to information or documents in the control or possession of Buyer for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third party claims. Accordingly, Buyer shall for a period of seven years after the Closing, and indefinitely with respect to any Governmental Authority or third party claims, maintain in accordance with retention requirements under applicable Law and make reasonably available to Sellers and their respective Representatives and/or Governmental Authorities, upon written request and reasonable advance notice and at the expense of Sellers, such documents and information as may be available relating to the Seller Facilities for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims (other than claims between the Parties). Each party shall cooperate with the other in connection with the handling of any such post-Closing matters as may reasonably be requested.

**5.9    Employee Matters**.

(a)        Upon the Closing Date, Sellers or their Affiliates shall terminate the employment of all of the Facility Employees currently employed by Sellers or their Affiliates and Buyer, subject to satisfactory results from standard background screening conducted pursuant to Buyer's personnel policies, will make offers of employment, for employment effective as of the day following the Closing Date, to all such Facility Employees in active status currently in good standing into positions (including job title, reporting structure and responsibilities) with Buyer that are substantially equivalent to Buyer's similar positions.

Following the Closing, Buyer shall offer employment to any Facility Employees in inactive status to the extent such employee is able to commence employment with Buyer within a 90-day period immediately following the Closing.  All employment offers shall be "at-will."  Buyer shall provide each Facility Employee who accepts such offer (collectively, the "***Transferred Employees***") with compensation (including a base salary or base wage rate but excluding any equity compensation) and benefits that are substantially similar to the compensation and benefits provided to similarly situated employees of Buyer. With respect to each Transferred Employee, Buyer shall assume Sellers' or their Affiliates' liability to such Transferred Employee for the Accrued PTO as of the Closing Date, subject to applicable Law (such amount as of the Closing Date, the "***PTO Liability***"). Such PTO Liability assumed by Buyer will be administered in accordance with Buyer's employee policies and procedures. For purposes of this Agreement, Facility Employees shall be considered to be in good standing if they are in compliance with Buyer's standard hiring practices and personnel policies and Sellers' standard personnel policies.

(b)    In respect of Transferred Employees employed by Buyer pursuant to offers made in accordance with Section 5.9(a), periods of service with Sellers or its Affiliates of all such Transferred Employees shall be credited for eligibility and vesting purposes and purposes of future service contribution under the benefit plans maintained by Buyer in which Transferred Employees are eligible to participate following the Closing (the "***Buyer Plans***") and Buyer shall use commercially reasonable efforts to permit such service crediting under the terms of the relevant Buyer Plan. Buyer shall use commercially reasonable efforts to cause each of its Buyer Plans that is a group health plan in which any Transferred Employee becomes eligible to participate in the plan year in which the Closing occurs to waive all limitations as to pre-existing conditions and waiting periods for such plan year with respect to participation and coverage requirements for any Transferred Employees and their eligible dependents.  Effective as of the Closing, Sellers shall cause all Transferred Employees who participate in any Employee Benefit Plan that is a qualified plan with a cash or deferred arrangement described in Section 401(k) of the Code (collectively, the "***Seller 401(k) Plans***") to become fully vested in all account balances under the Seller 401(k) Plans and to make to the Seller 401(k) Plans all employer contributions that would have been made on behalf of the Transferred Employees had the transactions contemplated by this Agreement not occurred, regardless of any service or end or year employment requirements, but prorated for the portion of the plan year that ends on the Closing Date. Buyer agrees to accept direct rollovers of any electing Transferred Employees from the Seller 401(k) Plans and Buyer agrees to cause the account balances of any electing Transferred Employees to be rolled over in cash to the Buyer Plan that is a defined contribution plan which satisfies the requirements of Code Section 401(k).

(c)    Except for the PTO Liability assumed by Buyer pursuant to this Agreement, Buyer shall not assume any obligations of Sellers related to any of Sellers' or their Affiliates' Employee Benefit Plans or any other benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any of Sellers or any of their Affiliates or with respect to which any of Sellers or any of their Affiliates has any current or contingent liability or obligation. Sellers and their Affiliates shall be solely responsible for satisfying the continuation coverage requirements of Section 4980B of the Code for all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation §54.4980B-9.

(d)    Nothing in this Section 5.9, express or implied, shall confer upon any Person other than the Parties any rights or remedies, including any third-party beneficiary rights, or shall be construed to: (i) establish, amend, terminate or modify any compensation or benefit plan, program, policy, Contract, agreement or arrangement; (ii) limit the ability of Buyer or any of its Affiliates to amend, modify or terminate any compensation or benefit plan, program, policy, Contract, agreement or arrangement; (iii) create any right in any Transferred Employee or any other Person to any employment or service with Buyer or any of its Affiliates or to any particular term or condition of employment or service with Buyer or any

of its Affiliates; or (iv) limit the ability of Buyer or any of its Affiliates to terminate the employment or service of any Person at any time and for any or no reason.

**5.10    Medical Staff**.

To ensure continuity of care in the applicable community, Buyer agrees that the medical staff members of the Seller Facilities who are in good standing as of the Closing Date shall maintain medical staff privileges at the Seller Facilities as of the Closing. At the Closing, the medical staff will be subject to the medical staff bylaws of the Seller Facilities then in effect, as amended from time to time.  Promptly following the Closing, the medical staff will be transitioned to the medical staff bylaws of Buyer then in effect, as amended from time to time.

**5.11    Misdirected Payments; Transitional Matters**.

(a)    Seller agrees that Buyer, from and after the Closing Date, shall have the right and authority to collect for Buyer's own account the proceeds generated by the operation of the Purchased Assets from and after the Closing Time which shall be transferred to Buyer as provided herein.

(b)    Any asset (including payments of Accounts Receivable for the Seller Facilities, Pre-Closing Receivables, or Sellers' Transition Receivables) or liability, all other remittances, and all mail and other communications, that are determined by this Agreement to be or otherwise relate to the Excluded Assets and that is or comes into the possession, custody or control of Buyer (or its successors-in-interest or assigns, or its respective Affiliates) shall forthwith be transferred, assigned or conveyed by Buyer (or its respective successors-in-interest or assigns and its respective Affiliates) to Sellers as promptly as reasonably practicable. Such communications shall include Notices of Program Reimbursement or similar Notices of payment settlements, payment demands or other documents from a Third Party Payor.  Without limiting the generality of the foregoing, and subject to the terms of this Agreement, to the extent there are any misdirected funds forwarded to Buyer (or its successors-in-interest or assigns, or its respective Affiliates) by any third parties, which misdirected funds are paid in respect of the performance of services or sale of goods by or on behalf of the Seller Facilities prior to the Closing Date, Buyer shall remit such misdirected funds, or cause such misdirected funds to be remitted, to Sellers within twenty (20) days after receipt thereof, to an account(s) designated by the Company.  Until such transfer, assignment and conveyance, Buyer (and its respective successors-in-interest and assigns and its respective Affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Buyer shall hold such asset in trust for the benefit of Sellers. Buyer shall have no right to set-off such funds against other obligations asserted by Buyer to be owed by Sellers hereunder or under any Transaction Agreement.

(c)    Any asset or any liability, all other remittances, and all mail and other communications that are determined by this Agreement to be or otherwise relate to the Purchased Assets, and that is or comes into the possession, custody or control of Sellers (or their successors-in-interest or assigns, or their respective Affiliates) shall forthwith be transferred, assigned or conveyed by Sellers (or their respective successors-in-interest or assigns and their respective Affiliates) to Buyer as promptly as reasonably practicable.  Without limiting the generality of the foregoing, and subject to the terms of this Agreement, to the extent there are any misdirected funds forwarded to Sellers (or their successors-in-interest or assigns, or their respective Affiliates) by any third parties, which misdirected funds are paid in respect of the performance of services by or on behalf of the Seller Facilities from and after the Closing Date, Sellers shall remit such misdirected funds, or cause such misdirected funds to be remitted, to Buyer within twenty (20) days after receipt thereof, to an account(s) designated by Buyer.  Until such transfer, assignment and conveyance, Sellers (and its successors-in-interest and assigns and its Affiliates) shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Sellers

shall hold such asset in trust for the benefit of Buyer.  Sellers shall have no right to set-off such funds against other obligations asserted by Sellers to be owed by Buyer hereunder or under any Transaction Agreement.

(d)    For a period of one hundred eighty (180) days after the Closing Date, Sellers shall permit Buyer to use the policy and procedure manuals of Sellers that relate to or affect patient care and safety at the Seller Facilities; provided, however, that Buyer (i) shall, as soon as reasonably practicable after the Closing Date, work to adopt or implement its own policy and procedure manuals that relate to or affect patient care and safety at the Seller Facilities; (ii) shall indicate that such policies and procedure manuals as used by Buyer in the operation of the Seller Facilities are policies and procedures of Buyer; and (iii) acknowledges that Sellers do not make any representations or warranties with respect to the content of such manuals.

