## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HOSPITAL ACQUISITION, LLC, *et al.*,[1] | ) | Case No. 19-10998 (BLS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | RE: Docket Nos. 227, 298, 393, 401 |
|  | ) |  |
|  | ) | Obj. Deadline: 8/1/2019, 5:00 p.m. ET |
|  | ) | Hearing Date: 8/13/2019, 10:00 a.m. ET |

### OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF HOSPITAL ACQUISITION, LLC, *ET AL.* TO THE DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (II) AN ORDER OR ORDERS APPROVING THE SALE OF THE ASSETS

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the above-captioned chapter 11 cases of Hospital Acquisition, LLC and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through its counsel, files this objection (the "**Objection**") to the *Debtors' Motion for (i) An Order Establishing Bidding Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of the*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC ( 431 0); New LifeCare REIT I LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094). The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

*ACTIVE 44822932v5*

*Assets* [Docket No. 227] (the "**Sale Motion**").[2]    In support of its Objection, the Committee respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1.     The Committee has been and remains supportive of the Debtors' efforts to maximize the value of their businesses and ensure ongoing patient care through a going-concern sale.  While the Committee remains supportive of this sale process, the Proposed Sale (as defined below) must be considered in the broader context of these cases – specifically, the implications that the sale process will have on the administrative solvency of the Debtors' estates and the conclusion of these cases, whether through a liquidating plan or otherwise.

2.     The Debtors have approximately $213 million of secured debt.  The Committee is under no illusion that this sale process will yield sufficient proceeds – even with a "home run" at the auction – to pay the secured lenders in full.  This economic reality is not, however, justification to sell substantially all the Debtors' assets without a viable means to pay the costs of these cases.

3.     Under the terms (described in more detail below) of the credit agreement governing the DIP Facility (the "**DIP Agreement**") and the final order approving the DIP Facility (the "**Final DIP Order**"),[3] the Debtors can use proceeds of the DIP Facility and cash collateral only pursuant to the terms of the Budget (as defined in the Final DIP Order). Currently, the Budget does not contemplate a post-sale wind down of the Debtors' estates. Moreover, after payment of the obligations under the DIP Facility, the Debtors' authority to use the prepetition lenders' cash collateral will terminate absent an agreement with the lenders on a

---

[2]     Capitalized but undefined terms herein shall have the same meanings as ascribed to them in the Sale Motion.

[3]     *See Final Order(i) Authorizing the Debtors to Obtain Postpetition Financing, (ii) Authorizing Use of Cash Collateral, (iii) Granting Liens and Providing Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, and (vi) Granting Related Relief* [Docket No. 278].

*ACTIVE 44822932v5*

Wind Down Budget (as defined in the Final DIP Order), which has not yet occurred. Without access to cash, the Debtors cannot appropriately wind down these cases. Accordingly, any authority granted to the Debtors to sell their assets should be conditioned on an appropriate Wind Down Budget that will be funded with the sale proceeds or other proceeds generated through the collection of accounts receivable.

4.    The Committee has had only preliminarily discussions with the Debtors and counsel to the Prepetition Second Term Facility Agents (as defined in the Final DIP Order) regarding a Wind Down Budget and related issues. The Committee has no assurances that a Wind Down Budget will be agreed to and no assurances that these cases will not be left administratively insolvent after the sale process is completed and the accounts receivable are liquidated. While the Committee understands that the sale closing and liquidation of the accounts receivable will take some time, absent a path to administrative solvency, consummating the Proposed Sale (and any other sales), as structured and without a Wind Down Budget in place, is not a sound exercise of the Debtors' business judgment.

5.    Finally, in addition to the Committee's macro concerns regarding the impact of the Proposed Sale on the viability of these cases, the Committee also has concerns regarding some of the specific provisions in the Stalking Horse APA.[4] The Committee has expressed its concerns to the Debtors. While the Committee will continue to work in to resolve the issues, the following is a summary of those that remain.

