# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Hospital Acquisition LLC, *et al.*,[1] | ) Case No. 19-10998 (BLS) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re: Docket Nos. 227, 294, 298, 392, 393, 414 & 479** |

### ORDER (I) AUTHORIZING THE SALE OF THE ASSETS TO THE PURCHASER FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF

Upon the motion [D.I. 227] (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Sale Order"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2001-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Hospital Acquisition LLC (3232); Hospital Acquisition Intermediate Sub LLC (9609); LifeCare Holdings LLC (f/k/a Hospital Acquisition Sub I LLC) (6612); LifeCare Behavioral Health Hospital of Pittsburgh LLC (9835); New LifeCare Hospitals LLC (7959); New LifeCare Hospitals of Dayton LLC (2592); New LifeCare Hospitals of Milwaukee LLC (2428); New LifeCare Hospitals of South Texas LLC (4237); Hospital Acquisition Sub II LLC (7920); New LifeCare Management Services LLC (4310); New LifeCare REIT 1 LLC (9849); New LifeCare Hospitals of Mechanicsburg LLC (0174); New Pittsburgh Specialty Hospital LLC (7592); LifeCare Vascular Services, LLC (5864); New LifeCare Hospitals of North Texas LLC (4279); New LifeCare Hospitals of Chester County LLC (1116); New LifeCare Hospitals of Northern Nevada LLC (4534); New San Antonio Specialty Hospital LLC (2614); New LifeCare Hospitals of North Carolina LLC (7257); New LifeCare Hospitals of Pittsburgh LLC (8759); New NextCare Specialty Hospital of Denver LLC (6416); Hospital Acquisition MI LLC (4982); LifeCare Pharmacy Services LLC (3733); New LifeCare REIT 2 LLC (1315); New LifeCare Hospitals at Tenaya LLC (6891); and New LifeCare Hospitals of Sarasota LLC (8094). The Debtors' address is 5340 Legacy Drive, Suite 150, Plano, Texas 75024.

[2]    Capitalized terms used but not defined herein shall have the meanings given to them in the Motion or, if not defined in the Motion, the Stalking Horse Agreement (as defined below).

(the "Local Rules"), (i) authorizing the Sale of the Assets free and clear of Liens (as defined

below), (ii) authorizing the assumption and assignment of certain executory contracts and

unexpired leases (collectively, the "Acquired Contracts"), and (iii) granting related relief; and

this Court having entered the *Order Establishing Bidding Procedures Relating to the Sale of All

or a Portion of the Debtors' Assets* [D.I. 298] (the "Bidding Procedures Order"), authorizing and

approving (i) the Bidding Procedures by which the Debtors were to solicit and select the highest

or otherwise best offer for the Sale of the Assets, (ii) the Assumption and Assignment

Procedures; (iii) the form and manner of notice of all procedures, protections, schedules, and

agreements described in the Motion and attached thereto, including the Debtors' selection of one

or more stalking horse bidders and the Bid Protections that the Debtors may provide to any such

stalking horse bidders, and (iv) the scheduling of the Auction, the Sale Hearing, and certain other

dates relating to the Sale, all as more fully set forth in the Motion; and this Court having entered

an order [D.I. 414] (the "Stalking Horse Selection Order"), approving the Debtors' selection of

PAM Squared, LLC (the "Purchaser") as the Stalking Horse Bidder and approving certain bid

protections granted to the Purchaser pursuant to that certain asset purchase agreement, dated July

18, 2019, by and among the Debtors, as Sellers, and the Purchaser, as Buyer (as amended

pursuant to that certain Amendment to Asset Purchase Agreement, dated as of August 12, 2019,

by and among the Debtors, as Sellers, and the Purchaser, as Buyer

the "Stalking Horse Agreement"), a copy of which is attached hereto as Exhibit A; and it

appearing that the relief requested is in the best interests of the Debtors, their estates, their

creditors, and other parties in interest; and this Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the

United States District Court for the District of Delaware*, dated as of February 29, 2012; and this

2

Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that adequate notice of the Motion and opportunity for objection having been given, with no objections having been filed, or all objections having been resolved or overruled, as the case may be; and this Court having found that no other notice need be given; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at the Sale Hearing before this Court; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is

**HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over this matter and over the property of the Debtors' estates, including the Purchased Assets to be sold, transferred, or conveyed pursuant to the Stalking Horse Agreement, pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for relief granted herein are sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1 and 6004-1.  Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The legal and factual bases set forth in the Motion, at the Auction, and at the Sale Hearing establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties in interest.

C.      The notice of the Motion, the Bidding Procedures, the selection of the Stalking Horse Bidder, the Auction, the Sale Hearing, the Cure Costs, and the Sale Order was adequate and sufficient under the circumstances of these chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.  Accordingly, no further notice of the Motion, the Bidding Procedures, the selection of the

3

Stalking Horse Bidder, the Auction, the Sale Hearing, the Cure Costs, or this Sale Order is necessary or required.

        D.     The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (i) authorize the sale of the Assets to the Purchaser free and clear of all Liens, (ii) authorize the assumption and assignment of the Acquired Contracts to the Purchaser, and (iii) grant related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion, on the record of the Bidding Procedures Hearing, on the record of the Auction, and on the record of the Sale Hearing, is incorporated herein by reference and, among other things, forms the basis for the findings of fact and conclusions of law as set forth herein.

        E.     The Debtors' decision to enter into the Stalking Horse Agreement with the Stalking Horse Bidder was a due and proper exercise of the Debtors' business judgment and was authorized pursuant to the Bidding Procedures Order.  The PAM Bid Protections (as defined in the Stalking Horse Selection Order) contained in the Stalking Horse Agreement (i) were necessary to preserve the value of the Debtors' estates by inducing the Stalking Horse Bidder to enter into the Stalking Horse Agreement and (ii) are in compliance with and authorized by the Bidding Procedures Order and the Stalking Horse Selection Order.

