# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HOSPITAL ACQUISITION LLC, *et al.,* | ) | Case No. 19-10998 (BLS) |
| | ) | |
| Debtors., | ) | Re: Docket No. 1059 |

M. Blake Cleary, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 N. King Street
Wilmington, DE  19801

Abid Qureshi, Esquire
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, NY 10036-6745
*Counsel to Debtors*

Donald J. Detweiler, Esquire
Troutman Pepper
1313 N. Market Street
Wilmington, DE  19801

James P. Muenker, Esquire
Neligan, LLP
325 N. St. Paul Street, Suite 3600
Dallas, TX  75201
*Counsel to LifeCare 2.0 LLC*

# **OPINION[1]**

Before the Court is the Motion of LifeCare 2.0 LLC ("LifeCare") to enforce the terms of this Court's sale order and for related relief (the "Motion") [Docket No. 1059]. By the Motion, LifeCare seeks a ruling from this Court that it is entitled to a roughly $2.3 million payment that was received by the Debtors two days after the closing of a transaction whereby LifeCare purchased one of the Debtors' healthcare facilities. The Debtors contend that they properly kept that payment and have objected to the Motion. For the reasons that follow, the Court finds and concludes that the $2.3 million payment in question is a "settlement" that was acquired from the Debtors by LifeCare and so properly belongs to LifeCare. The Motion will be GRANTED.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

1

## INTRODUCTION[2]

This case presents a specific question: Who is the rightful owner of a payment in the amount of $2.358 million (the "Lump Sum Adjustment" or the "LSA") that was received and kept by the Debtors on October 2, 2019, just two days after the Debtors closed the sale of a healthcare facility to LifeCare? The Debtors contend that the Lump Sum Adjustment relates to services that they provided in the first six months of 2019 and, therefore, constitutes a Pre-Closing Receivable which the sale agreement permits them to keep. The rub, however, is that in December of 2019, the Center for Medicare and Medicaid Services (hereinafter referred to as "CMS" or "Medicare") assessed overpayments relating to the sold facility in the amount of $2.322 million (the "Overpayment Liability"). As the current owner of the healthcare facility, LifeCare is obligated to reimburse CMS in that amount. LifeCare contends that the Lump Sum Adjustment received by the Debtors was either (i) an asset that was acquired by LifeCare in the sale and thus wrongly retained by the Debtors and or (ii) an overpayment based upon the Debtors' flawed projections that should be remitted to LifeCare to permit it to satisfy the CMS Overpayment Liability.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 334 and the Amended Standing Order of Reference dated as of February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. §157(b)(2). This Court has authority to enter a final order in this matter pursuant to 28 U.S.C. 157(b) and Rule 9013-1(f) of the Local Rules of the Court.

---

[2] The Court conducted a four-day evidentiary hearing with six witnesses and nearly one hundred admitted exhibits. The proceedings were conducted entirely by video on account of the pandemic. The Court extends its compliments to the professionals – and in particular to Messrs. Detweiler, Muenker, Qureshi, and Ms. Warrick – for ably collaborating to present this complex dispute efficiently and effectively.

Venue of this case and this proceeding in this District is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

On May 6, 2019 (the "Petition Date"), the Debtors commenced voluntary cases under Chapter 11 of the Bankruptcy Code. Prior to the Petition Date, the Debtors were engaged in the business of operating long-term acute care hospitals. Specifically, the Debtors provided clinical services to patients with serious and complicated illnesses requiring extended hospitalization, but not necessitating the services of an intensive care unit. The Debtors operated seventeen facilities in nine states, employing approximately 3,500 people, and substantially all of their revenues derived from payments received through Medicare and Medicaid and from private payors.[3] The stated purpose of their Chapter 11 proceedings was to conduct a sale or sales of substantially all of their assets under § 363 of the Bankruptcy Code.

As part of that effort, on July 30, 2019, the Debtors entered into an Asset Purchase Agreement (as amended, the "APA")[4] with LifeCare. Under the APA, the Debtors agreed to sell to LifeCare healthcare facilities located in Pittsburgh (the "Pittsburgh Facility") and in North Texas (the "North Texas Facility"). By Order dated August 21, 2019 (the "Sale Order")[5], this Court approved the sale to LifeCare 2.0.