**5.12    Transition Medicare Payments and Treatment of Payments Received for Patients**.

(a)    Buyer and Sellers will cooperate with each other to take the steps necessary to allow Buyer (or its designated billing agent) to bill Medicare electronically on and after the Closing Date and for Buyer to obtain access to remittance advices and other related materials in connection with any such post-Closing claims submitted by Buyer for services rendered at the Seller Facilities on and after the Closing Date; provided, however, that Buyer acknowledges and agrees that Sellers may continue to use the Medicare provider number for the Seller Facilities as assigned by CMS (the "***Medicare Provider Number***") after the Closing Date for a period of five (5) days to bill for Pre-Closing Receivables.

(b)    With respect to reimbursements and charges for items and services rendered by Buyer at the Seller Facilities after the Closing Date (the "***Transition Period Invoices***") until such time Buyer is certified by CMS as the holder of the Medicare Provider Number and CMS issues a "tie in notice" to Buyer (the "***Transition Period***"), Buyer will bill Medicare using the Medicare Provider Number in full compliance with the conditions of participation and all applicable coverage and billing rules mandated by the applicable government programs. All receipts for Transition Period Invoices shall continue to be paid into Sellers' Medicare bank account until such time as Buyer receives a tie-in notice from CMS certifying Buyer as the holder of the Medicare Provider Number.

(c)    To the extent that payments received by either party for medical, surgical, behavioral, diagnostic or other professional health services rendered and medicine, drugs and supplies provided either specifically indicate on the accompanying remittance advice or other supporting documentation, or if the parties otherwise agree, that they relate to the patients discharged by the Seller Facilities prior to the Closing Date (the "***Pre-Closing Receivables***"), the payments shall be retained by Sellers or forwarded by Buyer to Sellers or their designee by Buyer in accordance with Section 5.11(b) (and until so paid, shall hold in trust for the benefit of Sellers).

(d)    To the extent that payments received by either party for medical, surgical, behavioral, diagnostic or other professional health services rendered and medicine, drugs and supplies provided either specifically indicate on the accompanying remittance advice or other supporting documentation, or if the parties otherwise agree that they relate to the patients admitted at the Seller Facilities on or after the Closing Date (the "***Post-Closing Receivables***"), the payments shall be retained by Buyer or forwarded to Buyer or its designee by Sellers in accordance with Section 5.11(c) (and until so paid, shall hold in trust for the benefit of Buyer).

(e)    To compensate Sellers for medical, surgical, behavioral, diagnostic or other professional health services rendered and medicine, drugs and supplies provided up to the Closing with respect to patients who are admitted to the Seller Facilities prior to the Closing Date but who are not discharged until after the Closing Date, or patients who are undergoing an episode of care that commenced prior to the

Closing Date and continues after the Closing Date (such patients being referred to herein as the "***Transition Patients***" and services, medicine, drugs and supplies rendered to them being referred to herein as the "***Transition Services***"), the Parties shall take the following actions:

(i)       With respect to the Transition Services provided by the Parties to each Transition Patient whose medical care is paid for, in whole or in part, by a government payor or Third Party Payor, who pays for services based on an episodic period or other similar basis, Buyer shall pay to Sellers an amount equal to (i) the total payments per the remittance advice received by Buyer on behalf of the Transition Patient plus (ii) any deposits, deductibles or co-payments made or payable by such Transition Patient to Sellers, or any Medicare RAP (request for anticipated payment) payments or other payments made on behalf of Transition Patient to Sellers, multiplied by a fraction, the numerator of which shall be the total number of days of such episode prior to the Closing Date, and the denominator of which shall be the total number of days in such episode. Buyer shall be solely responsible for billing for all such episodic Transition Services furnished to such Transition Patients and Sellers shall not submit any claims for such episodic Transition Services.

(ii)       With respect to the Transition Services provided by the Parties to each Transition Patient whose medical care is paid for by a Third Party Payor or government payor or on a per diem basis, rather than an episodic period or similar basis, each party shall be entitled to the applicable per diem rate based on the total patient length of stay during such party's ownership of the Purchased Assets.

(iii)       The amounts payable to Sellers under this <u>Section 5.12(e)</u> are referred to herein as the "***Sellers' Transition Receivables***".

(f)       Sellers will cause their lender to (i) acknowledge and agree that it does not have any lien or security interest in the Post-Closing Receivables or any proceeds thereof, and will not include any deposits representing Post-Closing Receivables made to Sellers' bank accounts as collateral for any lien or security interest that their lender may have against Sellers or any Affiliate of Sellers and (ii) file an amendment to each UCC-1 financing statement filed by their lender which includes the Post-Closing Receivables or any proceeds thereof as collateral under such financing statement, which amendment shall remove and delete the Post-Closing Receivables or any proceeds thereof from the collateral description under each such financing statement. Furthermore, in order to address Buyer's concerns that, contrary to the mutual intent of the parties and notwithstanding the terms of this Agreement, a court or a Governmental Authority, in each case of competent jurisdiction, may determine (or any other person or entity may assert) that Sellers have not transferred all of its right, title and interest in the Post-Closing Receivables to Buyer, Sellers shall grant to Buyer, and upon the Closing the Sellers hereby grant to Buyer, to secure the payment and performance in full of all of the obligations of the Sellers under this Agreement, a continuing security interest in and lien on, any and all right, title or interest Sellers may have in or with respect to, the Post-Closing Receivables, whether now owned or hereafter acquired or arising, and the products and proceeds thereof (the "***Facility Account Collateral and Lien***"). Buyer intends to assign the Facility Account Collateral and Lien to Credit Suisse AG, New York Branch ("***Credit Suisse***"), for its benefit and the benefit of certain lenders under its Credit Agreement, as additional security for the Obligations (as defined in the Credit Agreement), and Sellers hereby acknowledge and consent to such assignment. Sellers, Buyer and Credit Suisse shall enter into a separate side letter agreement regarding the Facility Account Collateral and Lien upon terms mutually acceptable to Seller, Buyer and Credit Suisse (the "***Credit Suisse Side Letter Agreement***"), and the Credit Suisse Side Letter Agreement shall be a deliverable at Closing.

(g)       Buyer shall reasonably cooperate with Sellers for a period of one hundred and twenty (120) days after the Closing Date in Sellers' efforts to collect all Accounts Receivable for services rendered prior

to the Closing Date, including Pre-Closing Receivables to be paid over to Sellers in accordance with <u>Section 5.12</u> and Sellers' Transition Receivables. Any such amounts shall be retained by Sellers or forwarded by Buyer to Sellers or their designee in accordance with <u>Section 5.11(b)</u> (and until so paid, shall hold in trust for the benefit of Sellers.

(h)     Buyer shall use commercially reasonable efforts to provide to Sellers and its Representatives, and to the DIP Lender (as defined in the Sale Procedures Order) and its Representatives, all information reasonably available to it identifying the source of the amounts of any Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables and Sellers' Transition Receivables, so as to permit Sellers to correctly apply such amounts to its accounts receivable. In addition, upon reasonable request, Buyer shall permit Sellers and its Representatives, and the DIP Lender and its Representatives (at Sellers' sole cost) to audit, access and copy any of its records relating thereto; *provided* that any such audit, access and copy shall be conducted during normal business hours and in a manner so as not to interfere unreasonably with the conduct of the business of Buyer.

**5.13    <u>Waiver of Bulk Sales Law Compliance</u>.**

Each Buyer hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Purchased Assets are located and all other similar Laws applicable to bulk sales and transfers.

**5.14    <u>Closing of Financials</u>.**

Sellers shall cause their Representatives after the Closing Time (the "***Finance Team***") to complete (or take such action as shall be necessary for Buyer or Sellers to complete) the standardized closing of Sellers' financial records for the Seller Facilities through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "***Closing of Financials***"). Sellers shall cause the Finance Team to use their good faith efforts to complete the Closing of Financials by no later than the date which is 30 days after the Closing Date.

**5.15    <u>Financing</u>.**

(a)     Subject to the terms and conditions of this Agreement, Buyer shall, and shall cause its Affiliates to, at Buyer's sole cost and expense, use reasonable best efforts to take, or cause to be taken, all appropriate action, do, or cause to be done, all things necessary, proper or advisable, and to execute and deliver, or cause to be executed and delivered, such instruments and documents as may be required, to obtain the Debt Financing after the Effective Date on the terms contained in the Debt Financing Amendment.  Buyer shall not pursue any alternative financing transaction or other acquisition, collaboration or similar transaction to the extent that such alternative transaction would, or would be reasonably expected to have, an adverse effect on the availability of the Debt Financing on the Closing Date.

(b)     Buyer shall, and shall cause its Affiliates to, use reasonable best efforts (i) to maintain in effect the Credit Agreement and execute the Debt Financing Amendment, and (ii) to consummate the Debt Financing at or prior to the Closing. Without limiting the generality of the foregoing, Buyer shall give Seller prompt (and in any event within one business day) notice (A) of any breach or default (or any event that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any default or breach) by any party to the Credit Agreement of which Buyer becomes aware, (B) of the receipt of any written notice or other written communication from any financing source with respect to any actual or threatened breach, default, termination or repudiation by any party to the Credit Agreement, (C) if at any time for any reason Buyer believes in good faith that it will not be able to obtain all or any portion of the Debt Financing and (D) of any material dispute or disagreement between or among any of the parties related

to the Debt Financing solely to the extent such disagreement or dispute relates to the availability of the Debt Financing. As soon as reasonably practicable, but in any event within two (2) business days of receipt, Buyer shall provide any information reasonably requested by Sellers relating to any circumstance referred to in clauses (A), (B), (C) or (D) of the immediately preceding sentence. As reasonably requested by the Company from time to time, Buyer shall provide Seller with information concerning the status of Buyer's efforts to arrange the Debt Financing and of material developments concerning the timing of the closing of the Debt Financing.