---

[4]    The Committee's objections to the form of Stalking Horse APA are limited to the Stalking Horse APA included in the *Notice of Stalking Horse Bid in Connection with Debtors' Motion for (i) Order Establishing Bidding Procedures and Granting Related Relief and (ii) an Order or Orders Approving the Sale of Assets* [Docket No. 393] (the "**PAM Bid**"). On July 31, 2019, the Debtors filed a certification of counsel with this Court relating to a second proposed stalking horse bid for assets that are not included in the PAM Bid. [Docket No. 436] (the "**LifeCare 2.0 Bid**"). While the Committee has no objection to LifeCare 2.0, LLC being designated as the stalking horse bidder for certain assets and no objection to the proposed bid protections contained in the LifeCare 2.0 Bid, the Committee is in the process of reviewing the LifeCare 2.0 Bid and therefore expressly reserves its rights to raise objections to that asset purchase agreement at or prior to the Sale Hearing.

- ***Assumed Accounts Payable.***   Under section 2.3(a) of the Stalking Horse APA, the Buyer is assuming "all accounts payable related to the Seller Facilities that are listed on <u>Schedule 2.3(a)</u>."  Schedule 2.3(a) can continue to be changed up to the time of closing.  Moreover, if certain accounts payable related to the Seller Facilities are not listed on Schedule 2.3(a), then they are not assumed by the Buyer, again impacting the administrative solvency of these estates.

- ***Payment of Section 503(9) Claims.***   The Committee has indicated that claims arising under Section 503(b)(9) and relating to the Seller Facilities should be paid as part of this sale or otherwise addressed in the Wind Down Budget.

- ***Access to Books and Records.***   Under section 5.8 of the Stalking Horse APA, the Debtors have access to the Buyer's books and records.  The Committee and any post-confirmation entity (such as a liquidating trust) should have the same access to the books and records.

- ***Avoidance Actions.***   Under section 2.1(j) of the APA, the Buyer is purchasing Avoidance Actions related to the Purchased Assets.  If the Buyer wants to purchase these assets for the benefit of its go-forward business, it should agree to extinguish such Avoidance Actions.

- ***Causes of Action.***   Also under section 2.1(j) of the APA, the Buyer is purchasing "all claims or causes of action relating to or arising from any of the Purchased Assets."  This is a broad category for which the Debtors have not provided sufficient specificity.  Without more information, the Committee is not able to evaluate the value of these causes of action and whether the Buyer is paying a fair price.

- ***Amendments.***   Under paragraph 34 of the proposed sale order,[5] "the Stalking Horse [APA] and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court."  At a minimum, the Committee should receive notice of any such waiver, modification, amendment, or supplement.

6.      Accordingly, the Committee objects to entry of an order approving a sale on the terms currently proposed, and respectfully requests that the Court deny the relief requested in the Sale Motion absent modifications that would resolve the objections raised herein.

---

[5]     *See Notice of Filing of Order (i) Authorizing the Sale of the Assets to the Purchaser Free and Clear of Liens, Claims, Interests, and Encumbrances; (ii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (iii) Granting Related Relief* [Docket No. 401].

## II.
## BACKGROUND

### A.    Chapter 11 Cases

7.    On May 7, 2019 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "**Bankruptcy Code**").   The Debtors continue in possession of their properties and management of their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No trustee or examiner has been requested or appointed in these chapter 11 cases.   The Debtors' cases are being jointly administered for procedural purposes only, pursuant to an order the Court entered on May 8, 2019 [Docket No. 36].   On May 17, 2019, the United States Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.

### B.    Debtors' Capital Structure and Final DIP Order[6]

8.    As noted above, the Debtors have approximately $213 million in secured debt, consisting of amounts outstanding under the DIP Facility,[7] the Prepetition Priming Facility and the Prepetition Second Term Facility.