        F.     Notice and a reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities as required by the Bidding Procedures Order, including, without limitation: (a) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Assets within the past two (2) years; (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets; (c) counsel for the Committee; (d) counsel to the DIP Lender;

(e) counsel to the Prepetition Priming Term Loan Lenders; (f) counsel to the Prepetition Priming Term Facility Agent; (g) counsel to the Prepetition Second Term Facility Agent; (h) the U.S. Trustee; (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (j) the United States Attorney's offices for the District of Delaware, the Northern District of Texas, and all states in which the Debtors conduct business; (k) the Internal Revenue Service; (l) all parties entitled to notice pursuant to Local Rule 2002-1(b); (m) all known creditors of the Debtors, including their contract counterparties; and (n) all registered holders of equity securities in the Debtors. Other parties interested in bidding on the Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Assets.

G.      The Debtors have demonstrated a sufficient basis for entering into the Stalking Horse Agreement, to sell the Purchased Assets, and assume and to assign the Acquired Contracts pursuant to sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtors' business judgment and in the best interests of the Debtors, their estates, their creditors, and other parties in interest. Such business reasons include, but are not limited to, that (i) the Stalking Horse Agreement and the Closing will present the best opportunity to maximize and realize the value of the Purchased Assets, (ii) there is substantial risk of deterioration of the value of the Purchased Assets if the Sale is not consummated as promptly as reasonably practicable, and (iii) the Stalking Horse Agreement constitutes the highest or otherwise best offer for the Purchased Assets.

H.      The Bidding Procedures set forth in the Bidding Procedures Order were noncollusive and substantively and procedurally fair to all parties.

I.      The disclosures made by the Debtors concerning the Stalking Horse Agreement, the Auction and the transactions contemplated by the Stalking Horse Agreement and this Sale Order were good, complete and adequate.

J.      The Debtors and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order.  As demonstrated by any testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process and an auction conducted in accordance with the Bidding Procedures Order, the Debtors (i) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Purchased Assets, (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets, and (iii) considered any bids submitted on or before the Bid Deadline.  The Purchaser and its professionals have complied, in good faith, in all respects with the Bidding Procedures Order.  The Bidding Procedures assisted in obtaining the highest or otherwise best value for the Purchased Assets for the Debtors and their estates.

K.      Following the conclusion of the Auction, the Debtors determined that the Purchaser submitted the highest or otherwise best offer and selected the Purchaser as the Successful Bidder for the Purchased Assets in accordance with the Bidding Procedures Order. The offer of the Purchaser, upon the terms and conditions set forth in the Stalking Horse Agreement, including the form of and total consideration to be realized by the Debtors pursuant to the Stalking Horse Agreement, (i) is the highest or otherwise best offer received by the Debtors, (ii) is fair and reasonable, (iii) is in the best interests of the Debtors' estates, creditors, and other parties in interest, and (iv) constitutes full and adequate consideration and reasonably

01:25008453.1

equivalent value for the Purchased Assets.  The Debtors' determination that the Stalking Horse Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.  The Stalking Horse Agreement and the transactions contemplated thereby represent a fair and reasonable offer to purchase the Acquired Assets under the circumstances of these chapter 11 cases.  No other entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Purchaser.

L.      The Purchaser is not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code.  The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder; the Stalking Horse Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud of any kind; and neither the Debtors nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Stalking Horse Agreement or to the consummation of the Sale and transfer of the Purchased Assets and Acquired Contracts to the Purchaser.  Accordingly, the Purchaser is entitled to all of the protections and immunities under section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets and Acquired Contracts.

M.      The Debtors are authorized to execute the Stalking Horse Agreement and all other documents contemplated thereby, and to promptly consummate the transactions contemplated by the Stalking Horse Agreement.  No consents or approvals, other than as may be expressly provided for in the Stalking Horse Agreement, are required by the Debtors to consummate such transactions.

01:25008453.1

N.      The Debtors have advanced sound business reasons for seeking to enter into the Stalking Horse Agreement and to sell the Purchased Assets and assume and assign the Acquired Contracts, as more fully set forth in the Motion and as demonstrated at the Sale Hearing, and it is a reasonable exercise of the Debtors' business judgment to sell the Assets and to consummate the transactions contemplated by the Stalking Horse Agreement.  Notwithstanding any requirement for approval or consent by any person, the transfer of the Purchased Assets to the Purchaser and the assumption and assignment of the Acquired Contracts is a legal, valid, and effective transfer of the Purchased Assets and any Acquired Contracts.

O.      The terms and conditions of the Stalking Horse Agreement, including the consideration to be realized by the Debtors pursuant to the Stalking Horse Agreement, are fair and reasonable, and the transactions contemplated by the Stalking Horse Agreement are in the best interests of the Debtors' estates.

P.      Except as otherwise provided in the Stalking Horse Agreement, the Purchased Assets shall be sold free and clear of any lien (statutory or otherwise), hypothecation, encumbrance, security interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, or other interest in the subject property, including, without limitation, any right of recovery, tax (including foreign, federal, state, and local tax), order of any Governmental Authority, or other claim with respect thereto, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, and (iii) any claims based on any theory that the Purchaser is a successor, transferee or continuation of the Debtors or the Assets, and (iv) any leasehold interest, license or other right, in favor of a person other than

8

the Purchaser, to use any portion of the Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, material or nonmaterial, known or unknown (collectively, "Liens") (other than the Permitted Encumbrances (as defined in the Stalking Horse Agreement) (the "Permitted Liens")), with such Liens (other than the Permitted Liens) to attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing.  For the avoidance of doubt, the Debtors shall apply the proceeds of the Sale of the Purchased Assets and the Acquired Contracts consistent with the *Final Order (I) Authorizing The Debtors To Obtain Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief*, [D.I. 278] (the "DIP Order").  With respect to the DIP Lender that means: subject to the Carve Out, and after the payment of, or reservation of adequate funds for the claims of the Texas Taxing Authorities (as defined in the DIP Order) that are secured by Permitted Encumbrances (as defined in the DIP Order), all net proceeds of the Sale of the Purchased Assets shall be immediately paid as a first priority to the DIP Lender to reduce the DIP Obligations until such Obligations are indefeasibly paid in full in cash (including the provision for contingent obligations).