Because ownership of active and operating healthcare facilities was being transferred under the APA, the parties contemplated in Section 5.11 of the APA that they would enter into arrangements to provide for a period of transition between the Debtors and LifeCare. Specifically, on September 30, 2019 LifeCare and the Debtors entered into the Second

---

[3] See Declaration of James Murray, Chief Executive Officer of Hospital Acquisition LLC in Support of Chapter 11 Petitions and First Day Motions [Docket No. 2].
[4] Joint Exhibit No. 1.
[5] Docket No. 528

Amendment to the APA (the "Second Amendment")[6], which was effectively a transition services agreement that provided for issues that would arise relating to the billing and collection of receivables before and after the closing.  This was particularly important because the APA contemplated that LifeCare would utilize the Debtors' Medicare provider numbers to bill the Medicare program post-closing, pending the certification by Medicare of LifeCare 2.0 as holder of its own Medicare provider number.  Thus, because both the Debtors and LifeCare would be billing under the same provider numbers, there was a recognized risk of payments and liabilities or offsets being attributed to the wrong party.

**Periodic Interim Payment Methodology**

Before turning to the specifics of the APA, it is necessary to describe the historical billing and payment relationship between the Debtors and CMS.  The record reflects that the Debtors were paid pursuant to the Periodic Interim Payment ("PIP") methodology.  Under PIP, healthcare providers receive payments from CMS every two weeks that are calculated by CMS based upon the overall projected claims payments for the full year.  A PIP payment is an estimate based upon the provider's budget and projections and is susceptible to upward or downward adjustments during the course of a year.  PIP payments are reconciled on an interim and final basis to ensure that the PIP payments accurately reflect the actual value of the claims processed by the provider.  In the event that the interim review of PIP payments reflects that a provider has been underpaid, CMS can modify the amount of a PIP payment and/or issue a Lump Sum Adjustment to bring payments received under PIP in line with reality and updated projections.  If the review indicates that a provider has been overpaid, the provider must remit funds back to Medicare directly or via offsets to future payments.

---

[6] Joint Exhibit No. 3.

The record reflects that CMS engaged a third-party contractor, Novitas, LLC ("Novitas") to conduct interim and final reviews or audits of PIP payments made to the Debtors. On July 19, 2019, Novitas sent its report to the Debtors (the "July 19 Report").[7] The July 19 Report contained an analysis of PIP payments made to the Debtors in the first six months of 2019, along with a projection of services the Debtors were expected to provide for the balance of the calendar year. Based upon that analysis, Novitas determined that the Debtors were entitled to a Lump Sum Adjustment in the amount of $2,322,719.

The undisputed record reflects that, in the ordinary course of business, the Lump Sum Adjustment would have been paid promptly in July 2019 to the Debtors. However, because the Debtors were in bankruptcy, the Lump Sum Adjustment was withheld by Medicare pending a stipulated resolution of any and all claims between the Debtors and the United States. On October 2, 2019, the Court entered its Order Approving CMS Stipulation[8] resolving claims and issues between the United States and the Debtors. LifeCare was not a party to the Stipulation. This Stipulation effectively freed up and permitted payment of the Lump Sum Adjustment which had been approved in July 2019 but held back on account of the Debtors' bankruptcy. The Debtors received the LSA on October 2, 2019 and deposited it into their accounts.

The Debtors and LifeCare closed the transaction under the APA on September 30, 2019. As a result of a series of amendments to the APA negotiated between the parties[9], the actual cash consideration paid by LifeCare was steadily reduced, such that LifeCare's primary consideration offered under the APA was the assumption of the Debtors' liabilities. The record reflects that LifeCare ultimately paid approximately $400,000 in cash and actually received a portion of its

---

[7] Joint Exhibit No. 38.
[8] Joint Exhibit No. 7
[9] Joint Exhibit Nos. 2, 3 and 4.

deposit back at the closing, since the cash component of its offer had fallen below the amount of its original deposit with the Debtors.