(c)    During the Interim Period, in order to assist Buyer in obtaining the Debt Financing, Sellers shall, and shall cause its Affiliates to, use their respective reasonable best efforts to provide or cause to be provided, and to cause their respective representatives to provide or cause to be provided, to Buyer all cooperation reasonably requested by Buyer that is necessary to consummate the Debt Financing, including furnishing Buyer and its financing sources, promptly following Buyer's request therefor, with such pertinent and customary information, to the extent reasonably available to Sellers, regarding the Seller Facilities and the operation thereof as may be reasonably requested in writing by Buyer to consummate the arrangement and borrowings of loans and offerings of debt securities contemplated by the Debt Financing (in each case, so long as such requested cooperation does not unreasonably interfere with the ongoing operations of Sellers or its Affiliates).

(d)    Sellers hereby agree that after the Closing of the transactions contemplated herein, upon Buyer's request, it shall enter into a subordination agreement (the "**Subordination Agreement**") with the Lenders in form and substance reasonably satisfactory to the Lenders.  Sellers further agree and acknowledge that (i) they will enter into such subordination and/or intercreditor agreements with the Lenders that are required from time to time by such Lenders in connection with any refinancing, replacement, extension, supplementation, amendment or modification of Buyer's lending or financing arrangements, and (ii) they shall cooperate with Buyer and the Lenders in placing any designations, marks or legends on the Subordinated Promissory Note that may be required from time to time by the Lenders in order to further indicate thereon the subordinated nature of the obligations under the Subordinated Promissory Note.

**5.16**    **Exclusivity**.

If an auction is conducted for any of the Purchased Assets and Buyer is the successful bidder at the conclusion of such auction or if a decision is made to not conduct an auction for any of the Purchased Assets, then from and after the conclusion of such auction, or after any decision is made to not conduct an auction for any of the Purchased Assets, none of Sellers shall, and Sellers shall cause each of their respective Affiliates and Representatives not to, directly or indirectly, (i) submit, solicit, initiate, encourage or discuss any proposal or offer from any Person (other than Buyer and its Affiliates in connection with the transactions contemplated hereby) or enter into any agreement or accept any offer relating to or consummate any purchase or sale of any Purchased Assets (other than the purchase and sale of inventory in the Ordinary Course of Business) or any similar transaction or business combination involving the Seller Facilities or the Purchased Assets (each of the foregoing transactions, a "**Business Transaction**") or (ii) furnish any information with respect to, assist or participate in or facilitate in any other manner any effort or attempt by any Person (other than Buyer and its Affiliates) to do or seek to do any of the foregoing.  Sellers agree to notify Buyer immediately if any Person makes any proposal, offer, inquiry or contact with respect to a Business Transaction.  For the avoidance of doubt, in no event shall this <u>Section 5.16</u> (x) restrict Sellers, or their respective Affiliates and Representatives, from taking any action (including in respect of a potential transaction or series of transactions) solely in respect of the HHC Business or the long-term acute care hospitals operated by Sellers which do not constitute Seller Facilities or (y) restrict, modify or otherwise impede Sellers' right to terminate this Agreement in accordance with the terms of <u>ARTICLE VII</u>.

**5.17    Confidentiality; Restrictive Covenants**.

(a)    Following the Closing, Sellers shall maintain as confidential and shall not use or disclose (except to its Affiliates and Representatives or as requested or required by Law or as authorized in writing by Buyer) (i) any information or materials relating to the Seller Facilities or Seller's operation thereof, and (ii) any materials developed by Buyer or any of its Representatives. Except as otherwise permitted and provided above, in the event any Seller is requested or required by Law to disclose any such confidential information, such Seller shall promptly notify Buyer (to the extent not prohibited by Law) in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with Buyer (at Buyer's sole cost and expense) to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Law. Information subject to the confidentiality obligations in this Section 5.17(a) does not include any information which (x) is or becomes generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement) or (y) becomes available on a non-confidential basis from a Person who is not actually known by Sellers to be bound by a confidentiality agreement with Buyer or its Affiliates, or who is not otherwise prohibited by a duty of confidentiality to Buyer from transmitting the information. Notwithstanding anything to the contrary in this Section 5.17(a), nothing in this Agreement shall restrict Sellers' (A) use of the confidential information described in this Section 5.17(a) or (B) disclosure of such confidential information to any of their Affiliates or Representatives, in each case, in connection with any claims brought by or against Sellers in connection with this Agreement (including claims between the parties hereto).

(b)    Each Seller hereby acknowledges that it is familiar with such Seller's trade secrets and with other confidential information relating to the Seller Facilities. Each Seller acknowledges and agrees that Buyer may be irreparably damaged if it were to provide services to or otherwise participate in the business of any Person competing with Sellers in a similar business and that any such competition by such Seller (or its subsidiaries, parents, and each of their respective officers, directors, employees, Affiliates and assigns) may result in a significant loss of goodwill by Buyer. Each Seller further acknowledges and agrees that the covenants and agreements set forth in this Section 5.17 were a material inducement to Buyer to enter into this Agreement and to perform its obligations hereunder, and that Buyer and its stockholders would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if any Seller breached the provisions of this Section 5.17. Therefore, each Seller agrees, in further consideration of the amounts to be paid hereunder, that until the fifth anniversary of the Closing, such Seller shall not (and shall cause its subsidiaries, parents, and each of their respective officers, directors, employees, Affiliates and assigns not to) directly or indirectly own any interest in, build, operate or manage a long-term acute care hospital or inpatient or outpatient rehabilitation facility (i) within a radius of 20 miles from any of the Seller Facilities located in states other than Louisiana, and (ii) within Shreveport or Bossier City parishes with respect to any of the Seller Facilities located in Louisiana; provided, that nothing herein shall (A) prohibit Sellers and their Affiliates from continuing to own and operate in its present location any long-term acute care hospital that is owned and operated by such Seller as of the Effective Date or (B) restrict, impair, or otherwise affect the operation of the HHC Business by Sellers and their Affiliates following the Closing. Such Seller acknowledges that the geographic restrictions set forth above are reasonable and necessary to protect the goodwill of the Seller Facilities being sold by Sellers pursuant to this Agreement.

(c)    Each Seller further agrees that during the Interim Period and following the Closing until the fifth anniversary of the Closing it shall not (and shall cause its Affiliates and subsidiaries not to) directly, or indirectly through another Person, (i) induce or attempt to induce any employee of the Seller Facilities to leave the employ of the Seller Facilities, or in any way interfere with the relationship between Buyer, the Seller Facilities and any employee thereof, or (ii) hire any person who was an employee of the Seller Facilities at any time during the one (1)-year period immediately prior to the date on which such hiring

would take place; provided, however, that solicitations in general advertisements (and the hiring of persons other than employees with a title of vice president, director and above, who respond to such general advertisements) which do not target such persons shall not constitute a breach of this Section 5.17(c). For the avoidance of doubt, the restrictions set forth herein shall not apply to any employee of the HHC Business or the long-term acute care hospitals operated by Sellers which do not constitute Seller Facilities

(d)        If, at the time of enforcement of the covenants contained in Section 5.17(b) and 5.17(c) (the "**_Restrictive Covenants_**"), a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed and directed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by Law. Sellers have consulted with legal counsel regarding the Restrictive Covenants and based on such consultation have determined and each hereby acknowledges that the Restrictive Covenants are reasonable in terms of duration, scope and area restrictions and are necessary to protect the substantial investment in the Seller Facilities made by Buyer hereunder. If any Seller or a member, owner, Subsidiary, parent of Seller or any of their respective Affiliates, assigns or Representatives breaches, or threatens to commit a breach of, any of the Restrictive Covenants, Buyer shall have the right and remedy, which is in addition to, and not in lieu of, any other rights and remedies available to Buyer or any of its Affiliates at Law or in equity, to seek to have the Restrictive Covenants specifically enforced by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the Restrictive Covenants may cause irreparable injury to Buyer and that money damages may not provide an adequate remedy to Buyer. In the event of any breach or violation by any Seller of any of the Restrictive Covenants, the time period of such covenant shall be tolled until such breach or violation is resolved.

## ARTICLE VI- CONDITIONS TO CLOSING

**6.1        Conditions to Obligations of Buyer and Sellers**.

The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction, on or before the Closing, of each of the following conditions unless waived in writing by each of the Parties:

(a)        There must not be issued and in effect on the Closing Date any Order or Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of the Transactions.

(b)        The Bankruptcy Court shall have entered the Sale Order, which shall (i) be in full force and effect, (ii) not be subject to any stay or appeal, (iii) not have been materially modified without the written consent of Buyer and Sellers (not to be unreasonably withheld, conditioned or delayed), and (iv) not have been reversed or vacated.