9.    The Final DIP Order contains a waterfall with respect to the proceeds from the sale of the secured lenders' collateral.   Under paragraph 17, subject to the Carve Out, all net proceeds of the secured lenders' collateral must be used to (i) first, pay all obligations under the DIP Facility, (ii) second, pay all obligations under the Prepetition Priming Facility, and (iii) third, pay all obligations under the Prepetition Second Term Facility.

---

[6]    Capitalized terms in this section that are not otherwise defined shall have the meanings ascribed to such terms in the Final DIP Order.

[7]    All obligations under the Prepetition Facility have been "rolled up" into the DIP Facility.

10.     Prior to the repayment of the DIP Facility, the Debtors can use proceeds of the DIP Facility only pursuant to the Budget.[8]  After repayment of the DIP Facility, the Debtors' authority to use the Prepetition Term Facility Lenders' cash collateral is terminated unless the Debtors, the Prepetition Term Facility Agents, and the Committee agree on the terms of a Wind Down Budget.[9]  To date, the parties have not reached such an agreement.

C.     **Proposed Sale and Remaining Assets**

11.     Under the terms of the Stalking Horse APA, the Debtors propose to sell (the "**Proposed Sale**") ten of their long-term acute care ("**LTAC**") facilities, defined in the Stalking Horse APA as the "Seller Facilities," and certain assets (including avoidance actions) related thereto.  The cash purchase price is $29.5 million, subject to a downward adjustment based on the amount of liabilities assumed by the Buyer.

12.     The Buyer will also assume certain liabilities associated with the Seller Facilities, including cure costs, certain employee liabilities, and certain accounts payable.  As to the accounts payable, however, the Buyer will only assume payables listed on Schedule 2.3(a) of the Stalking Horse APA, which Schedule may be modified.  Thus, at this time, it is not possible to ensure that all postpetition accounts payable relating to the Seller Facilities are being assumed and paid in the normal course by the Buyer.

13.     The Proposed Sale under the Stalking Horse APA does not include (i) pre-closing receivables or (ii) the Debtors' remaining LTAC facilities.  Based on information provided by, and discussions with, the Debtors and their advisors, the Committee currently estimates that the proceeds of the sale under the Stalking Horse APA and other assets excluded from the Proposed Sale (the "**Remaining Assets**") will be sufficient to satisfy obligations under the DIP Facility

---

[8]     *See* Final DIP Order ¶¶ 20-21.

[9]     *See id.* ¶ 50(i).

*ACTIVE 44822932v5*

and the Prepetition Priming Facility, with a partial recovery on the Prepetition Second Term Facility.

### III.
### OBJECTIONS AND DISCUSSION

14.    As discussed in more detail below, to obtain approval of the Proposed Sale, the Debtors have the burden of meeting the requirements of section 363(b) of the Bankruptcy Code. Among other things, the Debtors must show a sound business purpose for the Proposed Sale. As currently structured, the Debtors cannot make this showing because of the likelihood that the sale will leave the estates administratively insolvent. In addition, as noted above, there are certain provisions of the Stalking Horse APA that are problematic and, thus, should not be approved.

**A.    The Debtors Must Establish a Sound Business Purpose**

15.    Section 363(b) of the Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). A court will approve a sale outside the ordinary course of business if: (i) a valid business justification exists for the sale, (ii) the price represents fair value, and (iii) the parties negotiated and entered into the sale transaction in good faith. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999).

16.    The first prong – the "sound business purpose" test – requires a debtor to establish four elements: (i) adequate notice to interested parties; (ii) that an adequate price is being paid for the assets; (iii) good faith by the parties; and (iv) a sound business judgment for the sale. *See e.g. Abbotts Dairies*, 788 F.2d at 149-50; *Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991) (citing *In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987)). Moreover, a debtor has the burden of establishing a sound business purpose. *See Montgomery Ward*, 242 B.R. at 153.