Q.     The Stalking Horse Agreement is a valid and binding contract among the Debtors and the Purchaser, which is and shall be enforceable according to its terms.

R.     The transfer of the Purchased Assets to the Purchaser is a legal, valid and effective transfer of all the Purchased Assets, and, except as may otherwise be provided in the Stalking Horse Agreement, shall vest the Purchaser with all right, title and interest of the Debtors

01:25008453.1

in and to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens).  Except as specifically provided in the Stalking Horse Agreement or this Sale Order, the Purchaser shall not assume or be liable for any Liens (other than the Permitted Liens) relating to the Purchased Assets.

S.      The Debtors may sell the Purchased Assets free and clear of all Liens of any kind or nature whatsoever (other than the Permitted Liens) because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those holders of Liens from which the Purchased Assets are to be sold free and clear (including, to the extent applicable, the nondebtor parties to Acquired Contracts) who did not object, or who withdrew their objections, to the sale of the Purchased Assets and the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All objections to the Motion have been resolved or overruled.  Those holders of Liens (other than the Permitted Liens) who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, if any, attach to the proceeds of the Sale of the Purchased Assets ultimately attributable to the property against or in which they claim or may claim any Liens, in the same order of priority and with the same validity, force and effect that such Liens had before the Sale of the Purchased Assets, subject to all claims and defenses the Debtors and their estates may possess with respect thereto.  With respect to the DIP Lender that means: subject to the Carve Out, and after the payment of, or reservation of adequate funds for the claims of the Texas Taxing Authorities (as defined in the DIP Order) that are secured by Permitted Encumbrances (as defined in the DIP Order), all net proceeds of the Sale of the Purchased Assets shall be immediately paid as a first priority to the DIP Lender to reduce the

01:25008453.1

DIP Obligations until such Obligations are indefeasibly paid in full in cash (including the provision for contingent obligations).

T.    Not selling the Purchased Assets free and clear of all Liens (other than the Permitted Liens) would adversely impact the Debtors' estates, and any Sale of the Purchased Assets other than one free and clear of all Liens (other than the Permitted Liens) would be of substantially less value to the Debtors' estates.  The Purchaser would not have entered into the Stalking Horse Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, if each of (i) the Sale of the Purchased Assets and (ii) the assumption and assignment of the Acquired Contracts to the Purchaser were not free and clear of all Liens of any kind of nature whatsoever (except for Permitted Liens) or if the Purchaser would, or in the future could, be liable for any Liens or any of the Excluded Liabilities.

U.    The Debtors and the Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f) of the Bankruptcy Code, in connection with the Sale and the assumption and assignment of the Acquired Contracts.  The Purchaser has demonstrated adequate assurance of future performance with respect to all Acquired Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.  The assumption and assignment of the Acquired Contracts pursuant to the terms of this Sale Order is integral to the Stalking Horse Agreement and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtors.

V.    The Acquired Contracts are assignable notwithstanding any provisions contained therein to the contrary, or providing for the termination thereof upon assignment or the

11

insolvency or commencement of the Debtors' chapter 11 cases.  The Purchaser, on behalf of the

Debtors, has provided for appropriate cures or other payments or actions required for the Debtors

to assume and assign the Acquired Contracts to the Purchaser.  The Purchaser has provided

adequate assurance of future performance under all Acquired Contracts.

       W.     In the absence of a stay pending appeal, the Purchaser is acting in good faith,

pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by

the Stalking Horse Agreement at any time on or after the entry of this Sale Order and cause has

been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy

Rules 6004(h) and 6006(d).

       X.     The transactions contemplated under the Stalking Horse Agreement do not

amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors or the

Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there

is no common identity between the Debtors and the Purchaser, there is no continuity of

enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the

Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their

estates.

       Y.     The Sale of the Purchased Assets outside of a plan of reorganization pursuant to

the Stalking Horse Agreement neither impermissibly restructures the rights of the Debtors'

creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the

Debtors.  The Sale does not constitute a *sub rosa* chapter 11 plan.

       Z.     The Stalking Horse Agreement was not entered into, and none of the Debtors or

the Purchaser have entered into the Stalking Horse Agreement or proposed to consummate the

transactions contemplated thereby, for the purpose of hindering, delaying or defrauding the

01:25008453.1

Debtors' present or future creditors.  The total consideration provided by the Purchaser for the Purchased Assets is the highest or otherwise best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets.

AA.     Time is of the essence in consummating the Sale.  In order to maximize the value of the Purchased Assets and preserve the viability of the business as a going concern, it is essential that the sale of the Purchased Assets occur as soon as reasonably practicable. Accordingly, there is cause to determine inapplicable the stays contemplated by Bankruptcy Rules 6004 and 6006.

BB.     The Purchaser has not agreed to assume and shall have no obligation with respect to any liabilities of the Debtors or their subsidiaries or affiliates other than as expressly set forth in the Stalking Horse Agreement.  Other than the Assumed Liabilities, and except as expressly provided for by the terms of the Stalking Horse Agreement, the Purchaser shall have no obligations with respect to any Excluded Liabilities and shall acquire all the Purchased Assets free and clear of the Excluded Liabilities.

CC.     The Debtors, in connection with offering products or services, did not disclose any policy prohibiting the transfer of personally identifiable information and, therefore, the Sale of the Purchased Assets may be approved pursuant to section 363(b)(1)(A) of the Bankruptcy Code without the appointment of a consumer privacy ombudsman, as defined in section 332 of the Bankruptcy Code.