Following the closing under the APA, LifeCare and the Debtors continued to coordinate through the following months on the operation and transition of the facilities over to LifeCare. Subsequently, in April 2020, the Debtors prepared their final cost report[10] which reflected amounts due to CMS in the amount of $2,322,719.[11] The Overpayment Liability is owed by LifeCare to CMS.

**The Asset Purchase Agreement**

The APA entered into by the parties contemplated treatment of pre- and post-closing receipts and liabilities. Given the nature of the services provided at the Facilities, the record reflects that there always was a lag between the provision of medical services and the processing and payment of claims relating thereto. Thus, the parties anticipated that monies might be received post-closing for services that had been provided prior to the closing, and that it would be necessary to be able to determine and direct monies either to the Debtors or to LifeCare, as appropriate. Consequently, when deciding who is entitled to the Lump Sum Adjustment and who is on the hook for the Overpayment Liability, the Court must look to the APA to determine the assets that were purchased or excluded, and the liabilities that were assumed or excluded.

Section 2.2 of the APA identifies property of the Debtors that was to be retained by the Debtors and not transferred to LifeCare:

> § 2.2 **Excluded Assets.** The Purchased Assets shall exclude all other assets, rights, business claims or properties of Sellers or any affiliate of Sellers that are not expressly set forth in Section 2.1, including but not limited to the assets set forth below:

---

[10] Joint Exhibit No. 70.
[11] The record reflects that this Overpayment Liability includes the $1.6 million overpayment first disclosed in January 2020.

\*\*\*\*

  (o) all Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables and Seller's Transition Receivables.[12]

The APA provided definitions of the terms "Accounts Receivable" and "Pre-Closing Receivables." However, these definitions were amended by the parties on the eve of the closing on September 30, 2019 by way of the Second Amendment. Specifically, the record reflects that the terms were clarified in order to ensure that monies flowing after the closing would be credited properly and remitted to the Debtors if those monies related to services that had been provided to the Debtors prior to the closing:

> "Accounts Receivable" or "Accounts" means all . . . obligations for the payment of money and goodwill, **including PIP**, whether now existing or hereinafter arising, including all payments due from the rendition of services . . . to a patient in the ordinary course of business, including those based on a cost report settlement or expected settlement . . . ."

> "Pre-Closing Receivables" means Accounts that relate to services rendered or goods provided prior to or on the Closing Date, including Seller's Transition Receivables and PIP received and/or due in respect of service dates prior to or on the Closing Date."[13]

Thus, the APA ensured that the Debtors would continue to receive monies and payments on account of services that they had rendered prior to the closing. However, the APA also provides that LifeCare acquired the Debtors' rights to payments arising from "settlements" with CMS, irrespective of whether those payments related to pre-closing services or activities. Section 2.1 of the APA provides as follows in relevant part:

**2.1 Purchase and Sale**

  Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, each Facility Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall acquire, all of each Facility Seller's right, title and interest to the following assets (all such assets other than the Excluded

---

[12] Joint Exhibit No. 1.
[13] Joint Exhibit No. 3 (emphasis added).

>Assets, the "Purchased Assets"), free and clear of any and all Encumbrances other than the Permitted Encumbrances:
>
>\* \* \* \*
>
>(k)    any receipts (i) relating to supplemental, disproportionate share or waiver payments, or Medicaid GME funding with respect to time periods prior to the Closing Time; (ii) relating to the Seller Cost Reports or Agency Settlements (whether resulting from an appeal by Sellers or otherwise) and other risk settlements with respect to time periods prior to the Closing Time, (iii) which result from Sellers' pursuit of one or more appeals pertaining to Medicare, Medicaid (including, without limitation, disproportionate share hospital program payments) or TRI CARE with respect to periods prior to the Closing Time, (iv) relating to participation in any group purchasing organization (including any Tax refunds, rebates or fee sharebacks for purchases made prior to Closing) with respect to periods prior to the Closing Time or (v) with respect to "meaningful use" attestations.