**6.2        Conditions to Obligations of Buyer**.

The obligations of Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing Date, of each of the following further conditions unless (but only to the extent) waived in writing by Buyer:

(a)        The representations and warranties of Sellers contained in ARTICLE III other than the Fundamental Representations shall be true and correct in all respects (other than in Section 3.16(i) without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth therein) on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specified date, which need only be true and correct as of such date), except for the failure of such representations and warranties to be true and correct which would not, in the aggregate, result in a Material

44

Adverse Effect.  Each Fundamental Representation shall be true and correct (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth therein) in all material respects on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specified date, which need only be true and correct in all material respects as of such date).

(b)     Sellers shall have performed in all material respects the covenants and agreements contained in this Agreement to be complied with or performed by Sellers on or before the Closing Date.

(c)     Buyer shall have received each of the items set forth in Section 2.9.

(d)     Since December 31, 2018, there shall have been no Material Adverse Effect.

(e)     There shall have been no material issues relating to Sellers' Medicare or Medicaid Cost Reports, Permits, or other compliance with Healthcare Laws resulting in a liability regarding the Purchased Assets, the Seller Facilities or Seller's operation of the Seller Facilities.

(f)     Sellers and the Seller Facilities shall be in good standing with all applicable non-governmental Third Party Payors for each Seller Facility.

(g)     There shall be no pending, ongoing, or threatened litigation regarding the Seller Facilities or Sellers' operation of the Seller Facilities that is not subject to the "free and clear" provisions of the Sale Order.

(h)     The average length of stay for each Seller Facility in each of the six months immediately preceding the Closing Date shall exceed 25 days.

(i)     All commercial payor contracts shall have been assigned to Buyer.

**6.3     Conditions to Obligations of Sellers**.

The obligations of Sellers to consummate the Transactions described herein are subject to the satisfaction, on or prior to the Closing Date, of each of the following further conditions unless (but only to the extent) waived in writing by Sellers:

(a)     The representations and warranties of Buyer contained in ARTICLE IV shall be true and correct in all respects (without giving effect to any limitation or qualification as to "materiality" set forth therein) on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specified date, which need only be true and correct as of such date), except for the failure of such representations and warranties to be true and correct which would not, in the aggregate, result in a material adverse effect on Buyer's ability to consummate the Transactions.

(b)     Buyer shall have performed in all material respects the covenants and agreements contained in this Agreement, the Sale Order or the Sale Procedures Order to be complied with or performed by Buyer on or before the Closing Date.

(c)     Sellers shall have received each of the items set forth in Section 2.10.

## ARTICLE VII - TERMINATION

**7.1     Grounds for Termination**.

This Agreement may be terminated at any time prior to the Closing:

45

(a)      by the mutual written consent of the Company and Buyer;

(b)      by Buyer, if any Seller breaches or fails to perform in any respect any of their representations, warranties or covenants contained in this Agreement such that a condition in <u>Section 6.1</u> or <u>Section 6.2</u> is incapable of being satisfied before the End Date, and such breach either (i) is not capable of being cured on or before the End Date or (ii) has not been cured by Sellers to Buyer's reasonable satisfaction within 30 days of Buyer's written notice to the Company of such breach; <u>provided</u>, that no cure period shall extend past the End Date; <u>provided</u>, <u>further</u>, that Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 7.1(b)</u> if Buyer is then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

(c)      by the Company, if Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement such that a condition in <u>Section 6.1</u> or <u>Section 6.3</u> is incapable of being satisfied before the End Date, and such breach either (i) is not capable of being cured on or before the End Date or (ii) has not been cured by Buyer to the Company's reasonable satisfaction within 30 days of the Company's written notice to Buyer of such breach; <u>provided</u>, that no cure period shall extend past the End Date; <u>provided</u>, <u>further</u>, that the Company shall not have the right to terminate this Agreement pursuant to this <u>Section 7.1(c)</u> if any Seller is then in material breach of any of its representations, warranties, covenants or agreements contained in this Agreement;

(d)      by either the Company or Buyer if the Closing has not occurred on or before December 31, 2019 (the "***End Date***"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 7.1(d)</u> shall not be available if the failure of the party so requesting termination to fulfill any obligation under this Agreement shall have been the primary cause of the failure of the Closing to occur on or before the End Date;

(e)      by either the Company or Buyer in the event (i) Sellers have entered into any material agreement (including any definitive purchase agreement) in furtherance of an Alternative Transaction other than as contemplated in the Sale Procedures Order; or (ii) the Bankruptcy Court approves an Alternative Transaction;

(f)      by Buyer upon the appointment of a trustee or examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code;

(g)      by either the Company or Buyer upon the dismissal of the Bankruptcy Case or the conversion of the Bankruptcy Case into a case under chapter 7 of the Bankruptcy Code;

(h)      by either the Company or Buyer if, at the end of the auction contemplated by the Sale Procedures Order, Buyer's bid is not determined to be the winning bid or the next-best bid (as determined pursuant to the Sale Procedures Order);

(i)      by the Company if (i) all the conditions set forth in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied (other than those conditions that by their nature or terms are to be satisfied at the Closing, but subject to satisfaction of those conditions at the Closing), (ii) Buyer is required to consummate the Closing pursuant to <u>Section 2.8</u>, (iii) Buyer fails to consummate the Closing within five (5) days following the date it was required to do so pursuant to <u>Section 2.8</u>, (iv) the Company gives irrevocable written notice to Buyer at least three (3) business days prior to such termination stating that (x) the Company will terminate this Agreement pursuant to this <u>Section 7.1(i)</u> if the Closing is not consummated within such three (3) business day period and (y) if the Debt Financing is funded, the Company will consummate the Closing in accordance with the terms of this Agreement, (v) the Company stood ready, willing and able to consummate the Closing during such three (3) business day period, and (vi) Buyer fails to consummate the Closing

within such three (3) business day period; provided that the Company shall not have the right to terminate this Agreement pursuant to this Section 7.1(i) if the Company or any Seller is then in material breach of any of its covenants, agreements, representations or warranties set forth in this Agreement;

(j)    by the Company if the Deposit is not timely paid by or on behalf of Buyer in accordance with Section 2.6(a); provided, however, that the right to terminate this Agreement under this Section 7.1(j) must be exercised, if exercisable, prior to the payment of the Deposit; or

(k)    by the Company if it, or the board of managers of the Company, determines, in consultation with outside legal counsel, that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with the board's fiduciary obligations under applicable Law, including to pursue an Alternative Transaction.  For the avoidance of doubt, and subject to the terms and conditions of this Agreement, the Company retains the right to pursue any transaction that, in the Company's business judgment, will maximize the value of its estate.

In the event of termination by Buyer or the Company pursuant to this Section 7.1, written notice thereof (describing in reasonable detail the basis therefor) shall be delivered to the other party.

**7.2    Breakup Fee and Expense Reimbursement**.

(a)    In the event of a termination of this Agreement pursuant to Section 7.1(b), Section 7.1(d) (unless the failure of Buyer to fulfill any obligation under this Agreement shall have been the primary cause of the failure of the Closing to occur on or before the End Date), Section 7.1(e) Section 7.1(f), Section 7.1(g), Section 7.1(h) or Section 7.1(k), and if Sellers thereafter consummate an Alternative Transaction, then on the closing date and in connection with the closing of such Alternative Transaction, Sellers shall pay to Buyer by wire transfer of immediately available funds to an account designated in writing by Buyer (i) an amount equal to all reasonable and documented out of pocket expenses incurred by Buyer in connection with its legal, environmental, accounting and business due diligence and the preparation and negotiation of this Agreement up to $250,000 (the "***Expense Reimbursement***"), and (ii) a breakup fee equal to $200,000 (the "***Breakup Fee***").  For the avoidance of doubt, the Breakup Fee will not be reduced by the Expense Reimbursement.

(b)    Seller's obligation to pay the Breakup Fee and the Expense Reimbursement pursuant to this Section 7.2 shall survive termination of this Agreement and shall constitute an administrative expense of Seller under Section 503(b) of the Bankruptcy Code.

**7.3    Effect of Termination**.

(a)    Except as otherwise provided in this Section 7.3, in the event of a termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become null and void and of no further force and effect (other than the provisions of Section 2.6(a) (Deposit), this ARTICLE VII (Termination) and ARTICLE VIII (General Provisions), all of which shall survive termination of this Agreement), and there shall be no liability on the part of any party hereto or any of its or their Affiliates to any other Person resulting from, arising out of, relating to, or in connection with this Agreement or any other Transaction Agreement; provided, however, that nothing in the preceding sentence shall relieve (i) Sellers' obligations with respect to the Breakup Fee and Expense Reimbursement as set forth herein, and (ii) any party hereto from any liability for fraud or willful breach of this Agreement prior to termination, with "willful" meaning an intentional action or omission known and intended to be a breach hereof; provided, further, that in no event shall Buyer be required to (x) pay an aggregate amount in excess of the Deposit or (y) pay any amount of monetary damages if the Company has (A) received the Deposit following release of the Deposit to the

47

Company in accordance with the provisions of Section 2.6(a) or (B) the Closing has occurred (including pursuant to an order for specific performance in the circumstances permitted by Section 8.16).