Page **7** of **13**

**B.    If the Debtors Cannot Establish Administrative Solvency, They Cannot Establish a Sound Business Purpose for the Proposed Sale**

17.    Though a sale of substantially all of a debtor's assets outside the structure of a chapter 11 plan and disclosure statement is not prohibited by the Bankruptcy Code, multiple courts have cautioned that in the absence of the protection and finality offered by a plan and disclosure statement, the court must closely scrutinize the proposed sale. *See In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004); *see also Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003).   Indeed, section 363 asset sales should not be used to circumvent the protections for creditors mandated in the Bankruptcy Code.   *Abbotts Diaries*, 788 F.2d at 150 (stating that the requirement of good faith is paramount in ensuring that section 363 will not be employed to circumvent usual creditor protections of chapter 11); *In re Westpoint Stevens, Inc.*, 333 B.R. 30, 52 (S.D.N.Y. 2005) (stating that "it is well established that section 363(b) is not to be utilized as a means of avoiding chapter 11's plan confirmation procedures") *aff'd in part*, *rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) (citing *In re The Babcock & Wilcox Co.*, 250 F.3d 955, 960 (5th Cir. 2001) ("[T]he provisions of § 363 . . . do not allow a debtor to gut the bankruptcy estate before reorganization or to change the fundamental nature of the estate's assets in such a way that limits a future reorganization plan.")).

18.    Therefore, in evaluating whether a debtor has met its burden of establishing that a sound business purpose exists for a proposed sale, courts will consider the impact the sale has on a debtor's ability to confirm a plan.   *See Delaware & H. R. Co.*, 124 B.R. at 175-176 ("A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include . . . the likelihood that a plan of reorganization will be proposed and confirmed in the near future; [and] the effect of the proposed disposition of the future plan of reorganization.")

*ACTIVE 44822932v5*

(citing *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1068-69 (2nd Cir. 1983)).

19.     A court cannot confirm a chapter 11 plan unless the plan provides for payment in full, in cash, of all administrative expense claims on the plan's effective date. *See* 11 U.S.C. §1129(a)(9)(A); *In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002). The same is generally true for priority claims under section 507(a) of the Bankruptcy Code. *See* 11 U.S.C. §1129(a)(9)(B); *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 166 (D. Del. 2006).

20.     For a number of reasons, the Committee has serious doubts about the Debtors' ability to confirm a chapter 11 plan after consummation of the Proposed Sale.   ***First***, the purchase price for the Proposed Sale, plus the likely value of the Remaining Assets, will not be sufficient to pay the secured debt in these cases.   ***Second***, the Debtors, the Committee, and the Prepetition Term Facility Agents have not yet agreed on a Wind Down Budget that would provide liquidity to pay administrative and priority claims and confirm a chapter 11 plan.   And ***third***, the Stalking Horse APA does not generally provide that all post-petition accounts payable relating to the Seller Facilities will be assumed and paid by the Buyer, making it is impossible to determine the scope of administrative claims that will be left for the estates to pay.

21.     Accordingly, absent modifications to the terms of the Proposed Sale or the order approving the sale, the Debtors cannot meet their burden of establishing that a sound business justification exists for the Proposed Sale.

## C.     Other Sale Objections

22.     Under section 2.1(j) of the APA, the Buyer is purchasing "all claims or causes of action relating to or arising from any of the Purchased Assets, including, without limitation, any Avoidance Actions . . . ."  First, this is a broad category for which the Debtors have not provided

sufficient specificity.  Without more information, the Committee is not able to evaluate the value of these causes of action and whether the Buyer is paying a fair price.  Moreover, if the Buyer wants to purchase avoidance actions, then those avoidance actions should be extinguished.

23.    Under section 2.3(a) of the Stalking Horse APA, the Buyer is assuming "all accounts payable related to the Seller Facilities that are listed on Schedule 2.3(a)."  Section 2.3(a) of the Stalking Horse APA permits the schedule to be "updated from time to time prior to the Closing Date to add or remove any accounts payable relating to the Seller Facilities accrued or paid in the ordinary course of business consistent with past practice."  The Buyer should be assuming all postpetition accounts payable relating to the Seller Facilities with a corresponding purchase price adjustment.