01:25008453.1

DD.    Other than claims arising under the Stalking Horse Agreement, the Debtors agree and acknowledge that they have no claims against the Purchaser, and the Purchaser agrees and acknowledges that the Purchaser has no claims against the Debtors or their non-Debtor affiliates.

EE.    The consummation of the transactions contemplated by the Stalking Horse Agreement is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transactions.

FF.    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.  To the extent any findings of fact are conclusions of law, they are adopted as such.  To the extent any conclusions of law are findings of fact, they are adopted as such.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted as set forth herein.

2.    All objections, responses, and requests for continuance concerning the Motion are resolved in accordance with the terms of this Sale Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied on the merits with prejudice.

**A.    Approval of the Sale**

3.    The Sale of the Purchased Assets, the terms and conditions of the Stalking Horse Agreement (including all schedules and exhibits affixed thereto and all other ancillary

14

documents), the Successful Bid by the Purchaser, and the transactions contemplated thereby and all of the terms and conditions thereof, are the highest and best offer for the Purchased Assets, and hereby are authorized and approved in all respects.

4.      The Sale of the Purchased Assets and the consideration provided by the Purchaser under the Stalking Horse Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

5.      The Purchaser is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code, including with respect to the transfer of Acquired Contracts as part of the sale of the Purchased Assets pursuant to section 365 of the Bankruptcy Code and this Sale Order.

6.      Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Sale Order are hereafter reversed, modified, or vacated by a subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity and enforceability of any transfer under the Stalking Horse Agreement or obligation or right granted pursuant to the terms of this Sale Order (unless stayed pending appeal), and notwithstanding any reversal, modification or vacatur shall be governed in all respects by the original provisions of this Sale Order and the Stalking Horse Agreement, as the case may be.

7.      Subject to the terms and conditions of the Stalking Horse Agreement, the Debtors are hereby authorized and directed to fully perform under, consummate and implement the terms of the Stalking Horse Agreement, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Stalking Horse Agreement, this Sale Order and sale of the Purchased Assets contemplated

01:25008453.1

thereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may be reasonably necessary for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession any or all of the Purchased Assets or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Stalking Horse Agreement, forthwith and without any further corporate action or orders of this Court. Neither the Purchaser nor the Debtors shall have any obligation to proceed with the Closing of the Stalking Horse Agreement unless and until all conditions precedent to the Purchaser's and the Debtors' respective obligations thereunder have been met, satisfied, or waived by the Purchaser and/or the Debtors, as the case may be, in each case subject to the terms of the Stalking Horse Agreement.

8.    The Debtors and each other person or entity having duties or responsibilities under the Stalking Horse Agreement, any agreements related thereto or this Sale Order, and their respective directors, officers, employees, members, agents, representatives, and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Stalking Horse Agreement, to carry out all of the provisions of the Stalking Horse Agreement and any related agreements; to issue, execute, deliver, file, and record, as appropriate, the documents evidencing and consummating the Stalking Horse Agreement, and any related agreements; to take any and all actions contemplated by the Stalking Horse Agreement, any related agreements or this Sale Order; and to issue, execute, deliver, file, and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases, or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and

16

consummate, the Stalking Horse Agreement, any related agreements and this Sale Order and the transactions contemplated thereby and hereby, forthwith and all without further application to, or order of, this Court.

9.     The secretary, any assistant secretary, agent, representative or officer of the Debtors shall be, and hereby is, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Stalking Horse Agreement, any related agreements, and this Sale Order, including amended and restated certificates or articles of incorporation and bylaws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of Delaware and all other applicable business corporation, trust and other laws of the applicable governmental units, with respect to the implementation and consummation of the Stalking Horse Agreement, any related agreements and this Sale Order, and the transactions contemplated thereby and hereby.

10.     Upon consummation of the transactions set forth in the Stalking Horse Agreement, if any person or entity that has filed financing statements, mortgages, mechanic's

01:25008453.1

liens, *lis pendens*, or other documents or agreements evidencing encumbrances, claims, interests, and Liens against or in the Purchased Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all encumbrances, claims, interests, and Liens that the person or entity has with respect to the Purchased Assets (unless otherwise assumed in the Stalking Horse Agreement), or otherwise, then (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Purchased Assets and (b) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all encumbrances, claims, interests, and Liens in the Purchased Assets of any kind or nature. For the avoidance of doubt, to the extent necessary, upon consummation of the Transactions set forth in the Stalking Horse Agreement, the Purchaser is authorized to file termination statements, lien terminations, or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Sale Order under section 363 and related provisions of the Bankruptcy Code.  For the avoidance of doubt, nothing contained in this paragraph 10 shall be deemed to apply with respect to any Permitted Liens.

11.    Effective as of the Closing, (a) the Sale of the Purchased Assets by the Debtors to the Purchaser shall constitute a legal, valid and effective transfer of the Purchased Assets notwithstanding any requirement for approval or consent by any person and vests the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Liens of any kind (other than the Permitted Liens), pursuant to section 363(f) of the Bankruptcy

01:25008453.1

Code, and (b) the assumption of any Assumed Liabilities by the Purchaser constitutes a legal, valid and effective delegation of any Assumed Liabilities to the Purchaser and divests the Debtors of all liability with respect to any Assumed Liabilities.