In keeping with these definitions, the Second Amendment required LifeCare to turn over to the Debtors monies they received that remained the Debtors' property under the APA. Correspondingly, the Debtors were obliged to remit or turn over to LifeCare any funds they received that properly belonged to LifeCare under the APA.

**The Parties' Positions**

By its Motion, LifeCare contends that the LSA belongs to it as a "Purchased Asset" under the APA that was received by the Debtors after the closing of the sale. LifeCare asserts and the LSA is a "settlement" with CMS that it purchased, notwithstanding that it may relate to pre-closing periods. Alternatively, LifeCare asserts that it is entitled to the LSA (or an administrative claim in that amount) on the ground that the Debtors breached certain representations and warranties in the APA. Finally, LifeCare asserts that the LSA resulted from the Debtors' inflated projections, so that it would be inequitable under the APA to permit the Debtors to keep the LSA and yet saddle LifeCare with the obligation to repay almost precisely that amount to Medicare.

The Debtors' primary argument is that the LSA was calculated, determined and approved in July 2019, and was based upon services the Debtors had provided many months before the closing. The LSA is therefore, according the Debtors, a Pre-Closing Receivable and thus an "Excluded Asset" under the APA rightfully retained by them. The Debtors object to any claim or demand for recovery by LifeCare that might be predicated upon the representations and warranties in the APA, on the ground that those representations and warranties did not survive the closing of the APA. Finally, the Debtors submit that there is nothing inequitable in having LifeCare on the hook for the later reimbursement: to the contrary, Debtors point to the business realities of the APA, whereby LifeCare acquired significant assets in exchange for almost no cash but by agreeing to be responsible for the liabilities that could arise after closing.

This matter has been fully briefed and well-presented through a full evidentiary trial. The matter is ripe for decision.

## DISCUSSION

### Legal Standard

The issue before the Court is whether, under the APA, the $2.358 million LSA belongs to the Debtors or LifeCare. The APA provides that it "shall be governed by and construed in accordance with the Laws of the State of Delaware, without regard to conflicts of law principles."[14] Courts in Delaware will construe an agreement as a whole and give effect to all of its provisions.[15] When interpreting a contract under Delaware law, the contract is construed using the objective theory of contracts. This means that the terms of the contract should be given the meaning which would be understood by an objective, reasonable third-party, and that the

---

[14] Joint Exhibit No. 1.
[15] *See Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).

terms of a clear and unambiguous contract will be interpreted according to their ordinary meaning.[16]

If the contract is unambiguous, courts will infer the parties' intent from the language of the contract alone.[17] Contractual ambiguity exists " '[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings.' "[18] It is not enough where the parties merely disagree about the meaning of the language.[19] However, if there is ambiguity in a contract, the reviewing court can look at extrinsic evidence to determine the contract's correct interpretation and the intentions of the parties.[20]

**The Asset Purchase Agreement**

All parties are in agreement that the terms of the APA should govern the question of ownership of the Lump Sum Adjustment. The LSA arises as a direct consequence of the Debtors' use of the PIP methodology for payment, but it is not a PIP payment. As noted above, this methodology allows care providers to receive a regular and predictable flow of bi-monthly payments from CMS during the course of a year. The amount of the bi-monthly PIP payment is based upon the Debtors' projections of the amount and value of services it expects to provide over a given upcoming period. The record reflects that the PIP methodology provides a measure of predictability to a provider's cash flow where there would otherwise be potential gaps or delays in payment due to customary billing processes with CMS.

---

[16] *See GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).
[17] *See Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003).
[18] *See Salamone v. Gorman*, 106 A.3d 354, 369 (Del. 2014).
[19] *See Alta Berkeley VI C.V. v. Omneon, Inc.,* 41 A.3d 381, 385 (Del. 2012).
[20] *See GMG Capital Investments, LLC*, 36 A.3d at 784.

Since the PIP payments were based upon the Debtors' projections of the value of services they expected to provide, the record reflects that Novitas, a CMS contractor, audited or reviewed the PIP payments received by the Debtors in the first few months of 2019 and compared those payments to the value of the services that the Debtors had provided and expected to provide going forward.  The testimony at trial indicates that the audit conducted by Novitas of the Debtors in the first half of 2019 was a typical and standard exercise.  The Notivas Determination Letter[21] identified that, based on projections, the Debtors had been underpaid by the amount of $2.358 million, and stated that the LSA should be awarded in that amount.