(b)     Without limiting Sellers' right to specific performance prior to termination of this Agreement solely to the extent provided in, and subject to the terms and conditions of, Section 8.16, the Company's right to receive the Deposit from Buyer pursuant to, and subject to the terms and conditions of, Section 2.6(a) shall be the sole and exclusive remedy of any Seller against Buyer for any monetary damages suffered by any Seller, or any liability or obligation of any kind of Buyer, in each case, caused by, arising out of, relating to or in connection with (A) any breach or threatened or attempted beach of this Agreement or any Transaction Agreement, (B) any failure or threatened or attempted failure of Buyer to comply with its obligations under this Agreement or any other agreement, certificate or other document entered into between the parties pursuant to the terms of this Agreement, (C) any failure to consummate any of the transactions contemplated by this Agreement (including the Closing and the funding of the Debt Financing) or (D) this Agreement, any other agreement, certificate or other document entered into between the parties pursuant to the terms of this Agreement, the transactions contemplated hereby or the failure of any of the transactions contemplated hereby to be consummated or the termination of this Agreement, in each case, including in any litigation under any legal theory, whether sounding in law (whether for breach of contract, in tort or otherwise) or in equity (the items referred to in the foregoing clauses (A) through (D), the "**_Potential Claims_**"). No Seller shall be entitled to bring, and shall in no event support, facilitate, encourage or take any action other than opposing, the bringing of, any litigation against Buyer or any of its Affiliates with respect to, arising out of, relating to or in connection with any Potential Claim or otherwise with respect to the transactions contemplated by this Agreement and Sellers shall dismiss with prejudice any then pending litigation by any Seller against Buyer or any of its Affiliates as promptly as practicable after such termination (and in no event later than three (3) days following such termination).

## ARTICLE VIII - GENERAL PROVISIONS

**8.1** <u>**Survival**</u>.

The Parties, intending to modify any applicable statute of limitations, agree that (a) the representations and warranties of the Parties contained in this Agreement and in any certificate delivered pursuant hereto shall terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of, nor shall any claim be made by, any party or any of their respective Affiliates in respect thereof, and (b) after the Closing, there shall be no liability on the part of, nor shall any claim be made by, any party or any of their respective Affiliates in respect of any covenant or agreement to be performed prior to the Closing contained in this Agreement and in any certificate delivered pursuant hereto.

**8.2** <u>**Certain Tax Matters**</u>.

(a)     All transfer, documentary, sales, use, stamp, registration and other such similar Taxes and fees, including penalties and interest, if any, (but exclusive of any income, gross receipts, franchise, capital or similar Taxes), incurred in connection with this Agreement and the transactions contemplated herein (each a "**_Transfer Tax_**" and, collectively, "**_Transfer Taxes_**") shall be borne and paid by the respective party upon which such Transfer Tax is imposed upon. Each party agrees to cooperate with such other parties in the timely completion, execution and filing of any documentation required or exemptions allowed by any local, state or other Governmental Authority in connection with the Transfer Taxes. Buyer and Seller shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

(b)        Sellers and Buyer each agree that the Purchase Price (including for the Assumed Liabilities and any other items required to be taken into account for income Tax purposes) shall be allocated among the Purchased Assets purchased pursuant to this Agreement in accordance with Section 1060 of the Code and <u>Schedule 8.2(b)</u>.  Within 60 days after Closing, Buyer shall provide to the Sellers a schedule (the "*Allocation Schedule*") allocating the Purchase Price in accordance with the foregoing and shall consider in good faith any reasonable comments provided by Sellers. Buyer and Seller shall work in good faith to resolve any disputes related to the Allocation Schedule and if they cannot do so within a reasonable period of time such dispute shall be resolved by a nationally recognized accounting firm mutually selected by Buyer and Sellers. The costs of such accounting firm associated with resolving such dispute shall be borne equally by Buyer and Sellers.   Buyer and Sellers each agree to file IRS Form(s) 8594 and all federal, state and local income Tax Returns in accordance with the Allocation Schedule, as finally determined, and none of them shall thereafter take an income Tax Return position inconsistent with such allocation unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the IRS or other Tax authority.  Sellers and Buyer each agree to provide the other promptly with any other information required to complete the Allocation Schedule.

(c)        Each party shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amount as it is required to deduct and withhold with respect to the making of such payment under the Code or other applicable Tax Law. Any such amounts that are deducted or withheld shall be treated as having been paid to the Person in respect of which such deduction and withholding was made.

**8.3        <u>Additional Assurances</u>**.

The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; <u>provided</u>, <u>however</u>, at the request of a party, the other party or parties shall execute such additional instruments and take such additional action as the requesting party may reasonably request to effectuate this Agreement.  In addition and from time to time after the Closing Date, Sellers and Buyer shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Purchased Assets.

**8.4        <u>Choice of Law; Jurisdiction</u>**.

(a)        This Agreement and all disputes or controversies arising out of or relating to this Agreement or the Transactions (whether in contract or tort) shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to conflicts of law principles.

(b)        Except as otherwise expressly provided in this Agreement or any of the other Transaction Agreements, and without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes arising out of or in connection with this Agreement or the Transactions or disputes relating hereto and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case is closed, any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the other Transaction Agreements or the Transactions shall be brought in a federal court located in District of Delaware and that any cause of action arising out of this Agreement or any of the other Transaction Agreements shall be deemed to have arisen from a transaction of business in the State of Delaware, and

each of the Parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

**8.5**    **WAIVER OF JURY TRIAL**.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**8.6**    **Benefit, Assignment and Third Party Beneficiaries**.

Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyer may assign this Agreement and/or any of its rights hereunder to any wholly owned Subsidiary or Affiliate of Buyer or in connection with any subsequent disposition or transfer of all or any portion of the Purchased Assets in any form of transaction, and Buyer may collaterally assign its rights and obligations under this Agreement to any party that provides funding for the Transactions as additional security for Buyer's obligations to such party, in each case without the prior written consent of Sellers. The Parties acknowledge that Buyer may assign ownership and title to certain of the Purchased Assets to certain designees of Buyer, such that more than one entity may own the Purchased Assets at Closing; provided, further, that no such assignment shall serve to release Buyer from its obligations or any liability hereunder. This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights; provided, that the Parties acknowledge and agree that the DIP Lender shall be an express third party beneficiary of Section 5.12(h) with a right of enforcement.

**8.7**    **Cost of Transaction**.

Except as expressly provided herein, all costs and expenses incurred in connection with negotiating, preparing and executing the Transaction Agreements shall be paid by the Party incurring such cost or expense.

**8.8**    **Waiver of Breach**.

The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**8.9**    **Notice**.

Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Eastern Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or

when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

Buyer:                    c/o Post Acute Medical, LLC
                          1828 Good Hope Road
                          Enola, PA 17025
                          Attention: Karick Stober
                          Facsimile No.: 717-695-0318
                          Email: kstober@thscorporate.com

With a copy (which shall not constitute notice) to:

                          Kirkland & Ellis LLP
                          300 N. LaSalle Street, Suite 5600
                          Chicago, Illinois 60654
                          Attention: Sanford E. Perl, P.C.
                                      Michael H. Weed, P.C.
                                      Hayley Hollender
                          Facsimile No.: (312) 862-2200
                          Email: sanford.perl@kirkland.com; michael.weed@kirkland.com;
                          hayley.hollender@kirkland.com

Sellers:                  c/o LifeCare Holdings LLC
                          5340 Legacy Dr. Ste. 150
                          Plano, TX  75024
                          Attention: Tracey Dry, General Counsel, Chief Compliance Officer
                          Facsimile No.: (469) 241-2158
                          Email: Tracey.Dry@lifecare-hospitals.com

With a copy (which shall not constitute notice) to:

                          Akin Gump Strauss Hauer & Feld, LLP
                          One Bryant Park
                          New York, NY 10036
                          Attention: Dan Fisher
                                      Allison Miller
                          Facsimile No.: (212) 872-1002
                          Email: dfisher@akingump.com; amiller@akingump.com

**8.10**   **Severability**.

In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms, and such invalid, illegal or unenforceable term automatically will be amended so that it is valid, legal and enforceable to the maximum extent permitted by applicable law, but as close to the Parties' original intent as is permissible.

**8.11**    **Interpretation**.

In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "$" refers to United States dollars, (c) the singular includes the plural, and vice versa, and each gender includes each other gender, (d) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (e) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (f) "Exhibit" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (g) "Schedule" refers to a schedule to this Agreement, unless otherwise stated in this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), (h) all references to times are times in Plano, Texas, (i) "day" refers to a calendar day unless expressly identified as a "business day," which means any day that is not a Saturday, Sunday, or official federal holiday in the United States, and (j) "made available to Buyer" or similar phrases means information included in a virtual data room maintained by Houlihan Lokey Capital, Inc. to which Buyer and its representatives have had access as of five business days prior to the Effective Date or Closing Date, as applicable.

**8.12**    **Entire Agreement, Amendments and Counterparts**.

This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material.  All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.  This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  Signatures received via facsimile or other electronic transmission shall be accepted as originals.

**8.13**    **Personal Liability**.

This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equity holder of any Party or any officer, director, employee, investor or other Representative of any Party.