24.    Under section 5.8 of the Stalking Horse APA, the Debtors have access to the Buyer's books and records.  The Committee and any post-confirmation entity (such as a liquidating trust) should have the same access to the books and records.  There is no justification for denying such access to the Committee and any post-confirmation estate representative.

25.    Under paragraph 34 of the proposed sale order, "the Stalking Horse [APA] and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court."  At a minimum, the Committee should receive notice of any such waiver, modification, amendment, or supplement.

## IV.
## RESERVATION OF RIGHTS

26.    The Committee expressly reserves the right (1) to supplement this Objection at any time prior to the hearing on the Sale Motion and/or at the Sale Hearing; and (2) to raise additional or further objections to the Sale Motion at any hearing on the Sale Motion and/or at the Sale Hearing.

*ACTIVE 44822932v5*

**WHEREFORE**, for the reasons set forth herein, the Committee respectfully requests that this Court (i) deny the relief requested in the Sale Motion absent certain modifications raised herein, and (ii) grant such other and further relief as the Court deems just and equitable.

*[Remainder of Page Intentionally Left Blank]*

*ACTIVE 44822932v5*

Dated:  August 1, 2019
Wilmington, Delaware

GREENBERG TRAURIG, LLP

*/s/ Dennis A. Meloro*
Dennis A. Meloro (No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

BAYARD, P.A.
Justin R. Alberto (No. 5126)
Erin R. Fay (No. 5268)
Daniel N. Brogan (No. 5723)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: jalberto@bayardlaw.com
        efay@bayardlaw.com
        dbrogan@bayardlaw.com

-and-

GREENBERG TRAURIG, LLP
David D. Cleary (admitted *pro hac vice*)
Nancy A. Peterman (admitted *pro hac vice*)
77 West Wacker Drive
Suite 3100
Chicago, IL  60601
Telephone: (312) 456-8400
Facsimile: (312) 456-8435
Email: clearyd@gtlaw.com
        petermann@gtlaw.com

*Co-Counsel for the Official*
*Committee of Unsecured Creditors*

*ACTIVE 44822932v5*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on August 1, 2019, I caused a true and correct copy of the foregoing to be served by mail and/or by hand delivery on:

| | |
|---|---|
| **Counsel to the Debtors**<br>Akin Gump Strauss Hauer & Feld LLP<br>2001 K St., N.W.<br>Washington DC 2006<br><br>– and –<br><br>2300 N. Field St., Suite 1800<br>Dallas, TX 75201<br>Email: *salberino@akingump.com*<br> *keide@akingump.com*<br> *sschultz@akingump.com* | **Local Counsel to the Debtors**<br>Young, Conaway, Stargatt & Taylor, LLP<br>Rodney Square<br>1000 N. King St.<br>Wilmington, DE 19801<br>Email: *mbcleary@ycst.com* |
| **Counsel to the DIP Agent and the Prepetition Agent**<br>King & Spalding LLP<br>1185 Avenue of the Americas,<br>34th Floor<br>New York, NY 10036<br>Email: *asteinberg@kslaw.com* | **Local Counsel to the DIP Agent and the Prepetition Agent**<br>The Rosner Law Group LLC<br>824 N. Market St., Suite 810<br>Wilmington, DE 19801<br>Email: *rosner@teamrosner.com* |
| **Counsel to the Prepetition Second Term Facility Agents**<br>Shearman & Sterling LLP<br>599 Lexington Ave.<br>New York, NY 10022<br>Email:<br>*ned.schodek@shearman.com* | **Counsel to the Prepetition Priming Term Facility Lenders**<br>Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036<br>Email:<br>*Matthew.Roose@ropesgray.com* |
| **Office of the United States Trustee**<br>844 N. King St., Room 2207,<br>Lockbox 35<br>Wilmington, DE 19801<br>Email:<br>*benjamin.a.hackman@usdoj.gov* | |

 */s/* Dennis A. Meloro
Dennis A. Meloro (No. 4435)

*ACTIVE 44822932v5*