12.     The Sale of the Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code or otherwise.

**B.      Transfer of Assets**

13.     Except to the extent specifically provided in the Stalking Horse Agreement and subject to the terms and conditions thereof, upon the Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b), and 365 of the Bankruptcy Code, to sell the Purchased Assets to the Purchaser.  The Sale of the Purchased Assets vests the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets free and clear of any and all Liens (other than the Permitted Liens), with all such Liens (other than the Permitted Liens) to attach only to the proceeds of the Sale with the same priority, validity, force, and effect, if any, as they now have in or against the Purchased Assets, subject to all claims and defenses the Debtors and their estates may possess with respect thereto.  The Motion or notice thereof shall be deemed to provide sufficient notice as to the sale of the Purchased Assets free and clear of all Liens.  Following the Closing Date, no holder of any Liens (other than the Permitted Liens) in the Purchased Assets shall have any basis to interfere with the Purchaser's use and enjoyment of the Purchased Assets based on or related to such Liens, or any actions that the Debtors may take in their chapter 11 cases, and no person may take any action to prevent, interfere with or otherwise impair consummation of the transactions contemplated in or by the Stalking Horse Agreement or this Sale Order.  For the avoidance of doubt, the Debtors shall apply the proceeds of the Sale of the Purchased Assets and the Acquired Contracts consistent with the terms of the DIP Order.  With respect to the DIP Lender that means: subject

to the Carve Out, and after the payment of, or reservation of adequate funds for the claims of the Texas Taxing Authorities (as defined in the DIP Order) that are secured by Permitted Encumbrances (as defined in the DIP Order), all net proceeds of the Sale of the Purchased Assets shall be immediately paid as a first priority to the DIP Lender to reduce the DIP Obligations until such Obligations are indefeasibly paid in full in cash (including the provision for contingent obligations).

14.    The provisions of this Order authorizing the Sale and assignment of the Purchased Assets free and clear of Liens and the Excluded Liabilities shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  However, the Debtors and the Purchaser, and each of their respective officers, employees and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Stalking Horse Agreement and this Sale Order.

15.    For the avoidance of doubt, following the Closing, the Debtors are authorized and directed to comply with their obligations under sections 2.7, 5.11, and 5.12 of the Stalking Horse Agreement in accordance with its terms.

16.    To the greatest extent available under applicable law and to the extent provided for under the Stalking Horse Agreement, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Purchased Assets, and, to the greatest extent available under applicable law and to the extent provided for under the Stalking Horse Agreement, all such

20

licenses, permits, registrations and governmental authorizations and approvals are deemed to have been transferred to the Purchaser as of the Closing Date.

17.    All of the Debtors' interests in the Purchased Assets to be acquired by the Purchaser under the Stalking Horse Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets acquired by the Purchaser under the Stalking Horse Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Purchased Assets to the Purchaser.

18.    All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the Purchased Assets are directed to surrender possession or control of the Purchased Assets to the Purchaser on the Closing Date or at such later time as the Purchaser may request.  All entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Stalking Horse Agreement and this Sale Order.

19.    Except as expressly provided in or pursuant to the Stalking Horse Agreement, the Purchaser is not assuming and is not deemed to assume, and the Purchaser shall not be, nor shall any affiliate of Purchaser be, in any way liable for or responsible for, as a successor or otherwise, under any theory of law or equity, for any liabilities, debts or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership, possession, control, or use of the Assets prior to the consummation of the transactions contemplated by the Stalking Horse Agreement, or any liabilities calculable by reference to the Debtors or their operations or to any

or all of the Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Stalking Horse Agreement, which liabilities, debts and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any of its affiliates.

**C.     Acquired Contracts**

20.     Subject to the terms of the Stalking Horse Agreement and the occurrence of the Closing Date, the assumption by the Debtors of Acquired Contracts and the assignment of all such Acquired Contracts to the Purchaser, as provided for or contemplated by the Stalking Horse Agreement, shall be, and hereby is, authorized and approved pursuant to sections 363 and 365 of the Bankruptcy Code.

21.     The Acquired Contracts shall be deemed valid and binding and in full force and effect and assumed by the Debtors and assigned to the Purchaser at the Closing, pursuant to sections 363 and 365 of the Bankruptcy Code, subject only to the payment of all Cure Costs (as defined below) required to assume and assign the Acquired Contracts to the Purchaser, and subject to the payment of the aforementioned Cure Costs, parties to such Acquired Contracts are without basis to assert against the Purchaser, among other things, any defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

22.     Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title and interest in and to each Acquired Contract.  The Debtors are authorized to take all actions reasonably necessary to effectuate the foregoing.

23.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided in this Sale Order, the Purchaser shall promptly pay or cause to be paid to the parties to any Acquired Contracts the requisite cure amounts, if any, set forth in the Cure Notice

22

or Supplemental Cure Notice (as applicable) served by the Debtors on each of the parties to the Assumed Contracts (the "Cure Costs"), with respect to the assumption and assignment thereof. The Cure Costs are hereby fixed at the amounts set forth in the Cure Notice or Supplemental Cure Notice (as applicable) served by the Debtors, or the amounts determined on the record of the Sale Hearing, as the case may be, and all parties to Acquired Contracts are forever bound by such Cure Costs, and, following the payment of the applicable Cure Costs, such parties shall not take any action against the Purchaser or the Purchased Assets with respect to any claim for cure under any Acquired Contract.  For the avoidance of doubt, the Purchase Price shall be reduced by the amount of Cure Costs paid by the Purchaser, as set forth in the Stalking Horse Agreement and subject to the limitations set forth therein.

24.    All defaults or other obligations under the Assumed Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be deemed cured by payment of the Cure Costs and the parties to such contracts shall be forever barred and estopped from asserting or claiming against the Debtors or the Purchaser that any additional amounts are due or other defaults exist.

25.    Any provision in any Acquired Contract that purports to declare a breach, default or payment right as a result of an assignment or a change of control in respect of the Debtors is unenforceable, and all Acquired Contracts shall remain in full force and effect, subject only to payment of the applicable Cure Cost, if any.  No sections or provisions of any Acquired Contract that purports to provide for additional payments, penalties, charges, or other financial accommodations in favor of nondebtor third parties to Acquired Contracts shall have any force or effect with respect to the transactions contemplated by the Stalking Horse Agreement and

23

assignments authorized by this Sale Order, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  No assignment of any Acquired Contract pursuant to the terms of the Stalking Horse Agreement in any respect constitutes a default under any Acquired Contract.  In the absence of objection, the party to each Acquired Contract shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Acquired Contract as of the applicable date of assumption without the necessity of obtaining such party's written consent to the assumption or assignment thereof.