LifeCare notes the distinction between PIP payments and the LSA.  While PIP payments are, in the estimation of the Court, payments for services rendered by a provider (and are effectively defined as such in the APA), Lump Sum Adjustments are not PIP payments and perform a different function.  The exhibits introduced at trial consistently support LifeCare's position that the LSA is a "settlement" under the APA.  First, the Court notes that the term "settlement" is not defined in the APA.  Accordingly, the Court must look to customary business practices between these parties and in this industry to ascertain what a "settlement" is and whether the term encompasses the LSA.

Joint Exhibit 72, introduced at trial and addressed by both parties, is titled "Understand the Remittance Advice:  A Guide for Medicare Providers, Physicians, Suppliers and Billers."[22] It is published by CMS.  In describing how the CMS computerized accounting systems work, the document offers a description of what is included in the term in question:

> SETTLEMENT PAYMENTS – This field reflects refund amounts issued for settlement payments.  A settlement payment can be issued for the following three reasons:
> - Cost Report Settlements (tentative and final);

---

[21] Joint Exhibit No. 38
[22] Joint Exhibit No. 72.

11

- Lump Sum Adjustments calculated during interim rate reviews;
- Any refunds issued due to excessive funds being withheld or over-payment withholdings.[23]

Bolstering this definitional argument, the Remittance Advice prepared as part of the audit exercise in July 2019 expressly provided that the LSA is listed in a category titled "Settlement Payments," directly above a line item that lists PIP Payments at $0.00.[24]

The remittance advice accompanying the actual payment of the LSA[25] in October 2019 listed the LSA with the description "Transparency Allowance" and a Reason Code "C5." The CMS Manual System[26] explains that Reason Code C5 governs settlement payments.[27] Putting all of this together, LifeCare's position is that the LSA is a settlement, and both common industry practices and the actual business documents and records here support this result.

The Debtors respond that PIP payments are "Accounts Receivable" or "Accounts" under the APA. This is correct: Section 2.2 of the APA defines these terms to "includ[e] PIP, whether now existing or hereafter arising, including all payments due from the rendition of services or sale of goods to a patient."[28] The record developed at trial demonstrates that PIP payments, while based on projections, nevertheless are made on account of services provided by the Debtors. Consequently, PIP payments received by the Debtors in the first half of 2019 (long before the closing in September 2019) were received "on account of services rendered" in the first half of 2019.

---

[23] Joint Exhibit No. 72, p. 0089.
[24] Joint Exhibit No. 52, 64.
[25] Joint Exhibit No. 37
[26] Joint Exhibit No. 63
[27] Joint Exhibit No. 63 at 009; Joint Exhibit No. 43 does state that Reason Code C5 covers Temporary Allowances, but this does not compel the conclusion that settlements are included here.
[28] Joint Exhibit No. 3

The LSA, by contrast, was calculated upon a set of revised projections for anticipated billings over the remaining period of 2019.  Presumably those forward-looking projections were informed by the actual value of services the Debtors provided in the first half of 2019.  But that does not mean that the LSA is a receivable or directly attributable in any respect to specific services the Debtors had previously provided to their patients.  Since the LSA was not "on account of services rendered," it was neither an Account nor a Pre-Closing Receivable. It is a settlement acquired by LifeCare at closing under the APA.

## **CONCLUSION**

For the reasons stated above, the Court finds and concludes that LifeCare is entitled to the $2.358 million LSA received by the Debtors, as it is a settlement and therefore a Purchased Asset under the APA and the Second Amendment.  LifeCare's Motion is GRANTED.[29]  The Court requests that the parties confer and submit a form of order consistent with this ruling within ten (10) days of the date hereof.

BY THE COURT:

Dated: December 21, 2020

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[29] Because the Court has determined that the APA answers the question of entitlement to the LSA, the Court does not reach LifeCare's alternative arguments based on equitable considerations or the APA's representations and warranties.