**8.14**    **Disclosure Generally**.

Notwithstanding anything to the contrary contained in the Article III Schedules or in this Agreement, the information and disclosures contained in any Article III Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Article III Schedule for which applicability of such information and disclosure is reasonably apparent on its face.  The fact that any item of information is disclosed in any Article III Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement.

**8.15**    **Public Announcements**.

Except as required by Law or in connection with the Bankruptcy Case, no Seller nor Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated

hereby without obtaining the prior written approval of the other Parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned. Prior to making any public disclosure required by applicable Law, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same. Notwithstanding the foregoing, Buyer shall not be restricted from making any public announcements or issuing any press releases after the Closing.

**8.16**    **Specific Performance**.

(a)    Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, subject to Section 8.16(b), Buyer agrees that Sellers will be entitled, and Sellers agree that Buyer will be entitled, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court or any other court of the United States or any state thereof having jurisdiction over the Parties and the matter, subject to Section 8.4 and Section 8.5, in addition to any other remedy to which the non-breaching Party may be entitled, at law or in equity.

(b)    Notwithstanding the foregoing, Sellers' right to obtain an injunction, specific performance or other equitable relief of Buyer's obligation to consummate the Closing (but not the right of Sellers to obtain an injunction, specific performance or other appropriate form of equitable relief, for any other reason) shall be subject to the requirement that: (i) all of the conditions set forth in Section 6.1 and 6.2 have been satisfied (other than those conditions that by their nature are to be satisfied at the Closing) and Buyer has failed to complete the Closing by the date the Closing is required to have occurred pursuant to Section 2.8 of this Agreement, (ii) the Debt Financing has been funded or would be funded if Buyer otherwise consummated the Closing, and (iii) the Company has irrevocably confirmed in a written notice delivered to Buyer that if specific performance is granted and the Debt Financing is funded, Sellers stand ready, willing and able to consummate the Closing.

(c)    For the avoidance of doubt, under no circumstances shall Sellers be entitled to receive both a grant of specific performance or other equitable remedies of the sort described in this Section 8.16 and any monetary damages, including payment or retention of all or any portion of the Deposit.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed by their authorized officers as of the Effective Date.

COMPANY:

LIFECARE HOLDINGS LLC

By: _____
Name:  Jim Murray
Title:  Chief Executive Officer

SELLERS:

NEW LIFECARE HOSPITALS LLC
NEW LIFECARE HOSPITALS OF NORTHERN
  NEVADA LLC
NEW LIFECARE HOSPITALS OF DAYTON LLC
NEW NEXTCARE SPECIALTY HOSPITAL OF
  DENVER LLC
NEW LIFECARE HOSPITALS OF NORTH
  CAROLINA LLC
NEW SAN ANTONIO SPECIALTY HOSPITAL LLC
NEW LIFECARE HOSPITALS AT TENAYA LLC
NEW LIFECARE HOSPITALS OF SARASOTA LLC
NEW LIFECARE MANAGEMENT SERVICES LLC
NEW LIFECARE REIT 1 LLC
LIFECARE PHARMACY SERVICES LLC

By: _____
Name:  Jim Murray
Title:   Chief Executive Officer

BUYER:

PAM SQUARED, LLC

By: _____
Name: Karick Stober
Title: Chief Financial Officer

Exhibit A

| Seller | Applicable Seller Facility | Applicable State |
|---|---|---|
| New LifeCare Hospitals LLC | LifeCare Hospitals Of Shreveport (North Campus) | LA |
| New LifeCare Hospitals LLC | LifeCare Hospitals Of Shreveport (Pierremont Campus) | LA |
| New LifeCare Hospitals Of Northern Nevada LLC | Tahoe Pacific Hospitals - North | NV |
| New LifeCare Hospitals Of Northern Nevada LLC | Tahoe Pacific Hospitals - Meadows | NV |
| New LifeCare Hospitals Of Dayton LLC | LifeCare Hospitals Of Dayton | OH |
| New NextCare Specialty Hospital Of Denver LLC | Colorado Acute Long Term Hospital | CO |
| New LifeCare Hospitals Of North Carolina LLC | LifeCare Hospitals Of North Carolina | NC |
| New San Antonio Specialty Hospital LLC | LifeCare Hospitals Of San Antonio | TX |
| New LifeCare Hospitals At Tenaya LLC | Complex Care Hospital At Tenaya | NV |
| New LifeCare Hospitals Of Sarasota LLC | Complex Care Hospital At Ridgelake | FL |

<u>Exhibit B</u>

Form of Bill of Sale

(Attached.)

## FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the terms and conditions of that certain Asset Purchase Agreement dated as of July 18, 2019 (the "***Asset Purchase Agreement***") by and among LifeCare Holdings LLC, a Delaware limited liability company, certain of its subsidiaries listed on Exhibit A of the Asset Purchase Agreement (together with LifeCare Holdings LLC, the "***Sellers***") and PAM Squared, LLC, a Pennsylvania limited liability company ("***Buyer***" and, together with Sellers, the "***Parties***"), each Seller hereby unconditionally and irrevocably grants, bargains, transfers, sells, assigns, conveys, and delivers to Buyer, its successors and assigns forever, all of such Seller's rights, titles, and interests, in, to and under the Purchased Assets owned or leased by such Seller pursuant to this bill of sale, dated as of [•], 2019 (this "***Bill of Sale***") and subject to the terms of the Asset Purchase Agreement, free and clear of all Encumbrances other than Permitted Encumbrances, TO HAVE AND TO HOLD the Purchased Assets with all appurtenances thereto, effective at the Closing pursuant to the Asset Purchase Agreement.

A.      Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

B.      Notwithstanding anything to the contrary contained herein, none of the Excluded Assets shall be included in the Purchased Assets.

C.      This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

D.      This Bill of Sale is being executed solely pursuant to the Asset Purchase Agreement to give effect to the transactions contemplated by the Asset Purchase Agreement. Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Asset Purchase Agreement. To the extent that any provisions of this Bill of Sale conflicts or is inconsistent with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

E.      Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to, any person, firm or corporation other than Buyer and its successors and assigns any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of Buyer and its successors and assigns.

F.      The provisions of Article VIII of the Asset Purchase Agreement are hereby incorporated into this Bill of Sale, *mutatis mutandis*.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Bill of Sale is being executed and delivered by Sellers as of the date first written above.

THE COMPANY:

LIFECARE HOLDINGS LLC


By: _____
Name:
Title:

FACILITY SELLERS:

NEW LIFECARE HOSPITALS LLC
NEW LIFECARE HOSPITALS OF NORTHERN
    NEVADA LLC
NEW LIFECARE HOSPITALS OF DAYTON
    LLC
NEW NEXTCARE SPECIALTY HOSPITAL OF
    DENVER LLC
NEW LIFECARE HOSPITALS OF NORTH
    CAROLINA LLC
NEW SAN ANTONIO SPECIALTY HOSPITAL
    LLC
NEW LIFECARE HOSPITALS AT TENAYA
    LLC
NEW LIFECARE HOSPITALS OF SARASOTA
    LLC
NEW LIFECARE MANAGEMENT SERVICES
    LLC
NEW LIFECARE REIT 1 LLC
LIFECARE PHARMACY SERVICES LLC


By: _____
Name:
Title:

<u>Exhibit C</u>

Form of Assignment and Assumption

(Attached.)

FORM<br>EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement, dated as of [•], 2019 (this "***Agreement***"), is by and among LifeCare Holdings LLC, a Delaware limited liability company, certain of its subsidiaries listed on Exhibit A to the Asset Purchase Agreement (as defined below) (together with LifeCare Holdings LLC, the "***Assignors***") and PAM Squared, LLC, a Pennsylvania limited liability company ("***Assignee***" and, together with Assignors, the "***Parties***").

## RECITALS

A.     Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of July 18, 2019 (the "***Asset Purchase Agreement***"), pursuant to which Assignee has agreed to purchase the Purchased Assets and assume the Assumed Liabilities on the terms and subject to the conditions of the Asset Purchase Agreement, including Sections 2.1 and 2.3 thereof; and

B.     In accordance with the terms of the Asset Purchase Agreement, Assignors and Assignee have agreed to enter into this Agreement, providing for (a) Assignors' sale, conveyance, grant, assignment, transfer and delivery to Assignee of all of Assignors' right, title and interest in, under and to the Purchased Assets, (b) Assignee's acceptance of such sale, conveyance, grant, assignment, transfer and delivery and (c) Assignee's assumption of all of the Assumed Liabilities, in each case on the terms and subject to the conditions of the Asset Purchase Agreement.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.     **Definitions.** Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

2.     **Assignment**. Assignors hereby sell, convey, grant, assign, transfer and deliver to Assignee as of the date hereof, all of their right, title and interest in, under and to the Purchased Assets free and clear of all Encumbrances other than the Permitted Encumbrances in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, effective at the Closing pursuant to the Asset Purchase Agreement (the "***Assignment***").