26.     The Purchaser has satisfied any and all requirements under sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code to provide adequate assurance of future performance under all Acquired Contracts.  The Purchaser shall not be required to provide any further evidence of any adequate assurance to any counterparty of an Acquired Contract.

27.     The Debtors and their estates shall be relieved of any liability for any breach of any of the Acquired Contracts occurring from and after Closing, pursuant to and in accordance with section 365(k) of the Bankruptcy Code.

28.     Parties to Acquired Contracts shall be prohibited from charging any rent acceleration, assignment fees, increases or other fees to the Purchaser as a result of the assumption and assignment of any Acquired Contract.

29.     Notwithstanding anything to the contrary in this Sale Order, (i) the rights of any party to an executory contract or unexpired lease listed on the Cure Notice filed by the Debtors on July 17, 2019 [D.I. 392] that timely filed an objection to the assumption and assignment of an executory contract or unexpired lease (including any objection relating to adequate assurance of

future performance) to the Purchaser in accordance with the Bidding Procedures Order are preserved to the extent that any such objection has not been resolved as of the date of the entry of this Sale Order, and any such objections shall be addressed at the hearing scheduled for August 28, 2019 at 2:00 p.m. (ET), or a subsequent hearing, and (ii) the rights of any party to an executory contract or unexpired lease listed on the Supplemental Notice of Assumption and Assignment filed by the Debtors on August 8, 2019 [D.I. 479] are preserved and shall be addressed at the hearing scheduled for August 28, 2019 at 2:00 p.m. (ET), or a subsequent hearing, or otherwise as provided in the Bidding Procedures Order.

**D.    Additional Provisions**

30.    Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Agreement and this Sale Order.

31.    To the maximum extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transactions contemplated by the Stalking Horse Agreement.

32.    The Purchaser has not assumed, or is otherwise not obligated for, any of the Debtors' obligations, debts (as defined in section 101(12) of the Bankruptcy Code), or liabilities other than the Assumed Liabilities, and as otherwise set forth in the Stalking Horse Agreement, and the Purchaser has not purchased any of the Excluded Assets or assumed any Excluded Liabilities.  Consequently, all persons and governmental units (as defined in sections 101(27) and 101(41) of the Bankruptcy Code, respectively) and all holders of Liens (other than Permitted

25

Liens) based upon, arising out of or related to liabilities retained by the Debtors shall not take any action against the Purchaser or the Purchased Assets, including asserting any setoff (to the extent not actually taken prepetition) or right of subrogation of any kind, to recover any Liens (other than Permitted Liens) or on account of any liabilities of the Debtors other than Assumed Liabilities pursuant to the Stalking Horse Agreement.  Additionally, all persons holding or asserting any Liens in the Excluded Assets shall not assert or prosecute such Liens or any cause of action against the Purchaser or the Purchased Assets for any liability associated with the Excluded Assets.

33.     The Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, be deemed to assume, or in any way be responsible for any liability, debt (as defined in section 101(12) of the Bankruptcy Code), or obligation of any of the Debtors or their estates including, without limitation, pursuant to any bulk sales law, successor liability, or other theory of liability or responsibility for any claim against the Debtors, against an insider of the Debtors, against the Purchased Assets, or similar liability except as otherwise expressly provided in the Agreement.  The Motion contains sufficient notice of such limitations in accordance with Local Rule 6004-1.  Neither the purchase of the Purchased Assets by the Purchaser or its affiliates, nor the fact that the Purchaser or its affiliates are using any of the Purchased Assets previously owned, used or operated by the Debtors, will cause the Purchaser or any of its affiliates to be deemed a successor to, or be otherwise liable in any respect on account of the Debtors' business within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, regulatory, investigatory, safety, consumer protection, patent or intellectual property, business practices, environmental or other law, regulation, rule, guideline, or other doctrine (including,

without limitation, filing requirements under any such laws, regulations, rules, guidelines, or other doctrines) or under any products liability or product warranty law, regulation, rule, guideline, or other doctrine with respect to the Debtors' actual or potential liability under such law, regulation, rule, guideline, or doctrine.  For the avoidance of doubt, the Purchaser shall not have any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Purchased Assets prior to Closing, except to the extent the Purchaser expressly assumes such taxes pursuant to the Stalking Horse Agreement.

34.    Except to the extent expressly included in the Assumed Liabilities or to enforce the Agreement or Permitted Liens, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtors, the Committee, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory or investigatory authorities of any sort (including, without limitation, environmental and product safety regulators or investigators), lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien or other claim of any kind or nature whatsoever against, in or with respect to any of the Debtors or all or any part of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Debtors, all or any part of the Purchased Assets, the operation of the Debtors' business prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, shall be forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien or other claim, whether by payment, setoff (to the extent not actually taken prepetition), or otherwise, directly or indirectly, against the Purchaser or any affiliate, successor or assign thereof, or against the Purchased Assets.

01:25008453.1

35.     Subject to the terms of the Stalking Horse Agreement, the Stalking Horse Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court; *provided*, *however*, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the Stalking Horse Agreement and any related agreements; and *provided*, *further*, that the Debtors shall provide advance written notice to the Committee, the DIP Lender, the Prepetition Priming Term Loan Lenders and the Prepetition Second Term Facility Agent of any such waiver, modification, amendment or supplement to the Asset Purchase Agreement.

36.     The failure specifically to include any particular provisions of the Stalking Horse Agreement or any related agreements in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Purchaser that the Stalking Horse Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Order prior to Closing.

37.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the sale and the transactions contemplated by the Stalking Horse Agreement.

38.     To the extent any provisions of this Sale Order conflict with the terms and conditions of the Stalking Horse Agreement, this Sale Order shall govern and control.