3.     **Acceptance and Assumption**. Assignee hereby, effective at the Closing pursuant to the Asset Purchase Agreement, (a) purchases, acquires and accepts the sale, conveyance, grant, assignment, transfer and delivery of Assignors' right, title and interest in, under and to the Purchased Assets free and clear of all Encumbrances other than the Permitted Encumbrances and (b) assumes and agrees to pay, perform and discharge when due, and shall be liable with respect to the Assumed Liabilities in accordance with and subject to the terms and conditions of the Asset Purchase Agreement. For the avoidance of doubt, Assignee does not, and will not by assumption of the Assumed Liabilities or acceptance of the Assignment, assume any Excluded Assets or Excluded Liabilities, all of which will remain the sole responsibility of Assignors as set forth in the Asset Purchase Agreement.

4.    **Parties in Interest**. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

5.    **Terms of Asset Purchase Agreement**. The scope, nature, and extent of the Assumed Liabilities are expressly set forth in the Asset Purchase Agreement. Nothing contained herein will itself change, amend, extend, or alter (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever. This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement will govern.

6.    **Other Provisions**. The provisions of Article VIII of the Asset Purchase Agreement are hereby incorporated into this Agreement, *mutatis mutandis*.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

<u>THE COMPANY:</u>

LIFECARE HOLDINGS LLC

By: _____
Name:
Title:

<u>FACILITY SELLERS:</u>

NEW LIFECARE HOSPITALS LLC
NEW LIFECARE HOSPITALS OF NORTHERN
    NEVADA LLC
NEW LIFECARE HOSPITALS OF DAYTON
    LLC
NEW NEXTCARE SPECIALTY HOSPITAL OF
    DENVER LLC
NEW LIFECARE HOSPITALS OF NORTH
    CAROLINA LLC
NEW SAN ANTONIO SPECIALTY HOSPITAL
    LLC
NEW LIFECARE HOSPITALS AT TENAYA
    LLC
NEW LIFECARE HOSPITALS OF SARASOTA
    LLC
NEW LIFECARE MANAGEMENT SERVICES
    LLC
NEW LIFECARE REIT 1 LLC
LIFECARE PHARMACY SERVICES LLC

By: _____
Name:
Title:

[Signature Page to Assignment and Assumption Agreement]

<u>BUYER</u>:

PAM SQUARED, LLC

By: _____
Name:
Title:

<u>Exhibit D</u>

Form of Subordinated Note

(Attached.)

FORM
EXHIBIT D

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY COMPARABLE STATE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN OPINION OF COUNSEL, SATISFACTORY TO THE ISSUER OF THE NOTE, EXPLAINING AN EXEMPTION FROM SUCH REGISTRATION.

PAYMENT AND THE EXERCISE OF REMEDIES WITH RESPECT TO THIS NOTE ARE SUBJECT TO THE TERMS AND PROVISIONS SET FORTH IN SECTION 3 HEREIN, AND PAYMENT WITH RESPECT TO THIS NOTE IS SUBORDINATE IN RIGHT OF PAYMENT TO SENIOR DEBT (AS DEFINED BELOW) AS SET FORTH BELOW.

## PAM SQUARED, LLC

## JUNIOR SUBORDINATED PROMISSORY NOTE

_____, 2019                                                    $5 million in the aggregate

   Pam Squared, LLC (the "Company"), hereby promises to pay to the order of the Sellers (as defined below) (the "Payees"), the principal amount of $5 million together with interest thereon calculated from the date hereof in accordance with the provisions of this note.

   This note is a junior subordinated promissory note (the "Note") issued pursuant to an Asset Purchase Agreement dated as of July 18, 2019, by and among LifeCare Holdings LLC, a Delaware limited liability company ("LifeCare"), each direct or indirect subsidiary of LifeCare listed on Exhibit A thereto (each, a "Facility Seller" and collectively with LifeCare, the "Sellers" and each, a "Seller") and the Company (the "Purchase Agreement").

   1.  Interest.

   (a)  Payment and Capitalization of Interest. Interest shall accrue at the rate of 5% per annum on the unpaid principal amount of this Note outstanding (including any portion thereof which is Capitalized Interest). Subject to Section 3 hereof, interest shall be payable with respect to this Note on each calendar quarter in cash by wire transfer or other same day funds to the respective account designated in writing by the Payees. In addition, subject to Section 3 hereof, interest shall be payable with respect to this Note, in arrears, in cash, upon any prepayment of this Note (to the extent of accrued interest on the principal amount of this Note so prepaid) and upon

– 1 –

_____, 2023[1] (the "Maturity Date"), in each case, by wire transfer or other same day funds to the respective account designated in writing by each Payee.  Interest shall be computed on the basis of a 365-day year and the actual number of days elapsed.   Any accrued interest which for any reason has not theretofore been paid shall be paid in full on the Maturity Date.

(b)    Capitalized Interest.   To the extent any payment of cash interest is prohibited to be made and/or received pursuant to Section 3 or by the terms and conditions of any Senior Debt, such cash interest shall be capitalized and made part of the unpaid principal amount hereunder as of such date (the "Capitalized Interest").

2.    Payment of Principal on Note.

(a)    Scheduled Payments.   The Company shall pay the principal amount then outstanding (including any portion thereof which is Capitalized Interest), together with all unpaid interest accrued hereon and any other amounts payable hereunder, to the holders of this Note on the Maturity Date.

(b)    Prepayments.   Subject to Section 3 hereof, the Company may, at any time and from time to time, without premium or penalty, prepay all or any portion of the outstanding principal amount of this Note (including any portion thereof which is Capitalized Interest); provided that such prepayment is not prohibited by any Senior Debt or Section 3.  A prepayment of less than all of the outstanding principal amount of this Note shall not relieve the Company of its obligation to make the scheduled payments on this Note on the Maturity Date pursuant to Section 2(a) above.

3.    Subordination.   Notwithstanding anything to the contrary contained in this Note or the Purchase Agreement:

(a)    The Company covenants and agrees, and the Payees by their acceptance and agreement hereof likewise covenants and agree, that to the extent and in the manner expressly set forth in this Section 3, that (i) the payment of all amounts due or other payable with respect to this Note (collectively, the "Subordinated Debt") is subordinate in all respects to the prior payment in full of all Senior Debt (as hereinafter defined) and the termination of all commitments related thereto (the "Discharge of Senior Debt"), (ii) the Subordinated Debt is and shall remain unsecured and an obligation solely of the Company and (iii) this Section shall constitute a "Subordination Agreement" within the meaning of Section 510(a) of the United States Bankruptcy Code.

(b)    Each of the Company and the Payees hereby acknowledges and agrees that (i) the Credit Agreement (as hereinafter defined) restricts the making of any payment in respect to the Subordinated Debt (a "Subordinated Debt Payment"), (ii) the Company shall not make, and the Payees shall not accept, directly or indirectly, all or any portion of any Subordinated Debt Payment, whether in cash, property or securities, if, at the time of such payment and after giving effect to the making of such payment, such payment is not permitted under the Credit Agreement, (iii) the failure to make any Subordinated Debt Payment prohibited by the Credit Agreement, other

---

[1]    Note to Draft: To be the four year anniversary of the Closing Date.

than on the Maturity Date, shall not result in a breach under this Note, (iv) in the event that any Payee receives, or is notified that it has received, any Subordinated Debt Payment in violation of this Section, such payments shall be held in trust for the Senior Agent (as hereinafter defined) and such Payee shall forthwith turn over such payments in the form received to the Senior Agent, (v) until the Discharge of Senior Debt, the Payee may demand, take any action to collect, or take any enforcement action in respect of all or any portion of any Subordinated Debt Payment that may be available to the Payee, whether at law, in equity, pursuant to judicial proceeding or otherwise (including the commencement of any litigation or insolvency proceeding) only in connection with a Permitted Subordinated Debt Payment (as hereinafter defined) that has not been paid, when due, by the Company.  Notwithstanding anything to the contrary contained in this <u>Section 3</u>, to the extent that a payment in respect of the Subordinated Debt is due and payable under this Note and permitted to be paid under the Credit Agreement, such payment may be made by the Company and retained by the Payee (each such payment, a "<u>Permitted Subordinated Debt Payment</u>").

(c)    In the event of any insolvency or bankruptcy of the Company, (i) all Senior Debt shall be paid in full in cash prior to any distribution whether in cash, property or securities to in respect of the Subordinated Debt, (ii) any payment which otherwise would be payable or deliverable in respect of the Subordinated Debt shall be paid or delivered directly to the Senior Agent until the Discharge of Senior Debt occurs and (iii) each Payee irrevocably authorizes, empowers and directs all receivers, trustees, liquidators, custodians, conservators or others having authority, to effect all such payments and deliverables to the Senior Agent.