39.     This Sale Order and the Stalking Horse Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a

28

chapter 7 case if this case is converted from chapter 11, all creditors and shareholders of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets.

40.     The provisions of this Sale Order are nonseverable and mutually dependent.

41.     Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in these chapter 11 cases, or in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or modify the provisions of the Stalking Horse Agreement or the terms of this Sale Order.

42.     The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to (i) deliver any notice provided for in the Stalking Horse Agreement or any other Sale-related document or (ii) take any and all actions permitted under the Stalking Horse Agreement or any other Sale-related document in accordance with the terms and conditions thereof.  The automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary to implement the preceding sentence.

43.     The Debtors are authorized and directed to take all actions necessary to implement and effectuate the relief granted in this Sale Order in accordance with the Stalking Horse Agreement.

44.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Sale

Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the Motion or notice thereof or of this Sale Order shall be deemed to provide sufficient notice of the Debtors' request for waiver of the otherwise applicable stay of this Sale Order.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the Stalking Horse Agreement at any time, subject to the terms of the Stalking Horse Agreement.  The Purchaser has acted in "good faith," and, in the absence of any person or entity obtaining a stay pending appeal, if the Debtors and the Purchaser close under the Stalking Horse Agreement, then the Purchaser shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

45.    The Debtors and the Purchaser each have standing to enforce the terms of this Sale Order, and, notwithstanding any closure of any of the Debtors' chapter 11 cases, the Debtors or the Purchaser may seek to reopen any closed chapter 11 cases to the extent necessary to enforce the terms of this Sale Order.

46.    Nothing in this Sale Order or related documents discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Closing Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of the Purchased Assets after the Closing Date; or (iv) any liability to a Governmental Unit on the part of any person other than the Debtors.  Nor shall anything in this Sale Order enjoin or otherwise bar a Governmental Unit from asserting or

enforcing, outside of this Court, any liability described in the preceding sentence.  Nothing in this Sale Order or related documents authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Sale Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit.  Nothing in this Sale Order shall affect any setoff or recoupment rights of any Governmental Unit.  Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.  For the avoidance of doubt, the matters preserved by this paragraph are subject to all rights and defenses available under applicable law.

47.    Notwithstanding anything to the contrary in this Sale Order or the Stalking Horse Agreement, in consideration of the resolution of certain of the Committee's objections to the Motion, the Purchaser has covenanted not to pursue, prosecute or otherwise assert any Avoidance Actions acquired by the Purchaser pursuant to the Stalking Horse Agreement.  Except as otherwise expressly provided in the Stalking Horse Agreement, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any Excluded Asset.

48.    Notwithstanding anything to the contrary in this Sale Order or the Stalking Horse Agreement, in consideration of the resolution of certain of the Committee's objections to the Motion, the Committee and any successor to the Debtors or their estates shall have the same

01:25008453.1

access to the Buyer's books and records as the Seller under section 5.8 of the Stalking Horse Agreement.

49.     Notwithstanding anything to the contrary in the Motion, the Bidding Procedures, the Bidding Procedures Order, any cure notice or assumption notice (including, but not limited to, any Notice of Assumption and Assignment or Supplemental Notice of Assumption and Assignment), or this Sale Order (i) none of the insurance policies or any related agreements (collectively, the "Zurich Insurance Contracts") issued at any time by Steadfast Insurance Company (together with its affiliates and successors, "Zurich"), or any rights, benefits, claims, rights to payments and/or recoveries under the Zurich Insurance Contracts shall be sold, assigned or otherwise transferred to the Purchaser in connection with the Sale; (ii) nothing shall alter, modify or otherwise amend the terms or conditions of the Zurich Insurance Contracts; and (iii) for the avoidance of doubt, the Purchaser is not, and shall not be deemed to be, an insured under any of the Zurich Insurance Contracts; *provided, however*, that to the extent any claim with respect to any Purchased Assets arises that is covered by the Zurich Insurance Contracts after the Closing Date (as defined in the Stalking Horse Agreement), the Debtors may pursue such claim in accordance with the terms of the Zurich Insurance Contracts, and, if applicable, turn over to the Purchaser any such insurance proceeds in accordance with article 2.1(f) of the APA (each, a "Proceed Turnover"); *provided, further, however*, that Zurich shall not have any duty to effectuate a Proceed Turnover or liability related to a Proceed Turnover.

50.     Nothing in this Sale Order shall be deemed or construed to modify or amend the DIP Order.

51.     For the avoidance of doubt, all Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables and Sellers' Transition Receivables shall

constitute Excluded Assets and shall continue to be collateral securing as a first priority the Debtors' obligations under the DIP Facility (as defined in the DIP Order) and as a junior priority the Adequate Protection Liens (as defined in the DIP Order), to the extent provided in and subject to the terms of the DIP Order, and such Accounts Receivable shall continue to be Prepetition Collateral (as defined in the DIP Order), the disposition of which remains subject to the terms of the Term Loan Intercreditor Agreement (as defined in the DIP Order).

52.      Notwithstanding anything to the contrary in this Sale Order, or any notice related thereto, the Objection [D.I. 440] ("Cigna Objection") of Cigna Health and Life Insurance Company and Life Insurance Company of North America is hereby adjourned to August 28, 2019, and the Cigna Contracts (as defined in the Cigna Objection) shall not be assumed or assigned absent further order of this Court or the agreement of the parties.

53.      Hewlett-Packard Financial Services Company ("HPFS") and the Debtors are parties to certain agreements (referred to herein as "Equipment Leases" and including any amendments, supplements or Schedules), which HPFS and the Debtors agree constitute valid leases under applicable law.  Notwithstanding anything to the contrary herein, nothing contained in this Sale Order shall permit the sale or transfer of any equipment subject to the Equipment Leases, free and clear of the Equipment Leases or HPFS' rights thereunder.  Until such time as any issues relating to assumption and assignment of the Equipment Leases are resolved (by order of this Court or agreement of the parties), including any issues relating to cure and adequate assurance, or until such time as the Equipment Leases are rejected, (a) the Equipment Leases shall not be assumed and assigned absent further order of this Court or agreement of the parties, and (b) the rights and obligations of the Debtors and HPFS under the Equipment Leases shall be governed by the terms of the Equipment Leases and applicable law.  Nothing contained in this

Sale Order is intended to nor should it be construed as a waiver of any of the Debtors' or HPFS's rights and remedies, under the Equipment Leases, at law, or in equity.

54.    Irrespective of anything contained herein or in the Stalking Horse Agreement, including paragraph 23 of this Sale Order, at Closing, the Lease Agreement and Hospital Purchased Services Agreement (collectively the "Agreements") between Debtor NewLifeCare Hospitals of Dayton, LLC and Kettering Medical Center ("Kettering") shall be assumed and assigned to the Purchaser as of the Closing, subject to the terms of written extension of the Agreements to be agreed upon by the parties (the agreements, as modified and extended, the "Amended Agreements"). With respect to obligations arising under the Agreements, (a) at Closing, Purchaser shall promptly pay to Kettering the Cure Amount of $775,185.00 for obligations arising prior to the Petition Date and (b) with respect to obligations arising on or after the Petition Date, such obligations shall be paid on the later of (i) the Closing and (ii) the date such obligations becomes due and owing in the ordinary course of business.  The Purchaser shall comply with all of its obligations in accordance with the Amended Agreements arising on and after the Closing, including modified payment terms as agreed to by the Purchaser.  Additionally, notwithstanding anything to the contrary in this Sale Order, the Purchaser shall be liable for any accrued but unpaid ordinary course obligations of the Debtors under the Agreements, whether such amounts were (a) billed or (b) unbilled but arising no more than 90 days prior to the Closing (with any such obligations to be treated as Assumed Accounts Payable under the Stalking Horse Agreement and paid in the ordinary course of business).  For avoidance of doubt, Debtors shall remain liable for all payments due under the Agreements until the Agreements are assigned to Purchaser.

55.     Irrespective of anything contained herein, including paragraph 23 of this Sale Order, subject to the Debtors and Welltower, Inc. ("Welltower") entering into a stipulation regarding certain terms unrelated to the Amended Welltower Master Lease (as defined below) to be assumed and assigned to the Purchaser on the Closing Date, and the Court's approval of such stipulation, on the Closing Date (a) the Welltower Master Lease, as amended in accordance with and pursuant to the Stalking Horse Agreement and as agreed upon by the parties (and as may be further amended, the "Amended Welltower Master Lease"), shall be assumed and assigned to the Purchaser as of the Closing, and (b) Purchaser shall pay to Welltower the Cure Amount of $1,917,324.96 for (i) obligations arising prior to the Petition Date and (ii) the postpetition rent due and owing for May 2019. With respect to any additional pre-closing obligations arising under the Welltower Master Lease on or after the Petition Date but prior to the Closing Date (the "Pre-Closing Obligations"), such obligations shall be paid to Welltower on the date such obligations become due and owing in the ordinary course of business by the Debtors.  In the event that the Purchaser pays any Pre-Closing Obligations, any such Pre-Closing Obligations shall be treated as Assumed Accounts Payable under the Stalking Horse Agreement.  For the avoidance of doubt, the assumption and assignment of the Amended Welltower Master Lease shall not be effective unless all accrued but unpaid Pre-Closing Obligations that are due and owing as of the Closing Date are paid in full on the Closing Date, or the Debtors and the Purchaser provide adequate assurance that all such accrued Pre-Closing Obligations shall be promptly paid.

56.     From the proceeds of the sale of any of the Debtors' assets located in Bexar County in the state of Texas, the amount of $77,000 shall be set aside by the Debtors in a segregated account (the "Local Texas Tax Account") as adequate protection for the secured

claims of the Bexar County prior to the distribution of any proceeds to any other creditor. The liens of the Bexar County shall attach to these proceeds to the same extent and with the same priority as the liens they now hold against the property of the Debtors. These funds shall be on the order of adequate protection and shall constitute neither the allowance of the claims of the Bexar County, nor a cap on the amounts they may be entitled to receive.  Furthermore, the claims and liens of Bexar County shall remain subject to any objections any party would otherwise be entitled to raise as to the priority, validity or extent of such liens. These funds may be distributed upon agreement between Bexar County and the Debtors, or by subsequent order of the Court, duly noticed to Bexar County.

57.    The amount in the Local Texas Tax Account may be reduced upon agreement of the Debtors and Bexar County in the event the 2019 ad valorem taxes are an "Assumed Liability" and/or "Permitted Encumbrance" under the Stalking Horse Agreement with respect to the sale of the Debtors' Assets located in Bexar County. In that case, the property is sold subject to the lien of Bexar County to the extent not segregated and/or paid at closing, and the Purchaser shall be responsible for paying the taxes timely pursuant to applicable non-bankruptcy law. In the event the taxes are not paid timely, Bexar County may proceed to collect all amounts owed from the Purchaser.  In the event that the Debtors are required to pay any amounts on account of ad valorem taxes allocated to the Purchaser under the Stalking Horse Agreement, the Debtors reserve the right to seek reimbursement from the Purchaser for such amounts to the extent permitted under the Stalking Horse Agreement.

58.    This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Sale Order, the Bidding Procedures Order, and the Stalking Horse Agreement in all respects and to decide any disputes concerning this Sale Order, the Bidding Procedures Order, or

01:25008453.1

the Stalking Horse Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Stalking Horse Agreement and this Sale Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and any Acquired Contracts, and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the Purchased Assets free and clear of all Liens.

**Dated: August 19th, 2019**
**Wilmington, Delaware**

**BRENDAN L. SHANNON**
**UNITED STATES BANKRUPTCY JUDGE**

37

01:25008453.1