(d)    Each Payee agrees (i) that it shall not sell, assign, dispose of or otherwise transfer all or any portion of its rights to the Subordinated Debt unless such assignee agrees to be bound by the subordination provisions of this <u>Section 3</u>, (ii) that the Credit Agreement and related loan documents may be amended, restated, refinanced, replaced, supplemented or otherwise modified in any manner at any time and from time to time, without the consent of or notice to the Payee, without impairing or releasing the obligations of such Payee under this Section or the subordination effected hereby; provided consent of such Payee shall be required with respect to any amendments, restatements, refinancings, replacements, supplements or other modifications to the Credit Agreement that add further restrictions on the ability of the Company to repay this Note, (iii) that the validity or enforceability of the Credit Agreement or the related loan documents or any exercise or non-exercise of any right, power or remedy under such documents by the Senior Agent or the Lenders (as defined in the Credit Agreement) shall not affect or impair the subordination effected hereby or the obligations of such Payee hereunder, (iv) not to sue, initiate or maintain any action or file any complaint, lawsuit or proceeding of any kind against the Senior Agent or any Lender or any of their affiliates arising out of or in any way relating to or connected with, the Company's obligation to pay the Subordinated Debt and that none of the Senior Agent or any Lender or any of their affiliates has any liability to the Payee for any such failure to make any such Subordinated Debt Payment as a result of such restrictions, and (v) until the Discharge of Senior Debt occurs, the Payee shall not be entitled to be subrogated to any of the rights of the Senior Agent or any Lender.

(e)    For purposes of this Note, the term "<u>Credit Agreement</u>" means that certain Credit Agreement dated as of September 7, 2018, as amended, restated, refinanced, replaced,

supplemented or otherwise modified from time to time, among the Company, certain of its affiliates from time to time party thereto, the lenders from time to time party thereto (collectively, the "Lenders") and Credit Suisse AG, New York Branch, as administrative agent (the "Senior Agent") and "Senior Debt" means all principal of, and interest and premium (if any) on, indebtedness of, and all fees, expenses, indemnities and all other obligations of and amounts payable under or in respect of the Credit Agreement and the related loan documents, whether or not outstanding or hereafter created, incurred, assumed or guaranteed (including but not limited to any interest, fees and other amounts accruing thereon after the commencement of any insolvency proceeding, without regard to whether or not such interest, fees or other amounts are allowed claims).

    4.    Events of Default; Remedies.

    (a)    Events of Default.  For purposes of this Note, an Event of Default shall be deemed to have occurred if:

    (i)    The Company fails to pay when due the full amount of any interest payment or of any principal payment (including any portion thereof which is Capitalized Interest), to the extent not prohibited by the terms of Section 3 or any Senior Debt, and such failure to pay is not cured within ten (10) days (other than with respect to payment in full of this Note on the Maturity Date for which there shall be no grace period) after the same becomes due and payable; provided, that any Capitalized Interest in accordance with Section 1 shall not be deemed to be due and payable (other than on the Maturity Date) and no Event of Default under this Note shall exist due to the fact that such interest is not paid in cash; or

    (ii)    The Company makes an assignment for the benefit of creditors or admits in writing its inability to pay its debts generally as they become due; or an order, judgment or decree is entered adjudicating the Company bankrupt or insolvent; or any order for relief with respect to the Company is entered under the Federal Bankruptcy Code; or the Company petitions or applies to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of the Company, or of any substantial part of the assets of the Company, or commences any proceeding relating to the Company under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or any such petition or application is filed, or any such proceeding is commenced, against the Company and either (A) the Company by any act indicates its approval thereof, consent thereto or acquiescence therein or (B) such petition, application or proceeding is not dismissed within 60 days.

    (b)    Consequences of Events of Default.  Subject to Section 3 above, upon the occurrence of an Event of Default, the holders of this Note representing a majority of the aggregate principal amount of this Note then outstanding may declare all or any portion of the outstanding principal amount (including any portion thereof which is Capitalized Interest) of this Note (together with all accrued interest thereon and all other amounts due in connection therewith) due and payable.

(c)     Waiver.  The Company hereby waives diligence, presentment, protest and demand and notice of protest and demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, or any payment hereunder, may be extended from time to time and that the holders hereof may accept security for this Note or release security for this Note, all without in any way affecting the liability of the Company hereunder.

5.     Cancellation.  After all principal (including any portion thereof which is Capitalized Interest) and accrued interest at any time owed on this Note has been paid in full, this Note shall be automatically cancelled and the Payees shall immediately surrender this Note to the Company for cancellation.  After cancellation of this Note, this Note shall not be reissued.

6.     Payment Procedures.  Payments of principal and interest are to be delivered to the holders of this Note by wire transfer or other same day funds to the respective account designated in writing by the Payees or, if not specified by such holder, then by cashier's or certified check to such holders at the following address (or at such other address as is specified by prior written notice by Payees to the Company):

_____
_____
_____
_____

7.     Miscellaneous.

(a)     Amendment and Waiver.  Except as otherwise expressly provided herein, the provisions of this Note may be amended and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company has obtained the written consent of the holders of a majority of the aggregate principal amount (plus all accrued but unpaid interest) of this Note then outstanding; provided that Section 3, this proviso of Section 7(a), and Section 7(b) may not be amended, supplemented, modified or waived without the written consent of the Senior Agent.

(b)     Third Party Beneficiaries.  The Senior Agent and the Lenders shall be third party beneficiaries of and shall be entitled to rely upon the terms and conditions of Section 3, and shall have a direct cause of action against the Company and/or any Payee, in accordance with, and subject to the terms and conditions of, Section 3.

(c)     Assignment.  The rights and obligations of the Company and the holders of this Note shall be binding upon and benefit the successors and permitted assigns and transferees of the Company.  The Payees shall not sell, transfer, assign, pledge or otherwise directly or indirectly dispose of any interest in this Note, other than to White Oak Healthcare Finance, LLC, Seaport Loan Products LLC, Wilmington Trust, National Association and/or Glas Trust Company LLC, without the consent of the Company, not to be unreasonably withheld.  Any transfer or attempted transfer of any interest in this Note in violation of this Section 7(c) shall be null and void and shall not transfer any interest in this Note, and the Company shall not record such transfer

– 5 –

on its books and records or treat any purported transferee of such interest as the owner of such interest for any purpose.  Any sale, transfer, assignment, pledge or other direct or indirect disposition shall be subject to <u>Section 3</u>, and any successor, assignor or transferee of this Note shall acquire any interest in this Note subject to <u>Section 3</u>.

(d)      <u>Business Day</u>.  If any payment on this Note shall become due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in computing interest in connection with payment.  The term "<u>Business Day</u>" as used herein means any day other than Saturday or Sunday or a public holiday under the laws of the State of Pennsylvania or other day on which banking institutions are authorized or obligated to close in the State of Pennsylvania as of the date of determination.

(e)      <u>Replacement</u>.  Upon receipt of evidence reasonably satisfactory to the Company of the mutilation, destruction, loss or theft of this Note and the ownership thereof, and, in the case of any such mutilation, upon surrender and cancellation of this Note, the Company shall, upon the written request of the holders of this Note, execute and deliver in replacement thereof a new Note in the same form, in the same original principal amount and dated the same date as this Note so mutilated, destroyed, lost or stolen, and this Note so mutilated, destroyed, lost or stolen shall then be deemed no longer outstanding hereunder.

(f)      <u>Usury Laws</u>.  It is the intention of the Company and the holders of this Note to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Note shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters.  If the maturity of this Note is accelerated by reason of an election by the holders hereof resulting from an Event of Default, voluntary prepayment by the Company or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment, and any interest in excess of the maximum amount permitted by law shall be cancelled automatically and, if theretofore paid, shall at the option of the holders hereof either be rebated to the Company or credited on the principal amount of this Note, or if this Note has been paid, then the excess shall be rebated to the Company.  The aggregate of all interest (whether designated as interest, service charges, points or otherwise) contracted for, chargeable, or receivable under this Note shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of this Note remaining unpaid from time to time.  If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be cancelled automatically and, if theretofore paid, rebated to the Company or credited on the principal amount of this Note, or if this Note has been repaid, then such excess shall be rebated to the Company.

(g)      <u>Governing Law; Consent to Jurisdiction</u>.  This Note and all disputes or controversies arising out of or relating to this Note (whether in contract or tort) shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles.  Any legal action or proceeding with respect to this Note shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by

– 6 –

execution and delivery of this Note, party hereto accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.

(h)    <u>WAIVER OF JURY TRIAL</u>.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS NOTE.

\*    \*    \*    \*    \*

IN WITNESS WHEREOF, Pam Squared, LLC has executed and delivered this Junior Subordinated Promissory Note as of the date above.

**PAM SQUARED, LLC**

By: _____
     Name:
     Its:

[Signature Page to Subordinated Note]

Agreed to and accepted this ____ day of _____, 2019
for purposes of Sections 3 and 7(b):

THE COMPANY:

LIFECARE HOLDINGS LLC

By: _____

Name:

Title:

FACILITY SELLERS:

NEW LIFECARE HOSPITALS LLC

NEW LIFECARE HOSPITALS OF NORTHERN
   NEVADA LLC

NEW LIFECARE HOSPITALS OF DAYTON
   LLC

NEW NEXTCARE SPECIALTY HOSPITAL OF
   DENVER LLC

NEW LIFECARE HOSPITALS OF NORTH
   CAROLINA LLC

NEW SAN ANTONIO SPECIALTY HOSPITAL
   LLC

NEW LIFECARE HOSPITALS AT TENAYA
   LLC

NEW LIFECARE HOSPITALS OF SARASOTA
   LLC

NEW LIFECARE MANAGEMENT SERVICES
   LLC

NEW LIFECARE REIT 1 LLC

LIFECARE PHARMACY SERVICES LLC

By: _____

Name:

Title: